**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

1. PETER POE, by and through his parents and next friends, Paula Poe and Patrick Poe;
2. PAULA POE;
3. PATRICK POE;
4. DAPHNE DOE, by and through her guardian and next friend, Donna Doe;
5. DONNA DOE;
6. BRANDON BOE, by and through his parents and next friends, Bethany Boe and Benjamin Boe;
7. BETHANY BOE;
8. BENJAMIN BOE;
9. LYDIA LOE, by and through her parent and next friend, Lauren Loe;
10. LAUREN LOE;
11. RYAN ROE, by and through his parents and next friends, Rachel Roe and Richard Roe;
12. RACHEL ROE;
13. RICHARD ROE; and
14. DR. SHAUNA LAWLIS, on behalf of her patients,

Plaintiffs,

v.

15. GENTNER DRUMMOND, in his official capacity as Attorney General of the State of Oklahoma;
16. STEVEN KATSIS, M.D., in his official capacity as President of the Oklahoma State Board of Medical Licensure and Supervision;
17. TREVOR NUTT, in his official capacity as Vice-President of the Oklahoma State Board of Medical Licensure and Supervision;
18. CLAYTON BULLARD, in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision
19. SUSAN CHAMBERS, M.D., in her official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision;
20. LOUIS COX, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision;
21. MARK FIXLEY, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision;
22. JEREMY HALL, in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision;

Civil Action No. 23-cv-00177-JFH-SH

1

23. TIMOTHY HOLDER, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision;

24. ROBERT HOWARD, in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision;

25. ROSS VANHOOSER, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision;

26. DON WILBER, M.D., in his official capacity as a member of the Oklahoma State Board of Medical Licensure and Supervision;

27. KATHERINE O'DELL, D.N.P., R.N., in her official capacity as President of the Oklahoma Board of Nursing;

28. KYLE LEEMASTER, M.B.A., R.N., in his official capacity as Vice-President of the Oklahoma Board of Nursing;

29. SHAWN STACHOVIC, L.P.N., in her official capacity as Secretary of the Oklahoma Board of Nursing;

30. SHELLY SWALLEY, M.S., R.N., in her official capacity as a member of the Oklahoma Board of Nursing;

31. LINDSAY POTTS, L.P.N., in her official capacity as a member of the Oklahoma Board of Nursing;

32. AMBER GARRETSON, APRN-CNS, C.C.R.N., in her official capacity as a member of the Oklahoma Board of Nursing;

33. NIKOLE HICKS, Ph.D., R.N., CNE, in her official capacity as a member of the Oklahoma Board of Nursing;

34. CALLIE RINEHART, M.S.N., R.N., C.P.N., in her official capacity as a member of the Oklahoma Board of Nursing;

35. SHASTON SALIE, L.P.N., in her official capacity as a member of the Oklahoma Board of Nursing;

36. GEORGINA CALHOUN, in her official capacity as a member of the Oklahoma Board of Nursing;

37. MARISA WRAPE, in her official capacity as a member of the Oklahoma Board of Nursing

38. BRET S. LANGERMAN, D.O., in his official capacity as President of the Oklahoma State Board of Osteopathic Examiners;

39. CATHERINE C. TAYLOR, J.D., in her official capacity as Vice President of the Oklahoma State Board of Osteopathic Examiners;

40. DUANE G. KOEHLER, D.O., in his official capacity as Secretary-Treasurer of the Oklahoma State Board of Osteopathic Examiners;

41. KATIE L. TEMPLETON, J.D., in her official capacity as a member of the Oklahoma State Board of Osteopathic Examiners;

42. LEROY E. YOUNG, D.O., in his official capacity as a member of the Oklahoma State Board of Osteopathic Examiners;

43. DENNIS J. CARTER, D.O., in his official capacity as a member of the Oklahoma State Board of Osteopathic Examiners;

44. C. MICHAEL OGLE, D.O., in his official capacity as a member of the Oklahoma State Board of Osteopathic Examiners;

**45.** CHELSEY D. GILBERTSON, D.O., in her official capacity as a
member of the Oklahoma State Board of Osteopathic Examiners;
**46.** UNIVERSITY HOSPITALS AUTHORITY;
**47.** UNIVERSITY HOSPITALS TRUST;
**48.** RANDY DOWELL, in his official capacity as Chief Executive
Officer of the University Hospitals Authority and the University
Hospitals Trust;
**49.** G. RAINEY WILLIAMS, JR., in his official capacity as Chair of
the Board of Directors of the University Hospitals Authority and
trustee of the University Hospitals Trust;
**50.** JIM EVEREST, in his official capacity as Vice-Chair of the Board
of Directors of the University Hospitals Authority and trustee of the
University Hospitals Trust;
**51.** ANTHONY F. KEATING, III, in his official capacity as Secretary
of the Board of Directors of the University Hospitals Authority and
trustee of the University Hospitals Trust;
**52.** GARY E. RASKOB, in his official capacity as a member the Board
of Directors of the University Hospitals Authority and trustee of the
University Hospitals Trust;
**53.** KEVIN CORBETT, in his official capacity as a member the Board
of Directors of the University Hospitals Authority and trustee of the
University Hospitals Trust;
**54.** OU MEDICINE, INC. d/b/a OU HEALTH, an Oklahoma not-for-
profit corporation;
**55.** DR. RICHARD LOFGREN, in his official capacity as President
and Chief Executive Officer of OU Health,

Defendants.

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

Plaintiffs, by and through their attorneys, bring this Complaint against Defendants, their

employees, agents, and successors in office, and in support thereof state the following:

## INTRODUCTION

1.      Plaintiffs[1] Peter Poe, Daphne Doe, Brandon Boe, Lydia Loe, and Ryan Roe (the "Minor Plaintiffs") are transgender adolescents in Oklahoma who have been thriving because they have the loving support of their parents and access to medically necessary care and treatments for their gender dysphoria, both of which allow them to live as the people they know themselves to be.  They have become active participants in their communities, are excelling in school, and are growing up to become what parents desire for their children: healthy and contributing members of our society.

2.      The Minor Plaintiffs, along with hundreds of other adolescents in Oklahoma, are now faced with the loss of access to this safe, effective, and medically necessary health care because Oklahoma has singled out transgender adolescents by enacting a discriminatory and categorical prohibition on medical treatments for transgender adolescents that are available to others.  In so doing, Oklahoma has endangered the health and wellbeing of transgender adolescents in Oklahoma.

3.      On May 1, 2023, Governor Kevin Stitt of Oklahoma signed into law Senate Bill (SB) 613 ("SB 613," the "Health Care Ban" or "Ban"), categorically banning the provision of necessary and often lifesaving medical care to transgender adolescents in Oklahoma.  The law passed despite the sustained and robust opposition of medical experts in Oklahoma and across the country, and the myriad of Sooner families that stand to be negatively impacted.  The law includes an emergency provision that made it effective upon Governor Stitt's signature.  The Health Care

---

[1] Plaintiffs Peter Poe, Paula Poe, Patrick Poe, Daphne Doe, Donna Doe, Brandon Boe, Bethany Boe, Benjamin Boe, Lydia Loe, Lauren Loe, Ryan Roe, Rachel Roe, and Richard Roe are filing a separate motion to proceed using these pseudonyms, rather than their legal names, to protect the privacy rights of the minor plaintiffs regarding their transgender status, medical diagnoses, and treatment, and for their safety.

Ban violates the constitutional rights of Oklahoma adolescents and their parents and will cause severe and irreparable harm.

4.     Medical providers long have followed evidence-based and comprehensive clinical practice guidelines that recommend certain medical treatments for gender dysphoria, which is a medical condition characterized by the clinically significant distress caused by the incongruence between a person's gender identity and the sex they were assigned at birth.  Decades of clinical experience and a large body of scientific and medical literature support these medical guidelines, which are recognized as authoritative by the major medical associations in the United States. These guidelines provide a framework for the safe and effective treatment of gender dysphoria, which if left untreated can have dire and serious consequences for the health and wellbeing of transgender people, including adolescents.  For some adolescent patients with gender dysphoria, puberty-delaying treatment and hormone therapy are medically indicated.

5.     By prohibiting any "health care provider" from "knowingly provid[ing] gender transition procedures to" any person under eighteen (18) years of age, the Health Care Ban denies transgender adolescents with gender dysphoria necessary, safe, and effective treatment and prevents parents from obtaining medically necessary care for their transgender adolescents.  It also prevents health care providers from treating their transgender patients in accordance with well-established and evidence-based clinical practice guidelines.

6.     Critically, the Health Care Ban does not seek to prohibit the medical treatments at issue for all medical conditions; rather, it prohibits the provision of these treatments only when they are "performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex," if inconsistent with the minor's "biological sex," which is not defined, or sex assigned at birth.  In other words, the Health Care Ban prohibits the provision of these

treatments only when used to treat a transgender adolescent's gender dysphoria, even though the risks of the treatments are similar, if not the same, regardless of the condition for which they are used.

7.     The Health Care Ban was passed because of, and not in spite of, its impact on transgender adolescents, depriving them of necessary, safe, and effective medical care, thereby interfering with and overriding the clinical and evidence-based judgment of medical providers and the decision-making of loving parents, like Paula and Patrick Poe, Donna Doe, Benjamin and Bethany Boe, Lauren Loe, and Rachel and Richard Roe (the "Parent Plaintiffs").

8.     If the Health Care Ban is not blocked, it will have devastating consequences for transgender adolescents in Oklahoma.  These adolescents will be unable to obtain critical medical care that their health care providers have recommended and their parents agree they need.  Further, those already receiving care will have their treatment halted.  For some transgender adolescents, the prospect of losing necessary medical care is unbearable.

9.     Concerned about the health and wellbeing of their children, some families of transgender adolescents are making plans to move out of the State of Oklahoma now that the Health Care Ban has taken effect.  No longer welcome in Oklahoma, they fear for their children's health and safety if they are unable to secure necessary medical treatment.  These parents are poised to leave their jobs, businesses, extended families, and communities—and uproot their families from their homes—to get the medical treatment their adolescent children need.

10.     Other parents, unable to move out of state, are making contingency plans to ensure the health and safety of their kids.  They are considering separating from their children by having their adolescent child live with a relative where they can access the necessary, safe, and effective medical care that the Health Care Ban bars, or they are establishing alternative access to care

hundreds of miles away, at great financial cost.  These families already have lived through the impact on their children of untreated gender dysphoria and have seen how treatment has enabled them to thrive.

11.     It has been amazing for Paula Poe to see her son Peter Poe bloom once he began receiving treatment and living as a boy; he is euphoric to be who he is.  Likewise, Donna Doe is so happy that following care, her granddaughter Daphne is excelling in school and thinking about auditioning for theater again.  Benjamin Boe is proud that his son, Brandon Boe, has been able to take a job where he greets strangers with confidence and self-assuredness; before treatment, he would not speak in public. Rachel Roe has observed the enormously positive impact gender-affirming care has had on her son, Ryan Roe, who is now thriving and happy as opposed to when he was not affirmed as who he is. And Lauren Loe has seen a drastic improvement in her daughter Lydia Loe's mental health; she can be her authentic self without fear of being misgendered.

12.     Many families, however, do not have the resources to uproot their lives or to establish access to care out-of-state, and they are terrified about the effect of the Health Care Ban on their transgender adolescent children.

13.     The Health Care Ban not only gravely threatens the health and wellbeing of transgender adolescents in Oklahoma; it also is unconstitutional.  The Health Care Ban violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates against the Minor Plaintiffs on the basis of sex and transgender status by prohibiting any "health care provider" from "knowingly provid[ing] gender transition procedures to any child."

14.     The Health Care Ban also discriminates against the Parent Plaintiffs in the exercise of their fundamental right to make decisions concerning the care, custody, and control of their children by prohibiting them from seeking and following medical advice to protect the health and

wellbeing of their minor children.  By preventing parents from seeking the medical care for their children that medical and mental health providers have recommended, the Health Care Ban violates the right to parental autonomy guaranteed by the Due Process Clause of the Fourteenth Amendment.

15.     The Health Care Ban is not the only legislation the Oklahoma State Legislature has enacted that unjustifiably restricts medical treatments for transgender adolescents and discriminates against them.  On September 29, 2022, the Oklahoma State Legislature enacted Senate Bill 3 ("SB 3"), which Oklahoma Governor Kevin Stitt signed into law on October 4, 2022. SB 3 appropriated $39.4 million to the University Hospitals Authority "for the construction and equipping of facilities designed to expand the capacity of behavioral health care for the children of [Oklahoma]."  However, SB 3 prohibited any monies from being expended for the benefit of any facility performing "gender reassignment medical treatment" on any patient under the age of 18.

16.     In response to SB 3, Defendants University Hospitals Authority, University Hospitals Trust, and OU Medicine, Inc. d/b/a OU Health ("OU Health") (together, the "Hospital Defendants") ceased providing hormone-related prescription therapies and surgical procedures for gender-affirming services to transgender patients under the age of eighteen to gain access to the funds conditioned by SB 3, even though they continue to provide these same medical services to non-transgender patients for other purposes.

17.     The decision of the Hospital Defendants to cease providing medical services for the treatment of gender dysphoria has endangered the health and wellbeing of Plaintiffs Peter Poe, Daphne Doe, Brandon Boe, and Lydia Loe ("the OU Health Minor Plaintiffs") by denying them critical medical care and treatment.  The policy also has forced Plaintiffs Paula and Patrick Poe,

Donna Doe, Benjamin and Bethany Boe, and Lauren Loe (the "OU Health Parent Plaintiffs") to incur costs to change providers or make plans to travel out of state for access to treatments.  In addition, it has required Plaintiff Dr. Lawlis to establish a separate practice to continue to care for her patients.

18.     The Hospital Defendants' decision and policy to cease providing medical services to transgender adolescents to treat gender dysphoria violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates on the basis of sex and transgender status.  It also violates Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557").

## JURISDICTION AND VENUE

19.     This action arises under the United States Constitution, 42 U.S.C. § 1983, and Section 1557 of the ACA, 42 U.S.C. § 18116.

20.     This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343, and 1367.

21.     This Court is authorized to issue a declaratory judgment and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

22.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1)(2) because one or more of the defendants reside in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## THE PARTIES

**A.    The Minor Plaintiffs and Their Families**

      **1.      The Poe Family**

23.    Plaintiffs Peter Poe, Patrick Poe, and Paula Poe live in Oklahoma.  Patrick and Paula are the parents of Peter, their twelve-year-old son.

24.    Peter is transgender and is receiving medically necessary care that the Health Care Ban prohibits.

      **2.      The Doe Family**

25.    Plaintiffs Daphne Doe and Donna Doe live in Oklahoma.  Donna is the legal guardian of Daphne, her fifteen-year-old granddaughter.

26.    Daphne is transgender and is receiving medically necessary care that the Health Care Ban prohibits.

      **3.      The Boe Family**

27.    Plaintiffs Brandon Boe, Benjamin Boe, and Bethany Boe live in Tulsa County, Oklahoma.  Benjamin and Bethany are the parents of Brandon, their seventeen-year-old son.

28.    Brandon is transgender and is receiving medically necessary care that the Health Care Ban prohibits.

      **4.      The Loe Family**

29.    Plaintiffs Lydia Loe and Lauren Loe live in Oklahoma.  Lauren is the mother of Lydia, her sixteen-year-old daughter.

30.    Lydia is transgender and is receiving medically necessary care that the Health Care Ban prohibits.

### 5.    The Roe Family

31.    Plaintiffs Ryan Roe, Richard Roe, and Rachel Roe live in Oklahoma.  Richard and Rachel are the parents of Ryan, their fourteen-year-old son.

32.    Ryan is transgender and is receiving medically necessary care that the Health Care Ban prohibits.

## B.    The Medical Provider Plaintiff

33.    Plaintiff Dr. Shauna M. Lawlis, M.D. is a member of OU Health Physicians and specializes in adolescent medicine at OU Health in Oklahoma City, Oklahoma.  Prior to SB 3, Dr. Lawlis provided gender-affirming care to patients at the Adolescent Medicine Roy G. Biv Program at Oklahoma Children's Hospital.  Following the passage of SB 3, Dr. Lawlis was required to move her care and treatment of transgender adolescents under the age of 18 to a private clinic.  The Health Care Ban prohibits the gender-affirming care Dr. Lawlis provides to her patients under the age of 18.  Dr. Lawlis is a recipient of federal financial assistance and therefore subject to the nondiscrimination mandate in Section 1557 of the ACA.  Dr. Lawlis brings her claims on behalf of her patients.  She is referred to as the "Medical Provider Plaintiff."

## C.    The Defendants

### 1.    The State Defendants

34.    Defendant Gentner Drummond is the Attorney General of the State of Oklahoma. The Attorney General is headquartered at 313 NE 21st Street, Oklahoma City, Oklahoma 73105, and has additional offices in Oklahoma.  Under the Health Care Ban, Defendant Drummond is tasked with bringing legal actions to enforce compliance with the Ban.  Defendant Drummond is sued in his official capacity.

35.     The Oklahoma State Board of Medical Licensure and Supervision ("Medical Board") regulates, licenses, and disciplines "allopathic and surgical practice." Okla. Stat. tit. 59, § 480. The Medical Board is headquartered at 101 NE 51st St, Oklahoma City, Oklahoma 73105-1821. The Medical Board enforces the Health Care Ban through medical license suspension, revocation, or through its "order [of] any other appropriate sanctions" for physician or surgeon licenses or special volunteer licensure for Physician Assistants. Okla. Stat. tit. 59, § 503; Okla. Stat. tit. 59, § 493.5 *et seq*.

36.     Defendant Steven Katsis, M.D. is the President of the Medical Board. Defendant Trevor Nutt is the Vice President of the Medical Board. Defendants Clayton Bullard; Susan Chambers, M.D.; Louis Cox, M.D.; Mark Fixley, M.D.; Jeremy Hall; Timothy Holder, M.D.; Robert Howard; Ross Vanhooser, M.D.; and Don Wilber, M.D. are members of the Medical Board. The Medical Board members ("Medical Board Members") are sued in their official capacities.

37.     The Oklahoma Board of Nursing ("Nursing Board") regulates, licenses, and disciplines nursing practice in Oklahoma. Okla. Stat. tit. 59, § 567.3a. The Nursing Board is headquartered at 2501 N. Lincoln Blvd., Ste. 207, Oklahoma City, Oklahoma 73105. The Health Care Ban provides that the Nursing Board "may cause to be investigated all reported violations," and "shall impose a disciplinary action against" nurses in violation of the statute. Okla. Stat. tit. 59, § 567.8(D).

38.     Defendant Katherine O'Dell, D.N.P., R.N., is the President of the Nursing Board. Defendant Kyle Leemaster, M.B.A., R.N., is the Vice-President of the Nursing Board. Defendant Shawn Stachovic, L.P.N., is the Secretary of the Nursing Board. Defendants Shelly Swalley, M.S., R.N.; Lindsay Potts, L.P.N.; Amber Garretson, APRN-CNS, C.C.R.N.; Nikole Hicks, Ph.D., R.N., CNE; Callie Rinehart, M.S.N., R.N., C.P.N.; and Shaston Salie, L.P.N. are members of the Nursing

Board.  Defendants Georgina Calhoun and Marisa Wrape are Public Members of the Nursing Board.  The Nursing Board members ("Nursing Board Members") are sued in their official capacities.

39.     The Oklahoma State Board of Osteopathic Examiners ("Osteopathic Board") regulates, licenses, and disciplines the "practice of osteopathic medicine."  Okla. Stat. tit. 59, § 620.  The Osteopathic Board is headquartered at 4848 N. Lincoln Blvd., Oklahoma City, Oklahoma 73105.  The Health Care Ban provides that the Osteopathic Board may "refuse to admit a person to a [licensing] examination or may refuse to issue or reinstate or may suspend or revoke any license issued or reinstated by the Board upon proof that the applicant or holder of such a license" is in violation of the Health Care Ban.  Okla. Stat. tit. 59, § 637(A).

40.     Defendant Bret S. Langerman, D.O. is the President of the Osteopathic Board.  Defendant Catherine C. Taylor, J.D. is the Vice President of the Osteopathic Board.  Defendant Duane G. Koehler, D.O. is the Secretary-Treasurer of the Osteopathic Board.  Defendants Katie L. Templeton, J.D.; LeRoy E. Young, D.O.; Dennis J. Carter, D.O.; C. Michael Ogle, D.O.; and Chelsey D. Gilbertson, D.O. are members of the Osteopathic Board.  The Osteopathic Board members ("Osteopathic Board Members") are sued in their official capacities.

41.     Defendants Drummond, the Medical Board Members, the Nursing Board Members, and the Osteopathic Board Members (collectively, the "State Official Defendants") are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.  Defendants are therefore liable for their violation of the Plaintiffs' rights to equal protection and their violation of the Parent Plaintiffs' fundamental rights under 42 U.S.C. § 1983.

### 2. The Hospital Defendants

42.     Defendant University Hospitals Authority is a state agency. The University Hospitals Authority has jurisdiction, supervision, management, and control of the University Hospitals, which include Oklahoma Children's Hospital.  Okla. Stat. tit. 63, §§ 3204, 3208.  The University Hospitals Authority receives federal financial assistance and is a "covered entity" for purposes of Section 1557 of the ACA. For example, Defendant University Hospitals Authority receives federal Medicaid funds that it provides to OU Health, which operates the University Hospitals, to subsidize Medicaid and indigent care.

43.     Defendant University Hospitals Trust is a public trust whose principal purpose is to effectuate the purposes of Defendant University Hospitals Authority.  Okla. Stat. tit. 63, § 3224(A)(4)(a).  The trustees of Defendant University Hospitals Trust are the same as the members of the University Hospitals Authority.  Okla. Stat. tit. 63, § 3224(A)(4)(g).  Defendant University Hospitals Trust by virtue of its relationship with Defendant University Hospitals Authority receives federal financial assistance and is a "covered entity" for purposes of Section 1557 of the ACA.  For example, grant and program revenues relating to the Medicaid Indirect Medical Education (IME) program—a state and *federal* matching program—are paid first to Defendant University Hospitals Trust before being expended for the purposes of Defendant University Hospitals Authority.

44.     Defendant Randy Dowell is the CEO of Defendant University Hospitals Authority, a non-voting member of its Board of Directors, and CEO of Defendant University Hospitals Trust. Defendant Dowell's office is located at 1000 NE 13th St. #6900, Oklahoma City, Oklahoma 73104. Defendant Dowell is responsible for carrying out the policies of Defendant University

Hospitals Authority and Defendant University Hospitals Trust.  Defendant Dowell is sued in his official capacity.

45.     Defendant G. Rainey Williams, Jr. is Chair of the Board of Directors of the University Hospitals Authority and a trustee of the University Hospitals Trust. Jim Everest is Vice-Chair of the Board of Directors of the University Hospitals Authority and a trustee of the University Hospitals Trust.  Anthony F. Keating, III is Secretary of the Board of Directors of the University Hospitals Authority and a trustee of the University Hospitals Trust. Gary E. Raskob and Kevin Corbett are members of the Board of Directors of the University Hospitals Authority and trustees of the University Hospitals Trust. Together with Defendant Dowell, Defendants Williams, Everest, Keating, Raskob, and Corbett are referred to collectively as the "Hospitals Authority Board Defendants." The Hospitals Authority Board Defendants are sued in their official capacities.

46.     Defendant OU Medicine, Inc. d/b/a OU Health, is an Oklahoma not-for-profit corporation.  It does business in Oklahoma County.  Defendant OU Health may be served through its registered agent, CT Corporation System, 1833 S. Morgan Road, Oklahoma City, Oklahoma, 73128. Defendant University Hospital Trust is the sole member of OU Medicine, Inc. OU Health operates and manages the University Hospitals, including Oklahoma Children's Hospital, pursuant to a joint operating agreement with Defendant University Hospitals Trust.  OU Health receives federal financial assistance and is a "covered entity" for purposes of Section 1557 of the ACA.

47.     Defendant Richard Lofgren is the President and CEO of Defendant OU Health. Defendant Lofgren's office is located at 700 NE 13th St., Oklahoma City, Oklahoma, 73104. Defendant Lofgren is responsible for the strategic vision, clinical and operational direction,

strategic growth, quality and safety, and financial performance of OU Health.  Defendant Lofgren

is sued in his official capacity.

48.     Defendant Dowell, the Hospitals Authority Board Defendants, and Defendant

Lofgren, referred to collectively as the "Hospital Official Defendants," are all governmental actors

and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the

Fourteenth Amendment.  Defendants are therefore liable for their violation of the equal protection

rights of the Minor Plaintiffs under 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

## I.      Medical Guidelines for Treating Adolescents with Gender Dysphoria

49.     Doctors in Oklahoma use evidence-based, well-researched, and widely accepted

clinical practice and medical guidelines to assess, diagnose, and treat adolescents with gender

dysphoria.  Decades of clinical experience and a large body of research have demonstrated that

these treatments are safe and effective at treating gender dysphoria in adolescents, and

consequently inform how this care is provided.

50.     Gender identity refers to a person's internal sense of belonging to a particular

gender.  Everyone has a gender identity, and a person's gender identity is durable and cannot be

altered voluntarily or changed through medical intervention.

51.     A person's gender identity usually matches the sex they were designated at birth

based on their external genitalia.[2]

---

[2] The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because there are many biological sex characteristics, and they do not always align with each other.  For example, some people with intersex characteristics may have a chromosomal configuration typically associated with a male sex designation but genital characteristics typically associated with a female sex designation.  For these reasons, the Endocrine Society, an international medical organization of over 18,000 endocrinology researchers and clinicians, warns practitioners that "the terms biological sex and biological male or female are

52.     Most boys are designated male at birth based on their external genital anatomy, and most girls are designated female at birth based on their external genital anatomy.  But transgender people have a gender identity that differs from the sex assigned to them at birth.  A transgender boy is someone who was assigned a female sex at birth but has a male gender identity.  A transgender girl is someone who was assigned a male sex at birth but has a female gender identity.  A transgender boy cannot simply turn off his gender identity like a switch, just as a non-transgender (also known as "cisgender") boy cannot turn off his gender identity.  A person's sexual orientation is a close analog.  A person's sexual orientation is an innate, immutable characteristic that, like a person's gender identity, cannot be altered.

53.     The health and wellbeing of all people, including those who are transgender, depends on their ability to live in a manner consistent with their gender identity.  For transgender people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress and discomfort.

54.     According to the American Psychiatric Association's *Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* ("DSM-5-TR"), "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.  To be diagnosed with gender dysphoria, the incongruence must have

---

imprecise and should be avoided."  Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINOLOGY AND METABOLISM 3869, 3875 tbl.1 (2017) ("Endocrine Society Clinical Guidelines"), https://academic.oup.com/jcem/article/102/11/3869/4157558.

persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.[3]

55.     Being transgender is not a medical condition to be treated or cured.  But gender dysphoria—the clinically significant distress that some transgender people experience as a result of the incongruence between their gender identity and sex assigned at birth—is a serious medical condition.[4]

56.     The goal of treatment for gender dysphoria is not to change someone's gender identity, but rather to resolve the distress associated with the incongruence between a transgender person's assigned sex at birth and their gender identity.

57.     If left untreated, gender dysphoria can result in negative mental health outcomes, including severe anxiety and depression, post-traumatic stress disorder, eating disorders, substance abuse, self-harm, and suicidality.

58.     The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published evidence-based and widely accepted clinical practice guidelines for the assessment, diagnosis, and treatment of gender dysphoria.[5]  The medical treatment for gender dysphoria is to eliminate or alleviate the clinically significant distress by helping a

---

[3] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEXT REVISION F64.0 (5th ed. 2022).

[4] *See* Eric Yarbrough et al., Am. Psych. Ass'n, *Gender Dysphoria Diagnosis*, *in* A GUIDE FOR WORKING WITH TRANSGENDER AND GENDER NONCONFORMING PATIENTS (2017), https://www.psychiatry.org/psychiatrists/cultural-competency/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis.

[5] *See* Eli Coleman et al., World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 INT'L J. TRANSGENDER HEALTH 1 (2022) ("WPATH Standards of Care"), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644; Endocrine Society Clinical Guidelines at 3869.

transgender person live in alignment with their gender identity.  This treatment is sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care."  These clinical practice guidelines are widely accepted as best practices for the treatment of adolescents and adults diagnosed with gender dysphoria and have been recognized as authoritative by leading medical organizations, including the American Academy of Pediatrics, which agree that this care is safe, effective, and medically necessary for many adolescents suffering from gender dysphoria.

59.    The precise treatment for gender dysphoria depends upon each person's individualized needs, and the guidelines for medical treatment differ depending on whether the treatment is for an adolescent or an adult.

60.    Before the onset of puberty, consistent with the WPATH Standards of Care and the Endocrine Society Clinical Guidelines, no medical interventions beyond mental health counseling are recommended or provided to any person.  In other words, gender transition does not include any pharmaceutical or surgical intervention before puberty.  Any transition before puberty is limited to "social transition," which means allowing a transgender child to live and be socially recognized in accordance with their gender identity.  Care is limited to supportive mental health counseling.  Typically, social transition can include allowing children to wear clothing, cut or grow their hair, use chosen names and pronouns, and use restrooms and other sex-separated facilities aligned with their gender identity instead of the sex assigned to them at birth.

61.    Under the WPATH Standards of Care and the Endocrine Society Clinical Guidelines, medical interventions may become medically necessary and appropriate as a transgender person reaches puberty.  In providing medical treatments to adolescents, qualified medical providers work in close consultation with mental health professionals experienced in diagnosing and treating gender dysphoria.

62.     For many transgender adolescents, the onset of puberty leading to physical changes in their bodies that are incongruent with their gender identities can cause extreme distress. Puberty-delaying medication allows transgender adolescents to avoid this, therefore minimizing and potentially preventing the heightened gender dysphoria caused by the development of secondary sex characteristics incongruent with their gender identity.

63.     Under the Endocrine Society Clinical Guidelines, transgender adolescents who have reached the onset of puberty may be eligible for puberty-delaying treatment if:

- A qualified mental health professional has confirmed that:

    o The adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed);

    o Gender dysphoria worsened with the onset of puberty;

    o Any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment;

    o The adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment;

- And the adolescent:

    o Has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility;

    o Has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation)

the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process;

- And a pediatric endocrinologist or other clinician experienced in pubertal assessment:

    o Agrees with the indication for gonadotropin-releasing hormone ("GnRH") agonist treatment;

    o Has confirmed that puberty has started in the adolescent;

    o Has confirmed that there are no medical contraindications to GnRH agonist treatment.[6]

64.    Puberty-delaying treatment is reversible.  If an adolescent discontinues the medication, endogenous puberty resumes.  Puberty-delaying treatment does not cause infertility.

65.    For some older adolescents, it may be medically necessary and appropriate to treat them with gender-affirming hormone therapy (e.g., testosterone for transgender boys and estrogen and testosterone suppression for transgender girls).

66.    Under the Endocrine Society Clinical Guidelines, transgender adolescents may be eligible for gender-affirming hormone therapy if:

- A qualified mental health professional has confirmed:

    o The persistence of gender dysphoria;

    o Any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment;

---

[6] Endocrine Society Clinical Guidelines at 3878 tbl.5.

- o The adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment;

- And the adolescent:

  - o Has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);

  - o Has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process;

- And a pediatric endocrinologist or other clinician experienced in pubertal induction:

  - o Agrees with the indication for sex hormone treatment;

  - o Has confirmed that there are no medical contraindications to sex hormone treatment.[7]

67.     Gender-affirming hormone therapy does not necessarily result in a loss of fertility, and many individuals treated with hormone therapy can still biologically conceive children.

68.     As with all medications that could affect fertility, transgender adolescents and their parents or guardians are counseled on the potential risks of the medical intervention, and treatment is only initiated where parents and adolescents are properly informed and consent/assent to the care.

69.     Adolescents who first receive treatment later in puberty and are treated only with gender-affirming hormone therapy (and not puberty-delaying treatment) also go through a

---

[7] Endocrine Society Clinical Guidelines at 3878 tbl.5.

hormonal puberty consistent with their gender identity. However, they will have undergone physical changes associated with their endogenous puberty that may not be wholly reversed by hormone therapy or even surgery later in life.

70.     Under the WPATH Standards of Care, transgender adolescents also may receive medically necessary chest reconstructive surgeries before the age of majority provided that the adolescent has lived in their affirmed gender for a significant period of time.[8]

71.     Medical treatment recommended for and provided to transgender adolescents with gender dysphoria can substantially reduce lifelong gender dysphoria and eliminate the medical need for surgery or other medical interventions later in life.

72.     Providing gender-affirming medical care can be lifesaving treatment and positively change the short- and long-term health outcomes for transgender adolescents.

73.     The treatments used to treat gender dysphoria are also used to treat other conditions. Neither the Health Care Ban nor SB 3 prohibits these treatments when used to treat any condition other than gender dysphoria, even though the treatments have comparable risks and side effects to those that can be present when treating gender dysphoria. The use of these treatments for gender dysphoria is not any riskier than for other conditions and diagnoses for which the same treatments are regularly used.

## II.     SB 3 and the Closure of the Adolescent Medicine Roy G. Biv Program

74.     In 2016, the Adolescent Medicine Roy G. Biv Program ("the Roy G. Biv Program") at the Oklahoma Children's Hospital was established.

75.     Oklahoma Children's Hospital is a "University Hospital" covered under the University Hospitals Authority Act and subject to the management and control of the University

---

[8] WPATH Standards of Care at S66.

Hospitals Authority.  *See* Okla. Stat. tit, 63, §§ 3202(A)(1), 3204.  Oklahoma Children's Hospital and the Roy G. Biv Program are associated with OU Health.

76.     Plaintiff Dr. Lawlis has worked at the Roy G. Biv Program since 2017.

77.     During its first six years of operation, the Roy G. Biv Program was the largest and only multidisciplinary academic clinic in Oklahoma dedicated to providing care to transgender and gender diverse adolescents with medical and mental health services, including consultation for families with gender diverse children. It provided mental health counseling, puberty-delaying medications, and hormone therapy to hundreds of adolescent patients experiencing gender dysphoria.

78.     The Roy G. Biv Program treated patients in accordance with well-established, evidence-based clinical practice guidelines, including the WPATH Standards of Care and the Endocrine Society's Guidelines. Prior to starting puberty-delaying medications or hormone treatment, every patient was carefully assessed for gender dysphoria consistent with the established evidence-based guidelines. Ongoing mental health care was recommended as indicated for each patient based on the patient's individual needs, and referrals were provided to patients and their families, as necessary.

79.     Prior to the passage of the SB 3, the Roy G. Biv Program was seeing more 350 transgender and gender diverse adolescents of varying ages, only a subset of whom were receiving gender-affirming medical care in the form of puberty-delaying medications or hormone treatment as treatment for gender dysphoria.

80.     Prior to the passage of the SB 3, Dr. Lawlis provided gender-affirming medical treatment at the Roy G. Biv Program to transgender adolescents with gender dysphoria, including

puberty-delaying medication and hormone therapy where such treatment was medically indicated for the patient.

81.     On October 4, 2022, Governor Kevin Stitt signed SB 3 into law.

82.     SB 3 authorized and appropriated more than $108.5 million in federal funds from the American Rescue Plan Act, Pub. L. No. 117–2, 135 Stat. 4 ("ARPA"), to Defendant University Hospitals Authority for a variety of medical services.

83.     SB 3 conditioned the appropriation to Defendant University Hospitals Authority of "the sum of Thirty-nine Million Four Hundred Thousand Dollars ($39,400,000.00) or so much thereof as may be necessary to budget and expend for the construction and equipping of facilities designed to expand the capacity of behavioral health care for the children of [Oklahoma]" on "no monies [being] budgeted or expended by the [University Hospitals] Authority for the benefit of any facility owned by the University Hospitals Authority or University Hospitals Trust performing 'gender reassignment medical treatment' … on children under eighteen (18) years of age."

84.     SB 3 defines "gender reassignment medical treatment" to mean "any health care to facilitate the transitioning of a patient's assigned gender identity on the patient's birth certificate, to the gender identity experienced and defined by the patient."

85.     Under SB 3, "gender reassignment medical treatment" includes: "a. interventions to suppress the development of endogenous secondary sex characteristics, b. interventions to align the patient's appearance or physical body with the patient's gender identity, and c. medical therapies and medical intervention used to treat gender dysphoria."

86.     Under SB 3, "gender reassignment medical treatment" does not include "services provided to individuals born with ambiguous genitalia, incomplete genitalia, or both male and female anatomy, or biochemically verifiable disorder[s] of sex development (DSD), including but

not limited to:  46,XX DSD; 46,XY DSD; sex chromosomes DSDs; XX or XY sex reversal; and ovotesticular disorder."

87.    In response to SB 3, the Hospital Defendants ceased providing gender-affirming medical care to patients under 18.

88.    Specifically, in or around October 2022, the following official statement was posted on the website of Oklahoma Children's Hospital:

### Official Statement on Behalf of OU Health

*As Oklahoma's flagship academic health system, OU Health seeks to reduce the burden of disease and improve the health of all Oklahomans. We are proud of the integrity, professionalism, care and passion our physicians and staff provide to all of our patients. Compassionate care and patient safety always have been and will remain our top priority.*

*In light of the legislation signed by Governor Stitt, we have ceased hormone-related prescription therapies and surgical procedures for gender-affirming services on patients under the age of 18. OU Health provides care in accordance with all state and federal laws and in compliance with regulatory governing bodies.*

89.    Despite being health programs or activities that receive federal and financial assistance, which are prohibited from discriminating on the basis of sex, to access the funds conditioned by SB 3, the Hospital Defendants are denying transgender adolescents and their families access to the same medical services and treatments they continue to provide to other adolescents (the "Hospital Defendants' SB 3 Policy") and they are doing so pursuant to a policy that facially restricts treatment based on sex.

90.    To ensure continuity of care for her patients, Dr. Lawlis worked with Oklahoma Children's Hospital and Diversity Family Health, a private health clinic that works primarily with the LGBTQ community, to receive the credentials to provide care one day per week at Diversity

Family Health to her Roy G. Biv Program patients who require prescriptions for puberty-delaying medications and gender-affirming hormone therapy.

91.     Dr. Lawlis also worked with other patients and their families to provide referrals to other providers so that they would not be adversely affected by the Hospital Defendants' decision to stop providing gender-affirming medical care in light of SB 3.

92.     Although Dr. Lawlis has been able to provide necessary care to her patients one day per week at Diversity Family Health, Dr. Lawlis and her patients have been deprived of working within a singular multidisciplinary clinic, which has caused significant distress for her patients and their families, as well as logistical difficulties.

93.     Plaintiffs Peter Poe, Daphne Doe, and Lydia Loe obtained medical care for gender dysphoria at Oklahoma Children's Hospital in Oklahoma City until the adoption of the Hospital Defendants' SB 3 Policy in response to SB 3.  Plaintiff Brandon Boe obtained medical care for gender dysphoria at OU Health.

94.     As a result of the Hospital Defendants' SB 3 Policy, the OU Health Minor Plaintiffs have been denied the care they previously had been receiving at Oklahoma Children's Hospital. The Hospital Defendants' SB 3 Policy denying treatment to transgender adolescents also has forced the OU Health Parent Plaintiffs to incur costs to change providers or explore options to travel out of state for access to the necessary treatments at issue.

95.     Although the Hospital Defendants have stopped providing "hormone-related prescription therapies and surgical procedures" to transgender adolescents to treat gender dysphoria, they continue to provide those same treatments to patients under 18 for conditions other than gender dysphoria.

### III.      The State Legislature's Passage of the Health Care Ban

96.      On April 27, 2023, the Oklahoma State Legislature passed the Health Care Ban. Governor Stitt signed the Ban into law on May 1, 2023.  The Health Care Ban took effect immediately.

97.      The Health Care Ban prohibits health care providers from "knowingly provid[ing] gender transition procedures" to any person under eighteen years of age.  SB 613 at Section 1(B), to be codified at Okla. Stat. tit. 63, § 2607(1)(B). The Health Care Ban defines "gender transition procedures" as "medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," namely, "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" and "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex."  SB 613 at Section 1(A)(1)–(2), to be codified at Okla. Stat. tit. 63, § 2607(1)(A)(1)–(2).

*98.*      The Health Care Ban includes a phase-out provision allowing for "the provision of puberty-blocking drugs or cross-sex hormones to a minor currently receiving such drugs or hormones as of the effective date of this act for a period of not more than six (6) months solely for the purpose of assisting the minor with gradually decreasing and discontinuing use of the drugs or hormones."  SB 613 at Section 1(A)(2)(b)(7), to be codified at Okla. Stat. tit. 63, § 2607.1(A)(2)(b)(7).  The Health Care Ban does not allow the initiation of new gender-affirming care during that six month period.  *Id.*

99.      The Health Care Ban provides that healthcare providers who knowingly provide gender transition procedures to a person under eighteen years of age "shall, upon an adverse ruling

by the provider's respective licensing board, be guilty of unprofessional conduct" and shall also "be guilty of a felony." SB 613 at Section 1(C)–(D), to be codified at Okla. Stat. tit. 63, § 2607.1(C)–(D).

*100.* Healthcare providers who violate the Ban are subject to civil actions from minors who received gender transition procedures or their parents, and they may be sued by the Attorney General. *See* SB 613 at Section 1(E)–(F), to be codified at Okla. Stat. tit. 63, § 2607.1(E)–(F).

101. The legislative history of the Heath Care Ban demonstrates it has no legitimate justification. Oklahoma lawmakers themselves confirmed the legislation was not based on evidence-based, well-researched, and widely accepted clinical practice and medical guidelines for treating adolescents with gender dysphoria.

102. As SB 613 moved through the legislature, several Oklahoma lawmakers made inflammatory statements about transgender people establishing that the legislation targeting transgender adolescents was based on the lawmakers own subjective, discriminatory beliefs.

103. On January 17, 2023, Senator Julie Daniels introduced SB 613 in the Senate. As introduced, the bill prohibited medical professionals from providing medically appropriate treatment for gender dysphoria to transgender adolescents under 18 years of age. The introduced version banned a broad range of widely accepted, evidence-based medical treatment protocols, including puberty-delaying medications, gender-affirming hormones, and other "medical therapies and medical intervention used to treat gender dysphoria." Under the introduced bill, medical professionals who provide such care would have their physician's or physician assistant's licenses immediately revoked by the state licensing board.

104.     On February 15, 2023, the Senate debated the legislation.  During the floor debate, Senator Daniels admitted she had not consulted with transgender adolescents or with providers, hospitals, or health centers providing medically appropriate care for transgender adolescents.

105.     Both Senator Daniels and Senator Greg Treat admitted during the floor debate that they lack medical expertise.  During the same floor debate, Senator Shane Jett accused medical officials of "getting paid" to promote gender-affirming care.

106.     The Senate passed SB 613 on February 15, 2023, sending it to the House of Representatives for consideration.

107.     On April 13, 2023, the House Public Health Committee held a hearing on SB 613. Representative Toni Hasenbeck, a co-author of SB 613, admitted that medical professionals endorsing the medically-accepted protocols for treating gender dysphoria are not wrong. Yet, she nevertheless agreed with statements by Representative Randy Randleman that transgender adolescents merely "try to make decisions that's maybe popular to the public."  The House Public Health Committee passed SB 613 out of committee the same day.

108.     On April 26, 2023, the House added an emergency provision to SB 613 making the Health Care Ban effective upon "its passage and approval."  The House also added provisions criminalizing the provision of gender-affirming care, imposing fines, and creating a private cause of action.  The House passed SB 613, as amended, later that day.  The next day, April 27, 2023, SB 613 was engrossed to the Senate.

109.     The Senate passed the House-amended version SB 613 on April 27, 2023 and it was signed into law by Governor Stitt on May 1, 2023.

110.     The Health Care Ban was just one of fifteen bills introduced in the Oklahoma State Legislature during the 2023 legislative session that sought to prohibit or limit medically-

appropriate treatment of gender dysphoria.  Other bills included HB 2177, SB 129, and SB 1011. Each of these bills singled out medical care only when provided to transgender individuals in Oklahoma.

111.    The rhetoric Oklahoma lawmakers used when discussing the proposed legislation demonstrated a marked anti-transgender animus and disregard for the well-established, evidence-based protocols and practices for the treatment of gender dysphoria.

112.    For example, during the floor debate for one of the bills seeking to ban health care for transgender adolescents, HB 2177, co-author Representative Jim Olsen claimed transgender adolescents were "delusional play acting" and labeled them "misguided children."  Representative Olsen downplayed clinical experience, scientific and medical literature, and major medical associations supporting treatment of gender dysphoria, stating transgender adolescents are in need of "wise and clear biblical guidance."

113.     During the same hearing on HB 2177, Representative Justin Humphrey compared gender-affirming care to "starving your child to death."

114.    On April 26, 2023, when addressing SB 613, Representative Olsen stated that being transgender was a path of "desolation, destruction, degeneracy and delusional play acting."

115.    In addition to SB 613, the Oklahoma State Legislature recently has enacted several other laws targeting transgender people for differential and discriminatory treatment.  In 2022 alone, the Oklahoma State Legislature passed SB 3, laws making it more difficult for transgender and nonbinary people to obtain identity documents, laws restricting transgender youth's ability to participate fully in schools, and laws banning transgender students in public and charter schools from using the restrooms and locker rooms that align with their gender identity.

116.    Governor Stitt also has taken discriminatory action against transgender people in Oklahoma.   On November 10, 2021, Governor Stitt signed an executive order ordering the Oklahoma Health Department to stop issuing gender-neutral birth certificates.  Governor Stitt also has signed an executive order preventing Oklahoma residents from changing their gender on their birth certificates.

117.    These legislative enactments and executive actions by Oklahoma officials are exemplars of the long history of discrimination that transgender people have faced, and continue to face, in Oklahoma and throughout the country.  Notwithstanding that a person's transgender status has no bearing on the person's ability to contribute to society, transgender people are often the target of discrimination and discriminatory laws.

118.    Because transgender people remain a very small minority of the population, they are a discrete and insular group that lacks the political power to protect their rights through the political or legislative process.  For the most part, transgender people have been unable to secure explicit state and federal protections against discrimination, and discriminatory legislation, such as the SB 3 and the Health Care Ban, continues to be enacted.

## IV.    The Impact of the Health Care Ban and the Hospital Defendants' SB 3 Policy on Plaintiffs

### 1.    The Poe Family

119.    Peter Poe is a twelve-year-old boy living in Oklahoma with his family.  Peter has an interest in animals and wants to be a zoologist when he grows up.  Peter also loves to draw, paint, and play video games.

120.    Peter is transgender.  He is a boy with a male gender identity, but when he was born, he was designated as female.

121.    Growing up, Peter was always very masculine.  He preferred more masculine clothing and hairstyles and often played with his shirt off.  When he was seven years old he knew that he did not like the name his parents gave him and asked to be called a boy's name.  Peter was confused when his family told him he was a girl because he felt like a boy.

122.    When Peter began puberty, he started to experience extreme anxiety and had trouble sleeping.  Peter wanted to hide his body.  Peter was initially afraid to tell his parents that he was a boy, but, when he was ten years old, he told his parents that he was a boy and wanted a boy's name.

123.    Paula and Patrick, Peter's parents, arranged for Peter to see a therapist to discuss his feelings.  Eventually, Peter and his family met with Dr. Lawlis at the Roy G. Biv Program.  Peter was also referred to a psychiatrist.

124.    Eventually, Peter was diagnosed with gender dysphoria.  After evaluation, Peter was prescribed Lupron to stop Peter from experiencing puberty.

125.    Despite being afraid of needles, Peter began Lupron injections to treat his gender dysphoria.  The Lupron injections stopped Peter from going through puberty.

126.    Peter has been taking Lupron for over a year and is much happier now that people recognize him as a boy.  Peter feels less of a need to hide his body.  He has become much more social and outgoing after receiving Lupron.  Peter eventually wants to begin taking testosterone and go through puberty as a boy.

127.    Unless the Health Care Ban is blocked, under the six-month phase out period that the Health Care Ban imposes, Peter's medication can be prescribed only "for the purpose of assisting [him] with gradually decreasing and discontinuing use" of his medication. As Peter begins receiving sub-therapeutic doses, he will begin to go through endogenous puberty.

128.    Peter and his parents are afraid of the impact the Health Care Ban will have on him and his family.  Peter is afraid to lose access to Lupron and horrified at the prospect of going through female puberty.  Peter's parents are worried about Peter's risks of self-harm if he loses access to his gender-affirming care.

129.    Peter has spent his entire life in Oklahoma.  His school, family, and friends are all in Oklahoma.  Peter never imagined leaving Oklahoma and the idea of having to move saddens him.  The Poe family is part of a supporting and welcoming community in Oklahoma.  They do not want to move, but it may be their only option for Peter to receive the gender-affirming care he needs for his gender dysphoria.

### 2.    The Doe Family

130.    Daphne Doe is a fifteen-year-old girl who lives with her grandmother Donna in Oklahoma.  Daphne is a freshman in high school and a straight A student.  She is involved in the French Club and academic team and wants to become an attorney.

131.    Daphne is transgender.  She is a girl with a female gender identity, but when she was born, she was designated as male.

132.    Daphne has always felt more like a girl than a boy.  As a toddler, Daphne told her grandmother that she was a girl.  Growing up Daphne loved to play with dolls and dresses.  She always gravitated towards playing with other girls.

133.    Even before she began puberty, Daphne informed her grandmother and her therapist that she did not want to experience puberty as a boy and wanted to be seen as a girl.

134.    In middle school, Daphne began experiencing male puberty.  These changes confirmed for Daphne what she already knew: she was a girl.  Daphne became depressed, anxious,

withdrawn, and began experiencing suicidal thoughts.  Around this time, Daphne began seeing a psychologist who eventually diagnosed her with gender dysphoria.

135.    Donna took Daphne to see Dr. Lawlis at Oklahoma Children's Hospital.  Dr. Lawlis also diagnosed Daphne with gender dysphoria.  After being advised about their options, Daphne and Donna decided that Daphne would start puberty-delaying medications.  Daphne began taking puberty-blocking medication when she was thirteen, and roughly a year later, she started taking estrogen.

136.    Since Daphne began receiving gender-affirming treatment, she has experienced a significant improvement in her wellbeing.  Daphne is less insecure, feels less anxious, and loves being able to dress and look the way that she wants.

137.    Unless the Health Care Ban is blocked, under the six-month phase out period that the Health Care Ban imposes, Daphne's medication can be prescribed only "for the purpose of assisting [her] with gradually decreasing and discontinuing use" of her medication.  When Daphne begins receiving sub-therapeutic doses of estrogen and puberty-delaying medication, she will likely begin developing secondary sex characteristics inconsistent with her gender identity, such as facial hair and an Adam's apple.

138.    The Health Care Ban would prevent Daphne from receiving the gender-affirming care that she needs and that has greatly improved her quality of life.  Daphne is worried that without puberty-delaying medication and estrogen she will go back to the dark place she was in prior to receiving gender-affirming care.  Donna is worried about her granddaughter's risk of suicidality if she can no longer access puberty-delaying medication or hormones.

139.    If Daphne is not able to receive gender-affirming care in Oklahoma due to the Health Care Ban, it would be extremely difficult for Donna to afford Daphne's medical care out

of state.  Despite the extreme financial burden, Donna is researching Daphne's out-of-state options to receive care.

140.    Donna wants to continue raising her granddaughter in Oklahoma, where they have a strong network of friends and where Donna has lived for over forty years.  Moving from Oklahoma is not an option for the Doe family, and Donna does not want Daphne to be forced out of Oklahoma for simply being who she is.

### 3.    The Boe Family

141.    Brandon is a seventeen-year-old boy who lives in Tulsa County with his parents Benjamin and Bethany and his younger sibling.  Brandon enjoys geology and wants to study engineering in college.

142.    Brandon is transgender.  He is a boy with a male gender identity, but when he was born, he was designated as female.

143.    As a child, there were clear signs Brandon was a boy.  He always preferred masculine activities and clothing.  In school, he told his teachers that he did not want to line up with the girls.  Whenever Brandon would draw himself, he drew himself as a boy.

144.    Just before Brandon turned fifteen, he told his parents he was transgender and that it was something he had been thinking about for a long time.  Brandon's parents asked him if he was sure, and Brandon explained that he was sure he was a boy.

145.    Brandon began using a binder to make his chest appear more masculine and realized how much it hurt him to be misgendered.  Brandon did not want to leave the house without his binder, he would not take his mask off in public, and he would avoid speaking because he did not want to be misgendered as a girl.  It is important to Brandon to be recognized as a boy because he is a boy.

146.    After Brandon came out, his parents found him mental health counseling.  In counseling, Brandon was diagnosed with gender dysphoria.

147.    Originally, Brandon's parents wanted him to wait until he was eighteen to start undergoing medical treatments for his gender dysphoria.  However, after seeing how Brandon was struggling and how isolated he was becoming, they had a change of heart.

148.    Brandon's parents researched gender-affirming care and eventually reached out to an endocrinologist at OU Health. After over a year of therapy, reviewing available literature, and conversations among Brandon, his parents, and his medical providers, Brandon and his family decided that he would start hormone therapy.  By the time Brandon began testosterone, he had been living socially as a boy for nearly two years.

149.    Brandon has become much more confident after receiving gender-affirming care. He is more joyful, less irritable, and overall, at peace with himself.  Brandon attends school dances with friends and recently took a job that requires him to speak to strangers.

150.    Unless the Health Care Ban is blocked, under the six-month phase out period that the Health Care Ban imposes, Brandon's medication can be prescribed only "for the purpose of assisting [him] with gradually decreasing and discontinuing use" of his medication. As Brandon receives sub-therapeutic doses of testosterone, he will stop developing the masculine secondary sex characteristics that have greatly improved his wellbeing, confidence, and ability to participate in society as a boy.

151.    Brandon and his family are afraid of the impact the Health Care Ban would have on Brandon.  Brandon is terrified of how his body would change if he can no longer receive hormone treatment.  Brandon's parents are worried about Brandon's mental health and his risk of suicidality if he is unable to continue receiving gender-affirming testosterone treatment.

152.     Due to the Health Care Ban, Benjamin and Bethany are researching how to obtain the gender-affirming care their son needs out of state.  The Boe family wants to remain in Oklahoma: they have lived here for generations, and Brandon has a supportive group of friends, a community, and a job.  But Brandon's parents worry it is unsafe for him to stay here.

### 4.     The Loe Family

153.     Lydia is a sixteen-year-old girl who lives in Oklahoma with her mother Lauren. Lydia is witty, creative, and cares deeply for her family and close group of supportive friends.

154.     Lydia is transgender.  She is a girl with a female gender identity, but she was designated as male.

155.     Growing up, Lydia knew that being a boy did not fit.  Eventually, she realized that was because she is a girl.

156.     Lydia lived in foster care before Lauren fostered and eventually adopted her.  In prior placements, after Lydia told her foster parents she was a girl, they rejected her. One of her former foster parents told her she was "gross" after she told them she was a girl.  Thereafter, Lydia began to hide who she truly was for fear of continued rejection.

157.     When Lydia was fourteen, Lauren became her foster parent.  After about a year, Lydia told Lauren that she was truly a girl, and Lauren was supportive.

158.     Since then, Lydia was able to explore expressing herself as she was.  She began using a girl's name, wearing girl's clothing, and trying female hairstyles and makeup.  Lydia's mood improved when she was able to express herself.  However, even as the pandemic improved, Lydia rarely left the house.

159.     Eventually, Lydia was diagnosed with gender dysphoria.

160.     After more than a year of additional counseling, extensive tests, and conversations with Lydia's doctors at Oklahoma Children's Hospital about the risks and benefits of hormone therapy, Lydia started estrogen and spironolactone.

161.     After receiving gender-affirming hormone therapy, Lydia's mental health and mood have drastically improved.  She spends more time with her friends and family and is more comfortable with how she is and what she looks like.  Lydia is finally able to leave the house without fear of being misgendered.

162.     When SB 3 went into effect, Lydia ceased receiving treatment from Oklahoma Children's Hospital and began receiving her treatment from Diversity Health Clinic.

163.     Unless the Health Care Ban is blocked, under the six-month phase out period that the Health Care Ban imposes, Lydia's medication can be prescribed only "for the purpose of assisting [her] with gradually decreasing and discontinuing use" of her medication.  As she begins receiving sub-therapeutic doses of estrogen and spironolactone, she will likely begin developing secondary sex characteristics that are incongruent with her gender identity, such as facial hair and a deeper voice.

164.     Lydia and her family are scared of the impact the Health Care Ban would have on her life.  If she is unable to continue receiving gender-affirming care, Lydia is afraid she would turn into someone she is not and would not be able to look at herself in the mirror without distress.  Lauren is concerned that her daughter's mental health will deteriorate if she is forced to stop treatment, or that she will return to the risk of suicidality and self-harm she experienced before receiving gender-affirming treatment.

5.       **The Roe Family**

165.     Ryan is a fourteen-year-old boy living in Oklahoma with his parents Richard and Rachel Roe.  Ryan loves theater, acting, and costume design.

166.     Ryan is transgender.  He is a boy with a male gender identity, but he was designated as female.

167.     As a child, Ryan did not feel comfortable with the expected interests and expressions typically associated with girls.  His mother, a mental health professional, understood how important it was to allow Ryan to express himself as he truly was.

168.     As Ryan approached puberty, he began to experience depression, anxiety, and loss of appetite.  He was uncomfortable being perceived as female and was distressed about the conflict between his body and who he is.

169.     Around this same time, Ryan began seeing a therapist.  Eventually he was diagnosed with gender dysphoria.

170.     In or around 2021, Ryan began working with medical professionals experienced with treating gender dysphoria.  After receiving advice from his medical team, Ryan and his parents decided that he would begin period blockers and eventually puberty-delaying treatment.

171.     Receiving gender-affirming care for Ryan's gender dysphoria, along with a supportive community and therapy, have significantly improved Ryan's mental health.  Ryan is relieved that that he has not undergone puberty as a girl.

172.     Rachel has observed the dramatic positive impact treatment has had on her son. Ryan has become a confident young man who excels in school.

173.     Unless the Health Care Ban is blocked, under the six-month phase out period that the Health Care Ban imposes, Ryan's medication can be prescribed only "for the purpose of

assisting [him] with gradually decreasing and discontinuing use" of his medication.  As Ryan begins to receive sub-therapeutic doses of puberty-delaying medication, he will begin to experience endogenous puberty, leading to the development of secondary sex characteristics that are incongruent with his gender identity as a boy.

174.    The Health Care Ban has caused Ryan and his family distress.  Ryan is terrified at the prospect of losing access to his gender-affirming treatment.  He fears having to live in a body that is not consistent with who he is.  Ryan's parents are concerned about the physical and mental consequences of depriving Ryan of the gender-affirming care he needs.

175.    Ryan and his family have lived in Oklahoma their entire lives and moving out of state is not a realistic option for them.  It is the only home that Ryan has ever known, and he has a supportive community of friends and family in Oklahoma.  However, Richard and Rachel are considering having Ryan move across the country to live with a family member.  The Roes do not want to split up their family for Ryan to continue to receive his gender-affirming health care.

### 6.    The Medical Provider Plaintiff

176.    Prior to SB 3, Dr. Lawlis treated transgender adolescents at the Roy G. Biv Program at Oklahoma Children's Hospital, a multidisciplinary academic clinic.  Dr. Lawlis was able to prescribe puberty-delaying medication and gender-affirming hormone treatment to adolescent patients with gender dysphoria when medically indicated.

177.    Following the passage of SB 3, as a result of the Hospital Defendants' SB 3 Policy, Dr. Lawlis no longer was able to provide this care at Oklahoma Children's Hospital.

178.    To ensure continuity of care for her patients, Dr. Lawlis had to obtain credentials to provide care to her patients one day a week at a private health clinic.  Although this move allowed for continuity of care, it deprived Dr. Lawlis and her patients of working within a singular

multidisciplinary clinic, which caused significant distress for her patients and their families, as well as logistical difficulties.

179.    With the enactment of SB 613, Dr. Lawlis now is prohibited from providing puberty-delaying medications and gender-affirming hormone therapy to her transgender patients anywhere in Oklahoma because the treatments relate to "gender transition."  She can, however, continue providing the same kinds of treatments to her cisgender patients, such as testosterone suppressants for her cisgender female adolescent patients with polycystic ovarian syndrome, in part so that they do not develop body hair inconsistent with their gender identity.

180.    Dr. Lawlis is very concerned about the effect the Health Care Ban will have on her transgender patients.  Based on her personal experience treating hundreds of adolescents with gender dysphoria, she believes that denying them access to gender-affirming care will significantly and severely compromise their health, including causing increased depression, anxiety, and suicidal ideation.  Denying her patients medically necessary and often lifesaving health care violates the tenets of her profession by leaving her patients to suffer needless pain.

181.    As a medical provider of patients who experience gender dysphoria, Dr. Lawlis has developed a close relationship with both her patients and their families.  Seeking and receiving treatment for gender dysphoria is a profoundly personal and informed decision based on a person's innermost sense of self and individual needs.  It is also a subject that remains very misunderstood by the public at large.  Many of her patients therefore require complete privacy, and Dr. Lawlis believes that, as a medical provider, it is her duty and obligation to advocate on behalf of her patients who are unable to publicly advocate for themselves.

182.    The Health Care Ban's six-month period for gradually decreasing her patients' medications does not alleviate Dr. Lawlis' serious concerns.  Providing her patients with sub-

therapeutic doses of puberty-blocking medication or hormones would be inconsistent with the evidence-based medicine that she practices, and she fully expects, based on her clinical observations when patients have experienced interruptions or delays in their care, that they will experience worsening gender dysphoria and the attendant distress.

183.    The Health Care Ban puts Dr. Lawless and other health care providers in the untenable position of either following state law and violating their ethical duties to promote their patients' wellbeing and protect them from harm or facing administrative, criminal, and civil penalties.  Either outcome results in harm to patients.

## V.    The Health Care Ban and the Hospital Defendants' SB 3 Policy Classify Based on Transgender Status and Sex.

184.    The Health Care Ban and the Hospital Defendants' SB 3 Policy prohibit the provision of evidence-based, medically necessary treatments—including puberty-delaying treatment, hormone therapy, and reconstructive chest surgery—only when they are provided to transgender adolescents as part of treatment for gender dysphoria or gender-affirming care.  They permit these same treatments for non-transgender adolescents for other purposes.

185.    The Health Care Ban prohibits any "health care provider" from "knowingly provid[ing] gender transition procedures to any child," which it defines as "medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," namely, "(1) surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex, or (2) puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex."  SB 613 at Section 1(A)–

(B), to be codified at Okla. Stat. tit. 63, § 2607(1)(A)–(B).  The same services, however, may be provided if they are used to treat other conditions.

186.    Likewise, SB 3, which led to the Hospital Defendants' SB 3 Policy, explicitly defines prohibited "gender reassignment medical treatment" to include "medical therapies and medical intervention used to treat gender dysphoria."  It expressly excludes from the ban "services provided to individuals born with ambiguous genitalia, incomplete genitalia, or both male and female anatomy, or biochemically verifiable disorder[s] of sex development."

187.    For example, the puberty-delaying treatment provided to transgender adolescents experiencing gender dysphoria is commonly used to treat central precocious puberty. The Health Care Ban and the Hospital Defendants' SB 3 Policy prohibit providing puberty-delaying treatment to transgender adolescents for gender dysphoria but permit puberty-delaying treatment for central precocious puberty.

188.    The Health Care Ban and the Hospital Defendants' SB 3 Policy also prohibit hormone therapy when the treatment is used to treat transgender adolescents with gender dysphoria.  But they permit the same hormone therapy when prescribed to non-transgender patients to treat other serious conditions and/or to help bring their bodies into alignment with their gender identity.

189.    The Health Care Ban and the Hospital Defendants' SB 3 Policy prohibit chest surgery on transgender young men to treat gender dysphoria, but non-transgender adolescents are permitted to undergo comparable surgeries.

190.    Indeed, in drafting the Health Care Ban, Senator Daniels reached out to OU Health, but not to ascertain their medical opinion about gender-affirming care; she reached out to ensure that SB 613, which includes a list of procedures not covered, would not prohibit the provision of

the medical treatments to adolescents in any circumstance other than when used for the treatment of a transgender adolescent's gender dysphoria.

## VI.     The Health Care Ban and the Hospital Defendants' SB 3 Policy Will Cause Severe Harm to Transgender Adolescents.

191.    Withholding medical treatment from adolescents with gender dysphoria when it is medically indicated puts them at risk of extreme harm to their health and wellbeing.

192.    Adolescents with untreated gender dysphoria suffer significant distress.  Many are on medication for depression and anxiety as a result of not being able to obtain care. Self-harm and suicidal ideation are exceedingly common.  Suicidality among transgender adolescents is a crisis.  In one survey, more than half of transgender youths had seriously contemplated suicide.[9] Studies have found that as many as 40% of transgender people have attempted suicide at some point in their lives.[10]

193.    When adolescents have access to puberty-delaying drugs and hormone therapy, which prevents them from going through endogenous puberty and allows them to go through puberty consistent with their gender identity, their dysphoria decreases and their mental health improves.  Both clinical experience and multiple medical and scientific studies confirm that for many young people, this treatment not only is safe and effective, but it also is positively transformative. Indeed, transgender adolescents able to access this medically necessary and evidence-based medical care often go from painful suffering to becoming thriving young persons.

---

[9] TREVOR PROJECT, NATIONAL SURVEY ON LGBTQ YOUTH MENTAL HEALTH 2022, at 6 (2022), https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf     (59 percent of transgender boys, 48 percent of transgender girls, and 53 percent of nonbinary youth considered suicide in the past year).

[10] SANDY E. JAMES ET AL., NAT'L CTR. FOR TRANSGENDER EQUAL., REPORT OF THE 2015 U.S. TRANSGENDER SURVEY 5 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

194.    If a healthcare provider is forced to stop puberty-delaying drugs or hormone therapy due to the Health Care Ban, it will cause patients to resume their endogenous puberty.  This will result in extreme distress for patients who have been relying on medical treatments to prevent the secondary sex characteristics that come with their endogenous puberty.  These bodily changes are extremely distressing for transgender adolescents with gender dysphoria that otherwise had been relieved by medical treatment.

195.    Additionally, the effects of underdoing endogenous puberty may not be reversible even with subsequent hormone therapy and surgery in adulthood, thus exacerbating lifelong gender dysphoria in patients who have this evidence-based and medically necessary treatment withheld or withdrawn.  Bodily changes from puberty to stature, facial appearance, genital growth, voice, and breast development can be more difficult or even impossible to counteract.

196.    For patients currently undergoing treatment with gender-affirming hormones like estrogen or testosterone, withdrawing care can result in a range of serious physiological and mental health consequences.  The body takes about six weeks to ramp up endogenous hormones.  If a healthcare provider is forced to abruptly stop treatment, a patient will be without sufficient circulating hormones.  This can result in depressed mood, hot flashes, and headaches.  For patients on spironolactone—a testosterone suppressant—abruptly terminating treatment can cause a patient's blood pressure to spike, increasing a young person's risk of heart attack or stroke.  But whether care is stopped abruptly or over a period of several months, the withdrawal of gender-affirming care results in predictable and negative mental health consequences, including returned or worsening gender dysphoria, along with heightened anxiety and depression.

197.    Laws like the Health Care Ban and the Hospital Defendants' SB 3 Policy that prohibit access to medically necessary health care in and of themselves gravely and directly threaten the mental health and wellbeing of transgender adolescents in Oklahoma.

198.    Gender-affirming medical care can be beneficial and even lifesaving treatment for transgender adolescents experiencing gender dysphoria.  The major medical and mental health associations in the United States support the provision of such care.

199.    These associations include the American Academy of Pediatrics,[11] American Medical Association,[12] the Endocrine Society,[13] the Pediatric Endocrine Society,[14] the American Psychological Association,[15] the American Academy of Family Physicians,[16] the American

---

[11] *See* American Academy of Pediatrics, Policy Statement, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, *in* PEDIATRICS, Oct. 2018, https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for.

[12] *See* AM. MED. ASS'N HOUSE OF DELEGATES, RESOLUTION 122: REMOVING FINANCIAL BARRIERS TO CARE FOR TRANSGENDER PATIENTS 1 (2008), http://www.tgender.net/taw/ama_resolutions.pdf.

[13] *See* ENDOCRINE SOC'Y & PEDIATRIC ENDOCRINE SOC'Y, TRANSGENDER HEALTH POSITION STATEMENT (2020), https://www.endocrine.org/-/media/endocrine/files/advocacy/position-statement/position_statement_transgender_health_pes.pdf.

[14] *Id.*; *see also* Pediatric Endocrine Society, Position Statement, *The Pediatric Endocrine Society Opposes Bills That Harm Transgender Youth* (Apr. 2021), https://pedsendo.org/news-announcements/the-pediatric-endocrine-society-opposes-bills-that-harm-transgender-youth-2/.

[15] *See* AM. PSYCH. ASS'N, POSITION STATEMENT ON ACCESS TO CARE FOR TRANSGENDER AND GENDER DIVERSE INDIVIDUALS (2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

[16] *See* AM. ACAD. OF FAM. PHYSICIANS, RESOLUTION NO. 1004 (2012), http://www.aafp.org/dam/AAFP/documents/about_us/special_constituencies/2012RCAR_Advocacy.pdf.

College of Obstetricians and Gynecologists,[17] the National Association of Social Workers,[18] and WPATH.[19]

200.    The Oklahoma State Medical Association also issued a statement regarding these bills: "Unfortunately, instead of supporting the mental health of Oklahoma's children, lawmakers are once again inserting themselves into private healthcare. As the state's largest physician organization, the OSMA firmly believe medical treatment should remain between physicians, patients and their families. Politics do not belong in the exam room, especially when these actions are rooted in anti-science rhetoric."[20]

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Fourteenth Amendment – Equal Protection (Health Care Ban)**
**All Plaintiffs Against the State Official Defendants**

201.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 200 of this Complaint as though fully set forth herein.

---

[17] *See* AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, COMMITTEE OPINION NO. 823: HEALTH CARE FOR TRANSGENDER INDIVIDUALS (2021), https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals.pdf.

[18] *See* NAT'L ASS'N OF SOC. WORKERS, TRANSGENDER AND GENDER IDENTITY ISSUES POLICY STATEMENT (1999), https://www.socialworkers.org/assets/secured/documents/da/da2008/reffered/Transgender.pdf.

[19] *See* WPATH, *Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.* (Dec. 21, 2016), https://www.wpath.org/newsroom/medical-necessity-statement.

[20] Andy Weber, *Doctor Torn On Leaving Oklahoma After Lawmakers Pass Bill Limiting Access to Gender-Affirming Care*, KOCO (Sept. 30, 2022, 6:02 PM), https://www.koco.com/article/doctor-torn-on-leaving-oklahoma-after-lawmakers-pass-bill-limiting-access-to-gender-affirming-care/41469056

202.    By enforcing the Health Care Ban, the State Official Defendants are engaging in discrimination on the basis of sex and transgender status in violation of all Plaintiffs' Fourteenth Amendment rights to equal protection under the law.

203.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. AMEND. XIV, § 1. It protects individuals and groups from discrimination by the government.

204.    The Health Care Ban classifies based on sex and transgender status on its face.  The Ban harms transgender adolescents, including the Minor Plaintiffs and the patients whom the Medical Provider Plaintiff treats, by denying them medically necessary care because of their sex and because of their transgender status.

205.     The Health Care Ban also discriminates against the Parent Plaintiffs by denying them the same ability to secure necessary medical care for their children that other parents can obtain, and it does so on the basis of sex and transgender status.

206.    Under the Equal Protection Clause of the Fourteenth Amendment, government discrimination based on sex is presumptively unconstitutional and subject to heightened judicial scrutiny, placing a demanding burden of justification upon the State to provide at least an exceedingly persuasive justification for the differential treatment.

207.    Discrimination on the basis of nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics are all forms of discrimination on the basis of sex.

208.    Under the Equal Protection Clause, government discrimination based on transgender status also is presumptively unconstitutional and subject to at least heightened scrutiny.

209.    Transgender people have suffered a long history of discrimination in Oklahoma and across the country and continue to suffer such discrimination to this day.  Transgender persons are a discrete and insular group and lack the political power to protect their rights through the legislative process. They largely have been unable to secure explicit state and federal protections to protect against discrimination.  A person's transgender status bears no relation to their ability to contribute to society.  And gender identity is a core, defining trait so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

210.    Treatment for gender dysphoria—a condition that only transgender people suffer from—is always aimed at affirming a gender identity that differs from a person's assigned sex at birth.  Discrimination against individuals based on gender dysphoria is discrimination based on sex and transgender status.

211.    By its very terms, the Health Care Ban facially discriminates on the basis of sex and transgender status.  It prohibits a "health care provider" from "knowingly provid[ing] gender transition procedures to any child," which it defines as services "attempting to affirm the minor's perception of his or her gender or [] sex," such as "procedures that alter or remove … characteristics or features … typical for the individual's biological sex" or that "promote the development of feminizing or masculinizing features consistent with the opposite biological sex."

212.    By enforcing the Health Care Ban, the State Official Defendants are engaging in constitutionally impermissible discrimination based on sex and transgender status.

213. The Health Care Ban prohibits medical treatments when provided to transgender adolescents to help align their bodies with their gender identity but permits the same medical treatments when provided to non-transgender patients to help align their bodies with their gender identity or for any other purpose.

214. The Health Care Ban prohibits the Medical Provider Plaintiff from providing certain medically necessary treatments to her transgender adolescent patients but permits her to provide the same medical care to her non-transgender adolescent patients.

215. Under the terms of the Heath Care Ban, whether a person can receive certain medical treatment turns on their assigned sex at birth.

216. Under the terms of the Heath Care Ban, whether a person can receive certain medical treatment turns on whether they are transgender.

217. Under the terms of the Heath Care Ban, whether a person can receive certain medical treatment turns on whether the care tends to reinforce or disrupt stereotypes associated with a person's sex assigned at birth.

218. Discrimination based on the exercise of a fundamental right also is presumptively unconstitutional and is subject to strict scrutiny. The Health Care Ban unconstitutionally discriminates against the Parent Plaintiffs in the exercise of their fundamental right to make decisions concerning the care, custody, and control of their children by prohibiting them from seeking and following medical advice to protect the health and wellbeing of their minor children.

219. The Heath Care Ban does nothing to protect the health or wellbeing of minors. To the contrary, it gravely threatens the health and wellbeing of adolescents with gender dysphoria by denying them access to evidence-based, medically necessary, and often lifesaving medical care.

220.    The Health Care Ban is not narrowly tailored to achieve a compelling governmental interest.  It is not substantially related to any important government interest.  And it is not rationally related to any legitimate government interest.

221.    The Health Care Ban's targeted prohibition on medically necessary care for transgender adolescents with gender dysphoria is based on generalized fears, negative attitudes, stereotypes, and moral disapproval of transgender people, which are not legitimate bases for unequal treatment under any level of scrutiny.

222.    The Health Care Ban, on its face and as applied to the Minor Plaintiffs, the Parent Plaintiffs, and the patients of the Medical Provider Plaintiff, deprives transgender adolescents and their parents or guardians of their right to equal protection of the laws and stigmatizes them as second-class citizens in violation of the Equal Protection Clause of the Fourteenth Amendment. The Health Care Ban also inflicts upon transgender adolescents and their parents, including the Minor Plaintiffs, the Parent Plaintiffs, and the patients of the Medical Provider Plaintiff, distress, humiliation, embarrassment, emotional pain and anguish, violation of their dignity, and harms to their short- and long-term health and wellbeing from being denied access to medically necessary health care.

223.    The State Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment and liable for their violation of Plaintiffs' rights to equal protection under 42 U.S.C. § 1983.

224.    Plaintiffs are entitled to a declaratory judgment that the Health Care Ban violates the Equal Protection Clause of the Fourteenth Amendment.

225.    Plaintiffs also are entitled to preliminary and permanent relief.  Without preliminary and permanent injunctive relief, Plaintiffs will suffer and/or continue to suffer irreparable harm. Plaintiffs have no adequate remedy at law to redress the wrongs alleged.

## SECOND CLAIM FOR RELIEF

**Fourteenth Amendment – Equal Protection (SB 3)**
**OU Health Minor Plaintiffs Against the Hospital Official Defendants**

226.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 200 of this Complaint as though fully set forth herein.

227.    By enforcing their SB 3 Policy, the Hospital Official Defendants are engaging in discrimination on the basis of sex and transgender status in violation of the OU Health Minor Plaintiffs' Fourteenth Amendment right to equal protection under the law.

228.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. AMEND. XIV, § 1. It protects individuals and groups from discrimination by the government.

229.    The Hospital Defendants' SB 3 Policy classifies based on sex and transgender status.

230.    Under the Equal Protection Clause of the Fourteenth Amendment, government discrimination based on sex is presumptively unconstitutional and subject to heightened judicial scrutiny.

231.    Under the Equal Protection Clause, government discrimination based on transgender status also is presumptively unconstitutional and subject to at least heightened scrutiny.

232.    The SB 3 Policy harms transgender adolescents, including the OU Health Minor Plaintiffs, by denying them medically necessary care because of their sex and because of their transgender status.

233.    By their very terms, SB 3 and the Hospital Defendants' SB 3 Policy facially discriminate based on sex and transgender status. SB 3 prohibits Defendant University Hospitals Authority from budgeting or expending any of the $39.4 million appropriated "for the construction and equipping of facilities designed to expand the capacity of behavioral health care for the children" for the benefit of a facility providing "gender reassignment medical treatment" to any patient under 18, including "a. interventions to suppress the development of endogenous secondary sex characteristics, b. interventions to align the patient's appearance or physical body with the patient's gender identity, and c. medical therapies and medical intervention used to treat gender dysphoria."

234.    In response to SB 3, the Hospital Defendants decided to stop providing "gender-affirming services" to patients under 18 to access the funds appropriated under SB 3.

235.    The Hospital Defendants continue to provide the same services to non-transgender adolescents for other purposes.

236.    By acquiescing to SB 3 and voluntarily deciding to no longer provide gender-affirming medical services to transgender adolescents, the Hospital Defendants are engaging in constitutionally impermissible discrimination based on sex and transgender status.

237.    Under the terms of the Hospital Defendants' SB 3 Policy, whether a person can receive certain medical treatment turns on their assigned sex at birth.

238.    Under the terms of the Hospital Defendants' SB 3 Policy, whether a person can receive certain medical treatment turns on whether they are transgender.

239.    Under the terms of the Hospital Defendants' SB 3 Policy, whether a person can receive certain medical treatment turns on whether the care tends to reinforce or disrupt stereotypes associated with a person's sex assigned at birth.

240.    The Hospital Defendants' SB 3 Policy does nothing to protect the health or wellbeing of minors. To the contrary, it gravely threatens the health and wellbeing of adolescents with gender dysphoria by denying them access to necessary and often lifesaving medical care.

241.    The Hospital Defendants' SB 3 Policy is not substantially related to any important government interest or rationally related to any legitimate government interest.

242.    The Hospital Defendants' SB 3 Policy's targeted prohibition on medically necessary care for transgender adolescents with gender dysphoria is based on generalized fears, negative attitudes, stereotypes, and moral disapproval of transgender people that are not legitimate bases for unequal treatment under any level of scrutiny.

243.    The Hospital Defendants' SB 3 Policy, on its face and as applied to the OU Health Minor Plaintiffs, deprives transgender adolescents of their right to equal protection of the laws and stigmatizes them as second-class citizens in violation of the Equal Protection Clause of the Fourteenth Amendment.  The Hospital Defendants' SB 3 Policy also inflicts upon transgender adolescents, including the OU Health Minor Plaintiffs, distress, humiliation, embarrassment, emotional pain and anguish, violation of their dignity, and harms to their short- and long-term health and wellbeing from being denied access to medically necessary health care.

244.    The Hospital Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment and liable for the violation of the OU Health Minor Plaintiffs' rights to equal protection under 42 U.S.C. § 1983.

245.    The OU Health Minor Plaintiffs are entitled to a declaratory judgment that the Hospital Defendants' SB 3 Policy violates the Equal Protection Clause of the Fourteenth Amendment.

246.    The OU Health Minor Plaintiffs also are entitled to permanent injunctive relief. Without injunctive relief, the OU Health Minor Plaintiffs will suffer and/or continue to suffer irreparable harm.  The OU Health Minor Plaintiffs have no adequate remedy at law to redress the wrongs alleged.

### THIRD CLAIM FOR RELIEF

**Fourteenth Amendment – Due Process Right to Parental Autonomy (Health Care Ban) Parent Plaintiffs Against State Official Defendants**

247.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 200 of this Complaint as though fully set forth herein.

248.    By enforcing the Health Care Ban, the State Official Defendants are preventing parents from making medical care decisions concerning their children in violation of the Parent Plaintiffs' Fourteenth Amendment Due Process right to parental autonomy.

249.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

250.    That fundamental right of parental autonomy includes the right of parents to seek and to follow medical advice to protect the health and wellbeing of their minor children.

251.    Parents' fundamental right to seek and to follow medical advice is at its apex when the parents' and child's liberty interests in pursuing a course of medical care align, and the child's medical providers agree and have recommended as appropriate the course of medical treatment.

252.     The Health Care Ban's prohibition on providing evidence-based and medically necessary care for adolescents with gender dysphoria stands directly at odds with parents' fundamental right to make decisions concerning the care of their children, particularly when it aligns with the adolescent's liberty interests.  The Health Care Ban barges into Oklahoma families' living rooms and strips Oklahoma parents, including the Parent Plaintiffs, of the right to seek, direct, and provide medical care that their children need.

253.     The Health Care Ban does nothing to protect the health or wellbeing of minors.  To the contrary, it gravely threatens the health and wellbeing of adolescents with gender dysphoria by denying their parents, including the Parent Plaintiffs, the ability to obtain necessary and often lifesaving medical care for their children.

254.     The Health Care Ban's prohibition against the provision of medically accepted treatments for adolescents with gender dysphoria is not narrowly tailored to serve a compelling government interest.  It also is not rationally related to any legitimate government interest.

255.     The State Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment and are liable for their violation of the Parent Plaintiffs' rights to due process under 42 U.S.C. § 1983.

256.     The Parent Plaintiffs are entitled to a declaratory judgment that the Health Care Ban violates the Due Process Clause of the Fourteenth Amendment.

257.     The Parent Plaintiffs also are entitled to preliminary and permanent injunctive relief.  Without preliminary and permanent injunctive relief, the Parent Plaintiffs will suffer and/or continue to suffer irreparable harm.  The Parent Plaintiffs have no adequate remedy at law to redress the wrongs alleged.

## FOURTH CLAIM FOR RELIEF

**Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 (SB 3)**
**OU Health Minor Plaintiffs and OU Health Parent Plaintiffs Against Hospital Defendants**

258.    Plaintiffs reallege and incorporate by reference paragraphs 1 to [x] of this Complaint as though fully set forth herein.

259.    By enforcing their SB 3 Policy, the Hospital Defendants are engaging in discrimination against OU Health Minor Plaintiffs and OU Health Parent Plaintiffs on the basis of sex in violation of Section 1557 of the ACA, 42 U.S.C. § 18116.

260.    Section 1557 provides in relevant part that "an individual shall not [on the basis of sex] be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance."

261.    Discrimination on the basis of transgender status, gender, gender identity, gender dysphoria, gender transition, nonconformity with sex stereotypes, and sex characteristics all are forms of discrimination encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

262.    The prohibition on sex discrimination in Section 1557 of the ACA protects transgender individuals from discrimination by healthcare providers, including physicians and hospitals.

263.    The Hospital Defendants receive federal financial assistance and each is a "covered entity" for purposes of Section 1557 of the ACA.  For example, SB 3 authorized and appropriated more than $108.5 million in federal funds to Defendant University Hospitals Authority.  The Hospital Defendants also receive federal financial assistance through Medicaid payments and research grants from the National Institutes of Health, which operates within the U.S. Department

of Health and Human Services. Defendant OU Health publishes a Patient Rights & Responsibilities page on its website, stating that it "compl[ies] with applicable Federal civil rights laws and do[es] not discriminate on the basis of … gender, … gender identity or expression, … medical condition, … or any other basis prohibited by federal, state, or local law."[21]

264.   Plaintiffs Peter Poe, Daphne Doe, and Lydia Loe obtained medical care for gender dysphoria at Oklahoma Children's Hospital in Oklahoma City until the adoption of the Hospital Defendants' SB 3 Policy. Plaintiff Brandon Boe obtained medical care for gender dysphoria at OU Health.

265.   SB 3 and the Hospital Defendants' SB 3 Policy facially discriminate based on sex. SB 3 prohibits the University Hospitals Authority from budgeting or expending any of the $39.4 million appropriated "for the construction and equipping of facilities designed to expand the capacity of behavioral health care for the children" for the benefit of a facility providing "gender reassignment medical treatment" to any patient under 18, including "a. interventions to suppress the development of endogenous secondary sex characteristics, b. interventions to align the patient's appearance or physical body with the patient's gender identity, and c. medical therapies and medical intervention used to treat gender dysphoria."

266.   In response to SB 3, the Hospital Defendants decided to stop providing "gender-affirming services" to patients under 18 to access the funds appropriated under SB 3.

267.   The Hospital Defendants continue to provide the same services to non-transgender adolescents for other purposes.

---

[21] *Patient Rights & Responsibilities*, OU HEALTH, https://www.ouhealth.com/ou-health-patients-families/patient-rights-responsibilities/.

268.    By adopting a policy pursuant to which they no longer provide "gender-affirming services" to patients under 18, even though they provide the same "hormone-related prescription therapies and surgical procedures" to patients under 18 for other conditions, the Hospital Defendants have discriminated against the OU Health Minor Plaintiffs and OU Health Parent Plaintiffs on the basis of sex.  Transgender patients cannot receive gender-affirming services but patients whose gender identity conforms with their sex assigned at birth can receive the same "hormone-related prescription therapies and surgical procedures" when medically necessary.

269.    Because the Hospital Defendants are covered entities under Section 1557 of the ACA, the OU Health Minor Plaintiffs and OU Health Parent Plaintiffs have a right under Section 1557 to participate in the same programs and access the same benefits the Hospital Defendants provide free from discrimination based on sex, transgender status, gender, gender identity, gender dysphoria, gender transition, nonconformity with sex stereotypes, and sex characteristics.

270.    The Hospital Defendants' SB 3 Policy subjects the OU Health Minor Plaintiffs and OU Health Parent Plaintiffs to unlawful sex discrimination by preventing the OU Health Minor Plaintiffs from obtaining medically necessary care because of their sex and by requiring healthcare providers to discriminate against the OU Health Minor Plaintiffs on the basis of sex.  As such, the Hospital Defendants' SB 3 Policy conflicts with the nondiscrimination requirements of Section 1557.  It also conflicts with and undermines the purposes and goals of Section 1557.

271.    The Medical Provider Plaintiff also is a recipient of federal financial assistance and therefore subject to Section 1557's nondiscrimination mandate.

272.    It is impossible for the Medical Provider Plaintiff to continue to comply with her obligations under Section 1557 and also comply with the restrictions imposed by the Hospital Defendants' SB 3 Policy.

273.    SB 3 and the Hospital Defendants' SB 3 Policy in response stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, including the objective of preventing discrimination based on sex in the provision of health care.

274.    As a result of SB 3 and the Hospital Defendants' SB 3 Policy, the OU Health Minor Plaintiffs are being denied access to medically necessary health care on the basis of sex.  They have suffered harm, such as distress, humiliation, embarrassment, emotional pain and anguish, violation of their dignity, and harms to their short- and long-term health and wellbeing from being denied access to medically necessary health care.

275.    As a result of SB 3 and the SB 3 Policy, the OU Health Parent Plaintiffs have incurred or will incur costs to change providers or costs for travel out of state for access to treatments.

276.    Accordingly, the OU Health Minor Plaintiffs and OU Health Parent Plaintiffs are entitled to declaratory and injunctive relief, as well as nominal damages.  They have no adequate remedy at law to redress the wrongs alleged, which are of a continuing nature and will cause them irreparable harm.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.    Enter a declaratory judgment declaring that:

    i.    the Health Care Ban, on its face and as applied to Plaintiffs, violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against (1) the Minor Plaintiffs, the patients of the Medical Provider Plaintiff, and all similarly situated individuals on the basis of sex and transgender status, and (2) the Parent Plaintiffs with regards to (a) their exercise of the right to parental autonomy and (b) their ability to secure

necessary medical care for their children that other parents can obtain based on sex and transgender status, and is therefore unenforceable;

    ii.    the Health Care Ban, on its face and as applied to the Parent Plaintiffs, violates the Parent Plaintiffs' right to parental autonomy guaranteed by the Due Process Clause and is therefore unenforceable;

    iii.    the Hospital Defendants' SB 3 Policy, on its face and as applied to the OU Health Minor Plaintiffs, violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against the OU Health Minor Plaintiffs and all similarly situated individuals on the basis of sex and transgender status and is therefore unenforceable;

    iv.    the Hospital Defendants' SB 3 Policy violates Section 1557 of the Affordable Care Act by discriminating against the OU Health Minor Plaintiffs and all similarly situated individuals on the basis of sex and is therefore unenforceable; and

B.    Issue preliminary and permanent injunctions enjoining:

    i.    The State Official Defendants, their employees, agents, successors, and all others acting in concert with them, from administering or enforcing the Health Care Ban; and

    ii.    The Hospital Official Defendants, their employees, agents, successors, and all others acting in concert with them, from administering or enforcing the Hospital Defendants' SB 3 Policy.

C.    Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

D.      Award the OU Health Minor Plaintiffs and OU Health Parent Plaintiffs nominal damages as compensation for the harms to their short- and long-term health and wellbeing from being denied access to medically necessary health care as a result of the Hospital Defendants' SB 3 Policy and for all other injuries that have been caused by the Hospital Defendants' acts and omissions alleged in this Complaint;

E.      Award Plaintiffs their costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 or other applicable statutes; and

F.      Grant such other and further relief as the Court deems just and proper.

*[The remainder of this page has been left blank intentionally.]*

Date:   May 2, 2023

/s/ *Megan Lambert*

Megan Lambert
   (OBA# 33216)
**American Civil Liberties Union**
  **Foundation of Oklahoma**
P.O. Box 13327
Oklahoma City, OK 73113
(405) 524-8511
mlambert@acluok.org

Chase Strangio*
Harper Seldin*
**American Civil Liberties Union**
  **Foundation**
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
cstrangio@aclu.org
hseldin@aclu.org

Laura J. Edelstein*
**Jenner & Block LLP**
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com

Luke C. Platzer*
Madeleine V. Findley*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
LPlatzer@jenner.com

Lauren M. Greene*
Blaine R. Valencia*
**Jenner & Block LLP**
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2246
(213) 239-5100
LGreene@jenner.com
BValencia@jenner.com

*Application for admission pro hac vice
forthcoming.*

Respectfully submitted

Omar Gonzalez-Pagan*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Shelly L. Skeen*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
Oak Lawn Ave, Ste. 500
Dallas, TX 75219
(214) 219-8585
sskeen@lambdalegal.org

Sasha Buchert*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
1776 K Street, N.W., 8th Floor
Washington, DC  20006
(202) 804-6245
sbuchert@lambdalegal.org

Remi Jaffre*
**Jenner & Block LLP**
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
RJaffre@jenner.com

Lillian M. McGuire*
Jocelyn Sitton*
Daniel L. Robertson*
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
LMcGuire@jenner.com
JSitton@jenner.com
DRobertson@jenner.com