**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

PETER POE, et al.,

    *Plaintiffs*,

             v.

GENTNER DRUMMOND, et al.,

    *Defendants*.

Case No.  23-cv-00177-JFH-SH

**OPENING MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    A.    Medical Protocols for the Treatment of Transgender Adolescents with Gender Dysphoria ........................................................................................2

    B.    The Health Care Ban ................................................................................4

    C.    The Health Care Ban Inflicts Severe and Irreparable Harms. ................5

ARGUMENT ........................................................................................................................10

I.      PRELIMINARY INJUNCTION STANDARD. ..................................................10

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM. ........................................................................11

    A.    The Health Care Ban Is Subject to Heightened Equal Protection Scrutiny Because It Discriminates Based on Transgender Status and Sex. .........11

        1.    The Ban Discriminates Based on Transgender Status. ..............12

        2.    The Ban Discriminates Based on Sex. ......................................13

        3.    The Health Care Ban Was Passed for the Purpose of Drawing Sex- and Transgender Status-Based Distinctions. ...............................15

    B.    The Health Care Ban Fails Heightened Equal Protection Scrutiny. .....16

        1.    There Is No Factual Support for Any Potential Justification of the Ban. ...........................................................................................16

        2.    Treating Gender-Affirming Care Differently from Medical Treatments with Comparable Risks, Benefits, and Scientific Support Is Unjustifiable. ...................................................................17

    C.    The Health Care Ban Fails Any Level of Review. .................................19

III.   THE PARENT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE HEALTH CARE BAN VIOLATES PARENTS' FUNDAMENTAL RIGHT TO PARENTAL AUTONOMY. .............................19

    A.    Strict Scrutiny Applies to the Parent Plaintiffs' Due Process Claims. .............20

    B.    The Health Care Ban Cannot Survive Strict Scrutiny. ..........................21

IV.   A PRELIMINARY INJUNCTION IS NECESSARY. ........................................22

    A.    Plaintiffs Will Suffer Immediate and Irreparable Harm If the Health Care Ban is Not Blocked. ................................................................................22

    B.    The Balance of Equities Weigh in Plaintiffs' Favor and Issuance of the Preliminary Injunction is in the Public Interest. ...................................24

    C.    A Facial Statewide Injunction Is Necessary. .........................................25

CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aposhian v. Barr*,
  958 F.3d 969, 978 (10th Cir. 2020) ........................................................24

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) .............................................................22

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
  531 U.S. 356 (2001)............................................................................19

*Bernal v. Fainter*,
  467 U.S. 216 (1984)............................................................................21

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020).............................................................13, 14, 15

*Boyden v. Conlin*,
  341 F. Supp. 3d 979 (W.D. Wis. 2018) ..................................................14

*Brandt by & through Brandt v. Rutledge*,
  47 F.4th 661 (8th Cir. 2022), *reh'g en banc denied*, 2022 WL 16957734 (8th
  Cir. Nov. 16, 2022) ...................................................................... *passim*

*Brandt v. Rutledge*,
  551 F. Supp. 3d 882 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022) ...............20, 21, 22

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)............................................................................11

*C. P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*,
  No. 3:20-CV-06145-RJB, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ........................12

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)............................................................................25

*Citizens United v. Gessler*,
  773 F.3d 200 (10th Cir. 2014) ..............................................................25

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)............................................................................19

ii

*Coal. of Concerned Citizens To Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp.*,
843 F.3d 886 (10th Cir. 2016) ........................................................11

*Denver Homeless Out Loud v. Denver*,
32 F.4th 1259 (10th Cir. 2022) ........................................................10

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) .....................................................................25

*Dodds v. U.S. Dep't of Educ.*,
845 F.3d 217 (6th Cir. 2016) (per curiam) .......................................14

*Eisenstadt v. Baird*,
405 U.S. 438 (1972) .........................................................................19

*Eknes-Tucker v. Marshall*,
603 F. Supp. 3d 1131 (M.D. Ala. 2022), *appeal filed*, No. 22-11707 (11th Cir.
May 18, 2022) ........................................................................ *passim*

*Fain v. Crouch*,
618 F. Supp. 3d 313 (S.D.W. Va. 2022) ...........................................12

*Flack v. Wis. Dep't of Health Servs.*,
328 F. Supp. 3d 931 (W.D. Wis. 2018) .............................................12

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) ....................................................15, 22

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ........................................................14

*Gonzales v. Carhart*,
550 U.S. 124 (2007) .........................................................................16

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ...........................................................12

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ........................................................11

*Kadel v. Folwell*,
446 F. Supp. 3d 1 (M.D.N.C. 2020) .................................................15

*Kadel v. Folwell*,
No. 1:19CV272, 2022 WL 11166311 (M.D.N.C. Oct. 19, 2022) .........12

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
  927 F.3d 396 (6th Cir. 2019) ............................................................... 20

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ............................................................. 12

*Kitchen v. Herbert*,
  755 F.3d 1193 (10th Cir. 2014) ........................................................... 20

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................................. 11

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) .............................................................................. 15

*Ray v. McCloud*,
  507 F. Supp. 3d 925 (S.D. Ohio 2020) ................................................ 12

*Romer v. Evans*,
  517 U.S. 620 (1996) .............................................................................. 19

*Santosky v. Kramer*,
  455 U.S. 745 (1982) .............................................................................. 21

*Schall v. Martin*,
  467 U.S. 253 (1984) .............................................................................. 20

*Schrier v. Univ. of Colo.*,
  427 F.3d 1253 (10th Cir. 2005) ........................................................... 10

*Smith v. Avanti*,
  249 F. Supp. 3d 1194 (D. Colo. 2017) ................................................ 14

*Toomey v. Arizona*,
  No. CV-19-00035-TUC-RM (LAB), 2019 WL 7172144 (D. Ariz. Dec. 23,
  2019) ..................................................................................................... 12

*Tudor v. Se. Okla. State Univ.*,
  13 F.4th 1019 (10th Cir. 2021) ........................................................... 13

*United States v. Virginia*,
  518 U.S. 515 (1996) ........................................................................ 11, 16

*Verlo v. Martinez*,
  820 F.3d 1113 (10th Cir. 2016) ........................................................... 24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .............................................................................. 15

iv

*Wasatch Equal. v. Alta Ski Lifts Co.*,
    55 F. Supp. 3d 1351 (D. Utah 2014)...............................................................11, 12

*Washington v. Glucksberg*,
    521 U.S. 702 (1997).............................................................................................20

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by*
    *Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ...............................14

## Court Rules

Fed. R. Civ. P. 65(a) .........................................................................................10

# INTRODUCTION

Absent a preliminary injunction, Senate Bill 613 ("SB 613," the "Health Care Ban," or "Ban") (attached as Exhibit 1) will categorically prohibit the provision of medically necessary, safe, effective, and often lifesaving healthcare to transgender adolescents with gender dysphoria in Oklahoma. In enacting the Health Care Ban, the Oklahoma State Legislature ignored the testimony and opposition of experienced health professionals and a myriad of Sooner families who, like Plaintiffs, will be negatively affected. Instead, the Oklahoma State Legislature chose to deprive Oklahoma adolescents, their parents, and their doctors of the right to make important medical decisions together without undue interference from the government by removing access to the only effective treatment for gender dysphoria, a serious medical condition. The Ban is not just harmful: it is also unconstitutional, warranting expedited and preliminary injunctive relief.

All relevant considerations strongly weigh in favor of preliminary injunctive relief.

*First*, Plaintiffs are likely to succeed on the merits of their constitutional claims. The Ban discriminates against transgender adolescents on the basis of their transgender status and sex in violation of the Equal Protection Clause and deprives parents of their fundamental right to seek appropriate medical care for their children in violation of the Due Process Clause.

*Second*, the Ban will cause immediate and irreparable harm to all the Plaintiffs. The Minor Plaintiffs will experience anxiety, distress, and potentially permanent physiological changes if they are cut off from the care they rely on to treat gender dysphoria. The Parent Plaintiffs will have their parental judgment and decision-making authority—one at its apex where, as here, parents, their adolescent children, and their medical providers are all aligned—usurped by the government. The Parent Plaintiffs will either have to disrupt their lives at great cost to so their children can receive critical medical care out of state or else watch them suffer without the care they need. The Medical

Provider Plaintiff will have to choose between abandoning her patients or facing criminal charges, professional discipline, and losing her medical license for honoring her duty to do no harm.

*Third*, the balance of the equities and the public interest both weigh heavily in favor of a preliminary injunction. The Ban will cause immediate and irreparable harm if it is not enjoined, but the State will not incur any harm if the *status quo* is maintained while this case proceeds.

Federal courts have preliminarily enjoined similar bans to preserve the *status quo* and protect plaintiffs from irreparable harm. *See*, *e.g.*, *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022) (affirming preliminary injunction against similar ban from Arkansas), *reh'g en banc denied*, 2022 WL 16957734 (8th Cir. Nov. 16, 2022); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1151 (M.D. Ala. 2022) (preliminary injunction against similar ban in Alabama), *appeal filed*, No. 22-11707 (11th Cir. May 18, 2022). This Court should do the same.

## STATEMENT OF FACTS

### A. Medical Protocols for the Treatment of Transgender Adolescents with Gender Dysphoria

"Gender identity" refers to a person's core sense of belonging to a particular gender. Janssen Decl. ¶ 30. A person's gender identity, which has biological bases, cannot be changed voluntarily, by external forces, or through medical or mental health intervention. Janssen Decl. ¶¶ 34–35; Adkins Decl. ¶¶ 17, 21. Everyone has a gender identity. Adkins Decl. ¶ 18. People whose gender identity matches the sex they were designated at birth are cisgender (or non-transgender). *Id.* ¶ 19. People whose gender identity differs from their sex designated at birth are transgender. *Id.* ¶ 20. Being transgender is not itself a condition to be cured. Janssen Decl. ¶ 35; Adkins Decl. ¶ 23. But it is common for clinically significant distress—called "gender dysphoria"—to arise from the incongruence transgender people experience between their gender identity and the sex they were designated at birth. Adkins Decl. ¶¶ 22–24.

Gender dysphoria is a serious medical condition that, if left untreated, can result in severe anxiety and depression, self-harm, and suicidality. Janssen Decl. ¶ 47; Adkins Decl. ¶ 23. Treatment for gender dysphoria is provided in accordance with evidence-based clinical guidelines. The Endocrine Society and the World Professional Association for Transgender Health ("WPATH") have published widely-accepted clinical standards and guidelines for diagnosing and treating gender dysphoria. Adkins Decl. ¶ 26; Janssen Decl. ¶¶ 48–50. The major medical organizations in the United States agree with WPATH and the Endocrine Society that gender-affirming medical treatments—which, for adolescents and adults, can include puberty-delaying medication, hormone treatment, and surgery—can be medically necessary to treat gender dysphoria. Janssen Decl. ¶ 53.

Under the WPATH Standards of Care and the Endocrine Society Guideline (the "Protocols"), gender-affirming medical care is only provided when a patient has: (i) gender incongruence that is both marked and sustained over time; (ii) a diagnosis of gender dysphoria; (iii) sufficient emotional and cognitive maturity to provide informed consent; (iv) the actual presence of such informed consent, including information regarding reproductive side effects; and (v) the absence or mitigation of any countervailing mental health concerns. *Id.* ¶¶ 62–63.

Treatment for gender dysphoria depends on a patient's stage of pubertal development. Under the Protocols, no medical treatments are provided before the onset of puberty. Adkins Decl. ¶ 32; Janssen Decl. ¶ 58. If medically indicated, adolescents with gender dysphoria who have entered puberty may be prescribed puberty-delaying medications (called GnRH agonists) to prevent the distress of developing permanent, physical characteristics that do not align with their gender identity. Adkins Decl. ¶ 33; Janssen Decl. ¶ 59. Puberty-delaying medications allow the adolescent time to better understand their gender identity, while delaying distress from the development of secondary sex characteristics such as breasts or facial hair. *Id.*

Pubertal suppression is prescribed only with parental consent and when certain diagnostic criteria are met, including "a long-lasting and intense pattern of gender nonconformity or gender dysphoria [that has] worsened with the onset of puberty," "sufficient mental capacity to give informed consent," and a detailed assessment from a pediatric endocrinologist or other clinician experienced in pubertal assessment. Adkins Decl. ¶ 35. Pubertal suppression is reversible, and if the treatment is discontinued, endogenous puberty will resume. *Id.* ¶¶ 33, 40.

In some cases, a healthcare provider may determine it is medically necessary for adolescent patients to be treated with gender-affirming hormone therapy. *Id.* ¶ 36. These treatments—testosterone for adolescent transgender boys and testosterone suppression and estrogen for adolescent transgender girls—alleviate distress by facilitating physiological changes consistent with the adolescent's gender identity. *Id.* Under the Protocols, treatment is advised only after a rigorous assessment of the minor's gender dysphoria, and capacity to understand the risks and benefits of treatment. Adkins Decl. ¶¶ 37–40; Janssen Decl. ¶¶ 63–64. In the U.S., parental consent is required to prescribe these medical treatments to minors. *See* Adkins Decl. ¶ 35.

Gender-affirming medical treatments in adolescence can drastically minimize dysphoria later in life and may eliminate the need for surgery. *Id.* ¶ 66. A delay in treatment, on the other hand, can result in significant distress, including anxiety and escalating suicidality, as well as permanent physical changes from puberty that can require surgical treatment to reverse later in life. *Id.* ¶¶ 67–70. The safety and efficacy of gender affirming medical care in improving mental health outcomes for adolescents suffering from gender dysphoria is supported by "a substantial body of evidence," including cross-sectional and longitudinal studies, as well as the clinical expertise of providers over decades. Turban Decl. ¶ 14.

### B. The Health Care Ban

SB 613 prohibits any "health care provider" from "knowingly provid[ing] gender transition

procedures to any child," defined as "any person under eighteen (18) years of age." SB 613 §§ 1(A)(1), 1(B). "Gender transition procedures" are defined by an enumerated list of "medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex." SB 613 § 1(A)(2)(a). Such procedures include "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex," or "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex." SB 613 § 1(A)(2)(a)(1)–(2). The Ban does not define "biological sex." But SB 613 excludes from the definition of banned procedures, *inter alia*, "medications prescribed … specifically for the purpose of treating precocious puberty or delayed puberty in that patient," "services provided to individuals born with ambiguous genitalia, incomplete genitalia, or both male and female anatomy, or biochemically verifiable disorder[s] of sex development," and treating conditions "caused by or exacerbated by" "gender transition procedures". SB 613 § 1(A)(2)(b)(3)–(5). Health care providers who violate SB 613 can be convicted of a felony and be found guilty of unprofessional conduct by their licensing board. *See* SB 613 § 2.

### C. The Health Care Ban Inflicts Severe and Irreparable Harms.

By cutting off access to treatment that transgender adolescents with gender dysphoria in Oklahoma rely on for their health and wellbeing and limiting future access to treatment, the Ban causes immediate, severe, and irreparable harm to all the Plaintiffs.

**The Poe Family:** Peter is a 12-year-old boy who is transgender. Peter Poe Decl. ¶¶ 2, 5. Peter has felt like a boy from a young age, and first asked his parents to call him by a boy's name when he was seven years old. *Id.* ¶¶ 7–8. When Peter started to go through puberty, he had extreme anxiety and trouble sleeping. *Id.* ¶ 9. Although he was initially afraid to tell his parents that he was

a boy, he finally told them when he was ten years old. *Id.* ¶¶ 10–11. Even though Peter is scared of needles, he takes Lupron shots to treat his gender dysphoria, and those injections stop him from going through puberty. *Id.* ¶¶ 12–13. He has been taking those shots for over a year, and he is scared about having to stop: he does not want to go back to getting a period or having his chest grow. *Id.* ¶ 14. When his mother told him that he might have to stop taking Lupron, he almost broke down: he felt powerless. *Id.* ¶ 15. He is scared about losing access to the puberty-delaying medication he needs, the changes his body would go through, and potentially having to leave Oklahoma to get medical care. *Id.* ¶¶ 16–17. Before starting Lupron, Peter's doctor explained the risks and benefits of puberty-delaying medication to Peter and his mother Paula. Paula Poe Decl. ¶ 14. Paula knows how upset Peter gets when he is unable to receive his puberty-delaying medication on time: he experiences breakthrough bleeding, which makes his gender dysphoria much worse, as does the thought that he might grow breasts. *Id.* ¶¶ 15, 20. Peter started to bloom once he began living as a boy: he is euphoric to be who he is. *Id.* ¶ 17. She worries about Peter's physical and mental health if he cannot continue receiving treatment, and that he might return to the suicidality and self-harm he experienced before starting puberty-delaying medications, or that he sometimes feels when his care is interrupted. *Id.* ¶ 21.

**The Doe Family:** Daphne is a 15-year-old girl who is transgender. Daphne Doe Decl. ¶¶ 2–3. Daphne lives with her grandmother, Donna Doe, her legal guardian. *Id.* ¶ 2; Donna Doe Decl. ¶ 2. Daphne has always felt more like a girl than a boy; beginning when she was a toddler, she repeatedly told her grandmother that she was a girl, that she felt like a girl in a "boy body," and always knew she preferred to hang out with other girls. Daphne Doe Decl. ¶¶ 4–5; Donna Doe Decl. ¶ 5. When Daphne started to go through puberty, she became "depressed, anxious, and withdrawn." Donna Doe Decl. ¶ 11. After a long period of counseling, Daphne was diagnosed with

gender dysphoria. *Id.* ¶¶ 10–13. When she was 13, Daphne began taking puberty-delaying medication; a year later, she began taking estrogen. *Id.* ¶ 14. The puberty-delaying medication stopped her body from developing like a boy's, which helped her tremendously: looking like a girl is very important to Daphne, because she is a girl. Daphne Doe Decl. ¶¶ 8, 11, 13. Daphne is more secure and less anxious now: the puberty-delaying medications gave her time to make the decision (with her grandmother) that she wanted to start estrogen, and the estrogen helps her look the way she wants. *Id.* ¶¶ 13–15. She is so glad that she was able to receive puberty-delaying medications before she experienced too much male puberty: she is more confident, can choose who to tell she is transgender (as opposed to being outed by the way she looks), and is no longer bullied. *Id.* ¶¶ 11, 13, 14–16. If she had to stop taking puberty-delaying medication or estrogen, she would go back to a male puberty, and she is afraid her dysphoria would get a lot worse. *Id.* ¶ 17. She just wants to live her life as a girl, the way she has been. *Id.* ¶ 19. Daphne is excelling in school, but without her medications, her grandmother is worried about her: before she transitioned, Daphne was very anxious and depressed, and had suicidal thoughts. Donna Doe Decl. ¶¶ 16, 19–20.

**The Boe Family:** Brandon Boe is a 17-year-old boy who is transgender. Brandon Boe Decl. ¶¶ 2, 4. Brandon told his parents that he was transgender just before he turned 15, but his father Benjamin Boe realizes that there were early and consistent signs that Brandon was a boy: Brandon always drew himself as a boy, refused to line up with girls in school, and threw a fit every time he was forced to wear a skirt. Benjamin Boe Decl. *Id.* ¶¶ 4–7. Brandon's parents did extensive research on how to support their son. *Id.* ¶¶ 8, 10. Initially, they wanted Brandon to wait until he turned 18 to undergo any medical treatments for his gender dysphoria, but they saw how isolated he was becoming without treatment. *Id.* ¶ 9. Brandon wouldn't speak in public, or even take his mask off, because he was so terrified of being misgendered. *Id.* ¶ 9. By the time Brandon started

testosterone to treat his gender dysphoria, he had been living socially as a boy for two years and had more than a year of therapy. *Id.* ¶ 10; Brandon Boe Decl. ¶¶ 10–11. Brandon's parents reviewed all of the literature the doctors gave them about hormone treatment and ensured that Brandon read every word. *Id.* ¶ 11; Benjamin Boe Decl. ¶ 11. Brandon has been taking testosterone for nine months and is much more confident: he goes out in public, and even has a job, which he would not have been able to do before starting hormones. Brandon Boe Decl. ¶ 12–14. Brandon's parents do not want to have to leave Oklahoma: their families have lived here for generations, and moving away would uproot their lives and everything their family knows. Benjamin Boe Decl. ¶¶ 18–20.

**The Loe Family:** Lydia is a 16-year-old girl and transgender. Lydia Loe Decl. ¶¶ 2, 5. Lydia has known for a long time that she is a girl. *Id.* ¶ 6. Lydia told two different foster care placements that she was a girl, and both rejected her. *Id.* ¶¶ 7–8. When Lydia was 14, she moved in with her adoptive mother, Lauren, but it took Lydia a year to trust Lauren enough to tell her that she was transgender. *Id.* ¶ 9. During the COVID-19 shutdown, Lauren homeschooled Lydia, which gave her time in a supportive environment to try on feminine hairstyles, makeup, and clothing. Lauren Loe Decl. ¶ 8. After more than a year of counseling leading to a gender dysphoria diagnosis, extensive tests, and conversations with Lydia's doctors about the risks and benefits of hormone therapy, Lydia started estrogen and spironolactone. *Id.* ¶ 11. With hormone treatment, Lydia acts more like herself: the difference in her mental health is night and day, and she seems more comfortable in her body. *Id.* ¶ 13. Lauren is very concerned about her daughter's mental and physical health if she is forced to stop taking estrogen; she is worried that Lydia will return to the suicidality and self-harm she experienced before treatment. *Id.* ¶ 15.

**The Roe Family:** Ryan is a 14-year-old boy who is transgender. Rachel Roe Decl. ¶¶ 5–6. Ryan began experiencing depression as he approached puberty. *Id.* ¶ 9. He started working with a

therapist and was eventually diagnosed with gender dysphoria. *Id.* ¶¶ 9, 11–12. Following the advice of his medical team, Ryan started period blockers and puberty delaying treatment. *Id.* ¶ 13. The medical treatment for his gender dysphoria, along with living and being recognized as his true self—a boy—has significantly improved his mental health. *Id.* ¶¶ 14–15. He is a confident and eloquent young man, but Rachel worries about his physical and mental health if he has to go through puberty inconsistent with his male identity. *Id.* ¶¶ 16–18. Being able to live as a boy has brought Ryan joy and happiness. Ryan Roe Decl. ¶ 28. He is immensely scared of being forced to live in a body that does not match who he is and terrified at losing access to his medical care. *Id.* ¶ 27. Because his family cannot leave Oklahoma, Ryan and his parents have discussed whether he should move to the East Coast and live with one of his mother's siblings, even though Oklahoma is the only home he has ever known. *Id.* ¶¶ 29–30.

**Dr. Shauna Lawlis:** Dr. Shauna Lawlis is a doctor at Oklahoma Children's Hospital, who is double board certified in pediatrics and in adolescent medicine. Lawlis Decl. ¶¶ 4, 6. She specializes in the care of transgender adolescents and gender diverse children and currently treats around 250 patients of varying ages, up to 24 years old, in Oklahoma. *Id.* ¶¶ 4–5. Since 2017, Dr. Lawlis has been providing care to transgender and gender diverse patients at Oklahoma Children's Hospital, including consultation for families with gender diverse children. *Id.* ¶¶ 6–7. When appropriate, for adolescent patients with gender dysphoria, she prescribes medications to delay puberty and provide gender-affirming hormone treatment. *Id.* Dr. Lawlis does so in accordance with evidence-based, well-accepted clinical practice guidelines, such as the WPATH Standards of Care and the Endocrine Society guidelines. *Id.* ¶ 8.

Since the passage of SB 3, and because of the Hospital Defendants' SB 3 Policy, Dr. Lawlis became credentialed to provide care and volunteer one day per week at Diversity Family Health,

where she currently sees her patients under 18 who require prescriptions for puberty-delaying medications and gender-affirming hormone therapy. *Id.* ¶ 17. As a result of the Health Care Ban, Dr. Lawlis is prohibited from providing puberty-delaying medications and gender-affirming hormone therapy to her transgender patients anywhere in Oklahoma, even though she is able to continue providing the same treatments to her cisgender patients to treat other conditions. *Id.* ¶ 19.

The Ban places Dr. Lawlis in the untenable position of complying by not providing her patients with gender dysphoria with the care that they need in accordance with the accepted standards of care and the tenets of her profession, or facing criminal prosecution, professional discipline, and even the loss of her license. *Id.* ¶¶ 20, 23. Dr. Lawlis is gravely concerned about her patients' ability to survive, much less thrive, if the Ban remains in effect. *Id.* ¶ 24. For Dr. Lawlis, the Ban's provision that existing care may be provided for six months "solely for the purpose of … gradually decreasing and discontinuing use of the drugs or hormones" is of little comfort, as the provision of sub-therapeutic doses of puberty-delaying medications and hormones will cause adolescent patients' gender dysphoria to worsen and will lead to physical changes inconsistent with their gender identity, some of which may not be reversible. *Id.* ¶¶ 25–26.

## ARGUMENT

### I. PRELIMINARY INJUNCTION STANDARD.

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The Court considers whether (1) the plaintiffs are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008)); *see* Fed. R. Civ. P. 65(a). The balance-of-harms and public-interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

If Plaintiffs make an especially strong showing on the irreparable harm, balance of the equities, and public interest factors of the preliminary injunction analysis, then the Court applies a "relaxed standard" to the likelihood of success on the merits factor, under which an injunction is warranted as long as "questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (quoting *Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006)), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

Plaintiffs must "show a reasonable probability that [they] will ultimately be entitled to the relief sought," *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (citation omitted), but not "a certainty of winning." *Coal. of Concerned Citizens To Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 901 (10th Cir. 2016) (citation omitted).

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM.

Prior to SB 613, transgender adolescents in Oklahoma could access medical care for the treatment of gender dysphoria. The Ban changes that status quo by singling out transgender adolescents for a categorical prohibition on medical treatments that remain available to others. The Ban classifies based on transgender status and sex, thereby triggering heightened equal protection scrutiny. The Ban cannot survive this "exacting" test. *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 555 (1996). Indeed, it fails even the most deferential standard of review.

### A. The Health Care Ban Is Subject to Heightened Equal Protection Scrutiny Because It Discriminates Based on Transgender Status and Sex.

Under the Equal Protection Clause, heightened scrutiny applies to classifications by sex

and certain "quasi-suspect classes." *Wasatch Equal. v. Alta Ski Lifts Co.*, 55 F. Supp. 3d 1351, 1360 (D. Utah 2014); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). Such classifications must be "substantially related to an important state interest." *Wasatch Equal.*, 55 F. Supp. 3d at 1360 (quoting *Mills v. Habluetzel*, 456 U.S. 91, 99 (1982)).

Because the Ban facially discriminates based on transgender status and sex, and because it was passed with a discriminatory purpose, it is subject to at least heightened scrutiny. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611–13 (4th Cir. 2020) (applying heightened scrutiny to discrimination based on sex and transgender status); *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (applying heightened scrutiny to discrimination based on transgender status); *Ray v. McCloud*, 507 F. Supp. 3d 925, 937–38 (S.D. Ohio 2020) (collecting cases).

### 1.     The Ban Discriminates Based on Transgender Status.

The Ban expressly classifies patients for differential treatment based on transgender status. A transgender person is, by definition, someone whose sex designated at birth is different from their gender identity. Janssen Decl. ¶ 29; Adkins Decl. ¶ 20. SB 613 explicitly bans "[g]ender transition procedures" for minors. SB 613 § 1(B). By targeting "gender transition," the law necessarily classifies based on transgender status: it is transgender people who undergo "gender transition" as part of treatment for gender dysphoria. But "a person cannot suffer from gender dysphoria without identifying as transgender." *Fain v. Crouch*, 618 F. Supp. 3d 313, 325 (S.D.W. Va. 2022); *see also C. P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *Kadel v. Folwell*, 2022 WL 11166311, at *4 (M.D.N.C. Oct. 19, 2022).  And the Ban singles out medical care that only transgender people need or seek. *See Fain*, 618 F. Supp. 3d at 327; *Toomey v. Arizona*, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 950 (W.D. Wis. 2018).

The Ban therefore expressly and exclusively targets transgender people by prohibiting medical treatments based on whether they "attempt[] to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex." *Eknes-Tucker*, 603 F. Supp. 3d at 1147 (explaining Alabama's ban on this care for minors "places a special burden on transgender minors because their gender identity does not match their birth sex").

### 2. The Ban Discriminates Based on Sex.

The Ban draws a classification based on sex in three distinct ways. First, the Ban speaks in explicit gendered terms and facially discriminates based on sex. Second, the Ban discriminates based on sex stereotypes relating to a person's sex assigned at birth. Third, the Ban discriminates based on sex because, as articulated above, it discriminates based on transgender status.

If the legislature cannot "writ[e] out instructions" for determining whether treatment is permitted "without using the words man, woman, or sex (or some synonym)," the law classifies based on sex. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1746 (2020). Here, the Ban prohibits medically necessary care when the care is provided in a manner the state deems "inconsistent with the minor's biological sex." SB 613 § 1(A)(2)(a). By "discriminating against transgender persons," the Ban "unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock*, 140 S. Ct. at 1746; *see Brandt*, 47 F.4th at 669 (by relying on "the minor's sex at birth," Arkansas' ban on gender-affirming care for minors "discriminates on the basis of sex").

The Ban likewise discriminates based on a person's failure to conform to sex stereotypes or expectations associated with a particular sex designated at birth. The Tenth Circuit has recognized, since *Bostock*, that discrimination "because of sex" includes discrimination based on transgender status. *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021). That holding is consistent with those from other circuits that "sex stereotyping based on a person's gender non-conforming behavior"—including a person's "failure to act and/or identify with his or

her" sex designated at birth—"is impermissible discrimination" under both federal civil rights statutes and the Equal Protection Clause. *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (per curiam) (cleaned up) (quoting *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004)).

"By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *accord Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011). When the government "penalizes a person identified as male at birth for traits or actions that it tolerates in" people "identified as female at birth,"—here, for example, receiving medical treatment to live in accordance with a female gender identity—the person's "sex plays an unmistakable and impermissible role." *Bostock*, 140 S. Ct. at 1741–42.

Here, the Ban explicitly enforces sex stereotypes and gender conformity by targeting health care for exclusion if the purpose of the care is to "attempt[] to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex." SB 613 § 1(A)(2)(a). Conversely, the Ban contains an explicit exception allowing for irreversible surgical interventions on infants with differences of sex development if the purpose of the surgery is to make the infant's body conform to their sex designated at birth.[1] SB 613 § 1(A)(2)(b)(4). By allowing and disallowing care based on sex designated at birth, the Ban is an impermissible "form of sex stereotyping where an individual is required effectively to maintain [their] natal sex characteristics." *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018); *see also Smith v. Avanti*, 249 F. Supp. 3d 1194, 1201 (D. Colo. 2017) (agreeing "discrimination based on applying

_____

[1] These surgeries have been widely criticized in the scientific literature and have far less evidence of efficacy than the procedures outlawed by the Ban. Antommaria Decl. ¶ 55.

14

gender stereotypes to someone who was assigned a certain sex … at birth, constitutes discrimination based on sex"); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019) ("[E]qual protection law should be particularly alert to the possibility of sex stereotyping in contexts where 'real' differences are involved, because these are the contexts in which sex classifications have most often been used to perpetuate sex-based inequality.") (citation omitted). The Ban "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020).

Finally, as the Supreme Court explained in *Bostock*, "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." 140 S. Ct. at 1741. As explained above, the Ban discriminates based on transgender status.

### 3. The Health Care Ban Was Passed for the Purpose of Drawing Sex- and Transgender Status-Based Distinctions.

Even if the Ban did not explicitly discriminate based on transgender status and sex, it would still be subject to heightened scrutiny as a law passed "because of," not "in spite of," its effects on transgender youth. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Oklahoma's intent to treat transgender patients differently also pervades the legislative history. And while bias is not required to show intent, throughout the legislative process, legislators made statements suggesting a bias against transgender people.[2] *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) ("contemporary statements by members of the decisionmaking body" are relevant to assessing legislative purpose); *see also* Compl. ¶¶ 101–117. Here, the Ban was just one part of a larger legislative strategy to discriminate against transgender people, including by

---

[2] One representative said that teenagers needed "biblical guidance," not "delusional play acting." Ben Felder, *Oklahoma House Approves Bill to Ban Insurance Coverage for Transgender Care*, OKLAHOMAN (Feb. 28, 2023, 4:30 PM), available at https://tinyurl.com/5xywe8tn.

restricting access to gender-affirming care for people of all ages.[3] In addition, the Ban was drafted with surgical precision such that it would impact *only* transgender persons seeking gender-affirming care. *See* Compl. ¶ 190; SB 613 § 1(A)(2)(b) (outlining circumstances in which procedures would not be banned). This context provides strong evidence that the Ban was adopted with the express purpose of targeting transgender people for disparate treatment.

### B. The Health Care Ban Fails Heightened Equal Protection Scrutiny.

To survive heightened scrutiny, Oklahoma must, at a minimum, provide an "exceedingly persuasive justification" for the Ban's classifications. *VMI*, 518 U.S. at 531. When evaluating whether the Ban is substantially related to an important governmental interest, "[t]he Court retains an independent constitutional duty to review [legislative] factual findings when constitutional rights are at stake." *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007). The "burden of justification is demanding"—not "deferential"—and it "rests entirely on the State." *VMI*, 518 U.S. at 533, 555. As discussed below, the government cannot possibly carry its demanding burden because of the broad medical consensus on the medical necessity for gender-affirming care and the absence of evidence-based alternatives to treat gender dysphoria, a serious medical condition. Nor is there any justification for treating gender-affirming health care differently from all other health care posing similar risks and benefits or supported by comparable evidence of efficacy.

### 1. There Is No Factual Support for Any Potential Justification of the Ban.

The Ban does not protect minors. To the contrary, providing gender-affirming care to adolescents with gender dysphoria is consistent with professional medical standards. *See Brandt*, 47 F.4th at 671 (Arkansas); *Eknes-Tucker*, 603 F. Supp. 3d at 1145 (Alabama). The widely-

---

[3] Legislators introduced fifteen bills to limit gender-affirming care, including for adults. *See, e.g.*, HB 1011 (proposing a ban up to 21 years old), available at https://tinyurl.com/dafb9unw; SB 345 (same), available at https://tinyurl.com/38jmf62y.

accepted protocols used to treat gender dysphoria were developed over decades based on rigorous review of existing evidence; are comparable to the types of guidelines used to treat other conditions; and are updated to respond to evolving scientific understandings of care and patient population needs, which is typical with clinical guidelines in medicine. Antommaria Decl. ¶¶ 27–36.

Gender-affirming care is neither harmful nor experimental. *See Brandt*, 47 F.4th at 671. The interventions prohibited by the Ban are safe, effective, and supported by peer-reviewed longitudinal and cross-sectional studies. Turban Decl. ¶ 14. Further, the treatment is not experimental in the colloquial or the scientific sense, and the risks associated with the care are comparable to the risks parents and adolescents assume in many other treatment decisions, including those explicitly permitted by the Ban. Antommaria Decl. ¶¶ 27, 31, 52.

Rather than "harming" children, gender-affirming medical care greatly improves the health and well-being of adolescent patients with gender dysphoria. Adkins Decl. ¶ 46; Turban Decl. ¶¶ 15–18; Janssen Decl. ¶¶ 72–78. Practitioners' clinical experience is bolstered by the nearly two decades of research—including published, peer-reviewed, cross-sectional, and longitudinal studies—likewise demonstrating that the proscribed care reduces symptoms of anxiety, depression, and suicidality and improves health outcomes for adolescent patients. Turban Decl. ¶¶ 15–18; Janssen Decl. ¶ 72. The personal experiences of the Minor Plaintiffs and their parents illustrate how this treatment positively transforms the lives of the adolescents who need it. Rather than harming them, gender-affirming care has enabled them to thrive.

### 2. Treating Gender-Affirming Care Differently from Medical Treatments with Comparable Risks, Benefits, and Scientific Support Is Unjustifiable.

The Ban further fails heightened scrutiny because Oklahoma can provide no justification for treating gender-affirming care differently from other medical treatments with similar risks and benefits and comparable scientific support. There is nothing uniquely risky about the care provided

to transgender minors to treat gender dysphoria when compared to any other type of health care. Pubertal suppression, testosterone, estrogen and testosterone suppression are used to treat other conditions and carry comparable risks and side effects regardless of the indication for which they are prescribed. Adkins Decl. ¶ 58. "[T]he risks related to hormone therapy and puberty suppression generally do not vary based on the condition they are being prescribed to treat, and the same hormones are used for a variety of indications in addition to gender dysphoria." *Id*. The fact that gender-affirming care has risks does not distinguish it from other forms of treatment. *Id.* ¶ 65.

To the extent that the Ban addresses any purported risk to fertility, no such risk applies to some of the banned procedures and, for those for which the risk exists, it is not unique to gender-affirming care. Puberty-delaying medications on their own do not affect fertility, and many patients treated with hormone therapy are able to biologically conceive children. Adkins Decl. ¶ 60. Chest masculinization surgery also has no effect on fertility. *Id*. For treatment that can affect fertility, there are ways to adjust the treatment to protect fertility if that is important to the patient and their family. Antommaria Decl. ¶¶ 45–46. Further, this is not the only type of medical care that can affect fertility, but it is the only care banned under the law. Adkins Decl. ¶¶ 61–62.

The evidence supporting the safety and efficacy of the banned care is comparable to the evidence supporting treatment for permitted conditions. The Ban explicitly permits the use of puberty-delaying medication to treat precocious puberty, but bans the same medication to treat gender dysphoria even though the evidence base supporting each treatment is the same. Antommaria Decl. ¶ 33. As discussed above, puberty-delaying medication and gender-affirming hormone therapy to treat gender dysphoria in adolescents are not experimental. But even if they were, Oklahoma does not ban the use of experimental treatments solely on that basis.

These justifications for the Ban cannot provide an "exceedingly persuasive" explanation

for why gender-affirming care should be treated differently from all other medical treatment.

### C. The Health Care Ban Fails Any Level of Review.

Although the Ban is properly subject to heightened scrutiny, it ultimately fails any level of review. What the law does is "so far removed from [the asserted] justifications that . . . it [is] impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996). Rather than protect children, the Ban harms them. There is no rational basis to conclude that allowing adolescents with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten legitimate interests of [Oklahoma] in a way that" allowing other types of care "would not." *City of Cleburne*, 473 U.S. at 448; *see also Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people while allowing access for married people). Even under rational basis review, the justifications for the Ban "ma[k]e no sense in light of how the [statute] treat[s] other [procedures] similarly situated in relevant respects." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001).

Finally, an improper motive for legislation can arise "not from malice or hostile animus alone" but "may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Id.* at 374 (Kennedy, J., concurring). That is precisely the case here and is another reason the Ban fails any level of review.

### III. THE PARENT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE HEALTH CARE BAN VIOLATES PARENTS' FUNDAMENTAL RIGHT TO PARENTAL AUTONOMY.

The Ban triggers strict scrutiny because it burdens the fundamental rights of parents to seek appropriate medical care for their minor children. As discussed above, the Ban cannot survive any level of constitutional scrutiny, let alone the most stringent review required for intrusions into

fundamental rights. Accordingly, the Parent Plaintiffs are likely to succeed on the merits of their substantive due process claim. *See Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892–93 (E.D. Ark. 2021) (holding that plaintiffs' parents were likely to succeed on similar claims because they "have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary"), *aff'd*, 47 F.4th 661 (8th Cir. 2022); *Eknes-Tucker*, 603 F. Supp. 3d at 1146 (holding that plaintiffs were likely to succeed on similar claims against Alabama).

### A. Strict Scrutiny Applies to the Parent Plaintiffs' Due Process Claims.

The Due Process Clause protects "against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The government cannot "infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Kitchen v. Herbert*, 755 F.3d 1193, 1218 (10th Cir. 2014) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

Strict scrutiny applies to "parents' substantive due process right . . . to direct their children's medical care." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019). To be sure, in some instances, "the State must play its part as parens patriae," and "the juvenile's liberty interest may . . . be subordinated to the State's 'parens patriae interest in preserving and promoting the welfare of the child.'" *Schall v. Martin*, 467 U.S. 253, 265 (1984); *see also Kanuszewski*, 927 F.3d at 419–20 (strict scrutiny would apply to mandatory neonatal blood draws to "screen[] for life-threatening diseases," but such requirement "may well" satisfy strict scrutiny "provided that the state operates the program for purely benevolent motives"). Here, the Ban prohibits care when a parent and child are in agreement. There is no situation where a minor will access the care subject to the Ban without the consent of their legal guardian, and certainly no

world where a parent may decide ***for*** their child that gender-affirming care is needed over the minor's objection. *See* Adkins Decl. ¶¶ 35, 37. Thus, every application of the Ban necessarily substitutes the judgment of the State for the aligned wishes of the parent and child. *See Brandt*, 551 F. Supp. 3d at 892 (similar statute infringed "right to seek medical care for their children… in conjunction with their adolescent child's consent and their doctor's recommendation").

When the parent's and child's liberty interests in pursuing a course of medical care align, the strength of those interests against state interference is at its apex. *Cf. Santosky v. Kramer*, 455 U.S. 745, 760–61 (1982) (heightened evidentiary standards required where the "vital interest" of the parent and child in preserving their relationship "coincide."). The Ban deprives the Minor Plaintiffs and their parents of the right to seek what every major medical association has recognized is safe, effective, and necessary care, and in so doing it ***endangers*** children against their wishes and the wishes of their parents. "Parents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether [gender-affirming] medications are in a child's best interest on a case-by-case basis." *Eknes-Tucker*, 603 F. Supp. 3d at 1146.

## B.    The Health Care Ban Cannot Survive Strict Scrutiny.

As discussed above, the Ban cannot survive any level of review, and thus necessarily fails the strict scrutiny that intrusions into fundamental rights require of the court. In addition to the reasons discussed above, the Ban fails strict scrutiny because the means chosen by Oklahoma to address any purported concerns about the banned care are nowhere near the "least restrictive." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

Nothing about the Ban is narrowly tailored to ***any*** interest. Rather than address any particularized concerns, the Ban simply rules out ***all*** medical treatment for gender dysphoria in adolescents. As the court noted in enjoining a similar Alabama law, "[t]he Act, unlike the cited European regulations, does not even permit minors to take transitioning medications for research

purposes, [despite maintaining] that more research on them is needed. . . . Because Defendants themselves offer several less restrictive ways to achieve their proffered purposes, the Act is not narrowly tailored." *Eknes-Tucker*, 603 F. Supp. 3d at 1146. Moreover, any hypothetical goal of protecting children "is pretextual because [the statute] allows the same treatments for cisgender minors that are banned for transgender minors as long as the desired results conform with the stereotype of the minor's biological sex." *Brandt*, 551 F. Supp. 3d at 893. "Based on these findings, the State could not withstand either heightened scrutiny or rational basis review." *Id.*

## IV.   A PRELIMINARY INJUNCTION IS NECESSARY.

### A.   Plaintiffs Will Suffer Immediate and Irreparable Harm If the Health Care Ban is Not Blocked.

If the Ban is not blocked, Plaintiffs will suffer serious and irreparable harm for which there is no adequate remedy at law. *See Free the Nipple-Fort Collins*, 916 F.3d at 806. As discussed above, the Ban violates the constitutional rights of adolescents and their parents, which is itself irreparable harm. "[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (citation omitted); *see Free the Nipple-Fort Collins*, 916 F.3d at 805–06 (claim that city ordinance discriminated on the basis of sex in violation of equal protection rights necessarily satisfied irreparable injury requirement).

But the irreparable harm here is far greater than just the deprivation of the Plaintiffs' constitutional rights. The Ban prohibits life-saving medical care by preventing the initiation of treatment and cutting patients off from treatment, forces families to watch their children suffer while incurring the significant expense of regular travel or relocation out-of-state to access care, and compels medical providers to abandon their patients by threatening their medical licenses.

**Patients:** As a result of the Ban, Peter Poe, Daphne Doe, Brendan Boe, Lydia Loe, and

Ryan Roe are at risk of losing the medical treatment that has allowed them to thrive. They are already experiencing severe anxiety and distress at the prospect of losing care. And the harm from this loss of care will be immediate: SB 613 limits existing care over the next six months solely to "gradually decreasing and discontinuing" it. *See* SB 613 § 1(A)(2)(b)(7). Many of the Minor Plaintiffs already experience worsening gender dysphoria during temporary interruptions in their existing care: a prolonged and intentional deprivation of care would be excruciating. For Peter Poe, this could mean being forced into his endogenous puberty that has been paused for over a year, causing him to develop physiological characteristics inconsistent with his gender. Peter Poe Decl. ¶ 16. For Lydia Loe, this could mean being forced to develop secondary sex characteristics typical of men and catastrophic to her identity as a young woman. Lydia Loe Decl. ¶ 17. For Brendan Boe, it would mean losing his newfound confidence and ability to participate in public life. Brandon Boe Decl. ¶¶ 12–16. For Ryan Roe, he would lose the euphoria he has gained living as his true self. Ryan Roe Decl. ¶¶ 19–22, 28. For Daphne Doe, she would experience male puberty causing her to develop an Adam's apple and grow facial hair, which would threaten her mental health and comfort in her own body. Daphne Doe Decl. ¶ 17. As the Minor Plaintiffs describe, losing this treatment after finally feeling relief and confidence is unimaginable. Peter Poe Decl. ¶ 16; Lydia Loe Decl. ¶ 17; Brandon Boe Decl. ¶ 16; Ryan Roe Decl. ¶ 23; Daphne Doe Decl. ¶ 18. The law will also irreparably harm Dr. Lawlis's minor patients who will have their medical treatment terminated. Without treatment, her patients could face worsening dysphoria, anxiety, distress, and suicidality. Lawlis Decl. ¶¶ 22–27. Here, the emotional distress the Minor Plaintiffs will face upon potentially losing care will be compounded by undergoing physiological changes that may be irreversible or later require surgery to reverse. Adkins Decl. ¶ 70. And the Ban's exception for care in the next six months to be provided "solely for the purpose of … gradually decreasing and

discontinuing use of the drugs or hormones" provides no solace: whether care is withdrawn abruptly or gradually, the deprivation of medically necessary, evidence-based care for gender dysphoria will severely and irreparably harm those minors currently receiving treatment. *Id.* ¶ 72; Lawlis Decl. ¶¶ 25–27.

**Parents:** If the Ban is not blocked, the Parent Plaintiffs will have their parental decision-making displaced by the state, forcing them either to watch their minor children suffer immense and possibly deadly pain or disrupt their lives and families to travel or move out of state for treatment. Paula Poe Decl. ¶¶ 21–22; Lauren Loe Decl. ¶ 15; Benjamin Boe Decl. ¶¶ 13–14; Rachel Roe Decl. ¶¶ 19–22; Donna Doe Decl. ¶¶ 20–21.

**Dr. Lawlis:** The Ban irreparably harms Dr. Lawlis by requiring her to make the untenable decision to either follow the law (and in so doing violate her professional obligations by sacrificing the health of her patients) or provide medically-necessary care to her patients consistent with established clinical practice guidelines, standards of care, and the tenets of the medical profession (and in so doing risk the loss of her medical license and her livelihood). Lawlis Decl. ¶¶ 22–27.

A preliminary injunction is necessary to prevent these severe and irreparable harms.

B.    **The Balance of Equities Weigh in Plaintiffs' Favor and Issuance of the Preliminary Injunction is in the Public Interest.**

The balance of the harms and the public interest, which "merge when, like here, the government is the opposing party," also favor an injunction. *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). The threat of harm to Plaintiffs far outweighs Defendants' interests in immediately enforcing the Ban, and preserving Plaintiffs' constitutional rights is in the public interest. *See Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights" (citation omitted)). A preliminary injunction is warranted here: the balance of equities decidedly favors the moving party, in which

case the court should preserve the status quo until the case can be decided on the merits.

The harm to Plaintiffs from allowing the Ban to go into effect would be tangible, immediate, and irreparable. Whatever interest the State may have in enforcing the Ban during the pendency of this case pales in comparison to Plaintiffs' certain and severe harm. Oklahoma has little to no cognizable interest in immediately enforcing the Ban because it is "likely unconstitutional." *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014) (when a law is likely unconstitutional, "the interests of those the government represents, such as voters, do not outweigh a plaintiff's interest in having its constitutional rights protected" (citation and alterations omitted)).

### C.    A Facial Statewide Injunction Is Necessary.

"[T]he scope of injunctive relief is dictated by the extent of the violation established," which here is statewide. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction for just the Plaintiffs is insufficient because patients cannot receive health care without an injunction allowing third parties to provide it. The Ban impacts medical providers, pharmacists, parents, and adolescents across Oklahoma, not just the individual Plaintiffs. Because of the limited exception for continuing care "solely for the purpose of … gradually decreasing and discontinuing use of the drugs or hormones," SB 613 § 1(A)(2)(b)(7), "third parties will likely react in predictable ways . . . even if they do so unlawfully," such that the breadth and scope of harm from the Ban is immediate and statewide. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). Facial relief is necessary to prevent irreparable harm. *See Brandt*, 47 F.4th at 672.

### CONCLUSION

Plaintiffs respectfully request the Court grant this Motion and enjoin the enforcement of SB 613 until decision on merits of Plaintiffs' claims and grant such other relief that the Court deems just and proper. Given the Ban's grave harms, Plaintiffs request a hearing as soon as practicable. Defendants are being served with the motion papers immediately.

Date:   May  2, 2023

/s/ *Megan Lambert*
Megan Lambert
   (OBA# 33216)
**American Civil Liberties Union**
  **Foundation of Oklahoma**
P.O. Box 13327
Oklahoma City, OK 73113
(405) 524-8511
mlambert@acluok.org

Chase Strangio*
Harper Seldin*
**American Civil Liberties Union**
  **Foundation**
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
cstrangio@aclu.org
hseldin@aclu.org

Laura J. Edelstein*
**Jenner & Block LLP**
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com

Luke C. Platzer*
Madeleine V. Findley*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
LPlatzer@jenner.com

Lauren M. Greene*
Blaine R. Valencia*
**Jenner & Block LLP**
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2246
(213) 239-5100
LGreene@jenner.com
BValencia@jenner.com

*Application for admission pro hac vice
forthcoming.*

Respectfully submitted

Omar Gonzalez-Pagan*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Shelly L. Skeen*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
Oak Lawn Ave, Ste. 500
Dallas, TX 75219
(214) 219-8585
sskeen@lambdalegal.org

Sasha Buchert*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
1776 K Street, N.W., 8th Floor
Washington, DC  20006
(202) 804-6245
sbuchert@lambdalegal.org

Remi Jaffre*
**Jenner & Block LLP**
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
RJaffre@jenner.com

Lillian M. McGuire*
Jocelyn Sitton*
Daniel L. Robertson*
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
LMcGuire@jenner.com
JSitton@jenner.com
DRobertson@jenner.com

**CERTIFICATE OF SERVICE**

I hereby certify that this motion will be served concurrently with the service of the Summonses and Complaint in this matter.

<div style="margin-left: 40%;">

*/s/ Megan Lambert*
Megan Lambert
Oklahoma Bar Number: 33216
American Civil Liberties Union of
Oklahoma Foundation
P.O. Box 13327
Oklahoma City, OK 73113
(405) 524-8511
mlambert@acluok.org
*Counsel for Plaintiffs*

</div>