**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

PETER POE, et al.,

                        *Plaintiffs*,

       v.

GENTNER DRUMMOND, et al.,

                       *Defendants*.

Case No. 23-CV-00177-JFH-SH

**STATEMENT OF INTEREST OF THE UNITED STATES**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

INTEREST OF THE UNITED STATES ...................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.    Transgender Youth and Their Need for Medically Appropriate Gender-Affirming Care... 2

    II.    Oklahoma Senate Bill 613 ..................................................................................... 5

        A.    The Text of the Statute ...................................................................................... 6

        B.    Legislative History ........................................................................................... 8

DISCUSSION ............................................................................................................... 9

    I.    SB 613's Ban on Gender-Affirming Medical Care Warrants Intermediate Scrutiny Under the Equal Protection Clause. ......................................................................... 9

        A.    SB 613's Ban on Gender-Affirming Medical Care is Subject to Intermediate Scrutiny Because It Discriminates on the Basis of Sex. ................................... 10

        B.    SB 613's Ban on Gender-Affirming Medical Care is Subject to Intermediate Scrutiny Because It Discriminates Against Transgender Individuals, a Quasi-Suspect Class. ........... 13

    II.    SB 613's Ban on Gender-Affirming Care Cannot Survive Intermediate Scrutiny............ 17

        A.    SB 613 is Not Substantially Related to Oklahoma's Purported Interest of Protecting Youth. ................................................................................................ 18

        B.    The Claimed Interest of Protecting Youth is Not "Genuine" and is Instead Pretextual. 21

CONCLUSION............................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) (en banc) ................................................................. 10

*Adkins v. City of New York*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015) ............................................................... 14, 16

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016) ............................................................. 14, 16

*Bostock v. Clayton County*,
   140 S. Ct. 1731 (2020) .................................................................................... 10

*Bowen v. Gilliard*,
   483 U.S. 587 (1987) .................................................................................... 15-16

*Brandt by and through Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022), *reh'g en banc denied*, 2022 WL 16957734
   (8th Cir. Nov. 16, 2022) ............................................................................ 11-12

*Brown v. Zavaras*,
   63 F.3d 967 (10th Cir. 1995) ..................................................................... 11, 14-15

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) .................................................................................... 15, 23

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) (plurality opinion) .................................................................. 17

*Clark v. Jeter*,
   486 U.S. 456 (1988) .................................................................................... 10

*Craig v. Boren*,
   429 U.S. 190 (1976) .................................................................................... 17

*Doe v. Ladapo*,
   No. 4:23-cv-114-RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6, 2023) .................. 11, 18, 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) .................................................................................... 21

*Eknes-Tucker v. Marshall*,
   603 F. Supp. 3d 1131 (M.D. Ala. 2022), *appeal filed*, No. 22-11707
   (11th Cir. May 18, 2022) .............................................................................. 2, 11

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017) ................................................................... 14

*F.V. v. Barron*,
286 F. Supp. 3d 1131 (D. Idaho 2018), *decision clarified sub nom. F.V. v. Jeppesen*,
477 F. Supp. 3d 1144 (D. Idaho 2020) ................................................................. 14

*Flack v. Wis. Dep't of Health Servs.*,
328 F. Supp. 3d 931 (W.D. Wisc. 2018) ............................................................... 14

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ................................................................. 12, 18

*Griffith v. El Paso County*,
No. 21-cv-00387-CMA-NRN, 2023 WL 3099625, at *7-*8 (D. Colo. Mar. 27, 2023),
*appeal filed*, No. 23-1135 (10th Cir. Apr. 26, 2023) ................................. 11, 13-14

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ............................................... 10, 12, 14-16

*Gross v. German Found. Indus. Initiative*,
456 F.3d 363 (3d Cir. 2006) .......................................................................... 1

*Heller v. Doe by Doe*,
509 U.S. 312 (1993) ..................................................................................... 23

*Holloway v. Arthur Andersen & Co.*,
566 F.2d 659 (9th Cir. 1977) ........................................................................ 14

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ...................................................................... 14

*Kirchberg v. Feenstra*,
609 F.2d 727 (5th Cir. 1979) ........................................................................ 19

*L.W. v. Skrmetti*,
No. 3:23-cv-00376, 2023 WL 3513302 (M.D. Tenn. May 16, 2023) ..................... 2

*Lyng v. Castillo*,
477 U.S. 635 (1986) .............................................................................. 13, 15-16

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
286 F. Supp. 3d 704 (D. Md. 2018) ............................................................. 14, 17

*Miss. Univ. for Women v. Hogan*,
458 U.S. 718 (1982) ............................................................................... 17-18, 21

*Norsworthy v. Beard*,
87 F. Supp. 3d 1104 (N.D. Cal. 2015) ............................................................... 14

*Palmore v. Sidoti*,
466 U.S. 429 (1984) ........................................................................ 23

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) ........................................... 14, 16

*Romer v. Evans*,
517 U.S. 620 (1996) ....................................................................... 21-22

*Smith v. City of Salem*,
378 F.3d 566 (6th Cir. 2004) .......................................................... 12

*SmithKline Beecham Corp. v. Abbott Labs.*,
740 F.3d 471 (9th Cir. 2014) .......................................................... 18

*Tudor v. Se. Okla. State Univ.*,
13 F.4th 1019 (10th Cir. 2021) ....................................................... 10

*United States v. Virginia*,
518 U.S. 515 (1996) ....................................................................... 17-19, 21

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ........................................................................ 18, 23

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ....................................................................... 21-23

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by*
*Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) .............................. 12, 15

## Constitutional Provisions

U.S. Const. amend. XIV ...................................................................... *passim*

## Statutes

28 U.S.C. § 517 ................................................................................ 1

Okla. Stat. tit. 59, § 503 .................................................................... 7

Okla. Stat. tit. 59, § 567.8 ................................................................. 7

## Regulations

86 Fed. Reg. 7,023 (Jan. 25, 2021) .................................................... 1

## INTRODUCTION

The State of Oklahoma recently enacted a statute that criminalizes the provision of medically necessary health care to children and adolescents and subjects health care providers to potential civil liability and license revocation. Senate Bill 613 ("SB 613") conditions the medical care a minor may receive on the sex that person was assigned at birth, prohibiting health care providers from administering medically necessary care for transgender minors with a diagnosis of gender dysphoria, while leaving non-transgender minors free to receive the same procedures and treatments. The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517[1] to advise the Court of the United States' view that, by denying transgender minors—and only transgender minors—access to medically necessary and appropriate care, SB 613 violates the Equal Protection Clause of the Fourteenth Amendment. Accordingly, Plaintiffs are likely to succeed on the merits of their equal protection claim. *See* Pls.' Mot. for Prelim. Inj. (Dkt. 5).[2]

## INTEREST OF THE UNITED STATES

The United States has a strong interest in protecting individual and civil rights, including the rights of transgender persons, and in the consistent application across the country of constitutional standards to the rights of transgender persons. Executive Order 13,988 recognizes the right of all people to be "treated with respect and dignity," "to access healthcare . . . without

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." *See Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 384 (3d Cir. 2006) ("The United States Executive has the statutory authority [under 28 U.S.C. § 517], in any case in which it is interested, to file a statement of interest . . . ."). While the United States does not interpret this statute to require leave to file this brief, the United States respectfully requests leave of Court if the Court interprets this statute differently.

[2] The United States expresses no view on any issues in this case other than those set forth in this brief.

1

being subjected to sex discrimination," and to "receive equal treatment under the law, no matter their gender identity or sexual orientation." 86 Fed. Reg. 7,023 (Jan. 25, 2021).

The United States has, for example, intervened in litigation challenging an Alabama law imposing a felony ban on the provision of gender-affirming care to minors and obtained a preliminary injunction to halt enforcement of the law. *See Eknes-Tucker v. Marshall,* 603 F. Supp. 3d 1131, 1151 (M.D. Ala. 2022) (enjoining enforcement), *appeal filed*, No. 22-11707 (11th Cir. May 18, 2022); U.S. Am. Compl. in Intervention, Dkt. 92, *Eknes-Tucker v. Marshall*, No. 2:22-cv-184-LCB-SRW (M.D. Ala. May 4, 2022). The United States also has intervened in litigation challenging a Tennessee law that bans the provision of gender-affirming medical care to transgender minors. *L.W. v. Skrmetti*, No. 3:23-cv-00376, 2023 WL 3513302 (M.D. Tenn. May 16, 2023) (granting intervention); U.S. Compl. in Intervention, Dkt. 38-1, *L.W. v. Skrmetti*, No. 3:23-cv-00376 (M.D. Tenn. Apr. 26, 2023). *See also* U.S. Statement of Interest, Dkt. 37, *Doe v. Thornbury*, No. 3:23-cv-00230-DJH (W.D. Ky. May 31, 2023); U.S. Statement of Interest, Dkt. 19, *Brandt v. Rutledge*, 4:21-cv-00450 (E.D. Ark. June 17, 2021); Br. for the U.S. in Supp. Pls.-Appellees, *Brandt by & through Brandt v. Rutledge*, No. 21-2875 (8th Cir. Jan. 25, 2022).

## BACKGROUND

**I.    Transgender Youth and Their Need for Medically Appropriate Gender-Affirming Care**

Transgender people are individuals whose gender identity does not conform with the sex they were assigned at birth.[3] A transgender boy is a child or youth who was assigned a female sex at birth but whose gender identity is male; a transgender girl is a child or youth who was assigned a male sex at birth but whose gender identity is female. By contrast, a non-transgender, or

---

[3] Declaration of Deanna Adkins, MD (Dkt. 6-3) ¶¶ 19-20 [hereinafter Adkins Decl.]; Declaration of Aron Janssen, MD (Dkt. 6-2) ¶ 29 [hereinafter Janssen Decl.].

cisgender, child has a gender identity that corresponds with the sex the child was assigned at birth. A person's gender identity is innate.[4]

According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders,[5] "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.[6] To be diagnosed with gender dysphoria, the incongruence between sex assigned at birth and gender identity must persist for at least six months and be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning.[7] The inability of transgender youth to live consistent with their gender identity due to the irreversible physical changes that accompany puberty can have significant negative impacts on their overall health and wellbeing.[8] Thus, the delay or denial of medically necessary treatment for gender dysphoria causes many transgender minors to develop serious co-occurring mental health conditions, such as anxiety, depression, and suicidality.[9]

---

[4] Adkins Decl. ¶ 21; Janssen Decl. ¶¶ 30, 33-34.

[5] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2022), https://perma.cc/FM78-QMZ2.

[6] Adkins Decl. ¶ 22; Janssen Decl. ¶¶ 38-39; Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C (Dkt. 6-16) ¶ 29 [hereinafter Antommaria Decl.].

[7] Adkins Decl. ¶ 22; Janssen Decl. ¶¶ 40, 44-45.

[8] Adkins Decl. ¶¶ 33, 67-70; Antommaria Decl. ¶ 43; Janssen Decl. ¶ 59.

[9] Adkins Decl. ¶¶ 23, 63, 67-70; Antommaria Decl. ¶ 50; Janssen Decl. ¶¶ 32, 81; Declaration of Jack Turban, M.D. (Dkt. 6-4) ¶¶ 12, 22 [hereinafter Turban Decl.]; *see* Substance Abuse and Mental Health Services Administration (SAMHSA), *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGTBQI+ Youth*, SAMHSA Publication No. PEP22-03-12-001 (2023), at 14, https://perma.cc/2SJU-8K66 [hereinafter *SAMHSA Report*] ("Withholding timely gender-affirming medical care when indicated . . . can be harmful because these actions may exacerbate and prolong gender dysphoria.") (footnotes omitted)).

Several well-established medical organizations, including the World Professional Association for Transgender Health ("WPATH"), the Endocrine Society, and the American Academy of Pediatrics ("AAP"), have published standards of care for treating transgender youth diagnosed with gender dysphoria.[10] These standards of care provide a framework that is based on the best available science and clinical experience, and are widely accepted and endorsed for the treatment of gender dysphoria in children and adolescents.[11] Generally, these organizations recommend that pre-pubertal children with gender dysphoria receive treatments that may include supportive therapy, encouraging support from loved ones, and assisting the young person through elements of a social transition.[12] What social transition means for an individual may evolve over time and can include a name change, pronoun change, bathroom and locker use, personal expression, and communication of affirmed gender to others.[13]

Medical organizations such as WPATH, the Endocrine Society, and AAP recommend that additional treatments involving medications may be appropriate for some adolescents.[14] After the onset of puberty, treatment options include the use of gonadotropin-releasing hormone agonists to prevent progression of pubertal development (also called "puberty blockers") and hormonal interventions such as testosterone and estrogen administration using a gradually increasing dosage

---

[10] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1 (2022), https://perma.cc/V639-K6FQ [hereinafter *WPATH Standards*]; Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) Pediatrics 1 (2018), https://perma.cc/D4R6-GP6C [hereinafter *AAP Statement*]; Wylie Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism 3869 (2017), https://perma.cc/8R3P-6NQY [hereinafter *ES Standards*].

[11] Adkins Decl. ¶ 26; Antommaria Decl. ¶ 29; Janssen Decl. ¶ 48.

[12] *See WPATH Standards* at S75-76; *AAP Statement* at 4-6; *see also* Adkins Decl. ¶ 32.

[13] *See WPATH Standards* at S76; *AAP Statement* at 6; *see also* Adkins Decl. ¶ 32.

[14] Adkins Decl. ¶¶ 33-37; Janssen Decl. ¶ 59.

schedule.[15] The guidelines make clear that gender-affirming medical care for transgender adolescents diagnosed with gender dysphoria should only be recommended when certain criteria are met.[16] These criteria include: when the adolescent meets the diagnostic criteria of gender dysphoria as confirmed by a qualified mental health professional; when the experience of gender dysphoria is marked and sustained over time; when gender dysphoria worsens with the onset of puberty; when the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; when the adolescent's other mental health concerns (if any) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and when the adolescent has been informed of any risks.[17] WPATH's guidelines also emphasize that an individualized approach to clinical care for transgender adolescents is both ethical and necessary and recommend a multidisciplinary approach.[18] The guidelines state that the available data reveal that pubertal suppression for transgender youth generally leads to improved psychological functioning in adolescence and young adulthood.[19]

## II.     Oklahoma Senate Bill 613

On May 1, 2023, Governor J. Kevin Stitt signed SB 613 into law. The bill became immediately effective under the bill's "emergency" provision. On May 18, 2023, Plaintiffs and

---

[15] Adkins Decl. ¶¶ 33-34, 36; Janssen Decl. ¶¶ 59, 61; *WPATH Standards* at S116.

[16] *See WPATH Standards* at S59-S66; *ES Standards* at 3878; *AAP Statement* at 4-5.

[17] *See id.*

[18] *See WPATH Standards* at S45 and S56.

[19] *See WPATH Standards* at S47; *ES Standards* at 3882; *AAP Statement* at 5; *see also SAMHSA Report* at 37 ("Access to gender affirmation can reduce gender dysphoria and improve mental and physical health outcomes among transgender and gender-diverse people . . . .").

certain Defendants[20] stipulated that Defendants would not enforce SB 613 pending resolution of Plaintiffs' Motion for a Preliminary Injunction. *See* Dkt. 41.

### A.  The Text of the Statute

SB 613 provides that a "health care provider shall not knowingly provide gender transition procedures to any child," § 1(B), defined as any person under the age of eighteen, § 1(A)(1). The statute defines "gender transition procedures" as "medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," specifically "(1) surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex," and "(2) puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex." § 1(A)(2)(a). The statute does not define "biological sex."[21] Excluded from the definition of "gender transition procedures," and therefore from the statute's prohibitions, are "services provided to individuals born with ambiguous genitalia, incomplete genitalia, or both male and female anatomy, or biochemically verifiable disorder of sex development . . . ." § 1(A)(2)(b)(4). "Disorders of sex development" are also known as intersex traits.[22]

---

[20] These are: Oklahoma Attorney General Gentner Drummond, Members of the Oklahoma State Board of Medical Licensure and Supervision, Members of the Oklahoma Board of Nursing, and Members of the Oklahoma State Board of Osteopathic Examiners. *See* Dkt. 41.

[21] The term "biological sex" is less precise than term "sex assigned at birth." This is because the physiological aspects of a person's sex are not always aligned. Adkins Decl. ¶ 22 n.1; *see also id.* (referring to literature explaining that "the terms biological sex and biological male or female are imprecise and should be avoided"). For example, a person with intersex traits may have chromosomes typically associated with males but genitalia typically associated with females. *Id.* For these reasons, unless referring to SB 613's text, this brief uses the term "sex assigned at birth."

[22] Antommaria Decl. ¶ 11.

The statute requires that health care providers stop providing gender-affirming care to minors who have already been receiving it. It includes a phase-out period, allowing for "the provision of puberty-blocking drugs or cross-sex hormones to a minor currently receiving such drugs or hormones as of the effective date of this act for a period of not more than six (6) months solely for the purpose of assisting the minor with gradually decreasing and discontinuing use of the drugs or hormones." § 1(A)(2)(b)(7).

SB 613 imposes five potential consequences for violations. First, a health care provider who provides gender-affirming care to a minor may be charged with a felony, with the statute of limitations extending through the minor's forty-fifth birthday. § 1(D). Second, the "parent, guardian, or next friend" of the minor may bring a civil cause of action against the provider for compensatory and punitive damages and injunctive relief, with the statute of limitations extending through the minor's eighteenth birthday. § 1(E)(1), (3). Third, the minor may bring a civil cause of action against the provider for the same relief, with the statute of limitations extending through the minor's forty-fifth birthday. § 1(E)(2), (3). Fourth, the Oklahoma Attorney General may "bring an action to enforce compliance" with the statute. § 1(F). Fifth, the health care provider's actions in providing such services constitute "unprofessional conduct," §§ 3(C), 2-5, subjecting the provider to sanctions up to and including revocation of the provider's license to practice in Oklahoma, *see, e.g.*, Okla. Stat. tit. 59, § 503 (physicians and surgeons), Okla. Stat. tit. 59, § 567.8 (nurses).

**B. Legislative History**

SB 613 was one of fifteen bills introduced during the 2023 Oklahoma legislative session that would prohibit or limit treatment of gender dysphoria.[23] In discussing SB 613 and these related bills, Oklahoma legislators demonstrated anti-transgender animus. For example, in addressing SB 613, one supporter of the bill said that being transgender was a path toward "desolation, destruction, degeneracy, and delusion, ending in delusional play acting."[24] In discussing a different bill prohibiting insurance coverage for certain gender-affirming care, the same legislator stated that transgender individuals need "wise and clear biblical guidance."[25] A co-author of SB 613, in a floor debate on the bill, referred to gender-affirming care as "misinformation" and "a lie."[26] Another legislator, in voicing support for SB 613, appeared to refer to two transgender individuals as "pretending."[27] *See also* Compl. (Dkt. 2) ¶¶ 102, 107, 111-13 (listing other similar statements by legislators). Both the governor and the legislature identified protecting children as the goal of

---

[23] These include House Bill 2177 (among other things, prohibiting gender-affirming care for minors, prohibiting the use of public funds in the provision of gender-affirming care to adults and minors, and prohibiting insurance coverage for gender-affirming care for adults and minors), Senate Bill 129 (prohibiting the use of public funds in the provision of gender-affirming care, regardless of age, and prohibiting gender-affirming care in state, county, or local health care facilities or by providers employed by state, county, or local government), and House Bill 1011 (among other things, prohibiting gender-affirming care to, and referrals for gender-affirming care to, individuals under the age of twenty-one, prohibiting the use of public funds in the provision of gender-affirming care to individuals under the age of twenty-one, and criminalizing the provision of gender-affirming care to individuals under the age of twenty-one).

[24] Statement of Representative Jim Olsen, House First Regular Floor Session, Day 47 Afternoon Session, Apr. 26, 2023, 6:03:20-6:03:38 PM, available at https://sg001-harmony.sliq.net/00283/ Harmony/en/PowerBrowser/PowerBrowserV2/20230525/-1/53682.

[25] *See* Ben Felder, *Oklahoma House Approves Bill to Ban Insurance Coverage for Transgender Care*, OKLAHOMAN (Feb. 28, 2023, 4:30 PM), available at https://www.oklahoman.com/ story/news/politics/government/2023/02/28/oklahoma-trans-bill-banning-insurance-passes-house-vote/69953471007/.

[26] Statement of Senator Shane Jett, Legislative Session in the Senate Chamber, Feb. 15, 2023, 10:23:28-10:23:40 AM, available at https://sg001-harmony.sliq.net/00282/Harmony/en/ PowerBrowser/PowerBrowserV2/20230525/-1/66172.

[27] Statement of Representative Scott Fetgatter, House First Regular Floor Session, Day 47 Afternoon Session, Apr. 26, 2023, 6:15:20-6:15:53 PM.

SB 613.[28] Proponents referred to the supposed dangers of gender-affirming care during discussion of SB 613.[29] But when asked about the support of "all major medical associations" for these allegedly dangerous treatments, one of the bill's co-authors acknowledged that supporters of the bill were not "saying that [these doctors] are wrong."[30]

## DISCUSSION

The Constitution prohibits discrimination against transgender individuals on the basis of their sex and membership in a quasi-suspect class. SB 613 does just that. Accordingly, it is subject to intermediate scrutiny, which it fails because it is not substantially related to an important government interest. Plaintiffs are therefore likely to succeed on the merits on their equal protection claim concerning SB 613.

**I.      SB 613's Ban on Gender-Affirming Medical Care Warrants Intermediate Scrutiny Under the Equal Protection Clause.**

SB 613 prohibits only transgender youth from obtaining medically necessary gender-affirming care but leaves other minors eligible for the same treatments. Accordingly, the statute is

---

[28] For example, on the day he signed the bill, Governor Stitt declared: "Last year, I called for a statewide ban on all irreversible gender transition surgeries and hormone therapies on minors so I am thrilled to sign this into law today and protect our kids." *Governor Stitt Bans Gender Transition Surgeries and Hormone Therapies for Minors in Oklahoma*, Governor J. Kevin Stitt, May 1, 2023, available at https://oklahoma.gov/governor/newsroom/newsroom/2023/may2023/governor-stitt-bans-gender-transition-surgeries-and-hormone-ther.html. *See also, e.g.*, Statement of Representative Kevin West (co-author of SB 613), House First Regular Floor Session, Day 47 Afternoon Session, Apr. 26, 2023, 6:21:58-6:22:11 PM ("One of the most important duties that we have as state lawmakers is to protect the citizens—their health, their safety. And that duty is even more important when it comes to protecting children.").

[29] For example, in discussing SB 613, the bill's author referred to gender-affirming care as "experimental" and "very dangerous," with the potential to cause "unpredictable, unsettled, and irreversible physical conditions" in children. Statement of Senator Julie Daniels, Legislative Session in the Senate Chamber, Feb. 15, 2023, 9:24:02-9:25:15 AM.

[30] Statement of Representative Toni Hasenback, House Public Health Committee Hearing, Apr. 12, 2023, 3:26:10-3:26:48 PM, available at https://sg001-harmony.sliq.net/00283/Harmony/en/PowerBrowser/PowerBrowserV2/20230525/-1/53653.

subject to intermediate scrutiny for two separate and independent reasons: (A) it discriminates on the basis of sex; and (B) it discriminates against transgender individuals, who constitute a quasi-suspect class.

### A. SB 613's Ban on Gender-Affirming Medical Care is Subject to Intermediate Scrutiny Because It Discriminates on the Basis of Sex.

When evaluating sex-based discrimination under the Equal Protection Clause, courts apply "heightened" or "intermediate" scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("Between the[] extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny . . . ."). Intermediate scrutiny is appropriate in this case because discrimination against individuals because they are transgender is a form of discrimination based on sex.

As the U.S. Supreme Court held in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1746 (2020), sex discrimination "unavoidably" occurs when an individual is treated differently based on transgender status, because the individual had "one sex identified at birth" but identifies with a different sex "today." For that reason, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 1741. And the Tenth Circuit has expressly acknowledged that "[i]n the wake of *Bostock*, it is now clear that transgender discrimination . . . is discrimination 'because of sex.'" *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021). In addition, following *Bostock*, numerous courts outside the Tenth Circuit have analyzed discrimination against transgender people as sex discrimination and applied intermediate scrutiny in the equal protection context. *E.g.*, *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 (11th Cir. 2022) (en banc); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611-13 (4th Cir. 2020).

A district court in Colorado recently declined to apply intermediate scrutiny to a transgender pretrial detainee's equal protection claims, but that case is both nonbinding and

wrongly decided. *See Griffith v. El Paso County*, No. 21-cv-00387-CMA-NRN, 2023 WL 3099625, at *7-*8 (D. Colo. Mar. 27, 2023), *appeal filed*, No. 23-1135 (10th Cir. Apr. 26, 2023). In *Griffith*, the court relied on a nearly thirty-year-old Tenth Circuit opinion, *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995), in which the court of appeals did not consider or analyze a sex discrimination claim. Rather, in *Brown*, the court of appeals considered whether transgender people were a "quasi-suspect class" entitled to intermediate scrutiny under the Equal Protection Clause, and declined to make that finding because the *pro se* plaintiff's allegations were "too conclusory" to permit analysis of the relevant factors. *Id.* at 971. Because *Brown* did not address whether discrimination against transgender individuals constitutes sex discrimination, the *Griffith* court was mistaken in construing *Brown* to preclude application of intermediate scrutiny under a sex-discrimination theory. The Court should decline to apply that reasoning here. *See also* Discussion § I.B., *infra* (discussing *Brown* and *Griffith* in context of quasi-suspect class analysis).

Here, the Court should conclude that SB 613 discriminates on the basis of sex because the medical treatments available to a minor depend on the sex the minor was assigned at birth. Other courts have recently reached the same conclusion in similar contexts. *See Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669-70 (8th Cir. 2022) (holding that "because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under" a law banning gender-affirming care for minors, that law "discriminates on the basis of sex" and is therefore subject to intermediate scrutiny), *reh'g en banc denied*, 2022 WL 16957734 (8th Cir. Nov. 16, 2022); *Doe v. Ladapo*, No. 4:23-cv-114-RH-MAF, 2023 WL 3833848, at *1, *8  (N.D. Fla. June 6, 2023) (granting preliminary injunction and holding that Florida's ban on gender-affirming care draws a "line . . . on the basis of sex, plain and simple[,]" and is therefore subject to intermediate scrutiny); *Eknes-Tucker*, 603 F. Supp. 3d at 1147 (holding that Alabama's felony

gender-affirming care ban "constitutes a sex-based classification for purposes of the Fourteenth Amendment").

Under SB 613, the medical treatments available to a minor depend expressly on "biological sex." *See* § 1(A)(2)(a). For example, under SB 613, a minor assigned female at birth cannot receive testosterone to treat gender dysphoria, but a non-transgender minor assigned male at birth can receive testosterone to treat low hormone production because the treatment is consistent with the sex the minor was assigned at birth. *See id.*

SB 613 also discriminates on the basis of sex because it conditions the availability of particular medical procedures on compliance with sex stereotypes.[31] First, it conditions medical care on the assumption that an individual's gender identity should match their sex assigned at birth. Second, it conditions medical care on whether the care would alter "physical or anatomic characteristics or features . . . *typical for* . . . the individual's biological sex," § 1(A)(2)(a)(1) (emphasis added), and prohibits certain care that would "promote the development of feminizing or masculinizing features *consistent with* the opposite biological sex," § 1(A)(2)(a)(2) (emphasis added). The phrases "typical for" and "consistent with" confirm reliance on sex stereotypes. If the

---

[31] Multiple circuits have held that discrimination against transgender individuals based on their gender nonconformity is sex discrimination. *See, e.g.*, *Rutledge*, 47 F.4th at 670; *Grimm*, 972 F.3d at 611-13 (concluding that school board's policy prohibiting transgender students from using restrooms that match their gender identity constitutes sex-based discrimination and transgender persons constitute quasi-suspect class); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (finding school policy requiring students to use bathroom in accordance with sex on student's birth certificate to be "inherently based upon a sex-classification"), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender."); *Smith v. City of Salem*, 378 F.3d 566, 572, 577 (6th Cir. 2004) (holding that employee whose employment the City sought to terminate because of employee's transgender status stated sex-discrimination claim under Title VII and Equal Protection Clause).

medical care sought reinforces sex stereotypes, SB 613's prohibitions are not triggered, such as when a non-transgender minor assigned female at birth has a voluntary breast reduction procedure for pain-remediation purposes. But SB 613 would prohibit a similar procedure—even when recommended as medically appropriate—for a transgender teenage boy who was assigned female at birth simply because it would result in certain "characteristics" or "features" not stereotypically associated with individuals assigned female at birth. Third, SB 613's carve-out for intersex minors, § 1(A)(2)(b)(4), again reflects sex stereotypes. SB 613 permits intersex minors to obtain treatments identical to those it forbids for transgender minors, presumably because those procedures are intended to align the intersex minors' physical appearance with stereotypes associated with their sex assigned at birth.

### B. SB 613's Ban on Gender-Affirming Medical Care is Subject to Intermediate Scrutiny Because It Discriminates Against Transgender Individuals, a Quasi-Suspect Class.

Although the Court need not reach the question here, SB 613 warrants intermediate scrutiny for the separate and independent reason that it discriminates on the basis of transgender status, a quasi-suspect classification.[32] *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (noting that "heightened scrutiny" applies to constitutional claims of discrimination based on membership in a "quasi-suspect" class). SB 613 penalizes medical practices performed upon a minor "for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex." § 1(A)(2)(a). A transgender person is, by definition, someone whose gender identity is not consistent with their sex assigned at birth.

---

[32] *Griffith*, 2023 WL 3099625, is currently on appeal to the Tenth Circuit and raises the question whether transgender individuals constitute a quasi-suspect class. Because discrimination against transgender individuals constitutes sex discrimination and thus independently triggers intermediate scrutiny, this Court need not determine whether transgender status is, itself, a quasi-suspect classification. Should the Court reach this question, however, the Court should conclude that transgender persons are a quasi-suspect class.

Numerous courts have held that transgender status is a quasi-suspect classification under the Equal Protection Clause. *See, e.g.*, *Grimm*, 972 F.3d at 611, 613; *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018), *decision clarified sub nom. F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wisc. 2018); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873-74 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-140 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015). *See also Karnoski v. Trump*, 926 F.3d 1180, 1200-02 (9th Cir. 2019) (concluding that intermediate scrutiny, not rational basis review, applies when evaluating a policy that treats transgender persons differently from other persons).

The Tenth Circuit's opinion in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995), does not preclude this Court from considering this issue. In 1995, the *Brown* court declined to find that transgender people were a quasi-suspect class entitled to intermediate scrutiny because the allegations of the *pro se* plaintiff in that case were "too conclusory" to permit analysis of the relevant factors. *Id.* at 971. The court's decision also rested on a since-overruled Ninth Circuit case holding that transgender status was "not an immutable characteristic." *Id.* (citing *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 663 (9th Cir. 1977)); *see also Grimm*, 972 F.3d at 611 (discussing *Brown* and noting it "reluctantly followed [the] since-overruled Ninth Circuit opinion" in *Holloway*). While some courts have suggested *Brown* still requires, nearly thirty years after it was decided, the application of rational basis review to equal protection claims involving anti-transgender discrimination, *see, e.g.*, *Grimm*, 972 F.3d at 611; *Griffith*, 2023 WL 3099625, at *7-

*8, the *Brown* decision itself cast doubt on that interpretation. Indeed, even in 1995, the *Brown* court recognized that "[r]ecent research concluding that sexual identity may be biological suggest[ed] reevaluating" its narrow holding. 63 F.3d at 971. Here, the Plaintiffs' allegations are robust and far from conclusory, *see, e.g.*, Compl. ¶¶ 50-52, 118, 209-10, 221, and as explained below, the medical and scientific literature has evolved dramatically over the last thirty years.

This Court should therefore join the chorus of courts cited above and recognize that transgender individuals constitute a quasi-suspect class. To determine whether a group constitutes a quasi-suspect class, the Supreme Court has analyzed whether the group: (1) has historically been subjected to discrimination, *see Lyng*, 477 U.S. at 638 (analyzing "close relatives" in context of federal benefits program); (2) has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985) (analyzing persons with intellectual disabilities in context of zoning ordinance); (3) has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) is a minority lacking political power, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (analyzing families receiving child-support payments from non-custodial parents in context of federal benefits program).

First, transgender individuals, as a class, have historically been subject to discrimination and continue to "face discrimination, harassment, and violence because of their gender identity." *Whitaker*, 858 F.3d at 1051 (recognizing transgender people as a quasi-suspect class); *accord Grimm*, 972 F.3d at 611-612 (citing to national survey showing that "[t]ransgender people frequently experience harassment in places such as schools (78%), medical settings (28%), and retail stores (37%)," "experience physical assault in places such as schools (35%) and places of

public accommodation (8%)," and "are more likely to be the victim of violent crimes"); *Ray*, 507 F. Supp. 3d at 937.

Second, no "data or argument suggest[s] that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society." *Adkins*, 143 F. Supp. 3d at 139; *accord Grimm*, 972 F.3d at 611-12; *Ray*, 507 F. Supp. 3d at 937; *Highland*, 208 F. Supp. 3d at 874. The American Psychiatric Association has stated that "[b]eing transgender or gender diverse implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[33]

Third, transgender individuals share "obvious, immutable, or distinguishing characteristics that define them as a discrete group." *See Bowen*, 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638). Specifically, transgender individuals' "gender identity does not align with the gender they were assigned at birth." *M.A.B*, 286 F. Supp. at 721. As many courts have recognized, "being transgender is not a choice. Rather, it is as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612-13; *see also Ray*, 507 F. Supp. 3d at 937; *Highland*, 208 F. Supp. 3d at 874 (quoting *Lyng*, 477 U.S. at 638).[34]

Fourth, people who are transgender lack political power. *See Grimm*, 972 F.3d at 613 (reviewing data on transgender population in the United States and representation in judicial, executive, and legislative branches, and finding that, "[e]ven considering the low percentage of the population that is transgender, transgender persons are underrepresented in every branch of government"). While the number of openly transgender elected officials is growing, they still represent a small fraction of office-holders. *Id*. The proliferation of enacted legislation aimed at

---

[33] APA Assembly and Board of Trustees, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2018), https://perma.cc/4LZB-BVMK.
[34] *See also* Adkins Decl. ¶ 21; Janssen Decl. ¶¶ 30, 33-34.

restricting the rights of transgender individuals, particularly transgender minors, is further evidence of the limited political power of the transgender community. *See M.A.B.*, 286 F. Supp. 3d at 721 (noting that courts have had to block numerous laws because they violated rights of transgender individuals).

Because SB 613 discriminates against transgender persons, who constitute a quasi-suspect class, the statute is subject to intermediate scrutiny.

## II.    SB 613's Ban on Gender-Affirming Care Cannot Survive Intermediate Scrutiny.

To withstand intermediate scrutiny, the government actor must show that the challenged action "serves important governmental objectives" and that the "discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 524 (1996) ("*VMI*") (requiring an "exceedingly persuasive justification" for a sex-based classification) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)); *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."). "The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 U.S. at 533. The intermediate scrutiny inquiry provides an enhanced measure of protection in circumstances where there is a greater danger that a legal classification results from impermissible prejudice or stereotypes. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion).

Moreover, where intermediate scrutiny applies, the "justification must be genuine, not hypothesized or invented post hoc in response to litigation," and it "must not rely on overbroad

generalizations." *VMI*, 518 U.S. at 533.[35] A classification does not withstand intermediate scrutiny when "the alleged objective" of the classification differs from the "actual purpose." *Miss. Univ. for Women,* 458 U.S. at 730. "[A] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also Ladapo*, 2023 WL 3833848, at *11 (referring to Florida's "purported justifications" for the state's ban on gender-affirming care, including alleged risks of certain care, as "largely pretextual").

SB 613's ban on medically necessary gender-affirming care for transgender youth cannot survive intermediate scrutiny for two reasons. First, even assuming the State's asserted interest of protecting youth is genuine, SB 613 is not substantially related to that interest because banning well-established, medically necessary, gender-affirming care is harmful, not beneficial. Second, the stated objective of protecting youth from dangerous treatments does not appear to be fully "genuine," *see VMI*, 518 U.S. at 533, and appears instead to be a "largely pretextual" justification, *see Ladapo*, 2023 WL 3833848, at *11, lacking accurate scientific or medical basis. Legislative history suggests that Oklahoma's passage of SB 613 reflected a desire to express moral disapproval of transgender individuals, "a politically unpopular group," *see Moreno*, 413 U.S. at 534—an interest that is not "legitimate," *see id.*, let alone important or exceedingly persuasive.

### A.  SB 613 is Not Substantially Related to Oklahoma's Purported Interest of Protecting Youth.

Even if lawmakers' asserted interest of protecting youth were genuine, SB 613's ban on transgender youth receiving certain forms of medically necessary gender-affirming care is not

---

[35] *See also Glenn*, 663 F.3d at 1321; *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 482 (9th Cir. 2014) ("[The court] must examine [the law's] actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.").

"substantially related" to achieving that objective. *See VMI*, 518 U.S. at 533. Instead, banning these forms of gender-affirming care will have devastating effects on many transgender children while providing no countervailing benefit to them or anyone else. *See Kirchberg v. Feenstra*, 609 F.2d 727, 734 (5th Cir. 1979) (courts must "weigh[] the state interest sought to be furthered against the character of the discrimination caused by the statutory classification").

First, it is well-established that the provision of gender-affirming care to treat gender dysphoria is helpful, not harmful, to transgender youth. Contrary to the State's asserted position that gender-affirming care for transgender youth is "very dangerous," every major medical association, including the AAP, the American Psychiatric Association, the Endocrine Society, and WPATH, has recognized that gender-affirming care is safe, effective, and medically necessary treatment for the health and wellbeing of some youth diagnosed with gender dysphoria.[36] In fact, the medical evidence shows that trying to "cure" a person with a diagnosis of gender dysphoria by forcing them to live in alignment with the person's sex assigned at birth is severely harmful and ineffective.[37] Transgender minors who do not receive gender-affirming care face increased rates of victimization, substance abuse, depression, anxiety, and suicidality.[38] The medical community overwhelmingly agrees that gender-affirming care is medically necessary for some transgender youth.[39]

---

[36] Adkins Decl. ¶¶ 29, 47-51; Antommaria ¶ 61; Janssen Decl. ¶¶ 24, 53.

[37] Janssen Decl. ¶¶ 28, 35-36; Turban Decl. ¶ 20.

[38] *See* Jack L. Turban, et al., *Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, 17(1) PLoS ONE 1, 1-15 (2022); Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145(2) Pediatrics 1, 1-8 (2020); Nat'l Academies Scis, Eng'g, and Med, *Understanding the Well-Being of LGBTQI+ Populations* 363-64 (2020); *AAP Statement*; *see also* Adkins Decl. ¶ 50; Antommaria ¶ 20; Janssen Decl. ¶¶ 47, 81; Turban Decl. ¶ 32.

[39] *See, e.g.*, Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5(2) Pediatrics 1 (2022); Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7(3) Clinical

Second, the medical research supporting the safety and efficacy of the forms of gender-affirming care banned by SB 613 is substantial. Contrary to lawmakers' assertions, gender-affirming medical treatment for patients diagnosed with gender dysphoria is far from "experimental" or "unsettled" in nature, and, instead, has long been recognized as part of the standards of care.[40] According to the American Medical Association, "[e]very major medical association in the United States recognizes the medical necessity of transition-related care for improving the physical and mental health of transgender people," which "may include mental health counseling, non-medical social transition, gender-affirming hormone therapy, and/or gender-affirming surgeries."[41] Clinicians have used these standards of care, which are peer-reviewed and based on reviews of scientific literature, for decades.[42] Puberty blockers have been used in the United States to treat gender dysphoria for approximately twenty years, and for several decades to treat medical conditions such as precocious puberty, a condition in which a child enters puberty at a young age.[43]

---

Practice in Pediatric Psychology 302 (2019); *see also* Adkins Decl. ¶ 29; Janssen Decl. ¶ 48, 62, 81.

[40] *E.g.*, Antommaria Decl. ¶ 29.

[41] James L. Madara, *AMA to States: Stop Interfering in Health Care of Transgender Children*, AMA (April 26, 2021), https://perma.cc/7JYQ-FW2P (letter from CEO); *see also* American Academy of Family Physicians et al., *Frontline Physicians Call on Politicians to End Political Interference in the Delivery of Evidence Based Medicine*, (May 15, 2019), www.aafp.org/news/media-center/more-statements/physicians-call-on-politicians-to-end-political-interference-in-the-delivery-of-evidence-based-medicine.html (statement issued on behalf of American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians, American Osteopathic Association, and American Psychiatric Association).

[42] *See* Meredith McNamara, M.D., M.S., et al., "A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria," at 5 (July 8, 2022), https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/florida%20report%20final%20july%208%202022%20accessible_443048_284_55174_v3.pdf; *see also* Antommaria Decl. ¶¶ 32-33; Turban Decl. ¶¶ 15-16.

[43] Adkins Decl. ¶ 48.

SB 613 implicitly acknowledges the longstanding safety of these treatments, as it allows health care providers to prescribe and administer them for purposes other than gender dysphoria. *See* § 1(A)(2)(a), (b). The carve-out for intersex minors further attenuates any connection between the law and Oklahoma's purported concern about the health risks to youth. *See* § 1(A)(2)(b)(4). This underscores the mismatch between the "alleged objective" and "actual purpose" of SB 613. *See Miss. Univ. for Women*, 458 U.S. at 730.

SB 613 prevents transgender minors diagnosed with gender dysphoria from receiving care that their physicians and parents agree is appropriate and medically necessary. Therefore, it simply does not substantially relate to the legislature's asserted interest in protecting youth. For these reasons, SB 613 fails intermediate scrutiny.

**B.  The Claimed Interest of Protecting Youth is Not "Genuine" and is Instead Pretextual.**

The medical evidence cited above, in conjunction with SB 613's text and legislative history, suggest that Oklahoma's claimed interest is not fully "genuine," *VMI*, 518 U.S. at 533, but rather a pretext for discrimination. Under any level of scrutiny, a challenged statute cannot "impos[e] a broad and undifferentiated disability on a single named group." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Evidence of a motivating purpose for a challenged statute or government action may be reflected in lawmakers' contemporaneous statements and the historical context surrounding the action. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (applying *Arlington Heights* factors to assess equal protection animus claim).

As noted above, an overwhelming body of medical evidence undermines the claim that gender-affirming care is "very dangerous," such that Oklahoma needs to "protect" its youth from receiving such care. Rather, this is a pretextual justification lacking accurate scientific or medical

basis that ultimately harms—not helps—the minors it purports to protect. Indeed, even a co-sponsor of the bill, when asked about the support of "all major medical associations" for these allegedly dangerous treatments, conceded that supporters of the bill were not "saying that [these doctors] are wrong."[44]

As to SB 613's text, the statute expressly applies only to those minors whose gender identity differs from their sex assigned at birth. And by limiting the receipt of specified forms of health care only to those minors whose gender identity differs from their sex assigned at birth, SB 613 imposes "a broad and undifferentiated disability on a single named group." *See Romer*, 517 U.S. at 620. Despite the absence of the word "transgender" in the statute, SB 613's passage indeed "seems inexplicable by anything but animus toward" transgender people. *See id.*

As to legislative history, legislators' remarks about SB 613 and transgender people reinforce the pretextual nature of the supposed goals of SB 613. *See Arlington Heights*, 429 U.S. at 268 (noting that "contemporary statements by members of the decisionmaking body" may be "highly relevant" in discerning legislative purpose). Moral disapproval appears throughout the legislative record. During discussion of SB 613, lawmakers referred to transgender people as leading lives of "degeneracy" and "delusion."[45] The statement that transgender individuals need "wise and clear biblical guidance" further reflects this moral disapproval.[46] As the *Ladapo* court recognized, these types of statements are evidence of "substantial bigotry directed at transgender individuals." 2023 WL 3833848, at *11 & n.62 (observing that legislator's comments that transgender individuals who spoke at a hearing were "mutants," that "God created men, male and women, female," and that these individuals are "demons and imps" who "pretend [to be] part of

---

[44] *See* note 30.
[45] *See* note 24.
[46] *See* note 25; *see also* Compl. ¶¶ 102, 107, 111-13 (other similar statements by legislators).

this world" constitute "bigotry directed at transgender individuals"). And SB 613 was enacted against a backdrop of multiple proposed bills specifically targeting transgender individuals, further reinforcing the statute's true discriminatory purpose. *See Arlington Heights*, 429 U.S. at 267 ("The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.").

"Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). Oklahoma's passage of SB 613 appears to do just that. Though purportedly meant to "protect" youth, SB 613 in fact prevents transgender minors diagnosed with gender dysphoria from receiving care that their physicians and parents agree is appropriate and medically necessary. Therefore, it does not substantially achieve the legislature's asserted interest in protecting youth. SB 613 fails intermediate scrutiny.[47]

## CONCLUSION

SB 613 bans certain forms of medically necessary care for transgender minors, while leaving non-transgender minors free to receive the same procedures and treatments. The law fails intermediate scrutiny because banning medically necessary care to treat gender dysphoria is not substantially related to serving an important government objective, and because Oklahoma lawmakers' asserted purpose—"protecting" minors from certain care—is pretextual. Instead, the

---

[47] Intermediate scrutiny applies in this case. But SB 613's ban on gender-affirming medical care would not survive even rational basis review because, for the reasons stated above, there is not a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). By restricting medically necessary health care only to transgender minors but allowing for the same care to be provided to non-transgender minors, Oklahoma shows its hand: the purpose of SB 613 is not to "protect" youth, but rather to deprive transgender minors of medically necessary care. A law motivated by prejudice towards a particular group and bearing no rational relationship to the law's stated purpose cannot survive even the lowest level of review. *See Cleburne*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534.

law expresses Oklahoma lawmakers' moral disapproval of transgender people, endangers the health of transgender youth, blocks parents and health care providers from making individual determinations regarding the appropriate care of transgender children, and threatens health care providers with criminal and civil liability, as well as professional licensing sanctions, simply for treating minor transgender patients consistent with broadly accepted standards of medical care. SB 613 violates the Equal Protection Clause of the Fourteenth Amendment, and Plaintiffs are likely to succeed on the merits of their equal protection claim.

Dated: June 9, 2023

Respectfully submitted,

CLINTON J. JOHNSON
United States Attorney
Northern District of Oklahoma
Tulsa, OK 74119
(918) 382-2700

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief
Federal Coordination and Compliance Section
Civil Rights Division

R. TAMAR HAGLER
Deputy Chief
Housing and Civil Enforcement Section
Civil Rights Division

/s/ John R. Fowler
JOHN R. FOWLER (DC Bar No. 1017595)
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
(202) 598-4252
john.fowler@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2023, the foregoing document was electronically transmitted to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to counsel of record.

/s/ John R. Fowler
John R. Fowler