UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PETER POE, *et al.*,<br><br>        *Plaintiffs,*<br><br>     v.<br><br>GENTNER F. DRUMMOND, *et al.*<br><br>        *Defendants.* | No.   23-cv-00177-JFH-SH |

## MOTION TO DISMISS BY DEFENDANTS 15-53

Submitted by:

GARRY M. GASKINS, II, OBA #20212
 *Solicitor General*
OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

ZACH WEST, OBA #30768
 *Director of Special Litigation*
AUDREY WEAVER, OBA #33258
 WILL FLANAGAN, OBA #35110
 *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov

COUNSEL FOR DEFENDANTS 15-53                                    June 16, 2023

## Table of Contents

Introduction ..................................................................................................................................1

Background ....................................................................................................................................2

Legal Standard ............................................................................................................................3

Argument and Authorities ......................................................................................................4

I.   Plaintiffs lack standing to challenge much of SB 613. ...............................................4

   A.   *Plaintiffs lack standing to challenge the ban on surgical procedures.* ...........................4

   B.   *Plaintiffs lack standing to challenge the Act as applied to pre-pubescent children.* ...................5

II.   Plaintiffs cannot plausibly allege that SB 613 violates the Equal Protection Clause. ......6

   A.   *Rational-basis review applies because the Act does not discriminate against a quasi-suspect class and instead regulates medical procedures.* ...................................................6

      i.   Transgender status is not a distinct quasi-suspect classification. ...........................7

      ii.   The Act does not discriminate based on transgender status. ...............................8

      iii.   The Act does not discriminate based on sex. ....................................................13

   B.   *The Act easily passes rational-basis scrutiny.* ....................................................16

III.   Plaintiffs cannot plausibly allege that the Act violates the Due Process Clause. ..........17

   A.   *Parents possess no fundamental right to have harmful surgeries and hormone treatments given to their child.* ...................................................................17

IV.   Plaintiffs cannot plausibly allege that Hospital Defendants violated the Equal Protection Clause by complying with SB 3. ...................................................21

V.   Plaintiffs cannot plausibly allege that Hospital Defendants violated Section 1557 of the Affordable Care Act by complying with SB 3. ...................................................23

Conclusion ....................................................................................................................................25

## TABLE OF AUTHORITIES

**Cases:**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
 495 F.3d 695 (D.C. Cir. 2007) .................................................................... 22

*Adams v. Sch. Bd. of St. Johns Cnty.*,
 57 F.4th 791 (11th Cir. 2022) ............................................................... *passim*

*Aid for Women v. Foulston*,
 441 F.3d 1101 (10th Cir. 2006) ................................................................. 16

*Ashaheed v. Currington*,
 7 F.4th 1236 (10th Cir. 2021) ..................................................................... 6

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .................................................................................... 3

*Ballard v. United States*,
 329 U.S. 187 (1946) .................................................................................. 15

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
 140 S. Ct. 2335 (2020) ............................................................................... 4

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) .................................................................................... 3

*Bostock v. Clayton Cnty., Ga.*,
 140 S. Ct. 1731 (2020) ......................................................................... *passim*

*Brandt v. Rutledge*,
 47 F.4th 661 (8th Cir. 2022) .................................................................... 15

*Bray v. Alexandria Women's Health Clinic*,
 506 U.S. 263 (1993) ............................................................................... 8, 9

*Brown v. Zavaras*,
 63 F.3d 967 (10th Cir. 1995) ...................................................................... 7

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985) .................................................................................... 7

*Clark v. City of Draper*,
 168 F.3d 1185 (10th Cir. 1999) ................................................................. 16

*Clark v. Jeter*,
 486 U.S. 456 (1988) .................................................................................. 17

*Collins v. Harker Heights,*
    503 U.S. 115 (1992) ................................................................................................. 18

*Copelin-Brown v. N.M. State Pers. Off.,*
    399 F.3d 1248 (10th Cir. 2005) ............................................................................. 16

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................................................. 4

*Davis v. FEC,*
    554 U.S. 724 (2008) ................................................................................................. 4

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) .................................................................................... *passim*

*Doe v. BlueCross BlueShield of Tenn., Inc.,*
    926 F.3d 235 (6th Cir. 2019) ................................................................................ 24

*Doe v. CVS Pharmacy, Inc.,*
    982 F.3d 1204 (9th Cir. 2020) .............................................................................. 24

*Druley v. Patton,*
    601 Fed. App'x 632 (10th Cir. 2015) (unpublished) ............................................ 7

*Eknes-Tucker v. Marshall,*
    603 F.Supp.3d 1131 (M.D. Ala. 2022) ................................................................. 5

*Engquist v. Or. Dep't of Agr.,*
    553 U.S. 591 (2008) ................................................................................................ 6

*Fowler v. Stitt,*
    No. 22-cv-115-JWB-SH, Doc. 52 (N.D. Okla. June 8, 2023) ................. 8, 12, 18

*Francois v. Our Lady of the Lake Hosp., Inc.,*
    8 F.4th 370 (5th Cir. 2021) .................................................................................. 24

*Geduldig v. Aiello,*
    417 U.S. 484 (1974) ................................................................................................ 8

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) .............................................................................................. 16

*Griffith v. El Paso Cnty., Co.,*
    No. 21-cv-387-CMA-NRN, 2023 WL 3099625 (D. Colo. Mar. 27, 2023) .......... 8

*Hayes v. Missouri,*
    120 U.S. 68 (1887) ................................................................................................. 6

*Heller v. Doe,*
   509 U.S. 312 (1993) .......................................................................................... 7

*Hennessy-Waller v. Snyder,*
   529 F.Supp.3d 1031 (D. Ariz. 2021) ............................................................... 5

*Kansas Penn Gaming, LLC v. Collins,*
   656 F.3d 1210 (10th Cir. 2011) ....................................................................... 12

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,*
   927 F.3d 396 (6th Cir. 2019) .......................................................................... 19

*Lewis v. Casey,*
   518 U.S. 343 (1996) .......................................................................................... 4

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .......................................................................................... 4

*Neitzke v. Williams,*
   490 U.S. 319 (1989) .......................................................................................... 3

*Nguyen v. INS,*
   533 U.S. 53 (2001) ........................................................................................... 15

*Nordlinger v. Hahn,*
   505 U.S. 1 (1992) .............................................................................................. 6

*Palmore v. Sidoti,*
   466 U.S. 429 (1984) ........................................................................................ 16

*Pelcha v. MW Bancorp, Inc.,*
   988 F.3d 318 (6th Cir. 2021) .......................................................................... 25

*Planned Parenthood of Cent. Mo. v. Danforth,*
   428 U.S. 52 (1976) .......................................................................................... 18

*Regan v. Tax'n with Representation of Wash.,*
   461 U.S. 540 (1983) ........................................................................................ 22

*Reno v. Flores,*
   507 U.S. 292 (1993) ........................................................................................ 17

*Rust v. Sullivan,*
   500 U.S. 173 (1991) ........................................................................................ 22

*Rutherford v. United States,*
   616 F.2d 455 (10th Cir. 1980) .................................................................... 19, 22

*SECSYS, LLC v. Vigil,*
666 F.3d 678 (10th Cir. 2012) ...................................................................... 6

*Seegmiller v. LaVerkin City,*
528 F.3d 762 (10th Cir. 2008) .................................................................... 18

*Spragens v. Shalala,*
36 F.3d 947 (10th Cir. 1994) ...................................................................... 16

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ...................................................................................... 5

*Tennessee v. U.S. Dep't of Educ.,*
615 F.Supp.3d 807 (E.D. Tenn. 2022) ...................................................... 25

*Thompson v. Oklahoma,*
487 U.S. 815 (1988) .................................................................................... 17

*Tonkovich v. Kan. Bd. of Regents,*
159 F.3d 504 (10th Cir. 1998) ...................................................................... 7

*Tudor v. SEOSU,*
13 F.4th 1019 (10th Cir. 2021) .................................................................... 7

*United States v. Am. Library Ass'n, Inc.,*
539 U.S. 194 (2003) .................................................................................... 23

*United States v. Virginia,*
518 U.S. 515 (1996) .................................................................................... 15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) .................................................................................... 11

*Washington v. Davis,*
426 U.S. 229 (1976) .................................................................................... 11

*Washington v. Glucksberg,*
521 U.S. 702 (1997) ................................................................................7, 20

*Whalen v. Roe,*
429 U.S. 589 (1977) .................................................................................... 18

*Wyoming v. United States,*
279 F.3d 1214 (10th Cir. 2002) .................................................................... 3

**Statutes**:

20 U.S.C. § 1681 .......................................................................................... 24

20 U.S.C. § 1686 ............................................................................................................................24

42 U.S.C. § 18116 ..........................................................................................................................23

OKLA. STAT. tit. 63, § 1-741 .........................................................................................................22

OKLA. STAT. tit. 63, § 2607.1 ...................................................................................................*passim*

**Rules:**

Fed. R. Civ. P. 12(b)(6) ....................................................................................................................3

**Regulations:**

34 C.F.R. § 106.37 .........................................................................................................................24

34 C.F.R. § 106.41 .........................................................................................................................24

**Legislative Materials:**

S.B. 3, 2022 O.S.L. 9 (2d Spec. Sess. 2022) ...................................................................................2

**Secondary sources:**

Cat Cattinson, *If I were a trans kid today: Here's what potentially saved my life*, FOXNEWS.COM
  (Nov. 28, 2022) ........................................................................................................................13

Harper Seldin, *Trans Students Should Be Treated With Dignity, Not Outed by Their Schools*,
  ACLU (Jan. 26, 2023) ..............................................................................................................18

**INTRODUCTION**

Last summer, the U.S. Supreme Court held that States have broad discretion to regulate and even ban a controversial medical practice in order to protect young human beings, eliminate "particularly gruesome or barbaric medical procedures," and preserve "the integrity of the medical profession . . . ." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022). That is precisely what Oklahoma has done here by prohibiting licensed physicians from permanently altering children by giving them powerful hormones and cutting off healthy breasts and genitals.

In *Dobbs*, it did not matter that State laws banning abortion only affected one sex; no heightened scrutiny applied. *See id.* at 2245-46. Nor did it matter that numerous medical organizations claimed Mississippi's law was "fundamentally at odds with the provision of safe and essential health care, scientific evidence, and medical ethics." Brief of *Amici Curiae* ACOG et al., *Dobbs* (No. 19-1392), 2021 WL 4312120 at *7. What controlled, instead, was the text of the U.S. Constitution. *See Dobbs*, 142 S. Ct. at 2242. And on that front, *Roe* was "egregiously wrong and deeply damaging" because it "usurped the power to address a question of profound moral and social importance that the Constitution unequivocally leaves for the people." *Id.* at 2265. The Constitution leaves the profound moral and social question of sterilizing surgeries and hormones for children to the people, as well.

Plaintiffs essentially ask this Court revive *Roe v. Wade* in a different context. But their argument is *weaker* than the plaintiff's case in *Dobbs*. Abortion bans only apply to one sex; the challenged Oklahoma laws apply equally to both. Numerous medical organizations support abortion, whereas the European medical community is moving increasingly against the procedures Oklahoma has prohibited. And in *Dobbs* the Court had to walk through a lengthy *stare decisis* analysis because abortion had been considered a fundamental right for half a century. Here, it was only in recent decades that American doctors even *began* to use drugs and surgery to treat gender dysphoric minors, and the practice has *never* been declared a right by the Supreme Court. This case is much simpler than *Dobbs*.

1

In sum, Senate Bill 3 and Senate Bill 613 prohibit certain experimental and barbaric procedures on minors, a topic the Constitution "unequivocally" does not address. *Dobbs*, 142 S. Ct. at 2265. Plaintiffs have challenged these laws under the Fourteenth Amendment, but no factual allegation they can make, no expert they could provide, and no evidence they might produce would somehow lead to protection for these procedures materializing in the Constitution's text. Nor could they make any arguments that *Dobbs* would not expressly or implicitly cover. The Constitution does not require the State to stand by as its children are rushed into unproven treatments and surgeries that might leave them infertile, mutilated, and scarred for life. Thus, this lawsuit should be dismissed.

### BACKGROUND

Oklahoma Senate Bill 3 ("SB 3") took effect on October 4, 2022. S.B. 3, 2022 O.S.L. 9 (2d Spec. Sess. 2022).[1] It appropriated slightly over 39 million dollars to the University Hospitals Authority. *Id.* at § 1. Relevant here, SB 3 barred the relevant funds from being used to perform "gender reassignment medical treatment … on children under eighteen (18) years of age." *Id.* This Act defined "gender reassignment medical treatment" as "any health care to facilitate the transitioning of a patient's assigned gender identity on the patient's birth certificate, to the gender identity experienced and defined by the patient." *Id.* This law did not, by itself, prohibit children from receiving hormones or surgery. It merely prevented the University Hospitals Authority—as a publicly funded entity—from providing them. (The Complaint indicates that Plaintiffs were able to receive the treatments they seek, even under SB 3. *See, e.g.,* Doc. 2 at ¶¶ 126, 135, 160, 162.)

On May 1, 2023, Governor Kevin Stitt signed Senate Bill 613 ("SB 613" or "the Act") into law. *See* OKLA. STAT. tit. 63, § 2607.1. The Act says that "[a] health care provider shall not knowingly provide gender transition procedures to any child." *Id.* § 2607.1(B). The Act defines "gender transition procedures" as "surgical procedures that alter or remove physical or anatomical characteristics or

---

[1] Available at https://www.sos.ok.gov/documents/legislation/58th/2022/2S/SB/3xx.pdf.

features that are typical for the individual's biological sex" or "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex." *Id.* § 2607.1(A)(2)(a).

SB 613 expressly excepts from its strictures "behavioral health care services or mental health counseling" as well as medications prescribed "for the purpose of treating precocious puberty or delayed puberty . . . ." *Id.* § 2607.1(A)(2)(b). In effect, the Act bans surgeries, puberty blockers, and hormones from being used to change a minor's healthy body to attempt to conform with a patient's asserted gender identity. It does not ban treatment on a minor whose body is sick or malfunctioning, such as one that has begun puberty early or late. It only prohibits chemical and surgical procedures on the healthy bodies of children.

## LEGAL STANDARD

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). While the Court must view a complaint in the light most favorable to the nonmoving party, courts need not accept as true labels and conclusions, legal characterizations, unwarranted deductions of fact, or "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678-679 (citation omitted) (cleaned up).

When a complaint presents a question of law and "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," the complaint "must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citation omitted). Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Id.* at 326; *see also Wyoming v. United States*, 279 F.3d 1214, 1222 (10th Cir. 2002).

## ARGUMENT AND AUTHORITIES

In light of *Dobbs*, and for various other reasons, Plaintiffs' claims must fail. The challenged laws do not discriminate based on sex in prohibiting all minors from undergoing experimental surgeries and hormone treatments. Parents possess no fundamental right to obtain treatment for their children that the State finds to be unsafe. Moreover, Plaintiffs even lack standing to pursue several of their claims. As such, this Court should dismiss Plaintiffs' Complaint, in whole or in part.

### I.   Plaintiffs lack standing to challenge much of SB 613.

The requirement that a plaintiff have "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing a plaintiff must demonstrate a concrete, particularized, and imminent injury-in-fact that is fairly traceable to the defendant's actions and likely to be redressed by a favorable ruling. *Id.* at 560-61. In other words, the standing analysis is "focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008).

#### A.  Plaintiffs lack standing to challenge the ban on surgical procedures.

"[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). The Supreme Court has long held that "a plaintiff must demonstrate standing for each claim he seeks to press" and "for each form of relief sought . . . ." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *see also Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2351 (2020) ("[P]laintiffs who successfully challenge one provision of a law may lack standing to challenge *other* provisions of that law.").

Here, no Plaintiff has alleged any desire or need for a surgical procedure to "alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex . . . ." OKLA. STAT. tit. 63, § 2607.1(A)(2)(a)(1). The Complaint is largely bereft of references to surgery, except to note *other* surgeries allowed by the Act and to argue that hormonal treatment might decrease the "need" for surgery in the future. Doc. 2 at ¶¶ 69-71, 184, 189, 195. This silence demonstrates that

Plaintiffs are not harmed by the surgical procedure ban, and it suggests that Plaintiffs are reticent to argue in favor of irreversible invasive surgeries that permanently scar and sterilize minors. Because the ban on hormonal treatment is severable from the prohibition on surgical interventions, the facial attack on SB 613 and SB 3, to the extent that it encompasses a challenge to the surgical provision, should obviously be dismissed. Plaintiffs had plenty of opportunity in their lengthy Complaint to defend cutting off breasts and genitals of healthy children, or to state a concrete and imminent desire for such procedures, and they declined to do so.[2]  They should be held to that strategic decision.

To the extent that Plaintiffs contend in response that they *may* wish to obtain surgical procedures to aid their gender transition in the future, that argument is foreclosed by Supreme Court precedent. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("Such 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent injury'…" (citation omitted)). As such, Plaintiffs' lawsuit should be dismissed to the extent it challenges the surgical prohibition for minors. Despite bringing a facial challenge, Plaintiffs virtually ignore one-half of the main statute they attack.[3]

### B.  Plaintiffs lack standing to challenge the Act as applied to pre-pubescent children.

For similar reasons, Plaintiffs do not have standing to challenge the Act as applied to pre-pubescent children. None of the Plaintiffs are pre-pubescent children seeking to receive puberty blockers or cross-sex hormones. Moreover, the Complaint explicitly *disavows* the idea that any pre-pubescent children should receive puberty blockers. Doc. 2 at ¶ 60 ("In other words, gender transition does not include any pharmaceutical or surgical intervention *before puberty*." (emphasis added)).

---

[2] Although not as relevant to a motion to dismiss, Plaintiffs' individual affidavits avoid the topic of surgery, as well. *See generally* Doc. 6-5; Doc. 6-7; Doc. 6-9; Doc. 6-11; Doc. 6-13.

[3] Notably, Alabama's similar surgical ban is currently in effect, as the plaintiffs in that case did not even challenge the prohibition at the preliminary injunction stage. *Eknes-Tucker v. Marshall*, 603 F.Supp.3d 1131, 1138 (M.D. Ala. 2022). And a federal district court in Arizona has held that plaintiffs did not show that gender reassignment surgeries are "safe and effective for treating gender dysphoria in adolescents . . . ." *Hennessy-Waller v. Snyder*, 529 F.Supp.3d 1031, 1045 (D. Ariz. 2021).

Therefore, based on Plaintiffs' own representations, none of them are injured by SB 613 (or SB 3) being applied to prevent pre-pubescent children from receiving puberty blockers, hormones, or life-altering surgery. Plaintiffs' claims should, then, be dismissed to the extent that they apply to SB 613's prohibition on providing pre-pubescent children with medical and surgical interventions to transform and mutilate their healthy bodies. Again, despite bringing a facial challenge, vast swaths of the Act's potential applications are virtually uncontested here.

## II.   Plaintiffs cannot plausibly allege that SB 613 violates the Equal Protection Clause.

### A.   *Rational-basis review applies because the Act does not discriminate against a quasi-suspect class and instead regulates medical procedures.*

The Equal Protection Clause "requires that all persons subjected to … legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 602 (2008) (quoting *Hayes v. Missouri*, 120 U.S. 68, 71-72 (1887)). However, the Clause "doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations . . . ." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012). After all, such requirements "might themselves generate rather than prevent injustice." *Id.* Rather, equal protection "keeps governmental decision makers from treating differently persons who are in *all relevant respects* alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added); *see also Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (purposeful discrimination occurs when "the plaintiff was treated differently from similarly situated persons who are 'alike in all relevant respects.'" (citation omitted)).

To determine whether a law violates the Equal Protection Clause, courts first "ask whether the challenged state action intentionally discriminates between groups of persons." *SECSYS*, 666 F.3d at 685. If that question is answered in the affirmative, the next step is to determine "whether the state's intentional decision to discriminate can be justified by reference to some upright government

purpose." *Id.* at 686. Courts assume that contested legislation is "valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Only when a plaintiff establishes that the intentional discrimination targets a fundamental right or a suspect classification does a heightened standard of review apply. *Id.*; *see also Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998).

Finally, as the Supreme Court just emphasized in *Dobbs*, "health and welfare laws" are "entitled to a 'strong presumption of validity.'" 142 S. Ct. at 2284 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). That presumption "applies even when the laws at issue concern matters of great social significance and moral substance." *Id.* (collecting cases). For example, the Supreme Court has applied this presumption in the context of the treatment of the disabled, *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 365–368 (2001), laws banning assisted suicide, *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997), and laws banning abortion, *Dobbs*, 142 S. Ct. at 2284. Laws such as these "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284. Plaintiffs cannot plausibly allege that SB 613— which protects all minors equally against interventions designed to permanently transform their healthy bodies—discriminates on sex or transgender status. So rational basis review applies.

i.   <u>Transgender status is not a distinct quasi-suspect classification.</u>

Because transgender status is not a quasi-suspect class that garners automatic intermediate scrutiny, rational basis review applies. *See Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995); *Druley v. Patton*, 601 Fed. App'x 632, 635 (10th Cir. 2015) (unpublished) ("To date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims."). To be sure, the Tenth Circuit has held that "transgender discrimination … is discrimination 'because of sex' prohibited under Title VII," *Tudor v. SEOSU*, 13 F.4th 1019, 1028 (10th Cir. 2021), but that holding was anchored to the Supreme Court's decision in *Bostock v. Clayton County*, which did

not declare transgender status a quasi-suspect class and was expressly limited to Title VII and the employment context. *See* 140 S. Ct. 1731, 1753 (2020) ("[W]e do not purport to address bathrooms, locker rooms, or anything else of the kind."). Thus, *Brown* still binds here. *See, e.g.*, *Griffith v. El Paso Cnty., Co.*, No. 21-cv-387-CMA-NRN, 2023 WL 3099625 at *8 (D. Colo. Mar. 27, 2023) ("Directed by binding precedent in *Brown* ...."); *Fowler v. Stitt*, No. 22-cv-115-JWB-SH, Doc. 52 at 42 (N.D. Okla. June 8, 2023) (holding that transgender plaintiffs did "not constitute a quasi-suspect class for equal protection purposes"). Even ignoring *Brown*, like the *en banc* Eleventh Circuit we would "have grave 'doubt' that transgender persons constitute a quasi-suspect class," in part because "the Supreme Court has rarely deemed a group a quasi-suspect class." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022); *see also Fowler*, supra, Doc. 52 at 9 ("As it currently stands, there is no indication that the Supreme Court is willing to extend heightened scrutiny to any other classifications.").

ii.   The Act does not discriminate based on transgender status.

Even if transgender status were a distinct quasi-suspect classification, Plaintiffs cannot establish as a matter of law that the Act purposefully discriminates against transgender individuals. The Supreme Court has repeatedly held that health care laws that restrict medical treatments that only members of one class receive do not discriminate against that class. Again, abortion restrictions apply exclusively to women and yet are not considered discriminatory. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) ("Women seeking abortion is not a qualifying class." (quotation omitted)). As *Dobbs* emphasized, "the regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" 142 S. Ct. at 2245-46 (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496, n.20 (1974)). And an obvious legislative decision to value and protect human life in the context of regulating a medical procedure is not evidence of discriminatory animus or pretext. *See Bray*, 506 U.S. at 274; *Dobbs*, 142 S. Ct. at 2246.

There is nothing different about the present context that would somehow remove it from this line of reasoning. The fact that numerous American medical organizations have lined up to oppose such laws, for example, did not change the outcome in *Dobbs*, so why should it contribute, say, to a pretext finding here? In *Dobbs*, twenty-five different American medical organizations signed onto an amicus brief declaring that "[a]ccess to abortion is an important component of reproductive health care" which "is essential to women's overall health." Brief of *Amici Curiae* ACOG et al., *Dobbs* (No. 19-1392), 2021 WL 4312120 at *7; *see also id.* (claiming that Mississippi's law was "fundamentally at odds with the provision of safe and essential health care, scientific evidence, and medical ethics"). Rather than give weight to these views, the Supreme Court in *Dobbs* went out of its way to observe that *Roe v. Wade* gave a "lengthy account" of the views of the American Medical Association and the American Public Health Association. *Id.* at 2243, 2267. The *Dobbs* Court *derided* this approach as the "sort of fact-finding that might be undertaken by a legislative committee[,]" and it criticized *Roe* for failing to "explain why these sources shed light on the meaning of the Constitution . . . ." *Id.* at 2267. Medical groups, *Dobbs* indicated quite plainly, do not get to dictate the constitutionality of state health laws. Quite the opposite: States have the authority to pass laws to "preserv[e] … the integrity of the medical profession." *Id.* at 2284. And Oklahoma has a difficult time imagining something more harmful to the medical profession's integrity than its potential embrace of castrating and sterilizing minors or pumping them full of life-altering hormones when their bodies are indisputably healthy.

Nor is a lengthy "fact-finding" inquest appropriate in these cases. *Dobbs* resolved the "pretext" inquiry in a single sentence. *See id.* at 2246 ("[A]s the Court has stated, the 'goal of preventing abortion' does not constitute 'invidiously discriminatory animus' against women." (quoting *Bray*, 506 U.S. at 273-74)). Here, the State's goal is nearly identical. Abortion restrictions seek to prohibit physicians from harming vulnerable human beings, as do restrictions on physicians pumping children full of

hormones, cutting off body parts, and irreversibly transforming their healthy bodies. If there is no "discriminatory animus" in *Dobbs*, there is none here, and heightened scrutiny does not apply.

In any event, Plaintiffs do not even allege here that all transgender youths need to chemically alter their body to align with their perceived gender identity prior to reaching adulthood. Instead, Plaintiffs merely allege that "[f]or *some older* adolescents, it *may* be medically necessary and appropriate to treat them with gender-affirming hormone therapy . . . ." Doc. 2 at ¶ 65 (emphases added). Implicit in this allegation is the admission that for at least some adolescents with gender dysphoria, and especially younger ones, powerful hormones are not prescribed. The law, then, only applies to a subsection of the adolescent population with gender dysphoria, much like how laws prohibiting abortion only apply to a subsection of pregnant women that would actually seek an abortion. This is a strong indication that Oklahoma is targeting the *procedures* and not the *persons*.

Plaintiffs try to undermine this obvious point by asserting that SB 613 discriminates against transgender youths because puberty blockers, hormones, or surgeries are allowed in Oklahoma when not done for purposes of a gender transition. Doc. 2 at ¶ 5; *see also* OKLA. STAT. tit. 63, § 2607.1(A)(2)(b) (explaining what SB 613 does not apply to, including "services provided to individuals born with ambiguous genitalia, incomplete genitalia, or both male and female anatomy, or biochemically verifiable disorder of sex development"). This claim is similarly unavailing. Discrimination involves treating individuals "worse than others who are similarly situated." *Bostock*, 140 S. Ct. 1731, 1740 (2020). And patients seeking to ingest cross-sex hormones or cut off healthy body parts are not "similarly situated" or "alike in all relevant respects," *Ashaheed*, 7 F.4th at 1250, to those that need the treatments to address an objective medical problem with their physical body.

Importantly, Plaintiffs do not allege that there is anything wrong with the bodies of transgender minors. Gender dysphoria does not mean a person's body is physically unhealthy. It only means that the healthy body is genetically or biologically of a sex that is different from the person's

proclaimed gender identity. What makes these medical interventions on minors controversial—driving legislative concern—is the fact that they artificially delay normal puberty, increase estrogen or testosterone to unnatural levels for male or female bodies, and permanently remove important body parts that are functioning and healthy. This is simply not the same thing in "all relevant respects" to a situation where, for example, a five-year-old girl is experiencing a menstrual period and seeking puberty blockers to postpone a dramatically precocious puberty. These are very different scenarios, and it is not discriminatory for the State to prohibit treatment in one but not the other. The FDA, after all, has approved puberty blockers for precocious puberty, but not for "gender-affirming" care. At bottom Plaintiffs cannot identify a single drug, treatment, or surgery that is not available to a transgender minor but is available to a similarly situated non-transgender minor. As such, the Act does not discriminate on the basis of sex.

Again, *Dobbs* is instructive. Abortion laws universally come with exceptions, some similar to the ones here. *Compare Dobbs*, 142 S. Ct. at 2243 (noting Mississippi permitted abortions "in a medical emergency or in the case of a severe fetal abnormality") *with* OKLA. STAT. tit. 63, § 2607.1(A)(2)(b)(6) (permitting treatment when "any physical injury or illness … would, as certified by a physician, place the individual in imminent danger of death or impairment of a major bodily function unless such treatment is performed"). *Dobbs* never even *hinted* that such carveouts could somehow subject State laws to heightened scrutiny. And, of course, to attack the State for spelling out various logical exceptions is to attack legislators for attempts at narrow tailoring. If accepted, this would perversely encourage legislators to paint with as (over)broad a brush as possible.

Moreover, the selective sampling of legislative quotes Plaintiffs allege does not plausibly indicate that SB 13 was enacted with a discriminatory intent. At the dismissal stage, Plaintiffs must plausibly allege that the law was passed with a purpose to discriminate, not just that it has a disparate impact. *See Washington v. Davis*, 426 U.S. 229, 239 (1976). That is, Plaintiffs must plausibly allege "that

11

a discriminatory purpose has been a motivating factor in the decision …." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). And again, although this Court must accept Plaintiffs' factual assertions as true, it does not need to accept the legal or implausible conclusions that Plaintiffs draw from those assertions. *See Iqbal*, 556 U.S. at 678; *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The Complaint does not meet this standard.

Courts have long frowned upon ascribing intent to a law based on stray statements from legislators. This is in part because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). As such, "the statements of a few legislators concerning their motives for voting for legislation is a reed too thin to support invalidation of a statute." *Citizens for Constitutional Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023). An even thinner reed is present here, where Plaintiffs allege that fifteen bills were introduced in the Oklahoma Legislature that sought to prohibit or limit aspects of gender transitioning. Doc. 2 at ¶ 110. Redundant bills are filed all the time. And if a bill's mere introduction can affect a different law's constitutionality, that would improperly chill legislative action.

Plaintiffs also cite Oklahoma laws that require minors in public schools to use the bathroom and play on the sports teams consistent with their biological sex, as well as a law ensuring that birth certificates accurately record biological sex. *Id.* at ¶ 115. But each of those laws are also supported by readily apparent non-discriminatory state interests and do not support a plausible inference of discriminatory intent against transgender minors. *See, e.g.*, *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc) ("[S]eparating school bathrooms based on biological sex passes constitutional muster and comports with Title IX."). Indeed, just last week a judge in the Northern District of Oklahoma upheld Oklahoma's law relating to birth certificates—a law Plaintiffs cite as evidence of foul intent here. *See Fowler*, supra, Doc. 52 at 46 ("Because there is a reasonably conceivable

12

state of facts that provides a rational basis for Defendants' Policy, the court finds that the Policy does not violate the Fourteenth Amendment.").

Plaintiffs do little better with their citationless, context-free quotes from a couple of legislators. Even if accurate, the statements do not plausibly indicate that discriminating against transgender minors was a motivating factor in the decision for the Legislature as a whole. Rather, the statements all point to the conclusion that the individual legislators in question believed that the children will be *better off* following the passage of SB 613, not that any harm to them is desired. For example, the statement (sans context) comparing the treatments in question to "starving your child to death," Doc. 2 at ¶ 113, suggests that the representative believes puberty blockers, hormones, castration, and mastectomies are highly dangerous for minors and that he sees a similarity between gender dysphoria and anorexia nervosa. He would hardly be the first to make this analogy.[4] Plaintiffs point to a different representative's alleged statements about "delusional play acting," *id.* at ¶¶ 112, 114, but even this sharp rhetoric is not dissimilar from stories told by detransitioners. Plaintiffs cannot deny that there are at least some individuals who thought they were transgender but later admitted they were mistaken. In any event, a single legislator's alleged disagreement with the premises surrounding transgenderism, no matter how fierce, cannot possibly be grounds for holding an entire statute to be unconstitutional in a Legislature with 48 Senators and 101 Representatives.

For all these reasons and more, SB 613 does not purposefully discriminate on the basis of transgender status such that any level of heightened scrutiny is merited.

### iii.   The Act does not discriminate based on sex.

Plaintiffs next allege that the Act discriminates on the basis of sex. Doc. 2 at ¶ 211. This

---

[4] *See, e.g.*, Cat Cattinson, *If I were a trans kid today: Here's what potentially saved my life*, FOXNEWS.COM (Nov. 28, 2022), *available at* https://www.foxnews.com/opinion/if-i-were-trans-kid-today-heres-what-potentially-saved-my-life ("Body modification is not a treatment for mental illness in any other scenario. Imagine if an anorexic requested a 'weight-affirming' gastric bypass. Any honest medical professional would be horrified.")

argument is similarly unavailing. SB 613 does not discriminate on the basis of sex nor sex stereotypes. Unlike the law in *Dobbs*, it doesn't even single out one sex over the other. Instead, the Act creates restrictions affecting both sexes based on biological realities. It does not allow doctors to push a physically healthy minor's hormone level beyond that which is the normal, healthy range for a person of that sex, whether it be male or female. For example, it is unlawful to prescribe a biological boy an estrogen dose designed to raise the levels of estrogen in his body to an unnatural level that would transform his healthy body—a transformation that would come with serious risks. The Act only bans treatment designed to change one's existing healthy body or to disrupt natural bodily processes that are ongoing, acknowledging the biological reality that the two sexes experience those natural bodily processes differently. Contrary to Plaintiffs' assertions, SB 613 is based on biology, not sex stereotypes.

To hold otherwise would call into question laws prohibiting practices like female genital mutilation and, contra *Dobbs*, abortion. Indeed, taken to its logical conclusion, it would also risk upending medicine as we know it. Men's and women's clinics and specialists are common in medicine; to hold that such practices are automatically suspect—or that state regulations of these practices are automatically suspect—would be both incredibly silly and scientifically absurd. It would also be passing strange to say that a group of physicians can label themselves as providing a certain type of procedure to a certain group of people ("gender-affirming care," here) and then claim that a State's stepping in to regulate that practice is per se discriminatory. Plaintiffs cannot have it both ways.

The Complaint alleges that SB 613 discriminates on the basis of sex because it prohibits gender transition procedures that "attempt[] to affirm the minor's perception of his or her gender or [] sex," such as "procedures that alter or remove … characteristics or features … typical for the individual's biological sex." *Id.* (quoting OKLA. STAT. tit. 63, § 2607.1(A)(2)(a)). In support of this, Plaintiffs will likely point to *Bostock*'s statement that "discriminating against transgender persons … unavoidably discriminates against persons with one sex identified at birth and another today." 140 S. Ct. at 1746.

14

But *Bostock* doesn't apply here. *Bostock,* in short, is not applicable to the medical context. Undergirding *Bostock's* rationale was the premise that it is unlawful to take a person's sex into account when making employment decisions. The reasons for this are obvious. Whether a person is male or female has little bearing on their ability to perform a job. On the other hand, whether a *patient* is male or female is crucial for the practice of medicine. The reason for this is that male and female bodies are biologically distinct, a fact the Supreme Court has repeatedly recognized. "Physical differences between men and women … are enduring . . . ." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Put differently, "the two sexes are not fungible . . . ." *Ballard v. United States*, 329 U.S. 187, 193 (1946). And "[t]here is nothing irrational or improper in the recognition" of the differences between the bodies of boys and girls when regulating medical treatments. *Nguyen v. INS*, 533 U.S. 53, 68 (2001). A treatment that is necessary for one of the sexes might be harmful to the other, and vice versa.

There's more. *Bostock* emphasized that the "only question" before the Supreme Court was the *employment law* question of "whether an employer who fires someone simply for being homosexual or transgender has … discriminated against that individual 'because of such individual's sex.'" *Id.* at 1753 (citation omitted). And, again, the *Bostock* Court did "not purport to address bathrooms, locker rooms, or *anything else of the kind.*" *Id.* (emphasis added). *Bostock*'s analysis was limited to Title VII, which contains very different language and was enacted a century after the Constitution's Equal Protection Clause. These factors alone render *Bostock* nearly irrelevant here. This Court should not be swayed by nonbinding precedent such as *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). In addition to ignoring *Dobbs* entirely, the Eighth Circuit based its holding on a misconception of the relevant law. The Court stated that

> medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex. A minor born as a male may be prescribed testosterone or have breast tissue surgically removed, for example, but a minor born as a female is not permitted to seek the same medical treatment.

*Id.* at 669. This is erroneous. Nothing in either law prohibits girls from having breast tissue removed *if there is something wrong with their breasts.* It only prohibits girls from having healthy breast tissue removed for the sole purpose of making her body look more like how she thinks a boy's body should look. The Act similarly does not categorically ban giving testosterone to girls. The fact that *Brandt*'s conclusion is based on an evident misunderstanding of the law at issue greatly diminishes its persuasive value.

### B. The Act easily passes rational-basis scrutiny.

Because the law does not purposefully discriminate, it is examined under rational-basis scrutiny. That is, "[i]t must be sustained if there is a rational basis on which the legislature could have thought it would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284. Plaintiffs' equal protection claim must fail "if there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Copelin-Brown v. N.M. State Pers. Off.*, 399 F.3d 1248, 1255 (10th Cir. 2005) (quoting *Spragens v. Shalala*, 36 F.3d 947, 951 n.3 (10th Cir. 1994)). Rational-basis review does not turn on testimony from dueling experts, as this form of review does not allow the Court to "conduc[t] the sort of fact-finding that might be undertaken by a legislative committee," or defer to the positions of various medical associations. *Dobbs*, 142 S. Ct. at 2267. And the State has "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). Again, *Dobbs* upheld Mississippi's law despite the medical establishment's opposition. Here, Plaintiffs cannot plausibly claim that the State lacks a rational basis for enacting SB 613.

The government, undisputedly, possesses a "strong interest in public health." *Clark v. City of Draper*, 168 F.3d 1185, 1189 (10th Cir. 1999). That interest is especially powerful in the context of minors. *Aid for Women v. Foulston*, 441 F.3d 1101, 1119 (10th Cir. 2006). Beyond just the health of minors, "the state has a strong *parens patriae* interest in protecting the best interests of minors." *Id.*; *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The State, of course, has a duty of the highest order to protect the interests of minor children, particularly those of tender years."). Plaintiffs cannot plausibly

allege that the State has no rational interest in protecting its children from medical treatments that alter and mutilate their healthy bodies. And even were this Court to disagree with Oklahoma about the experimental nature of the gender transition treatments, the State still has a legitimate interest in making sure that its minors do not make such major medical decisions before they have reached the age of majority. *Thompson v. Oklahoma*, 487 U.S. 815, 825 n.23 (1988) ("we act in [minors'] interest by restricting certain choices that we feel they are not yet ready to make with full benefit of the costs and benefits attending such decisions").

If this Court applied intermediate scrutiny, Plaintiffs still cannot plausibly alleged that the Act would fail. "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). SB 613 meets intermediate scrutiny for the same reason it passes the rational-basis test. The Legislature's interest in protecting the health and well-being of its young people is clearly important, and this Act, which requires that they reach the age of maturity before agreeing to drastic and life-altering transitioning procedures, is substantially related to that objective.

Thus, Plaintiffs have failed to plausibly allege that SB 613 violates the Equal Protection Clause. To hold otherwise requires ignoring the lessons and instructions of *Dobbs*.

## III.   **Plaintiffs cannot plausibly allege that the Act violates the Due Process Clause.**

### A.  *Parents possess no fundamental right to have harmful surgeries and hormone treatments given to their child.*

Substantive due process claims are subject to a two-part analysis. *Dobbs*, 142 S. Ct. at 2246. Courts examine whether the alleged right is one that is "objectively, deeply rooted in this Nation's history and tradition, . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." *Glucksberg*, 521 U.S. at 720-21 (cleaned up). This analysis requires a "'careful description' of the asserted fundamental liberty interest[,]" *id.* at 721 (quoting *Reno*

*v. Flores*, 507 U.S. 292, 302 (1993)), and "a careful analysis of the history of the right at issue." *Dobbs*, 142 S. Ct. at 2246. This careful analysis means that "[i]dentifying a new fundamental right subject to the protections of substantive due process is often an uphill battle, as the list of fundamental rights is short." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008) (citation omitted); *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). The Supreme Court has cautioned "against the natural human tendency to confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs*, 142 S. Ct. at 2247. This caution aids the Court in ensuring that it is not merely substituting its policy preference for the State's. *See id.* at 2247-48; *see also Fowler*, supra, Doc. 52 at 17 (warning against "constitutionalizing the judge's own notions of right and wrong").

Here, Plaintiffs have not alleged a carefully described right. Instead of following *Glucksberg*'s command, Plaintiffs assert that they have the expansive fundamental right as parents "to seek and to follow medical advice to protect the health and wellbeing of their minor children." Doc. 2 at ¶ 250. From the Complaint, it is unclear how there could be any limitations on the scope of such a right, stated as such. To be sure Defendants believe that parents play an important role in decisions surrounding their children's medical care,[5] but parents do not possess a constitutional right to have their children ingest dangerous drugs and cut off healthy body parts.

Much like a "doctor's claim is derivative from, and therefore no stronger than, the patients' [claim]," *Whalen v. Roe*, 429 U.S. 589, 604 (1977), a parent's right to direct the medical care of a child is derivative from, and therefore no stronger than, the child's own right to treatment, *see Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 75 (1976) ("Any independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy

---

[5] The ACLU, to the contrary, is wildly hypocritical on this point, as the organization opposes laws that would require teachers to inform parents if their children were identifying as the other gender. *See, e.g.*, Harper Seldin, *Trans Students Should Be Treated With Dignity, Not Outed by Their Schools*, ACLU (Jan. 26, 2023), *available at* https://www.aclu.org/news/lgbtq-rights/trans-students-should-be-treated-with-dignity-not-outed-by-their-schools.

of the competent minor . . . ."). And Plaintiffs do not even attempt to claim that minors—or anyone—possesses a "right" to seek these medical interventions in this situation. This is presumably why Plaintiffs have not alleged a substantive due process claim for the minors themselves.[6] Moreover, given that Plaintiffs do not allege these procedures have a long history in the United States, it is impossible to show that a right to pursue this treatment is "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 720-21 (citations omitted).

Undeterred, Plaintiffs in their injunction motion cite to nonbinding decisions that purport to apply a fundamental parental right "to direct their children's medical care." Doc. 6 at 20 (quoting *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019)). These decisions are either distinguishable or clearly erroneous, and do not allow Plaintiffs to escape dismissal on this claim. *Kanuszewski* involved the parental right to refuse the drawing and storage of their children's blood by state officers. 927 F.3d at 405. To the extent that the decision could be read more broadly to endorse a fundamental right to obtain a specific treatment for one's child, it is wrong. There is a world of difference between the State forcibly taking a child's blood or forcing a specific drug into a child's body and the State prohibiting certain radical and life-altering treatments until the minor is of age. And the Supreme Court has explicitly rejected the view that "the right to refuse unwanted medical treatment could be some-how transmuted into a right to" receive a specific treatment. *Glucksberg*, 521 U.S. at 725-26; *see also Rutherford v. United States*, 616 F.2d 455, 456-57 (10th Cir. 1980) (rejecting the proposition that a constitutional right to privacy encompassed a right for mentally ill patients "to take whatever treatment they wished regardless of" federal law).

In *Glucksberg*, the Supreme Court acknowledged "that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment[,]" and yet still held that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due

---

[6] It might also explain why the United States did not defend Plaintiffs' due process claim. Doc. 61.

Process Clause." 521 U.S. at 720, 728. Similar to Plaintiffs in this case, the respondents in *Glucksberg* sought to analyze their substantive due process claim from a high level of abstraction. Drawing on Supreme Court precedent that granted rights to reject life-saving medical care or to obtain an abortion—the latter being overturned by *Dobbs*—they argued that the due process clause protects "basic and intimate exercises of personal autonomy" which "protects the 'liberty of competent, terminally ill adults to make end-of-life decisions free of undue government interference.'" *Id.* at 724 (citation omitted). The Court rejected both this broad reading of precedent and the abstract description of the alleged right. *Id.* ("The question presented in this case, however, is whether the protections of the Due Process Clause include a right to commit suicide with another's assistance."). Following the Supreme Court's lead, the question in this case is whether the Due Process Clause includes a fundamental right for parents to choose for their children to use puberty blockers, cross-sex hormones, and body-part-removing surgeries for the purposes of effectuating a gender transition.

Plaintiffs have not conducted the historical inquiry necessary to "recognize a new component of 'liberty' protected by the Due Process Clause." *Dobbs*, 142 S. Ct. at 2247. The Complaint is empty of any historical reasoning for why their purported right exists under the Constitution. The novelty, alone, of Plaintiffs' claim is reason enough for dismissal. *See Flores*, 507 U.S. at 303 ("The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it"). In addition to the novel nature of their claim, Plaintiffs' failure to provide any form of historical evidence that their "right" existed in 1868 when the Fourteenth Amendment was ratified is dispositive of their claims.

Moreover, Plaintiffs' view of substantive due process conflicts with *Dobbs*. There, plaintiffs unsuccessfully asserted a right to receive a treatment they described as critical medical care. *Dobbs*, 142 S. Ct. at 2303-04 (Kavanaugh, J., concurring). However, the Court held that "the clear answer is that the Fourteenth Amendment does not protect the right to an abortion." *Dobbs*, 142 S. Ct. at 2248. The inevitable import of Plaintiffs' arguments in this case would—if adopted—serve to overrule *Dobbs* as

applied to minors. Plaintiffs' articulation of their alleged "fundamental right of parental autonomy [as] includ[ing] the right of parents to seek and to follow medical advice to protect the health and wellbeing of their minor children[,]" Doc. 2 at ¶ 250, would clearly apply to parents that would like their seventeen-year-old daughter to receive an abortion. If Plaintiffs are correct, abortion restrictions would have to meet strict scrutiny as applied to minors whose parents supported the abortion, while the restrictions would only be subjected to rational-basis review as applied to adults. Such a distinction would make little sense, and if true would have certainly been discussed at some point in *Dobbs*.

This Court should refrain from endorsing Plaintiffs' efforts to accomplish an end-around the Supreme Court's substantive due process jurisprudence. Plaintiffs have failed to plausibly allege a violation of the Due Process Clause. That claim should be dismissed.

**IV.** **Plaintiffs cannot plausibly allege that Hospital Defendants violated the Equal Protection Clause by complying with SB 3.**

As an initial matter, Plaintiffs' claims against SB 3 must fail for the same reasons their claims against SB 613 must fail: it does not violate the Equal Protection Clause for a State to decline to provide puberty blockers, hormones, or castration and mastectomies to minor children. *Supra* Section II. And it is simply not the case that "whether a person can receive certain medical treatment turns on their assigned sex at birth" or transgender status. Doc. 2 at ¶ 237. Plaintiffs have not identified a single drug, treatment, or surgery that is not available to a transgender minor but is available to a similarly situated non-transgender minor under the Hospital Defendants' SB 3 policy.

Take puberty blockers for example. Under the policy, they can be prescribed to anyone—regardless of sex or transgender status—to delay puberty when it is occurring abnormally early. What is prohibited is the use of blockers to delay naturally occurring, non-precocious puberty, in males or females, transgender identifying or no. The prohibition does not hinge on one's sex or transgender status. Prohibited surgeries follow the same analysis. If a young male has some sort of dangerous

infection in his genitalia that requires its surgical removal, under SB 3 that boy would be allowed to have his genitals removed—just as a transgender girl would be able to in the same situation. SB 3 simply prohibits the State from surgically removing perfectly healthy genitals. Again, this is not based on transgender status or sex, but rather on the specific treatment that is sought. And regardless, facial relief would be improper here, because no Plaintiff has alleged any intention of receiving surgeries, nor is there any indication that any pre-pubescent child would have standing. *See supra* Section I.

Plaintiffs' SB 3 claim also has troubling implications. SB 3, and the Hospital Defendants' compliance with that law, does not itself prohibit Plaintiffs from obtaining the treatment that they seek. Indeed, Plaintiffs' own declarations demonstrate that while SB 3 has been in effect they have successfully received their desired care elsewhere. By itself, the SB 3 policy only keeps Plaintiffs from receiving those treatments at specific state-sponsored hospitals. Plaintiffs possess no right to receive a certain treatment, and they certainly have no right to receive that treatment at a specific location, or to force the State to provide it. *See Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007) ("we conclude that there is no fundamental right 'deeply rooted in this Nation's history and tradition' of access to experimental drugs for the terminally ill" (citation omitted)); *Rutherford v. United States*, 616 F.2d 455, 456-57 (10th Cir. 1980). Even during the *Roe* era, States and even private hospitals were not *required* to provide abortions. *See, e.g.*, OKLA. STAT. tit. 63, § 1-741 (enacted 1978) ("No private hospital, hospital director or governing board of a private hospital in Oklahoma, is required to permit abortions to be performed or induced in such hospital.").

It cannot be disputed that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust v. Sullivan*, 500 U.S. 173, 194 (1991). And even within the context of a fundamental right—which child castration and mutilation is not— "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Id.* at 193 (quoting *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 549 (1983)). Similarly,

the Supreme Court upheld a congressional statute that restricted certain funds to public libraries across the country to only those libraries that have technology in place to prevent any person from accessing obscene materials or child pornography. *See United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 200-01, 203 (2003). Here, the Legislature, through SB 3, chose to not use state money to fund procedures and treatments that it views as experimental and dangerous. Hospital Defendants' decision to comply with SB 3 is not any more of a constitutional violation than public libraries complying with the law that requires them to block access to some material that might be constitutionally protected.

Under Plaintiffs' view, however, it would violate the Constitution for a state actor to decline to aid minor patients with hormones and radical surgeries. For example, an endocrinologist at a state hospital who treats patients with precocious puberty would be discriminating against transgender individuals if he or she refrained from prescribing puberty blockers to prevent normal puberty for a transgender patient. And again, heightened scrutiny would also apply to the existence of male or female health clinics or a state clinic that only provides pap smears to women. Such absurdities should not be countenanced, and Plaintiffs' Equal Protection claim against SB 3 should be dismissed.

## V.   <u>Plaintiffs cannot plausibly allege that Hospital Defendants violated Section 1557 of the Affordable Care Act by complying with SB 3.</u>

Finally, the Hospital Defendants' compliance with SB 3 does not violate Section 1557 of the Affordable Care Act ("ACA"). 42 U.S.C. § 18116 provides that

> an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 . . ., title IX of the Education Amendments of 1972 . . ., the Age Discrimination Act of 1975 . . ., or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance . . . .

By its text, the ACA prohibits discrimination based on the grounds of the four statutes referenced: Title VI's focus on race, color, and national origin discrimination, Title IX's focus on sex discrimination, the Age Discrimination Act's prohibition on age discrimination, and the Rehabilitation

Act's prohibition on disability discrimination. "By referring to [those] four statutes, Congress incorporated the legal standards that define discrimination under each one." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 239 (6th Cir. 2019); *see also Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1208-10 (9th Cir. 2020); *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 378 (5th Cir. 2021). Therefore, for sex discrimination, Section 1557 of the ACA only bans the conduct banned by Title IX.

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Title IX then clarifies that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, *from maintaining separate living facilities for the different sexes.*" *Id.* § 1686 (emphasis added). Title IX regulations allow, among other things, schools to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport[,]" 34 C.F.R. § 106.41(b) (2020), and even requires universities to consider sex in allocating athletic scholarships. *Id.* at § 106.37(c) (2020). Importantly, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities, among others." *Adams*, 57 F.4th at 811.

For the reasons stated above, SB 3 does not discriminate based on sex or transgender status. Moreover, contrary to Plaintiffs' assertion, Doc. 2 at ¶ 261, discrimination based on transgender status is not protected under Title IX. The differences between Title IX and Title VII unavoidably lead to this conclusion. To begin, "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females." *Adams*, 57 F.4th at 812. As the Eleventh Circuit has emphasized, "if 'sex' were ambiguous enough to include 'gender identity,' … the various carveouts under the implementing regulations[] would be rendered meaningless." *Id.* at 813.

Why? Because "transgender persons … would be able to live in both living facilities associated with their biological sex and living facilities associated with their gender identity or transgender status." *Id.* And a rationale based on sex stereotyping would be equally meritless as "'sex' is not a stereotype." *Id.* After all, even *Bostock* "proceed[ed] on the assumption" that sex in Title VII refers "only to biological distinctions between male and female." *Id.* (quoting *Bostock*, 140 S. Ct. at 1739). Therefore, "sex" in Title IX does not include gender identity or transgender status. *See id.* at 815; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("*Bostock* extends no further than Title VII"); *Tennessee v. U.S. Dep't of Educ.*, 615 F.Supp.3d 807, 839, 842 (E.D. Tenn. 2022) (enjoining the Department of Education's interpretation that Title IX prohibited discrimination on the basis of gender identity).

Moreover, Dr. Lawlis does not even have standing to challenge SB 3 or Defendants' compliance with SB 3 because she possesses no right to perform certain treatments at a specific center. Given the lack of clarity of the header for Plaintiffs' fourth claim for relief, it is difficult to ascertain exactly what Dr. Lawlis's claim against Hospital Defendants is, but Plaintiffs do state that "[i]t is impossible for [Dr. Lawlis] to continue to comply with her obligations under Section 1557 and also comply with the restrictions imposed by the Hospital Defendants' SB 3 Policy." Doc. 2 at ¶ 272. This Court cannot accept this allegation as true, given that the Complaint also alleges that Dr. Lawlis has been able to continue to treat transgender patients after SB 3 went into effect—just at a different health clinic. Doc. 2 at ¶ 178. Dr. Lawlis might have faced logistical difficulties with moving to a private clinic, but none of her rights have been violated. Furthermore, at no point has Dr. Lawlis alleged that she is not allowed *by SB 3* to treat transgender patients at Oklahoma Children's Hospital.

Plaintiffs cannot plausibly alleged that Hospital Defendants have violated Section 1557.

## CONCLUSION

State Defendants respectfully request that this Court grant the motion to dismiss on all claims.

Respectfully submitted,

*s/ Zach West*

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
ZACH WEST, OBA #30768
  *Director of Special Litigation*
AUDREY WEAVER, OBA #33258
WILL FLANAGAN, OBA #35110
  *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:   (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for Defendants 15-53*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 16th of June, 2023, I electronically filed the foregoing MOTION

TO DISMISS BY DEFENDANTS 15-53 with the Clerk of Court using the CM/ECF system, which

will send notification of this filing to the attorneys of record and all registered participants.


 s/ *Zach West*
Zach West