UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

PETER POE, *et al.*,

Plaintiffs,

v.

GENTNER F. DRUMMOND, *et al.*,

Defendants.

No.   23-cv-00177-JFH-SH

## DEFENDANTS 15-53'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Submitted by:

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

ZACH WEST, OBA #30768
  *Director of Special Litigation*
AUDREY A. WEAVER, OBA #33258
WILL FLANAGAN, OBA #35110
  *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov

COUNSEL FOR DEFENDANTS 15-53                              June 16, 2023

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

I.  Sex is objective and binary; gender dysphoria is a mental health condition. .................2

II.  Pumping hormones and puberty blockers into children (and cutting off their healthy body parts) to treat gender dysphoria is a recent practice. ...............................................3

III.  Adolescent-onset gender dysphoria has surged in recent years. ...................................5

IV.  There are significant risks to these procedures—risks Plaintiffs decline to detail. ........6

   A.  *Puberty blockers can permanently sterilize children, damage their brains, and weaken bone density.* ..........6

   B.  *By taking testosterone, female minors risk infertility, psychiatric issues, heart failure, and more.* ................8

   C.  *By taking estrogen, male minors risk a loss of fertility, heart issues, weight gain, and more.* ......................9

   D.  *Surgeries to cut off breasts and genitals carry drastic harms that cannot be reversed.* ...............................10

V.  There is no consensus: the safety and efficacy of hormones and surgeries for minors is hotly disputed, and Plaintiffs' evidence is undeniably of low quality. ...................................11

VI.  European countries have been moving to restrict these procedures. .............................12

VII. Oklahoma enacted Senate Bill 613 to protect minors from permanent damage. ..........14

VIII. Plaintiffs seek a broad injunction but make no case for surgery or pre-pubescents. ....................................................................................................................15

IX.  Numerous witnesses, lay and expert, testify here in favor of Senate Bill 613. ..............16

ARGUMENT AND AUTHORITIES ..........................................................................................16

I.  Plaintiff cannot demonstrate a likelihood of success on the merits. ...............................17

   A.  *Plaintiffs are not likely to succeed on their Equal Protection claim.* ........................17

      i.  The Act does not discriminate based on transgender status. .................................18

      ii.  The Act does not discriminate based on sex. ......................................................20

      iii.  The Act passes rational-basis scrutiny. .............................................................22

   B.  *Plaintiffs are not likely to succeed on their Substantive Due Process Claim.* ...........27

II.  Facial relief is plainly inappropriate here, given Plaintiffs' concessions and omissions. ................................................................................................................29

III.  Plaintiffs have not shown that they will suffer irreparable harm. ..................................30

IV.  The balance of harms and the public interest favor the State. ......................................30

CONCLUSION ...................................................................................................................30

### TABLE OF AUTHORITIES

Cases

*Abigail All. for Better Access to Dev. Drugs v. von Eschenbach,*
   495 F.3d 695 (D.C. Cir. 2007) ............................................................................29

*Aid for Women v. Foulston,*
   441 F.3d 1101 (10th Cir. 2006) ...........................................................................22

*Aposhian v. Barr,*
   958 F.3d 969 (10th Cir. 2020) .............................................................................30

*Awad v. Ziriax,*
   670 F.3d 1111 (10th Cir. 2012) ...........................................................................16

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
   140 S. Ct. 2335 (2020) .........................................................................................29

*Bostock v. Clayton Cnty.,*
   140 S. Ct. 1731 (2020) ............................................................................. 18, 20, 21

*Bray v. Alexandria Women's Health Clinic,*
   506 U.S. 263 (1993) .............................................................................................18

*Brown v. Zavaras,*
   63 F.3d 967 (10th Cir. 1995) .......................................................................... 17, 18

*Citizens for Const. Integrity v. United States,*
   57 F.4th 750 (10th Cir. 2023) ..............................................................................20

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ....................................................................................... 17, 21

*Clark v. City of Draper,*
   168 F.3d 1185 (10th Cir. 1999) ...........................................................................22

*Clark v. Jeter,*
   486 U.S. 456 (1988) .............................................................................................22

*Collins v. Harker Heights,*
   503 U.S. 115 (1992) .............................................................................................27

*Copelin-Brown v. N.M. State Pers. Off.,*
   399 F.3d 1248 (10th Cir. 2005) ..................................................................... 22, 25

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) .............................................................................................29

*Diné Citizens Against Ruining Our Env't v. Jewell*,
    839 F.3d 1276 (10th Cir. 2016) ...............................................................................17

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ...............................................................................passim

*Dodds v. U.S. Dep't of Educ.*,
    845 F.3d 217 (6th Cir. 2016) ...............................................................................21

*Druley v. Patton*,
    601 Fed. App'x 632 (10th Cir. 2015) ...................................................................18

*Eknes-Tucker v. Marshall*,
    603 F. Supp. 3d 1131 (M.D. Ala. 2022) ...............................................................18

*Engquist v. Or. Dep't of Agr.*,
    553 U.S. 591 (2008) ...............................................................................17

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ...............................................................................16

*Free the Nipple-Fort Collins, v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ...............................................................22, 30

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ...............................................................................11, 22

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ...............................................................24

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
    927 F.3d 396 (6th Cir. 2019) ...............................................................................28

*Maryland v. King*,
    567 U.S. 1301 (2012) ...............................................................................30

*Michigan v. Bay Mills Indian Cmty.*,
    542 U.S. 782 (2014) ...............................................................................20

*Munaf v. Geren*,
    553 U.S. 674 (2008) ...............................................................................16

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) ...............................................................................20

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) ...............................................................................30

*Palmore v. Sidoti,*
    466 U.S. 429 (1984) ...............................................................................................23

*Price Waterhouse v. Hopkins,*
    490 U.S. 228 (1989) ...............................................................................................21

*Reno v. Flores,*
    507 U.S. 292 (1993) ...............................................................................................28

*Roper v. Simmons,*
    543 U.S. 551 (2005) ...............................................................................................26

*Rutherford v. United States,*
    616 F.2d 455 (10th Cir. 1980) ...............................................................................28

*Schrier v. Univ. of Colo.,*
    427 F.3d 1253 (10th Cir. 2005) .......................................................................16, 17

*SECSYS, LLC v. Vigil,*
    666 F.3d 678 (10th Cir. 2012) ...............................................................................17

*Seegmiller v. LaVerkin City,*
    528 F.3d 762 (10th Cir. 2008) ...............................................................................27

*State v. EPA,*
    989 F.3d 874 (10th Cir. 2021) ...............................................................................16

*Tonkovich v. Kan. Bd. of Regents,*
    159 F.3d 504 (10th Cir. 1998) ...............................................................................17

*Tuan Anh Nguyen v. INS,*
    533 U.S. 53 (2001)..................................................................................................21

*Tudor v. SEOSU,*
    13 F.4th 1019 (10th Cir. 2021) ...............................................................................18

*United States v. O'Brien,*
    391 U.S. 367 (1968) ...............................................................................................20

*United States v. Virginia,*
    518 U.S. 515 (1996) ...............................................................................1, 21, 22, 26

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ...............................................................................................20

*Ward v. Utah,*
    398 F.3d 1239 (10th Cir. 2005) ...............................................................................17

*Washington v. Glucksberg,*
521 U.S. 702 (1997) ..........................................................................................................27

*Williamson v. Lee Optical of Okla. Inc.,*
348 U.S. 483 (1955) ..........................................................................................................20

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ..............................................................................................................16

**Statutes**

OKLA. STAT. tit. 10A, § 2-8-224 ............................................................................................26

OKLA. STAT. tit. 21, § 842.1 ...................................................................................................26

OKLA. STAT. tit. 37A, § 6-120 ...............................................................................................26

OKLA. STAT. tit. 3A, § 726 .....................................................................................................26

OKLA. STAT. tit. 63, § 2607 .............................................................................. 14, 15, 16, 29

OKLA. STAT. tit. 63, § 7302 ...................................................................................................26

**Other Authorities**

Joshua Cohen, *Increasing Number of European Nations Adopt a More Cautious Approach to Gender-Affirming Care Among Minors,*
FORBES (June 6, 2023) .......................................................................................................23

Emily Bazelon, *The Battle Over Gender Therapy,*
NEW YORK TIMES MAG. (June 15, 2022) ...................................................................... 4, 24

Erik Wemple, *A second look at the attacks on the New York Times's trans coverage,*
THE WASHINGTON POST (June 15, 2023) ........................................................................25

Frieda Klotz, *A Teen Gender-Care Debate Is Spreading Across Europe,*
THE ATLANTIC (April 28, 2023) .................................................................................. 13, 24

Lauren Moss & Josh Parry, *Puberty blockers to be given only in clinical research,*
BBC NEWS (June 10, 2023) ..............................................................................................23

Leor Sapir & Colin Wright, *Medical Journal's False Consensus on 'Gender-Affirming Care',*
THE WALL STREET JOURNAL (June 9, 2023) ...................................................................15

Megan Twohey & Christina Jewett, *They Paused Puberty, but Is There a Cost?,*
NEW YORK TIMES (Nov. 14, 2022)..............................................................................passim

NHS England, *Implementing advice from the Cass Review*
(June 2023)...........................................................................................................................2

*Senate approves bill prohibiting gender transition procedures for minors*,
   OKLA. SENATE (Feb. 15, 2023)..................................................................................................14

## INTRODUCTION

Bluntly put, Plaintiffs urge this Court to enjoin the State from preventing doctors from injecting physically healthy children with powerful life-altering hormones and from mutilating or removing their breasts and genitals. Plaintiffs say a "right" to take these radical actions exists, Doc. 6 at 1, but no such right can be found in our Constitution, explicitly or implicitly. For reasons explained in Defendants' motion to dismiss, Doc. 80, Plaintiffs are highly unlikely to succeed in convincing the Supreme Court to apply a heightened "undue interference" standard here, Doc. 6 at 1, just one year after it abandoned as "egregiously wrong" the "undue burden" standard it had long applied to another purportedly "essential" medical procedure in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242-44 (2022). The Constitution does not speak to this topic, ergo States are free to regulate it.

Plaintiffs' injunction motion fails for other reasons, as well. For starters, an injunction stopping enforcement of the entire law is obviously inappropriate. This is because Plaintiffs mostly ignore the surgical aspect of Senate Bill 613 ("SB 613") in their motion—one can imagine why—and none of the individual Plaintiffs mentions a desire or plan for surgery. As such, Plaintiffs don't have standing to challenge that half of the statute. Moreover, although they seek facial relief, Plaintiffs essentially concede that SB 613 is appropriate for pre-pubescent children. *See* Doc. 6 at 3 ("Under the Protocols, no medical treatments are provided before the onset of puberty."); *see also* Doc. 6-3, ¶ 32; Doc. 6-4, ¶ 25; Doc. 6-15, ¶ 13. That is another large category of minors for whom an injunction would be plainly mistaken. Plaintiffs, in short, have barely even *tried* to show that broad injunctive relief is merited here.

Moreover, Plaintiffs' affidavits are seemingly based on the conceit that sex and genetics do not really exist. They emphasize that each plaintiff really is a boy or a girl depending on their gender identity, and that their sex "assigned at birth" was wrong. But it is not stereotyping to legislate based on biology or genetics in the medical field. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women … are enduring."). In any event, it is Plaintiffs who

1

rely extensively on stereotypes, *see, e.g.*, Doc. 6-10, ¶ 5 (claiming a child "acted like a boy" because "[h]e would play in creeks and ponds, and always come home muddy"), while accusing Defendants of "stereotyping" by insisting that children's natural biological development should not be interrupted.

Finally, Plaintiffs paint a one-sided picture of the medical procedures and medical community on these issues. Most tellingly, Plaintiffs never actually explain the substantial risks of the procedures and practices they promote. They claim patients are told the risks, but they can't even bring themselves to inform the Court of the details. Plaintiffs also mostly ignore recent seismic developments in these fields in Europe. Another shoe dropped just last week, when England's National Health Service (NHS) announced—after an independent review of the evidence "highlight[ed] the **significant uncertainties surrounding the use of hormone treatments**"—that it "will only commission puberty suppressing hormones as part of clinical research." NHS ENGLAND, *Implementing advice from the Cass Review* (June 2023) (emphasis added).[1] Defendants' experts explain the other side of the story, as do three women who underwent similar procedures in Oklahoma and deeply regret it. The Constitution does not require Oklahoma to ignore these developments or these witnesses.

## BACKGROUND

### I.  Sex is objective and binary; gender dysphoria is a mental health condition.

Sex is objective and binary: Whether a person is male or female "can be ascertained regardless of any declaration by a person, such as by chromosomal analysis or visual inspection." Ex. 1, Expert Report of James Cantor, PhD, ¶ 106; *see also* Ex. 2, Expert Report of Michael Laidlaw, M.D., ¶¶ 14-15, 23-29; Ex. 3, Expert Report of Angela Thompson, MD, MPH, FACOG, ¶ 122; Ex. 4, Expert Decl. of Curtis Harris, MS, MD, JD, ¶ 31. The Diagnostic and Statistical Manual of Mental Disorders (DSM-5 TR), for example, states that "sex and sexual refer to the biological indicators of male and

---

[1] *Available at* https://www.england.nhs.uk/commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/implementing-advice-from-the-cass-review/.

female (understood in the context of reproductive capacity), such as in sex chromosomes, gonads, sex hormones, and non-ambiguous internal and external genitalia." Ex. 2, Laidlaw, ¶ 15; *see also* Ex. 1, Cantor ¶ 107. Sex is not "assigned at birth"—to the contrary, "the objective sex of a newborn was the same on the day before as the day after the birth." Ex. 1, Cantor, ¶ 108; Ex. 4, Harris, ¶ 31.

Gender dysphoria is a "mental health condition … characterized by a strong and lasting desire to be the opposite sex, and 'clinically significant' distress of sufficient severity to impair the individuals' ability to function in their daily life setting." Ex. 1, Cantor, ¶ 110 (citing the DSM-5 TR); Ex. 2, Laidlaw, ¶¶ 42, 51. Moreover, gender dysphoric "children are not simply younger versions of gender dysphoric adults. They differ in virtually every objective variable measured, including in their responses to treatments." Ex. 1, Cantor, ¶ 111. Thus, to understand gender dysphoria in children and adolescents, one cannot extrapolate from research into adult gender dysphoria. *Id.* ¶¶ 111-13.

## II.   Pumping hormones and puberty blockers into children (and cutting off their healthy body parts) to treat gender dysphoria is a recent practice.

"[N]ormally timed puberty" is a "crucial period of development" for children. Megan Twohey & Christina Jewett, *They Paused Puberty, but Is There a Cost?*, NEW YORK TIMES (Nov. 14, 2022) [hereinafter "NYT"][2]; *see also* Ex. 1, Cantor, ¶¶ 68, 227, 235; Ex. 2, Laidlaw, ¶¶ 33, 65-70, 259. Unsurprisingly, then, "[f]or decades, transgender medical treatment in multiple countries was restricted to patients 18 and older." NYT, *supra*. This only began to change in the past several decades. *Id.* Indeed, Plaintiffs' own expert claims the "first reference to the use of puberty blockers for the treatment of gender dysphoria in the medical literature was in 1998, 25 years ago," and observational trials of puberty blockers apparently did not begin recruiting participants until 2000. Doc. 6-16, ¶ 28. So puberty blockers, cross-sex hormones, and surgeries for minors did not take root in the United States until over 130 years after the Fourteenth Amendment was ratified. *See Dobbs*, 142 S. Ct. at 2248.

---

[2] *Available at* https://www.nytimes.com/2022/11/14/health/puberty-blockers-transgender.html.

More recently, medical providers have increasingly "lowered the ages at which they prescribe the treatments" in question. NYT, *supra*. Indeed, without an evidentiary basis, WPATH recently removed guidelines for a minimum age for the provision of hormones and surgery for minors. Ex. 2, Laidlaw, ¶¶ 181-85; *see also* Ex. 1, Cantor, ¶ 103 ("None of these studies and none of these reviews support such a change . . . ."), ¶ 250 ("The removal of age restrictions was not based on any research evidence at all . . . ."). And "[m]any physicians in the United States and elsewhere are prescribing blockers . . . as early as age 8 . . . and allowing them to progress to sex hormones as soon as 12 or 13." NYT, *supra*. For numerous children, then, including children in Oklahoma, the "crucial" period of "normally timed puberty" is being intentionally interrupted.

For various reasons, including its overruling of systematic review results based on the "*lowest* level of evidence in science," the WPATH guidelines "cannot be called evidence-based guidelines under any accepted meaning of that term." Ex. 1, Cantor, ¶¶ 101-04. But even taken at face value, WPATH and Endocrine Society instructions are mere "recommendations, not requirements[,]" since protocols are "largely left to the discretion of individual clinics and practitioners." NYT, *supra*. Doctors can therefore ignore them and, for example, ignore a patient's mental health. Although Plaintiffs' experts pretend all doctors everywhere are following the exact instructions of these organizations, Doc. 6 at 4, that simply is not the case. Indeed, there is a significant number of practitioners in this area who believe these increasingly lax guidelines are still far too strict. *See* Emily Bazelon, *The Battle Over Gender Therapy*, NEW YORK TIMES MAG. (June 15, 2022) [hereinafter "NYT Mag."].[3] For example, when WPATH in 2022 released a draft update of its guidelines, the authors "faced fury from providers and activists within the transgender world." *Id.* These providers and activists do not agree that children should demonstrate years of persistent cross-gender identification before being given puberty blockers and hormones, nor do they believe that children should undergo a "comprehensive diagnostic

---

[3] *Available at* https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html.

assessment" to evaluate their mental health. *Id.* These specific "guard rails [are] anathema" to some providers, who have labeled the WPATH authors "traitors." *Id.*

Illustrating these types of concerns, three women who received hormone treatment within Oklahoma all testify that they received minimal psychiatric evaluations prior to being diagnosed with gender dysphoria. Ex. 5, Decl. of Laura Smalts, ¶¶ 6-7; Ex. 6, Decl. of Zoe Hawes, ¶ 6; Ex. 7, Aff. of Aether Dixon, ¶¶ 11-12. One was diagnosed, as an adolescent, without any questioning of her professed identity or discussion about her extensive history as a victim of childhood sexual abuse. Ex. 7, Dixon, ¶¶ 11-12. That therapist even asked the woman's mother, in front of her, if the mother wanted "a dead daughter or living son?" when she expressed concerns over testosterone. *Id.* at 14. Following the gender dysphoria diagnosis, these detransitioners were able to quickly obtain prescriptions for testosterone with minimal questions and minimal information about the potential risks. *Id.* ¶¶ 13, 16; Ex. 5, Smalts, ¶ 8; Ex. 6, Hawes, ¶ 7.

### III. <u>Adolescent-onset gender dysphoria has surged in recent years.</u>

By virtually all accounts, the number of adolescents identifying for the first time as transgender or being diagnosed with gender dysphoria has skyrocketed in recent years, "numerically overwhelm[ing] the previously known and better characterized types" of gender dysphoria. Ex. 1, Cantor, ¶ 137. The New York Times, for example, reported "a sharp increase in the number of children ages 6 to 17 diagnosed with gender dysphoria, from about 15,000 in 2017 to about 42,000 in 2021." NYT, *supra.* This group is predominantly biologically female, and "[c]ases commonly appear to occur within clusters of peers in association with increased social media use … and among people with autism or other mental health issues." Ex. 1, Cantor, ¶ 137.

**IV.   There are significant risks to these procedures—risks Plaintiffs decline to detail.**

"As the number of adolescents who identify as transgender grows, drugs known as puberty blockers have become the first line of intervention for the youngest ones seeking medical treatment." NYT, *supra*. But pumping gender dysphoric children with puberty blockers and cross-sex hormones—to say nothing of surgeries—has increasingly stoked controversy because it saddles physically healthy children and adolescents with serious risks of permanent harm. Ex. 1, Cantor, ¶¶ 227-29; Ex. 3, Thompson, ¶ 5; Ex. 4, Harris, ¶¶ 24-26. As such, "concerns are growing among some medical professionals about the consequences of the drugs." NYT, *supra*. Indeed, "prominent specialists" have begun "to reconsider at what age to prescribe them and for how long." *Id*. A New York Times investigation found "emerging evidence of potential harm from using blockers, according to reviews of scientific papers and interviews with more than 50 doctors and academic experts around the world." *Id*. Defendants' experts, including a former Oklahoma medical board president, describe these potential harms in detail.

One finds very little of this in Plaintiffs' affidavits, and even less of it in their brief. Plaintiffs admit there are risks, *e.g.*, Doc. 6-16, ¶ 44, but they largely decline to detail those risks here, in public, which does not inspire confidence that physicians are fully informing minors and their parents of the risks behind closed doors. Those risks must be addressed. What follows is just a sampling.

*A.   Puberty blockers can permanently sterilize children, damage their brains, and weaken bone density.*

Puberty suppressors like Lupron are approved by the FDA to treat prostate cancer and the early onset of puberty. NYT, *supra*; Ex. 2, Laidlaw, ¶¶ 72-75. They are not FDA-approved for "gender-affirming" procedures. Ex. 2, Laidlaw, ¶ 76; Doc. 6-16, ¶ 37. Puberty blockers "suppress estrogen and testosterone, hormones that help develop the reproductive system but also affect the bones, the brain, and other parts of the body." NYT, *supra*; Ex. 2, Laidlaw, ¶ 70; Ex. 4, Harris, ¶ 20.

<u>Locking in</u>. Puberty blockers potentially lock children into lifelong medical dependence, Ex. 3, Thompson, ¶ 24, even though their dysphoria would likely otherwise "desist" on its own, Ex. 2, Laidlaw, ¶ 55. Whereas undergoing puberty "can help clarify gender, [some] doctors say," puberty blockers "could force life-altering choices . . . before patients know who they really are." NYT, *supra*. This is problematic because "most patients who take puberty blockers move on to hormones to transition, as many as 98 percent in British and Dutch studies." *Id.*; *see also* Ex. 1, Cantor, ¶¶ 115-20; Ex. 2, Laidlaw, ¶ 221-22. As a result, some doctors—including Defendants' experts—"worry that some young people are being swept into medical interventions too soon." NYT, *supra*; *see also* Ex. 2, Laidlaw, ¶¶ 93, 113-14.  Indeed, Plaintiffs' expert admits that studies of "gender diverse *prepubertal* children . . . have, in the past, shown that many of these children will not grow up to be transgender." Doc. 6-4, ¶ 24. He claims this data doesn't apply to post-pubertal adolescents, but there is strong disagreement on this point. Dr. Laidlaw, for example, points out several of the studies included post-pubertal children up to 12 years old. Ex. 2, Laidlaw, ¶¶ 223-24; *see also* Ex. 1, Cantor, ¶ 120.

<u>Sterilization</u>. "There is an egregious history in the United States of sterilizations being performed on disadvantaged and vulnerable women . . . ." Ex. 3, Thompson, ¶ 18. Yet, puberty blockers have proliferated even though the recent wave of gender dysphoria is overwhelmingly female and "[i]nfertility is among other lasting effects for patients who start blockers at the first stage of puberty and proceed to hormones and surgery." NYT, *supra*; *see also* Doc. 6-16, ¶ 45 (admission by Plaintiffs' expert that "treatment for gender dysphoria with gender-affirming hormones may impair fertility" and may not be reversible). Plaintiffs' experts claim that if a patient wants to stop taking blockers, then fertility will simply resume, but the answer isn't nearly that simple. *See, e.g.*, Ex. 2, Laidlaw, ¶ 90 & n.5 (noting a lack of studies on this point). Dr. Thompson, an OB/GYN, focuses much of her thorough report on the "severe risk[]" of sterilizing women with "gender-affirming" care. Ex. 3, Thompson, ¶ 5; *see also id.* ¶ 11 ("Because the [gender-affirming care] regimen at early pubertal

development . . . will almost certainly result in sterilization . . . and because the 'fertility preservation' options for these children are inaccessible, experimental, and speculative, it is my opinion that any notion of informed consent to the risks . . . is illusory."); *id.* at p. 9 ("Medical Organizations Normally Treat Concerns of Sterilization Seriously—But Not When It Comes to Transgender Youth.")

Brain damage. "Some doctors and researchers are concerned that puberty blockers may somehow disrupt a formative period of mental growth." NYT, *supra.* Again, this includes Defendants' experts. Ex. 1, Cantor, ¶¶ 210-14, 237 ("there are reasons to fear that use of puberty blockers may have permanent negative effects on brain development") 270; Ex. 2, Laidlaw, ¶ 108; Ex. 3, Thompson, ¶ 5; Ex. 4, Harris, ¶ 23. "In a 2020 paper, 31 psychologists, neuroscientists and hormone experts from around the world urged more study of the effects of blockers on the brain." NYT, *supra.*

Bone density. Bone mass "typically surges" during puberty, "determining a lifetime of bone health." *Id.*; Ex. 2, Laidlaw, ¶ 99 ("This rapid accumulation is referred to as peak bone velocity."). But "[w]hen adolescents are using blockers, bone density growth flatlines, on average." NYT, *supra*; Ex. 2, Laidlaw, ¶¶ 100-107. Many transgender adolescents do "not fully rebound from this" flatline and "lag behind their peers," which "could lead to heightened risk of debilitating fractures earlier than would be expected from normal aging." NYT, *supra.* In the end, "it's increasingly clear that the [puberty-blocking] drugs are associated with deficits in bone developments." *Id.*

Transgender adolescents in Sweden and Texas have developed osteoporosis after taking puberty blockers, a "permanent disability." *Id.* The parents of an 11-year-old child in New York were told puberty blockers were like a "tourniquet that would stop the hemorrhaging." *Id.* The parents halted the treatment after two years, however, when the child's "bone density plummeted" *Id.* The mother lamented that "I worry we've done permanent damage." *Id.; see also* Ex. 1, Cantor, ¶¶ 217-20.

B.   *By taking testosterone, female minors risk infertility, psychiatric issues, heart failure, and more.*

"Testosterone is an anabolic steroid of high potency," and it is not FDA-approved for gender

transitions. Ex. 2, Laidlaw, ¶¶ 117-19. Excess testosterone in females "is a serious risk to the healthy functioning of physiologic processes within the cardiovascular, endocrine, neurologic, pulmonary, and reproductive organ systems." Ex. 3, Thompson, ¶¶ 74, 87. Testosterone given to minor females—*i.e.*, deliberately inducing hyperandrogenism, Ex. 2, Laidlaw, ¶ 136—risks damage to ovaries and infertility. Ex. 3, Thompson, ¶¶ 16, 68-72, 80. Worryingly, the doses of testosterone given in gender-affirming care is "**extremely** elevated" for females, "the likes of which are not usually seen naturally." *Id.* ¶ 75; Ex. 2, Laidlaw, ¶ 133. There is evidence that testosterone increases the risk of heart attacks "in females who identify as transgender men compared to females who do not take exogenous testosterone." Ex. 3, Thompson, ¶ 76; *see also* Ex. 2, Laidlaw, ¶¶ 125, 135, 140-44; Ex. 4, Harris, ¶ 21. There are also risks of depression and mood instability, and associations with hypomanic, manic, or psychotic symptoms. Ex. 3, Thompson, ¶ 78; Ex. 2, Laidlaw, ¶¶ 121, 139. Breast and other cancers are a concern. Ex. 2, Laidlaw, ¶ 137; Ex. 3, Thompson, ¶¶ 81-82. Testosterone may also cause "irritation, dryness, and atrophy of the vaginal tissue, which can cause significant discomfort and even bleeding." *Id.* ¶ 84.

The three Oklahoma women who detransitioned—two of which transitioned as adolescents— testify that taking testosterone caused or coincided with excruciating joint pain, chronic dizziness and fainting spells, light-headedness, heart problems, cognitive problems including memory loss, anxiety, weight gain, vein enlargement, vaginal atrophy, hair loss, poor mental health, hospitalization, and even a suicide attempt. Ex. 5, Smalts, ¶ 15; Ex. 6, Hawes, ¶¶ 10, 13; Ex. 7, Dixon, ¶¶ 18-24. Many of these persisted after they stopped the treatment, including hair loss, hair growth, a lower voice, vaginal atrophy, etc. Ex. 6, Hawes, ¶ 19; Ex. 7, Dixon, ¶ 25; *see also* Ex. 2, Laidlaw, ¶¶ 136, 138 (criticizing Plaintiffs' expert for failing to specify what is and is not reversible); Ex. 4, Harris, ¶ 21.

*C.   By taking estrogen, male minors risk a loss of fertility, heart issues, weight gain, and more.*

"Estrogen is the primary sex hormone of the female." Ex. 2, Laidlaw, ¶ 145. Males with gender dysphoria taking estrogen—*i.e.*, those deliberately inducing the medical condition of

hyperestrogenemia, *id.* ¶ 150—risk serious cardiac events. *Id.* ¶ 152; Ex. 3, Thompson, ¶¶ 76-77. They also risk irreversible infertility, and testicular "cryopreservation may not be possible in males" undergoing gender-affirming therapy. Ex. 3, Thompson, ¶¶ 108, 132, 135; Ex. 4, Harris ¶ 22. Breast cancer is also a concern, as its risk is much higher with high dose estrogen in males. Ex. 2, Laidlaw 153. There would potentially be a risk of weight gain, thin skin, and bruising. Ex. 4, Harris, ¶ 22.

      *D.  Surgeries to cut off breasts and genitals carry drastic harms that cannot be reversed.*

      Plaintiffs make little effort to show that they seek or desire surgeries here. Nevertheless, "transition surgeries, in particular mastectomies, are being performed on minors throughout the country." Ex. 2, Laidlaw, ¶ 157; Ex. 3, Thompson, ¶ 16. Thus, their obvious and dramatic risks merit mention. Mastectomies, the surgical removal of the breasts, automatically "result[] in a permanent loss of the ability to breastfeed and significant scarring of 7 to 10 inches"—scars that are "prone to widening . . . ." Ex. 2, Laidlaw, ¶ 164. They do not heal any malady or disease. *Id.* ¶ 166. Other relevant surgeries on minors include removing the testicles to lower testosterone levels—"by nature a sterilizing procedure." *Id.* ¶ 167. "Further surgeries may be done in an attempt to create a pseudo-vagina which is called vaginoplasty. In this procedure, the penis is surgically opened and the erectile tissue is removed. The skin is then closed an inverted into a newly created cavity in order to simulate a vagina." *Id.* Complications "may include urethral strictures, infection, prolapse, fistulas and injury to the sensory nerves with partial or complete loss of erotic sensation." *Id.* ¶ 168.

      For females, additional surgeries may remove "the ovaries, uterus, fallopian tubes, cervix, and the vagina." *Id.* ¶ 169. Removing the ovaries is automatically sterilizing. *Id.* A "phalloplasty" involves attempts to create a penis by removing "a roll of skin and subcutaneous tissue . . . from one area of the body" and transplanting it to the pelvis, inserting rods or inflatable devises to simulate erection, and so on. *Id.* ¶ 171; Ex. 3, Thompson, ¶ 16. Complications "may include urinary stricture, problems

with blood supply to the transplanted roll of tissue, large scarring . . . infections . . . and possible injury to the sensory nerve of the clitoris." Ex. 2, Laidlaw, ¶ 172. Complication rates for this are high. *Id.*

**V.** **There is no consensus: the safety and efficacy of hormones and surgeries for minors is hotly disputed, and Plaintiffs' evidence is undeniably of low quality.**

There is a fierce dispute in the medical community as to whether any benefits from puberty blockers, hormones, and surgeries on minors exist at all, and whether they outweigh the many risks. *See, e.g.*, NYT, *supra* ("For some medical professionals across the country, there are too many *uncertainties* about the effects of blockers to provide the treatment." (emphasis added)). And the State is entitled to take sides in that dispute. *See Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific *uncertainty*." (emphasis added)). Put differently, Plaintiffs' claim that a "broad medical consensus on the medical necessity for gender-affirming care[,]" Doc. 6 at 16, is simply false. *See, e.g.*, Ex. 1, Cantor, ¶ 28 (collecting quotes indicating a lack of consensus); Ex. 2, Laidlaw, ¶ 173.

There is very little evidence about the long-term effects of these treatments. *See* NYT, *supra* ("A Reuters examination of a range of transgender treatments also found scant research into the long-term effects."). The short-term evidence that Plaintiffs and their experts are relying on is considered low quality evidence. Ex. 1, Cantor, ¶ 58; Ex. 2, Laidlaw, ¶¶ 193-97; *See* NYT, *supra* (reporting that The Endocrine Society "in 2017 had described the limited research on the effects of the drugs on trans youth as 'low-quality'"). Indeed, while several of Plaintiffs' experts tout that "peer-reviewed cross-sectional and longitudinal studies[] demonstrate the positive impact of pubertal suppression in adolescents with gender dysphoria," Doc. 6-2, ¶ 72; *see also* Doc. 6-4, ¶ 15, Plaintiffs' final expert admits "observational studies," which "include cross-sectional and longitudinal studies," "generally constitute 'low' quality evidence." Doc. 6-16, ¶ 20. Going further, he admits that the Endocrine Society's "clinical practice guideline [in this area] includes 28 recommendations: 3 (11%) are based on 'moderate' and 19 (68%) are based on 'low' or 'very low' quality evidence." *Id.* ¶ 30.

11

Plaintiffs' short-term evidence is also cherry-picked. Defendants' experts, on the other hand, rely on systematic reviews of the highest level of evidence available, and those reviews agree that there is insufficient evidence to conclude that hormonal interventions to treat gender dysphoria are effective or safe. Ex. 1, Cantor, ¶¶ 65, 71-88. Moreover, adolescent-onset gender dysphoria, the predominant clinical population today, is largely unstudied. *Id.* ¶¶ 137-39. The cohort studies of puberty blockers and cross-sex hormones in minors have not provided reliable evidence for improving mental health compared to mental health treatments with no accompanying risk. *Id.* ¶¶ 178-201.

Plaintiffs insist that there is an "absence of evidence-based alternatives" to medicalized transition. Doc. 6 at 16. However, "[p]sychotherapy has support equal to that of medicalized transition while lacking the harms and risks of medicalized transition." Ex. 1, Cantor, ¶¶ 278, 280. While Plaintiffs also insist that these treatments are "life-saving medical care[,]" Doc 6 at 22, "no studies have documented any reduction in suicide rates in minors (or any population) as a result of medical transition." Ex. 1, Cantor, ¶ 148. And studies have not provided meaningful evidence that medical transition decreases suicidality in minors. *Id.*; *see also* Ex. 2, Laidlaw, ¶¶ 211-16. Because of the lack of evidence supporting the effectiveness and safety of puberty blockers, hormones, and transitional surgeries for minors, the States' experts oppose these treatments being performed on minors. Ex. 1, Cantor, ¶¶ 71-205, 280; Ex. 2, Laidlaw, ¶ 259; Ex. 3, Thompson, ¶¶ 8, 142; Ex. 4, Harris, ¶¶ 24-30.

## VI.   European countries have been moving to restrict these procedures.

Swirling questions surrounding these procedures have been "fueling government reviews in Europe, prompting a push for more research." NYT, *supra*. This research has led "European health care ministries to step back and discourage or even cease providing medicalized transition of minors, other than in exceptional and carefully limited circumstances." Ex. 1, Cantor, ¶ 16. A more thorough recounting of these developments can be found in Dr. Cantor's report. *See id.* at ¶¶ 16-33. These

developments lead to the inevitable conclusion that the "[i]nternational consensus explicitly regards gender transition to be experimental." *Id.* ¶¶ 168-172.

England. In 2020, the English National Health Service ("NHS") commissioned an independent review of the usage of puberty blockers and cross-sex hormones on minors. The interim report concluded that there had been "very limited research on the sexual, cognitive, or broader developmental outcomes" from the use of puberty blockers for gender dysphoria. *Id.* ¶ 19; Ex. 2, Laidlaw, ¶ 235. This month, the NHS has announced that "there is not enough evidence to support their safety or clinical effectiveness as a routinely available treatment" and that puberty blockers will only be used in clinical trials. Ex. 1, Cantor, ¶ 20; Ex. 2, Laidlaw, ¶ 236; NYT, *supra*.

Sweden. The Swedish National Board of Health has concluded that the "risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." Ex. 1, Cantor, ¶ 28. Sweden has "placed limits on the treatment, concerned not just with the risk of blockers, but the steep rise in young patients, the psychiatric issues that many exhibit, and the extent to which their mental health should be assessed before treatment." NYT, *supra*; Ex. 2, Laidlaw, ¶ 239.

Finland. In 2020, Finnish researchers found that "[m]edical gender reassignment is not enough to improve functioning and relieve psychiatric comorbidities among adolescents with gender dysphoria." Ex. 1, Cantor, ¶ 22. Finland has "ended the surgical transition of minors." *Id.* at ¶ 24; Ex. 2, Laidlaw, ¶ 238. "[D]octors there remain concerned about the physical effects of blockers, including on brain development." NYT, *supra*. Puberty blockers and cross-sex hormones can only be prescribed if "other psychiatric symptoms have ceased." Ex. 1, Cantor, ¶ 24.

The Netherlands. "Doubts have now come to the Netherlands, where the most-contested interventions for children and adolescents were developed." Frieda Klotz, *A Teen Gender-Care Debate*

*Is Spreading Across Europe*, THE ATLANTIC (April 28, 2023).[4]

      <u>Norway</u>. The Norwegian Healthcare Investigation Board has "deemed medicalized transition to be experimental" and "concluded that the evidence for the use of puberty blockers and cross-sex hormone treatments in youth was insufficient." Ex. 1, Cantor, ¶ 30; Ex. 2, Laidlaw, ¶ 240.

**VII.**    <u>Oklahoma enacted Senate Bill 613 to protect minors from permanent damage.</u>

      SB 613 was approved by the Oklahoma Senate on February 15, 2023. Senator Daniels, the author, stated that "[t]hese transition treatments are permanent, irreversible, and can lead to a host of medical problems later in life. Being transgender, gender non-conforming, or experiencing gender dysphoria is very real, but these are mental, not physical conditions. Children need behavioral and mental health treatment to give them the opportunity to resolve these issues. … Once they reach 18 … at least they will have reached some level of maturity to make a more informed decision." *Senate approves bill prohibiting gender transition procedures for minors*, OKLA. SENATE (Feb. 15, 2023).[5]

      In its final form, SB 613 does not punish children or their parents, but sets out that "[a] health care provider shall not knowingly provide gender transition procedures to any child." OKLA. STAT. tit. 63, § 2607.1(A)(3)(B). The Act defines "gender transition procedures" as "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" or "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of … features consistent with the opposite biological sex." *Id.* § 2607.1(A)(2)(a)(1-2). SB 613 expressly excepts from its strictures "behavioral health care services or mental health counseling" as well as medications prescribed "for the purpose of treating precocious puberty or delayed puberty." *Id.* § 2607.1(A)(2)(b).

---

[4] *Available at* https://www.theatlantic.com/health/archive/2023/04/gender-affirming-care-debate-europe-dutch-protocol/673890/.
[5] *Available at* https://oksenate.gov/press-releases/senate-approves-bill-prohibiting-gender-transition-procedures-minors.

On May 1, 2023, Governor Kevin Stitt signed SB 613. *Id.* § 2607.1. It took effect immediately. Around 20 States have now enacted similar legislation. *See* Leor Sapir & Colin Wright, *Medical Journal's False Consensus on 'Gender-Affirming Care'*, THE WALL STREET JOURNAL (June 9, 2023).[6]

**VIII.   Plaintiffs seek a broad injunction but make no case for surgery or pre-pubescents.**

On May 2, 2023, represented by the ACLU, Lambda Legal, and Jenner & Block attorneys from Washington, D.C., Chicago, Los Angeles, and New York City, Plaintiffs filed the present lawsuit. *See* Doc. 2. Plaintiffs demanded facial relief and a preliminary injunction of the entire law. Doc. 6 at 25. But Plaintiffs mostly ignore the surgical aspect of SB 613, and none of the individual Plaintiffs mentions a desire or plan for adolescent surgery. One of Plaintiffs' experts instead implies that "surgical treatment" is only for "adulthood." Doc. 6-3, ¶ 46. Moreover, Plaintiffs essentially concede that SB 613 is appropriate for pre-pubescent children. *See* Doc. 6 at 3; Doc. 6-3, ¶ 32; Doc. 6-4, ¶ 25; Doc. 6-15, ¶¶ 13. Indeed, Dr. Lawlis—the only Oklahoma practitioner Plaintiff—states that she would only begin to "explore gender-affirming hormone therapy … around the age of 14." Doc. 6-15, ¶ 12.

This is effectively a concession that, at a bare minimum, the law should not be enjoined for pre-teens.  Plaintiffs make several other admissions, as well. For example, one Plaintiff and parent admit that the parents initially wanted the Plaintiff to "take some time to think about it" and "wait until [the Plaintiff] was 18 to start" medical treatments for gender dysphoria. Doc. 6-9, ¶ 10; Doc. 6-10, ¶ 9. This is a sound sentiment, even if the parents changed their mind. It was not discriminatory or irrational, nor is it discriminatory or irrational for the State to reach the same conclusion.

Plaintiffs make several admissions that weaken their claims of harm. One Plaintiff concedes that, aside from SB 613, it is "already very hard to get hormone therapy." Doc. 6-9, ¶ 16. And Dr. Lawlis admits that her patients have "experienced interruptions or delays in their puberty-blocking

---

[6] *Available at* https://www.wsj.com/articles/medical-journals-false-consensus-on-gender-affirming-care-sex-change-procedure-transgender-f10cd52b.

treatments" due to "insurance or other reasons." Doc. 6-15, ¶ 26. This indicates that some of the claimed harms are already happening because of the difficulty of acquiring the drugs. Similarly, Dr. Lawlis admits the provision in SB 613 that allows minors "currently receiving such drugs or hormones" six months to "gradually" wean off the drugs, OKLA. STAT. tit. 63, § 2607.1(A)(2)(b)(7), "may prevent some of my patients from suffering the most severe side effects." Doc. 6-15, ¶ 25.

### IX.     Numerous witnesses, lay and expert, testify here in favor of Senate Bill 613.

Finally, Plaintiffs have accused the Legislature of ignoring "the testimony and opposition of experienced health professionals and a myriad of Sooner families."  Doc. 6 at 1. Here, however, Defendants produce the testimony of seven different witnesses, lay and expert, national, international, and Oklahoma-based. Two of Defendants' experts, Drs. Cantor and Laidlaw, rebut in detail many of the claims made by Plaintiffs' experts. Regardless, nothing in the Constitution requires a State Legislature to prefer a particular individual or group's experts and lay testimony over that of another.

### ARGUMENT AND AUTHORITIES

"A preliminary injunction is an 'extraordinary and drastic remedy'" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–690 (2008) (citations omitted). To obtain it, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). For the injunction to issue, "the right to relief must be clear and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation omitted). Courts disfavor preliminary injunctions "that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *State v. EPA*, 989 F.3d 874, 883–84 (10th Cir. 2021) (citation omitted). This type of injunction "must be more closely scrutinized." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (citation omitted).

Moreover, when plaintiffs seek facial relief, as they do here, "it is necessary to proceed with

caution and restraint." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). Caution is necessary "because facial challenges push the judiciary towards the edge of its traditional purview and expertise." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). Therefore, "courts must be vigilant in applying a most exacting analysis to such claims." *Id.*

## I.   Plaintiff cannot demonstrate a likelihood of success on the merits.

Plaintiffs' inability to demonstrate a likelihood of success on the merits is fatal to their motion. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). SB 613 protects all Oklahoma minors equally, and parents do not possess a fundamental right to obtain an experimental, high-risk treatment for minors, certainly not a "clear and unequivocal" right. *Schrier*, 427 F.3d at 1258 (citation omitted). Further, Plaintiffs lack standing to pursue several of their remedies.

### A.  *Plaintiffs are not likely to succeed on their Equal Protection claim.*

The Equal Protection Clause "requires that all persons … shall be treated alike, under like circumstances and conditions." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 602 (2008) (citation omitted). This requirement does not "suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012).

Relevant here, "health and welfare laws" in particular are "entitled to a 'strong presumption of validity.'" *Dobbs*, 142 S. Ct. at 2284 (2022) (citation omitted). These laws "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Id.* Only when a plaintiff establishes that the intentional discrimination targets a fundamental right or a suspect classification does a heightened standard of review apply. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). For reasons also explained in Defendants' motion to dismiss, Doc. 80, Plaintiffs have not established that SB 613 discriminates on the basis of sex or transgender status.

i.   <u>The Act does not discriminate based on transgender status.</u>

As explained in Defendants' motion to dismiss, Doc. 80 at 7-8, transgender status is not a quasi-suspect class. *See Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995); *Druley v. Patton*, 601 Fed.Appx. 632, 635 (10th Cir. 2015) (unpublished). The Tenth Circuit's holding that "transgender discrimination … is discrimination 'because of sex' prohibited under Title VII," *Tudor v. SEOSU*, 13 F.4th 1019, 1028 (10th Cir. 2021), does not change that conclusion because that holding was anchored to the Supreme Court's decision in *Bostock*, which did not declare transgender status a quasi-suspect class and was expressly limited to Title VII and the employment context. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020) ("[W]e do not purport to address bathrooms, locker rooms, or anything else of the kind."). Thus, *Brown* still binds here. *See* Doc. 80 at 7-8.

Regardless, the Act does not discriminate based on transgender status. *See* Doc. 80 at 8-13. Plaintiffs' entire argument boils down to the claim that the Act "singles out medical care that only transgender people need or seek." Doc. 6 at 12. Even assuming Plaintiffs are correct that only transgender people seek out these treatments, the Supreme Court has repeatedly held that health care laws that restrict medical treatments that only members of one class receive do not discriminate against that class. For example, abortion restrictions apply exclusively to women, yet "[w]omen seeking abortion is not a qualifying class." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) (citation omitted). The Supreme Court was clear: "the regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245-46 (citation omitted). The cases Plaintiffs rely on wrongly ignore this binding line of precedent. *See, e.g.*, *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022).

Again, discrimination involves treating a class of individuals "worse than others who are similarly situated." *Bostock*, 140 S. Ct. at 1740. Here, Plaintiffs allege that the Act "explicitly permits

18

the use of puberty-delaying medication to treat precocious puberty, but bans the same medication to treat gender dysphoria." Doc. 6 at 18. Plaintiffs are pretending that two very different treatments, one FDA-approved and one not, are the same in all relevant respects, when they are not. *See* Ex. 1, Cantor, ¶¶ 65, 68, 228; Ex. 2, Laidlaw, ¶ 78, 95-97. Precocious puberty means that the individual has begun puberty abnormally early. Ex. 2, Laidlaw, ¶ 73. This might mean that a five-year-old girl has started experiencing periods. The treatment for this is FDA-approved and involves using puberty blockers only until the girl reaches a physically appropriate age for puberty to begin. Ex. 2, Laidlaw, ¶¶ 73-74; Ex. 3, Thompson, ¶ 125. "Whereas the use of puberty blockers to treat precocious puberty *avoids* the medical risks caused by undergoing puberty growth before the body is ready (thus outweighing other risks), use of blockers to treat gender dysphoria in patients already at their natural puberty pushes them *away* from the mean age of the health population." Ex. 1, Cantor, ¶ 68; *see also* Ex. 2, Laidlaw, ¶ 75-76, 95-97; Ex. 4, Harris, ¶ 25.  The independent review for England's NHS, for example, stated that it "is important that it is not assumed that outcomes for, and side effects in, children treated for precocious puberty will necessarily be the same in children or young people with gender dysphoria." Ex. 1, Cantor, ¶ 65. These are not the same treatments, and these are not similarly situated patients.

Moreover, the Act does not prohibit transgender individuals from taking puberty blockers. They are allowed to take them to delay precocious puberty just the same as any other person in the State. The same rationale applies to surgeries. An adolescent girl who needs to have her breasts surgically removed because of a physical sickness is not similarly situated to an adolescent girl who wants to have her healthy body altered in an attempt to treat a mental condition. As these are different treatments, it is not discriminatory for the State to prohibit one and not the other.

Plaintiffs similarly complain that the law does not prohibit services provided to intersex individuals. Doc. 6 at 14. But these are also different conditions. *See, e.g.*, Ex. 1, Cantor, ¶ 277 (intersex disorders "are *physical* medical disorders diagnosed with high accuracy according to objective and

verifiable evidence"); Ex. 4, Harris, ¶ 26 ("Unlike truly intersex anomalies, which I will treat, a finding of gender dysphoria does not involve a simple blood test, a genetic analysis, or a similarly objective measurement."). The patients are not "in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Regardless, courts "do[] not revise legislation … just because the text as written creates an apparent anomaly as to some subject it does not address. Truth be told, such anomalies often arise from statutes, if for no reason than that Congress typically legislates by parts." *Michigan v. Bay Mills Indian Cmty.*, 542 U.S. 782, 794 (2014); *see also Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 489 (1955).

Moreover, Plaintiffs have not demonstrated that the Act was enacted with a discriminatory intent. To succeed on such a claim, Plaintiffs must plausibly allege "that a discriminatory purpose has been a motivating factor in the decision…." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Courts have long frowned upon ascribing intent to a law based on stray statements from legislators. *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023). And Plaintiffs' other proffered evidence for this allegation is remarkably bare. Plaintiffs' notation that fifteen bills restricting aspects of gender transitioning were introduced only demonstrates widespread concern about the dangers of such medical interventions on healthy bodies. Incredibly, Plaintiffs seem to believe the fact that a failed bill allegedly would have prohibited the same treatments for people under the age of 21 supports their proposition, but this only demonstrates that the Legislature chose to enact a more limited measure.

ii.   The Act does not discriminate based on sex.

The Act treats both sexes equally, and it does not treat transgender minors any different than it treats non-transgender minors. Plaintiffs object that the Act "speaks in explicit gendered terms" and strips a quote from its context in *Bostock* to fashion a novel test for sex discrimination. Doc. 6 at 13. Specifically, Plaintiffs claim that "[i]f the legislature cannot 'writ[e] out instructions' for determining whether treatment is permitted 'without using the words man, woman, or sex (or some synonym),'

20

the law classifies based on sex." *Id.* (quoting *Bostock*, 140 S. Ct. at 1746). But *Bostock* never held that sex discrimination occurs every time a law writes out "man, woman, or sex." The Court was merely addressing in an employment context why an employer was wrong to argue that there was a distinction between discriminating on the basis of transgender status as opposed to sex.

Besides, such a rule would be absurd in medicine and elsewhere. *See City of Cleburne*, 473 U.S. at 468-69 (Marshall, J., concurring in judgment in part) (a "sign that says 'men only' looks very different on a bathroom door than a courthouse door"). Courts have long understood that the "physical differences between men and women are enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996). "There is nothing irrational or improper in the recognition" the differences between boy and girl bodies when regulating medicine. *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68 (2001). It would not be sex discrimination for the State to offer pap smears only to biological women. The unavoidable consideration of sex in medicine also diminishes Plaintiffs' reliance on *Bostock* and *Tudor*. Both of those cases involved discrimination in employment decisions. With employment, it is obvious why asking questions about one's sex might be discriminatory. That is clearly not the case with medicine. Otherwise, the existence of men's and women's health clinics would be discriminatory.

The problem with Plaintiffs' sex stereotyping claim is that this theory of discrimination is based on behavior. The emblematic example of sex stereotyping is "[a]n employer who objects to aggressiveness in women but whose positions require this trait." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). And even the case cited by Plaintiffs says that "[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination." *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (per curiam) (citation omitted). The Act has nothing to do with behavior. It only contemplates biology. There are body parts that only males have and there are body parts that only females have. *See Virginia*, 518 U.S. at 533. Prohibiting surgeries that cut off healthy body parts because the patient does not identify with the sex that possesses those body parts is not engaging in a

stereotype. Deciding otherwise would necessitate holding that it is a mere stereotype that males have penises and females have vaginas, which is beyond ludicrous.

     iii.   <u>The Act passes rational-basis scrutiny.</u>

Because the law does not discriminate, it "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284. Plaintiffs' equal protection claim must fail "if there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Copelin-Brown v. N.M. State Pers. Off.*, 399 F.3d 1248, 1255 (10th Cir. 2005) (citation omitted). This does not allow the Court to "conduct[] the sort of fact-finding that might be undertaken by a legislative committee," or defer solely to the positions of various medical associations. *Dobbs*, 142 S. Ct. at 2267. And the State has "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163. Here, Plaintiffs cannot establish that the State lacks a rational basis. Indeed, the entire background section above details the rational basis—and bases—for the State's actions here. Gender dysphoria diagnoses are exploding in adolescent girls, experimental treatments with lifelong impacts are being pushed without sufficient scientific support, and many in the medical community, including in Europe, are sounding the alarm. Ex. 1, Cantor, ¶¶ 79-88; Ex. 2, Laidlaw, ¶¶ 234-41.

Even were this Court to disregard *Dobbs*, the most rigorous form of scrutiny the Act could be subjected to is intermediate scrutiny. *See, e.g.*, Doc. 61 at 9. "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). That means that "[t]he classification must serve 'important governmental objectives' through means 'substantially related to' achieving those objectives." *Free the Nipple-Fort Collins, v. City of Fort Collins*, 916 F.3d 792, 799 (10th Cir. 2019) (quoting *Virginia*, 518 U.S. at 533). The Act also meets this standard of review.

22

To begin, the Act fulfills the State's "strong interest in public health." *Clark v. City of Draper*, 168 F.3d 1185, 1189 (10th Cir. 1999). This interest is especially powerful when the State is considering the health of its minor population. *Aid for Women v. Foulston*, 441 F.3d 1101, 1119 (10th Cir. 2006). And the State's interest in protecting its minors is not limited to just their health, as "the state has a strong *parens patriae* interest in protecting the best interests of minors." *Id.*; *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The State, of course, has a duty of the highest order to protect the interests of minor children, particularly those of tender years.").

The State has provided expert reports and lay declarations that demonstrate the life-altering risks of these experimental treatments. Those include, but are not limited to, permanent sterilization, decreased bone density, osteoporosis, delayed development, increased anxiety, permanent loss of genitalia, increased risks of cardiovascular disease and cancer, loss of sexual function, as well as a lifetime of dependence on experimental and expensive drugs. *See supra,* Background IV. Moreover, three women—from Oklahoma—describe tragic accounts of how they were rushed into taking experimental drugs before receiving adequate counseling or therapy. *See supra,* Background II. Their stories demonstrate both how quickly therapists and doctors greenlight these treatments in reality, as well as the lifetime of consequences and regret that may stem from these lifechanging decisions made by minors. *Id.* And again, these witnesses are not some mere outliers. All one needs to do is look to Europe to see that. *See supra* Background VI; *see also* Joshua Cohen, *Increasing Number of European Nations Adopt a More Cautious Approach to Gender-Affirming Care Among Minors*, FORBES (June 6, 2023);[7] Lauren Moss & Josh Parry, *Puberty blockers to be given only in clinical research*, BBC NEWS (June 9, 2023).[8]

---

[7] *Available at* https://www.forbes.com/sites/joshuacohen/2023/06/06/increasing-number-of-european-nations-adopt-a-more-cautious-approach-to-gender-affirming-care-among-minors/?sh=494f42b47efb.

[8] *Available at* https://www.bbc.com/news/uk-65860272.

Plaintiffs protest that "[g]ender-affirming care is neither harmful nor experimental." Doc. 6 at 17. But the Norwegian Healthcare Investigation Board independently examined the evidence surrounding these treatments and declared that they are experimental. *See supra,* Background VI. Surely Oklahoma is entitled to take the same view. And Plaintiffs admit that there is less than two decades of research on the effects of puberty blockers and cross-sex hormones. Doc. 6 at 17. And as the State's experts demonstrate, the limited research shows little support for prescribing these treatments to minors. Ex. 1, Cantor, ¶¶ 74-88; Ex. 2, Laidlaw, ¶¶ 173-98. The gender dysphoric population has spiked in recent years, and the demographics of the population has fundamentally changed. Ex. 2, Laidlaw, ¶ 173. Now, transgender minors are disproportionately girls and disproportionately have cofounding mental health issues. Ex. 1, Cantor, ¶¶ 137-39. The prevalence of mental health issues supports the State's efforts to ensure that minors have time to mature before taking life-altering steps. Plaintiffs argue that many other treatments have risks, Doc. 6 at 18, but most of those treatments can be objectively diagnosed through observation, and regardless the State is not required to treat every problem in the world in one piece of legislation. Ex. 1, Cantor, ¶¶ 278, 280.

In sum, Plaintiffs' entire case hinges on the premise that scientists uniformly agree that puberty blockers, cross-sex hormones, and "gender affirming" surgeries are both medically necessary and supported by the evidence. "But doctors do not agree." Frieda Klotz, *A Teen Gender-Care Debate Is Spreading Across Europe*, THE ATLANTIC (April 28, 2023).[9] Plaintiffs, and their experts, largely ignore higher quality evidence and developments in Europe to paint a misleading picture of scientific agreement of the safety and efficacy of these treatments. *See In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (criticizing expert for "cherry-picking observational studies that support his conclusion"). Much the same can be said for WPATH and the

---

[9] *Available at* https://www.theatlantic.com/health/archive/2023/04/gender-affirming-care-debate-europe-dutch-protocol/673890/.

American medical establishment, which have moved in the opposite direction from Europe. This has been done even though scientists in the United States—including scientists supportive of these procedures in theory—have raised concerns that American children are being rushed into these treatments without adequate safeguarding. *See* NYT, *supra*; NYT Mag., *supra*.

WPATH has responded to these developments by *loosening* safeguards despite the lack of new evidence to justify this change. *See supra,* Background II. Regardless, WPATH's and the Endocrine Society's guidelines are also just recommendations. No doctor is required to follow them and reporting, including from witnesses here, has demonstrated that they are not being followed. NYT, *supra*. Doctors are prescribing puberty blockers and cross-sex hormones without addressing the severe mental health issues that many of these patients are dealing with. *See, e.g.*, Ex. 7, Dixon, ¶¶ 11-12 ("The therapist did not do a psychologist evaluation or testing. She never went deeper to determine why I was experiencing dysphoria. She also never talked about my extensive childhood sexual abuse.")

How has WPATH responded to these concerns? With censorship, not science. Specifically, WPATH signed onto a letter denouncing the New York Times's journalistic endeavors—cited above—with "the real purpose to discourage in-depth stories on trans healthcare or put an end to such coverage altogether." Erik Wemple, *A second look at the attacks on the New York Times's trans coverage*, THE WASHINGTON POST (June 15, 2023).[10] This is not an objective organization that should have any role dictating what medical procedures the Constitution requires Oklahoma to allow for minor children within its borders. *See also* Ex. 1, Cantor, ¶ 101 ("WPATH has explicitly abandoned evidence-based medicine."); Ex. 2, Laidlaw, ¶¶ 176-190.

Given medical uncertainty surrounding the lifetime consequences of these procedures and the medical establishment's unwillingness to regulate itself, the Legislature made the rational decision to

---

[10] *Available at* https://www.washingtonpost.com/opinions/2023/06/15/new-york-times-transgender-coverage-controversy/.

prohibit these treatments for minors. The evidence above provides a "reasonably conceivable state of facts" to establish a rational basis. *Copelin-Brown*, 399 F.3d at 1255 (citation omitted).

Were intermediate scrutiny to apply, the Act serves the important governmental objectives of protecting the health of minors and ensuring that they are mature before making life-altering decisions. As the State has established, these treatments have substantial risks and permanent effects. Plaintiffs' claims that gender transition treatments are not "uniquely risky … when compared to any other type of health care[,]" Doc. 6 at 17-18, is simply incorrect. As the background above shows, there is an "exceedingly persuasive" reason for SB 613. *Virginia*, 518 U.S. at 531.

Elsewhere, the State has consistently found that minors lack the maturity to make certain decisions. For example, people under the age of 18 participate in a completely different justice system because of a "recognition of the comparative immaturity and irresponsibility of juveniles." *Roper v. Simmons*, 543 U.S. 551, 569 (2005). Indeed, under Oklahoma law, no person under the age of 18 years old is allowed to receive a tattoo. OKLA. STAT. tit. 21, § 842.1. Minors cannot vote, OKLA. CONST. art. III, § 1, smoke tobacco, OKLA. STAT. tit. 10A, § 2-8-224, use a tanning facility, OKLA. STAT. tit. 63, § 7302, drink alcohol, OKLA. STAT. tit. 37A, § 6-120, or buy lottery tickets. OKLA. STAT. tit. 3A, § 726. These laws are based on the common sense understanding that minors are not mature enough to make certain consequential decisions. Yet Plaintiffs are asking the Court to ignore this understanding. Plaintiffs are asking this Court to rule that the Constitution *requires* allowing a 13-year-old boy to have his healthy, functioning genitals cut off when he is not even allowed to get his mother's initials tattooed on his shoulder or legally drink a beer. This is not required by the Constitution.

Plaintiffs will likely emphasize that European countries have not banned the treatments from being conducted on minors, but rather allow for the use of puberty blockers in research trials. But that is not meaningful under intermediate scrutiny, and it certainly does not matter under a rational basis review. The Act does not need to employ the least restrictive means. At most, it needs to be

substantially related to its important governmental objectives. The European restrictions demonstrate that the evidence supporting the efficacy of the treatments is low quality and that the risks of the procedure are profound. And nothing in the Constitution forbids Oklahoma from protecting its minors *here* and allowing research to proceed *there*. Put differently, nothing in the Constitution requires States to operate as research hubs for experimental medicine. And regardless, Plaintiffs have not even alleged that they would like to participate in research. Any pushback on this front is irrelevant here.

For these reasons, the Act would likely survive any relevant level of scrutiny.

B. *Plaintiffs are not likely to succeed on their Substantive Due Process Claim.*

The substantive due process analysis proceeds through two parts. The plaintiff must assert a carefully defined right that is "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such as that neither liberty nor justice would exist if [it] were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (cleaned up). Determining whether an asserted right is deeply rooted in history and implicit in the concept of ordered liberty involves "a careful analysis of the history of the right at issue." *Dobbs*, 142 S. Ct. at 2246. Establishing a new fundamental right "is often an uphill battle, as the list of fundamental rights is short." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008) (citation omitted); *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Courts must guard "against the natural human tendency to confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy" lest they end up merely enshrining their own policy preferences. *Dobbs*, 142 S. Ct. at 2247.

Plaintiffs have not carefully described a right. Plaintiffs argue that parents possess a fundamental right to direct their child's medical care. Doc. 6 at 20. This description is overly broad. *Glucksberg* is illustrative. There, the plaintiffs described their proposed fundamental right as protecting the "liberty of competent, terminally ill adults to make end-of-life decisions free of undue government interference." *Glucksberg*, 521 U.S. at 724 (citation omitted). The Supreme Court rejected this overly

27

abstract description of the right, saying that "[t]he question presented in this case, however, is whether the protections of the Due Process Clause include a right to commit suicide with another's assistance." *Id.* Following the Supreme Court's lead, the question in this case is whether the Due Process Clause includes a fundamental right for parents to choose for their children to use puberty blockers, cross-sex hormones, and surgeries for the purposes of effectuating a gender transition. The answer is no.

      With the appropriate question in mind, it is clear Plaintiffs have not conducted the necessary inquiry to "recognize a new component of the 'liberty' protected by the Due Process Clause." *Dobbs*, 142 S. Ct. at 2247. Indeed, Plaintiffs' brief is empty of any historical evidence for the existence of the claimed fundamental right. The reason for this is simple: The treatments that they seek have only existed for a few decades. Doc. 6-16 at ¶ 28. Therefore, Plaintiffs cannot point to any form of historical evidence that the claimed right existed in 1868 when the Fourteenth Amendment was ratified which greatly weakens their claim. *Reno v. Flores*, 507 U.S. 292, 303 (1993). This might explain why the federal government declined to support Plaintiffs' substantive due process claim. Doc. 61.

      Plaintiffs seek to avoid this inevitable conclusion by citing a non-binding case stating that parents have the right "to direct their children's medical care." Doc. 6 at 20 (quoting *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019). However, the right Plaintiffs are truly seeking is the right for a parent and child to choose for the children to receive a certain treatment. This is not a fundamental right. *Kanuszewski* involved the parental right to refuse the drawing and storage of their children's blood by state officers. 927 F.3d at 405. To the extent that the decision could be read more broadly to endorse a fundamental right to obtain a specific treatment for one's child, it is erroneous. There is an important difference between the State forcing someone's child to take a certain drug or give blood and the State prohibiting that same minor from a treatment. The Supreme Court and the Tenth Circuit have rejected the view that that "the right to refuse unwanted medical treatment could be some-how transmuted into a right to" receive a specific treatment.

*Glucksberg*, 521 U.S. at 725-26; *see also Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980) (there is no right for mentally ill patients "to take whatever treatment they wished regardless of" the FDA); *Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007) (holding there is no fundamental right for the terminally ill to access experimental drugs).

## II.   Facial relief is plainly inappropriate, given Plaintiffs' concessions and omissions.

Facial injunctive relief is inappropriate here. *See* Doc. 80 at 4-6. The Supreme Court has long held that "a plaintiff must demonstrate standing for each claim he seeks to press" and "for each form of relief" sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020) ("plaintiffs who successfully challenge one provision of a law may lack standing to challenge *other* provisions of that law"). No Plaintiff has asserted any desire or need for a surgery. OKLA. STAT. tit. 63, § 2607.1(A)(2)(a)(1). Plaintiffs' brief largely avoids surgeries—which effectively concedes both that these surgeries are not necessary before the age of 18 and that Plaintiffs are hesitant to defend the practice of performing these grotesque surgeries on minors. As such, even were this Court to agree with Plaintiffs as to the hormone treatments and puberty blockers, injunctive relief should not reach the surgical prohibition.

Plaintiffs also do not appear to challenge the Act as applied to pre-pubescent children for similar reasons as to the surgery prohibition. None of Plaintiffs are pre-pubescent children seeking to receive puberty blockers or cross-sex hormones. In fact, Plaintiffs' Complaint explicitly disavows the idea that any pre-pubescent children receive puberty blockers. Doc. 2 at ¶ 60 ("In other words, gender transition does not include any pharmaceutical or surgical intervention before puberty."); Doc. 6-15 at ¶¶ 12-13. Therefore, based on Plaintiffs' own words and representations, none of them are injured by the application of SB 613 to pre-pubescent children. Any potential injunctive relief should not apply to SB 613's prohibition on providing pre-pubescent children with medical and surgical interventions to transform their healthy body to align with their perceived gender identity.

III.   **Plaintiffs have not shown that they will suffer irreparable harm.**

For constitutional claims, the Tenth Circuit tends to "collapse[] the first and second preliminary-injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury." *Free the Nipple-Fort Collins*, 916 F.3d at 806. As Plaintiffs are unlikely to succeed on the merits, they necessarily fail to establish irreparable harm. Plaintiffs also fail to demonstrate that their harm "is far greater than just the [alleged] deprivation of the Plaintiffs' constitutional rights." Doc. 6 at 22. The primary harm Plaintiffs point to is that the minors will be "forced into … endogenous puberty." *Id.* at 23. But until the past several decades, virtually every person who has ever existed has experienced natural puberty. And many struggle with the bodily changes that occur during puberty. *See* Ex. 4, Harris, ¶ 26. Surely it is not an irreparable injury worthy of an injunction for Plaintiffs to experience the normal and natural physical process that everyone else does. Moreover, the Act also seeks to mitigate any harms by providing a six-month tapering off period to ease the transition to natural puberty. And these harms are not necessarily irreparable, given that Plaintiffs can seek any transitioning treatments they like once they turn eighteen.

IV.   **The balance of harms and the public interest favor the State.**

The balance of the harms and the public interest merge when the State is party. *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citation omitted). The Act also protects Oklahoman children from experimental treatments with substantial lifetime risks. If the law were enjoined, minors in this State will continue using puberty blockers, dangerous doses of hormones, and have permanent surgeries removing their healthy body parts. They will be subject to all the numerous risks listed above.

### CONCLUSION

Defendants respectfully request that this Court deny the motion for a preliminary injunction.

Respectfully submitted,

s/ Zach West
_____

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
ZACH WEST, OBA #30768
  *Director of Special Litigation*
AUDREY A. WEAVER, OBA #33258
WILL FLANAGAN, OBA #35110
  *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:   (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for Defendants 15-53*

31

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of June, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

_s/ Zach West_____

Zach West
