# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

PETER POE, et al.,

    Plaintiffs,

      v.

GENTNER DRUMMOND, et al.,

    Defendants.

No. 4:23-cv-00177-JFH-SH

---

## BRIEF OF DO NO HARM AND OKLAHOMA COUNCIL OF PUBLIC AFFAIRS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

David H. Thompson*
Peter A. Patterson*
Brian W. Barnes*
John D. Ramer*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Ryan Haynie, OBA No. 32796
Oklahoma Council of Public Affairs
1401 N. Lincoln Blvd.,
Oklahoma City, OK 73104
Tel: (405) 590-6070
ryan@ocpathink.org

*Motions for admission *pro hac vice* pending

June 27, 2023

*Counsel for Amici Curiae Do No Harm and Oklahoma Council of Public Affairs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ....................................................... 1

INTRODUCTION ............................................................................................................... 1

I.  The Practice of Experimental Gender Medicine on Children And Adolescents Causes Harm, Carries Serious Unknown Risks, and Offers No Proven Benefit. ........................... 3

  A.  Puberty Blockers, Cross-Sex Hormones, and Gender-Transition Surgeries Carry Numerous and Severe Known Harms—Including Death. ........................... 3

  B.  The Full Scope of Harm Resulting From Puberty Blockers, Cross-Sex Hormones, and Gender-Transition Surgeries Is Wholly Unknown. ....................... 6

  C.  There Are No Proven Benefits From Puberty Blockers, Cross-Sex Hormones, and Gender-Transition Surgeries That Outweigh Their Harms and Risks. ............ 9

II.  The Court Should Not Permit Politically Motivated Medical Interest Groups to Set The Constitutional Standard. ..................................................................................... 13

III.  Many Practitioners of Experimental Gender Medicine Oppose *Any* Limitation on Minors Obtaining These Harmful and Irreversible Treatments. ....................................... 19

CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ............................................ 13, 19

**Other Authorities**

Abbruzzese, et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine:*
    *A critical evaluation of the Dutch Studies—and research that has followed*,
    J. OF SEX & MARITAL THERAPY 1 (2023), https://bit.ly/3r6ewwe ............................... 7, 12

Alison Clayton, *Gender-Affirming Treatment of Gender Dysphoria in Youth: A Perfect Storm*
    *Environment for the Placebo Effect—The Implications for Research and Clinical*
    *Practice*, 52 ARCHIVES OF SEXUAL BEHAVIOR 483 (2022), https://bit.ly/44fsBpC ........... 10

American Academy of Child & Adolescent Psychiatry, *AACAP Statement on DACA*
    *Rescission* (Sept. 2017), https://bit.ly/3pnOQuI ............................................................... 16

American Academy of Child & Adolescent Psychiatry, *Anti-Racism Resource Library*
    (Jan. 2023), https://bit.ly/42UCKXz ................................................................................ 15

American Academy of Child & Adolescent Psychiatry, *Climate Change and Eco-Anxiety in*
    *Youth* (Mar. 2022), https://bit.ly/44abk14 ....................................................................... 17

American Academy of Child & Adolescent Psychiatry, *Policy Statement on Children*
    *and Guns* (Jun. 2022), https://bit.ly/3NqsPn4 ................................................................ 15

American Academy of Family Physicians, *Nuclear, Biological and Chemical (NBC)*
    *Warfare* (2020), https://bit.ly/3NN6XU5............................................................................ 17

American Academy of Nursing, *American Academy of Nursing's Statement:*
    *Firearm Safety and Violence Prevention* (Oct. 26, 2022)*,* https://bit.ly/3NsYFPT.......... 15

American Academy of Pediatrics Board of Directors, *Truth, Reconciliation, and*
    *Transformation: Continuing on the Path to Equity*,
    146 PEDIATRICS 449 (2020), https://bit.ly/3r8kgph ......................................................... 15

American College of Osteopathic Pediatricians, *ACOP Statement Against Structural Racism*
    *and Inequality* (June 4, 2020), https://bit.ly/3XqukGi .................................................... 15

American College of Osteopathic Pediatricians, *The ACOP Supports The Call To ACTION*
    *Towards Common Sense Gun Regulation* (Jun. 1, 2022), https://bit.ly/3Xnd05b ............. 15

American Medical Association, *AMA Urges Elimination of Nuclear Weapons*
    (Nov. 18, 2015), https://bit.ly/3NXSpS1 ........................................................................... 17

*APA Resolution on the Imposition of Death as a Penalty for Persons Aged 18 Through 20,*
    *Also Known As the Late Adolescent Class,* at 2, AMERICAN PSYCHOLOGICAL
    ASSOCIATION,  (Aug. 2022), https://bit.ly/3JsRyWH...................................................... 18

Annelou de Vries & Peggy T. Cohen-Kettenis, *Clinical Management of Gender Dysphoria*
    *in Children and Adolescents: The Dutch Approach*, 59 J. OF HOMOSEXUALITY 301
    (2012), https://bit.ly/44a01pE......................................................................................... 6

Annelou L C de Vries, et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. OF SEX MED. 2276 (2011), https://bit.ly/3psgUwT ................................................................................................ 11, 12

Annelou L C de Vries, et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 PEDIATRICS 696 (2014), https://bit.ly/3CP6iLU ............ 12

Ari Blaff, *'Mature Enough': Undercover Video Reveals Docs Routinely Approve Puberty Blockers for Kids as Young as Eight*, NATIONAL REVIEW (Apr. 19, 2023), https://bit.ly/3JBG4jB ................................................................................................ 21

*Board of Directors Part One: The Tavistock and Portman*, NHS ENGLAND 53 (2015), https://bit.ly/3UdrNh3 ...................................................................................................... 7

Br. for the Am. Academy of Child and Adolescent Psychiatry, *et al.*, as *Amici Curiae* Supporting Neither Party, *Miller v. Alabama*, 567 U.S. 460 (2012) (Nos. 10-9646, 10-9647), 2012 WL 121237 .............................................................. 14

Br. for the Am. Academy of Child and Adolescent Psychiatry, *et al.*, as *Amici Curiae* Supporting *The Evidence to Support Medicalised Gender Transitions in Adolescents is Worryingly Weak*, THE ECONOMIST (Apr. 5, 2023), https://econ.st/3GnvET8Catherine ................................................................................ 1, 2

Br. for the Am. Med. Colls., *et al.*, as *Amici Curiae* Supporting Respondents, *Students For Fair Admissions, Inc. v. President & Fellows of Harvard College*, Nos. 20-1199, 21-707 (U.S. July 28, 2022), 2022 WL 3036400 ...................................... 17

Catherine A. Wu & Alex S. Keuroghlian, *Moving Beyond Psychiatric Gatekeeping for Gender-Affirming Surgery*, 158 JAMA SURGERY 231 (2023), https://bit.ly/4407HLx ............................................................................................... 22, 23

Chad Terhune, et al., *As More Transgender Children Seek Medical Care, Families Confront Many Unknowns*, REUTERS (Oct. 6, 2022), https://reut.rs/42XOrgq .............................. 3, 6

David Larson, *Duke Health Emerges as Southern Hub for Youth Gender Transition*, THE CAROLINA J. (Aug. 31, 2022), https://bit.ly/3JvXuOy .............................................. 3, 4

Diane Chen, et al., *Consensus Parameter: Research Methodologies to Evaluate Neurodevelopmental Effects of Pubertal Suppression in Transgender Youth*, 5 TRANSGENDER HEALTH 246 (2020), https://bit.ly/3COdwzO ........................................ 6, 7

Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, 23 INT'L J. OF TRANSGENDER HEALTH S1 (2022), https://bit.ly/41c6sHl ......... 4, 20

Draft WPATH Standards of Care 8 (Dec. 2, 2021), https://bit.ly/42YDJGm ............................... 20

Emily Bazelon, *The Battle over Gender Therapy*, N.Y. TIMES (Mar. 17, 2023), https://nyti.ms/3r6fJ76 ................................................................................................ 2, 20

GenderGP, *How Many People Detransition? Exploring Detransition – Jack Turban* (Mar. 2, 2021), https://bit.ly/44byQuq .......................................................................... 22

Henri Feola, *It's Time to Stop Gatekeeping Medical Transition*, AMERICAN SCIENTIST (Feb. 18, 2022), https://bit.ly/46kWbfh .......................................................................... 22

Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Interim Report*, THE CASS REVIEW 32 (Feb. 2022), https://bit.ly/3r1OQRw ......................7

Jack Turban, *The Evidence for Trans Youth Gender-Affirming Medical Care*, PSYCH. TODAY (Jan. 24, 2022), https://bit.ly/3NLkKL6 ..................................................10

Jamie Reed, *I Thought I Was Saving Trans Kids. Now I'm Blowing the Whistle*, THE FREE PRESS (Feb. 9, 2023), https://bit.ly/3qYid7f......................................................21

Jennifer Block, *Gender Dysphoria in Young People Is Rising—and So Is Professional Disagreement*, BMJ (Feb. 23, 2023), https://bit.ly/3NXKlRf ...........................................11

Jenny Harvie, *This abortion doctor is not ready to leave Alabama. 'You don't want me here? That's why I'm gonna stay,'* L.A. TIMES (Apr. 28, 2023), https://lat.ms/3CLceVU ..........21

Jianhong Liu, et al., *Policy Brief on Climate Change and Mental Health/Well-Being,* 68 NURSING OUTLOOK 517 (2020), https://bit.ly/3JxHH1X ............................................17

Jing J. Zhao, et al., *Surgical Site Infections in Genital Reconstruction Surgery for Gender Reassignment, Detroit: 1984-2008*, 15 SURGICAL INFECTIONS 99 (2014), https://bit.ly/3Uklubu ........................................................................................................4, 5

Journal of the American Academy of Child and Adolescent Psychiatry, *Call for Papers on the Effects of Race, Racism, Social Justice, and Health Equity in Child and Adolescent Psychiatry* (2023), https://bit.ly/3pr9El1 ..........................................................................15

Leor Sapir, *The Distortions in Jack Turban's Psychology Today Article on 'Gender Affirming Care,'* REALITY'S LAST STAND (Oct. 7, 2022), https://bit.ly/3PqI4yY .............................10

Leor Sapir, *The School-to-Clinic Pipeline*, CITY J. (Autumn 2022), https://bit.ly/42U82Ox .....5, 6

Leor Sapir, *Trust the Experts' Is Not Enough: U.S. Medical Groups Get the Science Wrong on Pediatric 'Gender Affirming' Care*, MANHATTAN INST. 5 (2022), https://bit.ly/3Jw5Wxg .........................................................................................9, 10, 12

Leor Sapir, *Yes, Europe is Restricting "Gender-Affirming Care,"* CITY J. (Feb. 13, 2023), https://bit.ly/3r3PSfZ ...................................................11

Letter from AANS/CNS Joint Section on Neurotrauma & Critical Care, et al., to Patrick Leahy, U.S. Senate Comm. on Appropriations, Chairman (Apr. 28, 2022), https://bit.ly/3pr1hpu....................................................................16

Letter from Susan Bostwick, Academic Pediatric Ass'n President, et al., to Representative Stephanie Murphy, (Apr. 2, 2018), https://bit.ly/3Psn377................................................16

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021), https://bit.ly/433UwI2.........................8

Lisa Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria,* 13 PLOS ONE 1 (2018), https://bit.ly/40P6zbY .............................................................................................12, 13

Michael Biggs, *Suicide by Clinic-Referred Transgender Adolescents in the United Kingdom*, 51 ARCHIVES OF SEXUAL BEHAVIOR 685 (2022), https://bit.ly/3Kk3ARL ..................10, 11

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins and Evidence*, 49 J. OF SEX & MARITAL THERAPY 348 (2022), https://bit.ly/3Kgax6p ...............3, 5, 6, 12

Nastasja M. de Graaf, et al., *Suicidality in Clinic-Referred Transgender Adolescents*, 31 EUROPEAN CHILD & ADOLESCENT PSYCHIATRY 67 (2022), https://bit.ly/42YZwh9 ..................................................................................... 11

NAT'L ASS'N of Pediatric Nurse Practitioners, *NAPNAP Position Statement on the Effects of Climate Change on Children's Health: The Role of Pediatric-Focused Advanced Practice Registered Nurses*, 35 J. PEDIATRIC HEALTH CARE 621 (2021), https://bit.ly/441SUQy................................................................................16, 17

Philip J. Cheng, et al., *Fertility Concerns of the Transgender Patient*, 8 TRANSLATIONAL ANDROLOGY AND UROLOGY 209 (2019), https://bit.ly/3nW2K6p ...........................3

Press Release, AAP, et al., *Leading Pediatric Medical Organizations Respond to Recent Executive Orders Impacting Immigrants and Refugees* (Feb. 14, 2017), https://bit.ly/46pFsre........................................................................................ 16

Press Release, American Medical Association, *AMA Adopts New Policy Declaring Climate Change a Public Health Crisis* (Jun. 13, 2023), https://bit.ly/3Xt8X7a .......................... 17

Press Release, Justin Worsley, *NAPNAP Position Statement on Prevention of Firearm Violence and Injury in Children*, National Association of Pediatric Nurse Practitioners (Jan. 12, 2023), https://bit.ly/3Jy3NRA.............................................................. 16

Riittakerttu Kaltiala-Heino, et al., *Two Years of Gender Identity Service for Minors: Overrepresentation of Natal Girls with Severe Problems in Adolescent Development*, 9 CHILD & ADOLESCENT PSYCH. & MENTAL HEALTH 1 (2015), https://bit.ly/3r04aye.....................................................................................7, 8

Robert M. McClean, et al., *Firearm-Related Injury and Death in the United States: A Call to Action From the Nation's Leading Physician and Public Health Professional Organizations*, ANNALS OF INTERNAL MEDICINE (2019), https://bit.ly/3NOi7Im.............16

Robin Respaut & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, REUTERS (Oct. 6, 2022), https://reut.rs/3PNUGAz ......................................7

Sarah C.J. Jorgensen, et al., *Puberty Blockers for Gender Dysphoric Youth: A lack of sound science,* 5 J. OF THE AM. COLLEGE OF CLINICAL PHARM. 1005 (2022), https://bit.ly/3Mkz253 .................................................................................3

Sarah L. Schulz, *The Informed Consent Model of Transgender Care: An Alternative to the Diagnosis of Gender Dysphoria*, 58 J. OF HUMANISTIC PSYCHOLOGY 72 (2017), https://bit.ly/3NqyZDI ...................................................................................22

Scott C. Denne, *Funding for Gun Violence Research: The Importance of Sustained Advocacy By Academic Pediatricians*, 87 PEDIATRIC RESEARCH 800 (2020), https://go.nature.com/42YEvTB .......................................................................15

American Academy of Child & Adolescent Psychiatry, *AACAP Calls for Swift Congressional Passage of the "Dream Act"* (May 21, 2018), https://bit.ly/441SycG .............................16

Spencer Lindquist, *WATCH: Director of Boston Children's Gender Clinic Says Puberty Blockers Cause Infertility, Are Given Out 'Like Candy,'* BREITBART (Oct. 10, 2022), https://bit.ly/3NuhWkc ....................................................................21, 22

Stephen B. Levine, et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults,* 48 J. OF SEX & MARITAL THERAPY 706 (Mar. 17, 2022), https://bit.ly/3pr6qOr .............................................................. 11

Suzzanna Diaz & J. Michael Bailey, *Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases*, 52 ARCHIVES OF SEXUAL BEHAVIOR 1031 (2023), https://bit.ly/3Pucal0 ............................................................................................8

Thomas B. Newman, *Taking a Stand Against Nuclear Proliferation: The Pediatrician's Role,* 121 PEDIATRICS e1430 (2008), https://bit.ly/3Js7msJ ..................................17, 18

Valentin Maurer, et al., *Penile Flap Inversion Vaginoplasty in Transgender Women: Contemporary Morbidity and Learning-Curve Analysis from a High-Volume Reconstructive Center*, FRONTIERS IN SURGERY (Feb. 23, 2022), https://bit.ly/3KDJ135 ...............................................................................................5

Valeria B. Bustos, et al., *Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence,* PLASTIC AND RECONSTRUCTIVE SURGERY GLOBAL OPEN 1 (Mar. 19, 20212023), https://bit.ly/3JyVKEm.................................................................5

Wouter B. van der Sluis, et al., *Clinical Characteristics and Management of Neovaginal Fistulas After Vaginoplasty in Transgender Women*, 127 OBSTETRICS AND GYNECOLOGY 1118 (2016), https://bit.ly/3CMFyeN ...........................................................................5

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amicus* Do No Harm is a diverse group of physicians, healthcare professionals, medical students, patients, and policymakers whose goal is to protect healthcare from a radical, divisive, and discriminatory ideology. Basing its name in the ethical underpinnings of the Hippocratic Oath, Do No Harm believes healthcare should be free from experimental procedures that place political agendas ahead of patient well-being.

*Amicus* Oklahoma Council of Public Affairs (OCPA) is an organization dedicated to promoting the flourishing of the people of Oklahoma by advancing principles and policies that support free enterprise, limited government, individual initiative, and personal responsibility. OCPA believes it is important to protect children and families from medical treatments that are wholly unproven, that cause known harm, and that carry lifelong and irreversible consequences.

*Amici* submit this brief in support of Defendants' opposition to Plaintiffs' motion for preliminary injunction.

## INTRODUCTION

No reliable scientific evidence justifies the use of puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria in minors. To the contrary, such treatments carry harmful lifelong consequences, including infertility, total loss of adult sexual function, and increased risk of several other serious medical conditions. Despite activists' efforts to stifle dissent, even otherwise sympathetic audiences have begun to raise the alarm over the use of these treatments. In recent exposés, writers for *The Economist* and *The New York Times* have warned that the evidence supporting such treatments is "worryingly weak" and that "it is impossible to justify the current recommendations about gender-affirming care based on the existing data." *The Evidence to Support Medicalised Gender Transitions in Adolescents is Worryingly Weak*, THE ECONOMIST

1

(Apr. 5, 2023), https://econ.st/3GnvET8; *see also* Emily Bazelon, *The Battle over Gender Therapy*, N.Y. TIMES (Mar. 17, 2023), https://nyti.ms/3r6fJ76 ("There is no published research on the physical effects in middle or old age of having transitioned in adolescence[.]").

While public discourse over the appropriate treatments for gender dysphoria in minors has become tragically politicized, a fair-minded reading of the existing medical literature leads to the inescapable conclusion that Oklahoma is justified in prohibiting the practice of experimental gender medicine on minors. Nevertheless, numerous medical interest groups have lined up in opposition to Oklahoma's commonsense law that protects children and adolescents from the harm and unknown risks that accompany these treatments. Although these groups claim to offer objective analysis, an even cursory glance at the positions these groups have taken elsewhere reveals that they peddle nothing more than political ideology dressed up as "science."

*Amici* Do No Harm and OCPA submit this brief to make three points. First, the current scientific evidence reveals that the practice of experimental gender medicine on minors causes significant harm, carries serious unknown risks, and offers no proven benefit. Second, *amici* explain why this Court should not hesitate to depart from the purported objective recommendations put forth by politically motivated medical interest groups. And third, *amici* explain that, even if the Court accepts the characterization of the supposedly "robust" and "rigorous" screening procedures for experimental gender medicine, many advocates—including one of Plaintiffs' own experts—have publicly criticized those (and, really, any) screening procedures as too strict. Thus, the advocates of practicing experimental gender medicine on minors are already trying to move the goalposts *beyond* the standards they describe in polished legal briefs. For all these reasons and the reasons explained by Defendants, the Court should deny Plaintiffs' motion for a preliminary injunction.

I.     **The Practice of Experimental Gender Medicine on Children And Adolescents Causes Harm, Carries Serious Unknown Risks, and Offers No Proven Benefit.**

All the treatments at issue—puberty blockers, cross-sex hormones, and gender-transition surgeries—pose significant health risks to patients. These treatments (1) cause known harms, (2) carry entirely unknown risks, and (3) achieve no proven benefit.

A.     **Puberty Blockers, Cross-Sex Hormones, and Gender-Transition Surgeries Carry Numerous and Severe Known Harms—Including Death.**

We first address the safety of puberty blockers, technically labeled GnRH agonists. For minors suffering from gender dysphoria, pharmaceutical interventions commonly begin with the prescription of these drugs to halt the normal course puberty. *See* Chad Terhune, et al., *As More Transgender Children Seek Medical Care, Families Confront Many Unknowns*, REUTERS (Oct. 6, 2022), https://*reut.rs/42XOrgq*. Though advocates suggest puberty blockers merely "pause" puberty and are "fully reversible," the use of puberty blockers has been linked to life-altering side-effects, including decreased bone density, cognitive impairment, polycystic ovarian syndrome, metabolic syndrome, and greater risk of infertility. *See* Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins and Evidence*, 49 J. OF SEX & MARITAL THERAPY 348 (2022), https://bit.ly/3Kgax6p; Sarah C.J. Jorgensen, et al., *Puberty Blockers for Gender Dysphoric Youth: A Lack of Sound Science,* 5 J. OF THE AM. COLLEGE OF CLINICAL PHARM. 1005 (2022), https://bit.ly/3Mkz253; Philip J. Cheng, et al., *Fertility Concerns of the Transgender Patient*, 8 TRANSLATIONAL ANDROLOGY AND UROLOGY 209 (2019), https://bit.ly/3nW2K6p. Moreover, it is well documented that the prescription of these drugs could permanently diminish adult sexual function in patients. Even the president of the World Professional Association for Transgender Health (WPATH) has acknowledged that individuals who are prescribed puberty blockers by age 11 would likely never have the capacity to attain an orgasm in their lifetime. *See* David Larson,

*Duke Health Emerges as Southern Hub for Youth Gender Transition*, THE CAROLINA J. (Aug. 31, 2022), https://bit.ly/3JvXuOy.

After blocking a child's normal puberty, doctors may prescribe cross-sex hormones to artificially induce some of the effects of the puberty of the opposite sex. For males, the use of cross-sex hormones is associated with numerous health risks, such as thromboembolic disease, including blood clots; cholelithiasis, including gallstones; coronary artery disease, including heart attacks; macroprolactinoma, which is a tumor of the pituitary gland; cerebrovascular disease, including strokes; hypertriglyceridemia, which is an elevated level of triglycerides in the blood; breast cancer; and irreversible infertility. Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, 23 INT'L J. OF TRANSGENDER HEALTH S1, S119-23 (2022), https://bit.ly/41c6sHl.

For females, the use of cross-sex hormones is associated with risks of erythrocytosis, which is an increase in red blood cells; severe liver dysfunction; coronary artery disease, including heart attacks; depression; hypertension; infertility; and increased risk of breast, cervical, and uterine cancers. *Id.* S117. The serious and potentially life-threatening side effects associated with cross-sex hormones clearly shows Oklahoma wisely prohibited the use of these drugs to treat gender dysphoria.

Puberty blockers are also a potential gateway drug. The treatment of gender dysphoria typically culminates in sex reassignment surgeries, which replicate primary or secondary sex characteristics of the opposite sex. Such procedures may involve bilateral mastectomy to remove the breasts, penectomy to remove the penis, vaginoplasty to "create" a vagina, or phalloplasty and scrotoplasty to "create" a penis and scrotum, as well as non-genital procedures like facial feminization or chest masculinization. *See* Jing J. Zhao, et al., *Surgical Site Infections in Genital*

*Reconstruction Surgery for Gender Reassignment, Detroit: 1984-2008*, 15 SURGICAL INFECTIONS 99, 99-100 (2014), https://bit.ly/3Uklubu. The known risks of these surgeries include fistulas, chronic infection, atrophy, need for colostomy, and complete loss of sexual sensation. *See* Wouter B. van der Sluis, et al., *Clinical Characteristics and Management of Neovaginal Fistulas After Vaginoplasty in Transgender Women*, 127 OBSTETRICS AND GYNECOLOGY 1118 (2016), https://bit.ly/3CMFyeN; Valentin Maurer, et al., *Penile Flap Inversion Vaginoplasty in Transgender Women: Contemporary Morbidity and Learning-Curve Analysis from a High-Volume Reconstructive Center*, FRONTIERS IN SURGERY (Feb. 23, 2022), https://bit.ly/3KDJ135; Valeria B. Bustos, et al., *Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence,* PLASTIC AND RECONSTRUCTIVE SURGERY GLOBAL OPEN 1 (Mar. 19, 20212023), https://bit.ly/3JyVKEm; Zhao, *supra*.

In addition, when minors are prescribed puberty blockers, the drugs inhibit the growth of the minor's genital tissue, which reduces the tissue needed to construct artificial genitalia and thus requires surgeons to borrow tissue from other areas of the body, such as the colon. The need for a second surgical site increases the risk of infection, which has even led to death after a sex-reassignment surgery. *See* Biggs, *supra,* 49 J. OF SEX & MARITAL THERAPY at 355.

Although the transitioning process generally entails three sequential steps that each present their own risks—puberty blockers, cross-sex hormones, and surgery—the harms for all three steps must be considered together because the use of puberty blockers is associated with an *increase in the likelihood* of seeking cross-sex hormones and surgery. In medicine, interventions sometimes create or worsen the problems they are supposed to alleviate, a process known as iatrogenesis. *See* Leor Sapir, *The School-to-Clinic Pipeline*, CITY J. (Autumn 2022), https://bit.ly/42U82Ox. Here, delaying a child's natural puberty while his or her peers continue to develop the characteristics that

come from puberty can actually *worsen* a minor's gender dysphoria. *Id.* The prescription of puberty blockers is thus associated with an increase in the likelihood of *additional* medical intervention with cross-sex hormones and surgery. Indeed, research shows that the vast majority of children (96%-98%) who start puberty blockers continue on to use cross-sex hormones. Biggs, *supra*, at 49 J. OF SEX & MARITAL THERAPY 352. This high conversion rate underscores the risks of promoting these treatments.

B.     **The Full Scope of Harm Resulting From Puberty Blockers, Cross-Sex Hormones, and Gender-Transition Surgeries Is Wholly Unknown.**

Beyond the *known* harms and risks of the treatments at issue in this case, the *unknown* risks equally warrant concluding that children and adolescents should be protected from these treatments. For example, the use of puberty blockers for gender dysphoria has never been approved by the U.S. Food and Drug Administration, and no clinical trial has ever established the safety of using them for this purpose. *See* Terhune, *supra.* To obscure this fact, activists argue the off-label use of puberty blockers is safe because they are also used to treat youth suffering from precocious puberty, meaning puberty that begins too early. *See* Annelou de Vries & Peggy T. Cohen-Kettenis, *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*, 59 J. OF HOMOSEXUALITY 301 (2012), https://bit.ly/44a01pE. But unlike the treatment of gender dysphoria in young people, the treatment of precocious puberty involves *the resumption of normal puberty* at an appropriate age—making it an entirely separate condition and course of treatment from using puberty blockers for gender dysphoria.

The unknowns regarding puberty blockers are startling. Specifically, it remains unknown the extent to which puberty blockers impact brain development and cognition. *See* Diane Chen, et al., *Consensus Parameter: Research Methodologies to Evaluate Neurodevelopmental Effects of Pubertal Suppression in Transgender Youth*, 5 TRANSGENDER HEALTH 246 (2020),

https://bit.ly/3COdwzO. In one study, authors were concerned that puberty blockers "may prevent key aspects of development" during adolescence—"a sensitive period of brain organization"—and did not know whether a patient would "catch-up" to otherwise resume developmentally normal brain functioning. *Id.* at 249. Even more worrying, some have raised concerns that the use of puberty blockers may *contribute to* suicidal ideation and behavior. *See Board of Directors Part One: The Tavistock and Portman*, NHS ENGLAND 53 (2015), https://bit.ly/3UdrNh3 (noting a statistically significant increase in self-harm after a year of puberty suppression). No treatment can be deemed safe and effective when it remains unknown whether its application could permanently stunt patients' cognitive development or may lead them to suicide.

There are also unanswered questions concerning the correlation between gender dysphoria and other comorbid psychiatric diagnoses. Recent data reveal a sharp uptick in the number of children and adolescents who are being treated for gender dysphoria. *See generally* Robin Respaut & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, REUTERS (Oct. 6, 2022), https://reut.rs/3PNUGAz. And many of the children and adolescents seeking experimental gender medicine today concurrently suffer from depression, anxiety, autism spectrum disorder, or attention deficit hyperactivity disorder. Abbruzzese, et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A Critical Evaluation of the Dutch Studies— and Research That Has Followed*, J. OF SEX & MARITAL THERAPY 1, 12 (2023), https://bit.ly/3r6ewwe. Moreover, evidence suggests these comorbidities both afflict a *substantial* portion of minors treated for gender dysphoria and often *precede* the onset of gender dysphoria. For example, of minors referred to the United Kingdom's gender service, up to one-third were either autistic or otherwise neurodivergent. Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Interim Report*, THE CASS REVIEW 32 (Feb. 2022),

https://bit.ly/3r1OQRw. And in a review of patient medical records, Finnish experts found that comorbid mental health diagnoses preceded gender dysphoria in 75% of reviewed cases. Riittakerttu Kaltiala-Heino, et al., *Two Years of Gender Identity Service for Minors: Overrepresentation of Natal Girls with Severe Problems in Adolescent Development*, 9 CHILD & ADOLESCENT PSYCH. & MENTAL HEALTH 1, 5 (2015), https://bit.ly/3r04aye. And a recent survey of parents found that mental health issues preceded a diagnosis of gender dysphoria by an average of almost 4 years. Suzzanna Diaz & J. Michael Bailey, *Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases*, 52 ARCHIVES OF SEXUAL BEHAVIOR 1031 (2023), https://bit.ly/3Pucal0. Without properly understanding the relationship between gender dysphoria and other comorbid psychiatric diagnoses, minor patients are put at risk of receiving experimental and risky treatments in place of those that may effectively and safely mitigate their *real* underlying mental-health problems. That risk is especially acute given the lack of adequate explanation for the precipitous rise in minors presenting with gender dysphoria and the disproportionate number of young females now suffering from gender dysphoria.

Lastly, a growing body of evidence points to individuals who have come to regret irreversible physical changes made to their bodies to treat gender dysphoria. These individuals are commonly referred to as "detransitioners." *See* Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition who Subsequently Detransitioned: A Survey of 100 Detransitioners,* 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021), https://bit.ly/433UwI2. Currently, there are *zero* reliable, long-term studies on rates of regret and detransition among the new cohort of children and adolescents who were treated under the "gender affirming" model. Therefore, the extent to which these children and adolescents may come to regret their gender transition, or will otherwise face adverse effects, is completely unknown.

**C.     There Are No Proven Benefits From Puberty Blockers, Cross-Sex Hormones, and Gender-Transition Surgeries That Outweigh Their Harms and Risks.**

Any potential benefits of experimental gender medicine, to the extent they exist, are vastly outweighed by the known harms and risks associated with these treatments for minors. Health authorities in Sweden, Finland, and the United Kingdom have conducted systematic reviews of evidence and, having found that the evidence of benefits is too uncertain to outweigh the risks, have decided to place severe restrictions on medical transition procedures—generally limiting the use of these treatments to *research studies*. Oklahoma has now reached the same reasonable conclusion. And although some countries have decided to permit experimentation with these drugs, nothing in the Constitution compels Oklahoma to make the same choice. At least three facts support that determination.

First, there is no reliable evidence to support the conclusion that these treatments result in long-term improvement of minors with gender dysphoria. Currently, there are simply no studies long enough to provide such a finding. This lack of evidence is unsurprising given the fact that more than 90% of the research on gender dysphoria has occurred in the last ten years. *See* Larson, *supra*.

Even though some studies purport to show *short*-term benefits, the effects are so minimal as to be immaterial, and the studies do not control for the confounding effects of psychotherapy or the placebo effect. For example, researchers consistently fail to control for the effects of psychotherapy—*i.e.*, non-pharmaceutical and non-surgical interventions designed to help a child through his or her gender-related distress. Due to this methodological shortcoming, to the extent a study reports benefits of experimental gender medicine, those benefits could be attributed to counseling instead of drugs. Leor Sapir, *Trust the Experts' Is Not Enough: U.S. Medical Groups Get the Science Wrong on Pediatric 'Gender Affirming' Care*, MANHATTAN INST. 5 (2022),

9

https://bit.ly/3Jw5Wxg. Moreover, there is a strong possibility that any short-term improvement reported in conjunction with experimental gender medicine is the result of a placebo effect. Specifically, the mere fact that an adolescent receives these treatments may lead to a self-reported improvement in his or her psychological outlook—even if the physical effects caused by the treatments are not themselves the cause of that improvement. Conversely, unsupported suggestions of increased risk of depression, anxiety, and suicide if these treatments are denied may create a "nocebo" effect—whereby a patient develops negative side effects that he or she *believes* will occur absent treatment. *See* Alison Clayton, *Gender-Affirming Treatment of Gender Dysphoria in Youth: A Perfect Storm Environment for the Placebo Effect—The Implications for Research and Clinical Practice*, 52 ARCHIVES OF SEXUAL BEHAVIOR 483 (2022), https://bit.ly/44fsBpC.

Second, advocates of these treatments push the sensational, and unfounded, claim that minors who cannot access the treatments are at imminent risk of suicide. For example, a popular article by one of Plaintiffs' experts cited six studies related to suicidality and the treatment of gender dysphoria. *See* Jack Turban, *The Evidence for Trans Youth Gender-Affirming Medical Care*, PSYCH. TODAY (Jan. 24, 2022), https://bit.ly/3NLkKL6. But these studies are riddled with methodological weaknesses. Indeed, the lead author of one of the studies stated that Dr. Turban's article overstated her research and that she "cannot claim that [her] research would have shown that gender affirming hormonal treatment reduces suicidality." *See* Leor Sapir, *The Distortions in Jack Turban's Psychology Today Article on 'Gender Affirming Care,'* REALITY'S LAST STAND (Oct. 7, 2022), https://bit.ly/3PqI4yY. Because gender-dysphoric children also suffer from high rates of other mental health conditions that are associated with suicidality, a simple comparison between gender-dysphoric and non-dysphoric children cannot show whether a child's gender dysphoria, as opposed to other mental health conditions, increases the risk of suicidality. Michael

10

Biggs, *Suicide by Clinic-Referred Transgender Adolescents in the United Kingdom*, 51 ARCHIVES OF SEXUAL BEHAVIOR 685, 687-88 (2022), https://bit.ly/3Kk3ARL. In fact, when a recent study controlled for mental-health comorbidities, the differences in suicidality rates between gender-dysphoric and non-dysphoric children were either miniscule or non-existent. *See* Nastasja M. de Graaf, et al., *Suicidality in Clinic-Referred Transgender Adolescents*, 31 EUROPEAN CHILD & ADOLESCENT PSYCHIATRY 67 (2022), https://bit.ly/42YZwh9.

Even in the context of heightened suicide risk, however, assertions regarding the alleged benefits of experimental gender medicine generally rely on low-quality evidence. Stephen B. Levine, et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults,* 48 J. OF SEX & MARITAL THERAPY 706, 712–13 (Mar. 17, 2022), https://bit.ly/3pr6qOr. In a recent interview, an expert in the field of medical-evidence review identified "serious problems" with the current Endocrine Society treatment guidelines, which he criticized for failing to "look at the effect of the interventions on gender dysphoria itself." *See* Jennifer Block, *Gender Dysphoria in Young People Is Rising—and So Is Professional Disagreement*, BMJ (Feb. 23, 2023), https://bit.ly/3NXKlRf. As discussed above, experts in Sweden, Finland, and the UK, have all found that the evidence supporting the benefits of these treatments is poor. *See* Leor Sapir, *Yes, Europe is Restricting "Gender-Affirming Care,"* CITY J. (Feb. 13, 2023), https://bit.ly/3r3PSfZ.

Lastly, proponents try to use the so-called Dutch Protocol as a cudgel against any opposing opinion, arguing that Dutch clinicians have established the safety and efficacy of these treatments for minors. This protocol is the foundation for the "gender affirming model" for treating gender dysphoria and was one of the earliest experiments in using puberty blockers and cross-sex hormones as treatments for pediatric gender-related confusion. *See* Annelou L C de Vries, et al.,

*Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. OF SEX MED. 2276 (2011), https://bit.ly/3psgUwT; Annelou L C de Vries, et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 PEDIATRICS 696 (2014), https://bit.ly/3CP6iLU. The protocol, however, has been subjected to intense methodological criticism due to the researchers' selection of only the most successful cases, inappropriate use of a scoring mechanism that guaranteed the results would show an improvement in patient gender dysphoria, conflation of the effects of drugs with the effects of counseling, and omission of a patient who died during surgery from the already small sample (n=55). *See* Abbruzzese, *supra* at 5-15; Biggs, *supra*, 49 J. OF SEX & MARITAL THERAPY at 349, 355-358.

Beyond these serious flaws, the Dutch research is weaker yet for its inapplicability to the present context. To be eligible for inclusion in the Dutch research, participants were required to meet five gatekeeping requirements: (1) they suffered from early-onset gender dysphoria, (2) the condition persisted or intensified into adolescence, (3) they were psychologically and emotionally stable with no comorbid psychiatric diagnoses, (4) they had parental approval, and (5) informed consent was obtained as a continuous process, often over the course of months. Sapir, *Trust the Experts*, *supra*, at 5-6. Because many of the children presently receiving transition drugs and surgeries do not meet those criteria, the findings of the Dutch Protocol cannot be generalized to patients in the United States. Specifically, the majority of minors now seeking treatment are adolescent girls with no prior history of dysphoria and with high rates of mental health comorbidities. *Id.* This new presentation—also referred to as rapid onset gender dysphoria, or ROGD—has led researchers to develop a theory of "social contagion," which posits that peer or online influence could be a significant cause of the recent uptick in gender dysphoria. *See* Lisa Littman, *Parent Reports of Adolescents and Young Adults Perceived To Show Signs of a Rapid*

12

*Onset of Gender Dysphoria,* 13 PLOS ONE 1, 4 (2018), https://bit.ly/40P6zbY. Under the affirmative model, gender *identity*, not gender dysphoria, appears to drive treatment decisions.

## II.     The Court Should Not Permit Politically Motivated Medical Interest Groups to Set The Constitutional Standard.

The State of Oklahoma has ably explained why the harmful and irreversible practice of experimental gender medicine on minors should be prohibited. *See* Doc. 86 at 13–19.[1] And as the State *Amici* have highlighted, the Supreme Court recently explained that "'the position of the American Medical Association' and other medical interest groups may be relevant to a 'legislative committee,'" but "it does not 'shed light on the meaning of the Constitution.'" *See* Doc. 78-1 at 9–10 (quoting *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022)). State *Amici* also recount the troubling stories suggesting that medical interest groups—including those appearing as *amici* here, *see* Doc. 63—stifle dissent and base decisions on ideology, not science, *see* Doc. 78-1 at 13–18 (discussing the American Academy of Pediatrics (AAP), WPATH, and the Endocrine Society). Given these disturbing reports, State *Amici* correctly urge the Court not to "allow the opinions of interest groups like AAP, WPATH, and the Endocrine Society to override the responsibility of the state to make its own policy judgments about appropriate medical care." *See* Doc. 78-1 at 18.

*Amici* Do No Harm and OCPA file this amicus brief in part because the State *Amici*'s examples only scratch the surface. Although the State *Amici* addressed the medical interest groups that have authored their own treatment standards for experimental gender medicine, the phenomenon the State *Amici* identify—ideology, rather than science, driving decision making—is

---

[1] All pincites are to the ECF-stamped page number.

not limited to those three groups. Indeed, the phenomenon is not even limited to those three *amici in this very case*.

Start with the American Academy of Child & Adolescent Psychiatry (AACAP). *See* Doc. 63-1 at 2. When it comes to the permanent and lifelong risks of experimental gender medicine, such as sterilization, AACAP believes that children and adolescents can provide informed consent to these treatments. *See id.* at 24 (noting that "the patient" must give "informed consent" for puberty blockers and cross-sex hormones). But when it came to lifetime prison sentences for minors, AACAP had this to say:

> Scientists have found that adolescents as a group, even at later stages of adolescence, are more likely than adults to engage in risky, impulsive, and sensation seeking behavior. This is, in part, because they overvalue short-term benefits and rewards, and are less capable of controlling their impulses, making them susceptible to acting in a reflexive rather than a planned voluntary manner. Adolescents are also more emotionally volatile and susceptible to stress and peer influences. In short, the average adolescent cannot be expected to act with the same control or foresight as a mature adult.

*See* Br. for the Am. Academy of Child and Adolescent Psychiatry, *et al.*, as *Amici Curiae* Supporting Neither Party, *Miller v. Alabama*, 567 U.S. 460 (2012) (Nos. 10-9646, 10-9647), 2012 WL 121237 at *2–3. Another *amicus* here, the American Medical Association, *see* Doc. 63-1 at 2, joined AACAP in arguing to the Supreme Court that adolescents "engage in risky, impulsive, and sensation seeking behavior" and are "more emotionally volatile and susceptible to stress and peer influences," *see Miller v. Alabama* Br., 2012 WL 121237 at *2-3.

*Amici* Do No Harm and OCPA obviously take no position on the merits of *Miller v. Alabama*. But AACAP's argument to the Supreme Court in that case cannot be squared with its argument to this Court regarding the capacity of children and adolescents to give informed consent to the high risk of sterilization that accompanies the use of puberty blockers and cross-sex hormones to treat gender dysphoria. Instead, one is left with the distinct impression that something

14

more than "science" is driving the bus here. Indeed, the Medical Interest Group *Amici*, *see* Doc. 63-1, consist almost entirely of repeat players who issue public policy statements on issues that bear no relation to their purported expertise. Name a hot-button social issue, and they have it covered.

Critical race theory? Check. *See* American Academy of Child & Adolescent Psychiatry, *Anti-Racism Resource Library* (Jan. 2023), https://bit.ly/42UCKXz; American College of Osteopathic Pediatricians, *ACOP Statement Against Structural Racism and Inequality* (June 4, 2020), https://bit.ly/3XqukGi; Journal of the American Academy of Child and Adolescent Psychiatry, *Call for Papers on the Effects of Race, Racism, Social Justice, and Health Equity in Child and Adolescent Psychiatry* (2023), https://bit.ly/3pr9El1(calling for papers on "structural racism" and "health equity"); American Academy of Pediatrics Board of Directors, *Truth, Reconciliation, and Transformation: Continuing on the Path to Equity*, 146 PEDIATRICS 449 (2020), https://bit.ly/3r8kgph (reiterating organization's belief that "racism [i]s a core social determinant of health and a driver of health inequities" and stating its commitment to combatting "structural and systemic anti-Black racism" through its "equity agenda").

Gun control? Check. *See* American Academy of Child & Adolescent Psychiatry, *Policy Statement on Children and Guns* (Jun. 2022), https://bit.ly/3NqsPn4; Scott C. Denne, *Funding for Gun Violence Research: The Importance of Sustained Advocacy By Academic Pediatricians*, 87 PEDIATRIC RESEARCH 800 (2020), https://go.nature.com/42YEvTB (from the Academic Pediatric Association, among other groups); American Academy of Nursing, *American Academy of Nursing's Statement: Firearm Safety and Violence Prevention* (Oct. 26, 2022)*, https://bit.ly/3NsYFPT; American College of Osteopathic Pediatricians, *The ACOP Supports The Call To ACTION Towards Common Sense Gun Regulation* (Jun. 1, 2022), https://bit.ly/3Xnd05b;

15

Robert M. McClean, et al., *Firearm-Related Injury and Death in the United States: A Call to Action From the Nation's Leading Physician and Public Health Professional Organizations*, ANNALS OF INTERNAL MEDICINE (2019), https://bit.ly/3NOi7Im (from the American Academy of Family Physicians, American Medical Association, and other groups); Letter from Susan Bostwick, Academic Pediatric Ass'n President, et al., to Representative Stephanie Murphy, (Apr. 2, 2018), https://bit.ly/3Psn377 (from the Association of Medical School Pediatric Department Chairs and other groups); Press Release, Justin Worsley, *NAPNAP Position Statement on Prevention of Firearm Violence and Injury in Children*, NAT'L ASS'N OF PEDIATRIC NURSE PRACTITIONERS (Jan. 12, 2023), https://bit.ly/3Jy3NRA; Letter from AANS/CNS Joint Section on Neurotrauma & Critical Care, et al., to Patrick Leahy, U.S. Senate Comm. on Appropriations, Chairman (Apr. 28, 2022), https://bit.ly/3pr1hpu (from the American College of Obstetricians and Gynecologists, American College of Physicians, American Pediatric Society, Pediatric Endocrine Society, Society for Pediatric Research, among other groups).

Immigration? Check. *See* American Academy of Child & Adolescent Psychiatry, *AACAP Calls for Swift Congressional Passage of the "Dream Act"* (May 21, 2018), https://bit.ly/441SycG; Press Release, AAP, et al., *Leading Pediatric Medical Organizations Respond to Recent Executive Orders Impacting Immigrants and Refugees* (Feb. 14, 2017), https://bit.ly/46pFsre (offering, in part, a policy position on border defenses from the Academic Pediatric Association, Association of Medical School Department Chairs, American Pediatric Society, Society for Pediatric Research, among other groups); American Academy of Child & Adolescent Psychiatry, *AACAP Statement on DACA Rescission* (Sept. 2017), https://bit.ly/3pnOQuI.

<u>Climate change?</u> Check. *See* Press Release, American Medical Association, *AMA Adopts New Policy Declaring Climate Change a Public Health Crisis* (Jun. 13, 2023), https://bit.ly/3Xt8X7a; American Academy of Child & Adolescent Psychiatry, *Climate Change and Eco-Anxiety in Youth* (Mar. 2022), https://bit.ly/44abk14; National Association of Pediatric Nurse Practitioners, *NAPNAP Position Statement on the Effects of Climate Change on Children's Health: The Role of Pediatric-Focused Advanced Practice Registered Nurses*, 35 J. PEDIATRIC HEALTH CARE 621 (2021), https://bit.ly/441SUQy; Jianhong Liu, et al., *Policy Brief on Climate Change and Mental Health/Well-Being,* 68 NURSING OUTLOOK 517 (2020), https://bit.ly/3JxHH1X (from American Academy of Nursing).

<u>Affirmative action?</u> Check. *See* Br. for the Am. Med. Colls., *et al.*, as *Amici Curiae* Supporting Respondents, *Students For Fair Admissions, Inc. v. President & Fellows of Harvard College*, Nos. 20-1199, 21-707 (U.S. July 28, 2022), 2022 WL 3036400 (joined by American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Pediatric Society, among other groups).

And if anyone has ever wondered what the American Academy of Family Physicians thinks about nuclear weapons or biological warfare, the Medical Interest Group *Amici* have that covered too. *See* American Academy of Family Physicians, *Nuclear, Biological and Chemical (NBC) Warfare* (2020), https://bit.ly/3NN6XU5. Remarkably, AAFP is not the only *amicus* to set forth its nuclear proliferation policy. *See* American Medical Association, *AMA Urges Elimination of Nuclear Weapons* (Nov. 18, 2015), https://bit.ly/3NXSpS1. Indeed, AAP has even promulgated its view on "the pediatrician's role" in "taking a stand against nuclear proliferation." Thomas B.

Newman, *Taking a Stand Against Nuclear Proliferation: The Pediatrician's Role,* 121 PEDIATRICS

e1430 (2008), https://bit.ly/3Js7msJ (cleaned up).

Lastly, we wish to highlight the American Psychological Association. Although that group

is not serving as *amicus* in this case, the Medical Interest Group *Amici* cite its work. *See* Doc. 63-

1 at 6 & nn. 10, 14. Perhaps the American Psychological Association has not joined the Medical

Interest Group *Amici* here because it recognizes that its basis for previously opposing the death

penalty for 18 to 20-year olds also serves as a basis for opposing the provision of sterilizing

treatments to children and adolescents. Just a year ago, the Association adopted a resolution

explaining that brains are not fully developed enough—even by age 20—to justify the imposition

of the death penalty for eligible crimes:

> WHEREAS developmental neuroscience, including research on both the structure and function of brain development, establishes that significant maturation of the brain continues through at least age 20, especially in the key brain systems implicated in a person's capacity to evaluate behavioral options, make rational decisions about behavior, meaningfully consider the consequences of acting and not acting in a particular way, and to act deliberately in stressful or highly charged emotional environments, as well as continued development of personality traits (e.g., emotional stability and conscientiousness) and what is popularly known as 'character.'

*APA Resolution on the Imposition of Death as a Penalty for Persons Aged 18 Through 20, Also*

*Known As the Late Adolescent Class,* at 2, AMERICAN PSYCHOLOGICAL ASSOCIATION (Aug. 2022),

https://bit.ly/3JsRyWH (internal citations omitted). "[I]t is clear," the resolution continued, that

"the brains of 18- to 20-year-olds are continuing to develop in key brain systems related to higher-

order executive functions and self-control," which includes "planning ahead, weighing

consequences of behavior, and emotional regulation." *Id.* This reasoning is as good as any for

acknowledging the children and adolescents are incapable of adequately consenting or assenting

to the harms and risks associated with these treatments.

In sum, this Court should not permit these medical interest groups to set the constitutional standard. *Amici* Do No Harm and OCPA do not need to overstate the point: medical interest groups, like all other interest groups, are of course entitled to take policy positions on any range of topics— including those beyond the groups' expertise (such as nuclear armament). But it is a different situation altogether when those same groups ask the Court to defer to *their* judgment about the *constitutionality* of particular medical treatments. That is neither the role of medical interest groups nor the role of the Judiciary. *See Dobbs*, 142 S. Ct. at 2267. And given the track record of the Medical Interest Group *Amici* here, *see supra* at 14-18, it is hard to take seriously the proposition that these *amici* come forward to offer their humble opinion regarding the "science" and then return to their clinics. Rather, their *modus operandi* appears to be reaching a policy decision first and then backfilling the science to achieve their preferred policy outcome.

Therefore, the Court should not hesitate to say what the law is irrespective of what politically motivated medical interest groups insist—no matter how many of them line up to add their name to yet another brief. Under the correct application of the Constitution and Supreme Court precedent, Oklahoma's prohibition on the harmful and irreversible practice of experimental gender medicine on minors is indisputably constitutional.

## III. Many Practitioners of Experimental Gender Medicine Oppose *Any* Limitation on Minors Obtaining These Harmful and Irreversible Treatments.

The Court should not embrace the fiction that experimental gender medicine is performed on minors in strict accordance with the "protocol" outlined in legal briefs. Plaintiffs say these harmful and irreversible treatments are provided "only after a rigorous assessment of the minor's gender dysphoria, and capacity to understand the risks and benefits of treatment." Doc. 6 at 10. The Medical Interest Group *Amici* likewise contend that "a robust diagnostic assessment is required before medical interventions are provided." *See* Doc. 63-1 at 20. That may indeed be the

position that proponents of experimental gender medicine put forward in legal briefs. But that position is *not* what many practitioners of experimental gender medicine think is appropriate.

Instead, some believe that even the meager "gatekeeping" assessments developed by WPATH are too strict. Indeed, even the term "gatekeeping" has come to be seen as pejorative. For example, radical backlash against WPATH began when a team tasked with updating the organization's standards of care released a draft of the "Standards of Care 8" (SOC-8) in December 2021. Like the final version, the draft standards for the treatment of adolescents included several gatekeeping guidelines, such as recommending an assessment to be conducted by a mental health professional and requiring evidence that symptoms of gender dysphoria had persisted "over time," potentially for "several years." *See* Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, 23 INT'L J. OF TRANSGENDER HEALTH S1, S50, S60 (2022), https://bit.ly/41c6sHl; *see also* Draft WPATH Standards of Care 8 (Dec. 2, 2021), https://bit.ly/42YDJGm.

These recommendations in the SOC-8 were more than some activists could accept. As the *New York Times* explains, the drafters were branded as "traitors" to the experimental gender medicine movement. *See* Bazelon, *supra*. A practitioner of experimental gender medicine at the Mayo Clinic, Colt St. Amand, wrote that "[t]he adolescent chapter is the worst," on one of the field's more popular online forums. *See id.* Other scholars and practitioners said that the draft "sucks," specifically criticizing the mental health assessment requirement and calling it "harmful and destructive and abusive and unethical and immoral." *Id.*

This dim view of "gatekeeping" has been underscored by stunning reports of medical professionals declining to adhere even to the lax standards put forth by Plaintiffs and the Medical Interest Group *Amici*. For example, a whistleblower from a prominent St. Louis gender clinic

recently reported that the clinic frequently steered children to a preferred list of therapists whom the clinic knew would rubberstamp pre-treatment letters of support, and even made the process easier for the therapists by sending along a template. Jamie Reed, *I Thought I Was Saving Trans Kids. Now I'm Blowing the Whistle*, THE FREE PRESS (Feb. 9, 2023), https://bit.ly/3qYid7f. According to the whistleblower, it typically took a patient 1-2 visits to receive "the green light." *Id.*

That clinic does not appear to be an outlier. The *Los Angeles Times* recently reported on an Alabama provider who brags that a "whisper network" is used to circumvent her clinic's publicly advertised age guidelines, that she does not need "a psychologist or psychiatrist to evaluate" an adolescent who is seeking hormones, and that one of the reasons "she d[oes] her job" is to provide individuals with access to hormones when they have been unsuccessful in acquiring a prescription from other health care professionals. Jenny Harvie, *This Abortion Doctor Is Not Ready To Leave Alabama. 'You Don't Want Me Here? That's Why I'm Gonna Stay,'* L.A. TIMES (Apr. 28, 2023), https://lat.ms/3CLceVU.

The examples do not stop there. In Texas, video recordings reportedly showed a social worker at Dell Children's Medical Center admitting that puberty blockers can be provided after just one consultation with a prescriber because "it's not something [the clinic] wants to gatekeep." *See* Ari Blaff, *'Mature Enough': Undercover Video Reveals Docs Routinely Approve Puberty Blockers for Kids as Young as Eight*, NATIONAL REVIEW (Apr. 19, 2023), https://bit.ly/3JBG4jB. Clips from a 2020 investigation reportedly show a Boston Children's Hospital doctor explaining the lack of gatekeeping at the clinic: "I've never seen anywhere in medicine as much as I do in this field where I think we as providers get very very very swayed by our patients." *See* Spencer Lindquist, *WATCH: Director of Boston Children's Gender Clinic Says*

*Puberty Blockers Cause Infertility, Are Given Out 'Like Candy,'* BREITBART (Oct. 10, 2022), https://bit.ly/3NuhWkc. She added that puberty blockers were often prescribed "like candy." *Id.*

Even one of Plaintiff's experts, Dr. Turban, admits that gatekeeping procedures like those in the SOC-8 often take the form of a charade: "Like if you're, if you set up this assessment, gatekeeping protocol, people are just going to figure out the answers and then tell you what you want to hear. And you've set up this really kind of like argumentative relationship with your patient or client. And you're like, why, why even bother? You know?" GenderGP, *How Many People Detransition? Exploring Detransition – Jack Turban* (Mar. 2, 2021), https://bit.ly/44byQuq (internal parentheticals omitted).

Disdain for "gatekeeping" does not appear to be limited to practitioners on the ground. Advocates have penned articles arguing that "[i]t's time to stop gatekeeping medical transition." *See* Henri Feola, *It's Time to Stop Gatekeeping Medical Transition*, AMERICAN SCIENTIST (Feb. 18, 2022), https://bit.ly/46kWbfh (capitalization omitted). The elimination of gatekeeping, it has been said, would be a victory because it would allow children and adolescents "to access hormone treatment and surgical interventions without undergoing mental health evaluation or referral from a mental health specialist." Sarah L. Schulz, *The Informed Consent Model of Transgender Care: An Alternative to the Diagnosis of Gender Dysphoria*, 58 J. OF HUMANISTIC PSYCHOLOGY 72 (2017), https://bit.ly/3NqyZDI. And Dr. Turban has expressed frustration over the fact that "people have had an easier time in adult medicine kind of recognizing that these like assessment, gatekeeping models were a little bit ridiculous and damaging," and he finds it "interesting that not all of the lessons from that have made it into pediatrics yet[.]" *See* GenderGP, *supra*. A sometimes co-author of Dr. Turban's has also argued against the requirement of letters of support for sex change surgeries. Catherine A. Wu & Alex S. Keuroghlian, *Moving Beyond Psychiatric*

*Gatekeeping for Gender-Affirming Surgery*, 158 JAMA SURGERY 231 (2023), https://bit.ly/4407HLx.

In sum, there is every reason to suspect that the WPATH and Endocrine Society standards, as articulated in polished legal briefs, do not govern what is happening on the ground. Moreover, there is every reason to suspect that advocates of experimental gender medicine on minors do not *intend* for those standards to govern. Put simply: we should not be surprised when the goalposts start moving. And Oklahoma is more than justified in protecting children from radical actors who disdain *any* attempt to protect children from these irreversible and harmful treatments.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: June 27, 2023

Respectfully submitted,

/s/ Ryan Haynie
Ryan Haynie, OBA No. 32796

David H. Thompson*
Peter A. Patterson*
Brian W. Barnes*
John D. Ramer*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Oklahoma Council of Public Affairs
1401 N. Lincoln Blvd.,
Oklahoma City, OK 73104
Tel: (405) 590-6070
ryan@ocpathink.org

*Motions for admission *pro hac vice* pending

*Counsel for Amici Curiae Do No Harm and Oklahoma Council of Public Affairs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Ryan Haynie
Ryan Haynie
*Counsel for Amici Curiae Do No Harm and
Oklahoma Council of Public Affairs*