**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

PETER POE, et al.,

    *Plaintiffs*,

        v.

GENTNER DRUMMOND, et al.,

    *Defendants*.

Case No.  23-CV-00177-JFH-SH

**<u>PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 1

LEGAL STANDARD................................................................................................... 4

ARGUMENT ............................................................................................................... 5

I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE BAN. ................................. 5

II.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED EQUAL PROTECTION CLAIMS. ...... 7

      A.    Heightened Scrutiny Applies Because the Ban and the Policy Classify on the
            Basis of Sex and Transgender Status. .................................................................... 7

            1.    The Ban and the Policy classify based on sex and transgender status........ 8

            2.    Defendants' attempts to escape heightened scrutiny are unavailing. ....... 10

      B.    The Ban and the Policy Fail Any Level of Scrutiny. ............................................ 14

            1.    Gender dysphoria is diagnosed just like other psychiatric conditions...... 15

            2.    The evidence for the safety and efficacy of gender-affirming medical care
                  is well-researched and longstanding. ....................................................... 16

            3.    The State's asserted interests do not justify the Ban and the Policy......... 16

            4.    The Ban and the Policy undermine rather than advance public health..... 17

      C.    The OU Health Plaintiffs Allege an Equal Protection Claim. ............................... 18

III.  PARENT PLAINTIFFS ALLEGE A DUE PROCESS CLAIM..................................... 20

      A.    SB 613 Impinges on Fundamental Parental Rights to Direct Medical Care......... 20

      B.    SB 613 Does Not Satisfy Strict Scrutiny. ........................................................... 22

IV.   THE OU HEALTH PLAINTIFFS ALLEGE A SECTION 1557 CLAIM. ..................... 22

CONCLUSION........................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) (en banc) ........................................................24, 25

*Adarand Constrs., Inc. v. Pena*,
   515 U.S. 200 (1995) ...........................................................................................6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................4

*Ayotte v. Planned Parenthood of N. New Eng.*,
   546 U.S. 320 (2006) ...........................................................................................6

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
   531 U.S. 356 (2001) ..........................................................................................18

*Bostock v. Clayton Cnty., Georgia*,
   140 S. Ct. 1731 (2020) ...........................................................................8, 14, 24

*Boyden v. Conlin*,
   341 F. Supp. 3d 979 (W.D. Wis. 2018) .......................................................12, 25

*Brandt v. Rutledge*,
   2023 WL 4073727 (E.D. Ark. June 20, 2023) ........................................... *passim*

*Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ...........................................................................7, 9

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark. 2021) .........................................................11, 21

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ..........................................................................................11

*Buchwald v. Univ. of N.M. Sch. of Med.*,
   159 F.3d 487 (10th Cir. 1998) ...........................................................................6

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*,
   2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ...........................................25

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*,
   536 F. Supp. 3d 791 (W.D. Wash. 2021) ..........................................................23

*Christian Legal Soc'y v. Martinez*,
    561 U.S. 661 (2010)................................................................12

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)................................................................18

*Colo. Env't Coal. v. Wenker*,
    353 F.3d 1221 (10th Cir. 2004) ............................................4

*D.C. v. Heller*,
    554 U.S. 570 (2008)................................................................20

*Dekker v. Weida*,
    2023 WL 4102243 (N.D. Fla. June 21, 2023) ............................. *passim*

*Dias v. City & Cnty. of Denver*,
    567 F.3d 1169 (10th Cir. 2009) ............................................4

*Doe 1 v. Thornbury*,
    2023 WL 4230481 (W.D. Ky. June 28, 2023)........................8, 12, 13, 21

*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) ............................................5, 6

*Doe v. Ladapo*,
    2023 WL 3833848 (N.D. Fla. June 6, 2023) ........................8, 9, 13, 21

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) ................................................24

*Eknes-Tucker v. Marshall*,
    603 F. Supp. 3d 1131 (M.D. Ala. 2022) ........................9, 13, 21, 22

*Fain v. Crouch*,
    618 F. Supp. 3d 313 (S.D. W.Va. 2022)................................23, 25

*Flack v. Wis. Dep't of Health Servs.*,
    395 F. Supp. 3d 1001 (W.D. Wis. 2019) ................................25

*Fletcher v. Alaska*,
    443 F. Supp. 1024 (D. Alaska 2020) ....................................11

*Geduldig v. Aiello*,
    417 U.S. 484 (1974)................................................................11

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ............................................12

*Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*,
   245 F.3d 1172 (10th Cir. 2001) ...................................................................24

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020)...........................7

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
   2023 WL 121741 (D. Md. Jan. 6, 2023) .......................................................25

*J.E.B. v. Alabama ex rel. T.B.*,
   511 U.S. 127 (1994)................................................................................13, 14

*K.C. v. Individual Members of Med. Licensing Bd.*,
   2023 WL 4054086 (S.D. Ind. June 16, 2023)..........................................8, 22

*Kadel v. Folwell*,
   2022 WL 17415050 (M.D.N.C. Dec. 5, 2022) .............................................25

*Kadel v. Folwell*,
   446 F. Supp. 3d 1 (M.D. N.C. 2020), *aff'd,* 12 F.4th 422 (4th Cir. 2021), *cert.
   denied*, 142 S. Ct. 861 (2022) ...........................................10, 14, 23, 24

*Kanuszewski v. Mich. Dep't of Health & Human Servs.*,
   927 F.3d 396 (6th Cir. 2019) ...............................................................21, 22

*Kyllo v. United States*,
   533 U.S. 27 (2001)........................................................................................20

*L.W. v. Skrmetti*,
   2023 WL 4232308 (M.D. Tenn. June 28, 2023)............................... *passim*

*Lawrence v. Texas*,
   539 U.S. 558 (2003)......................................................................................12

*Loving v. Virginia*,
   388 U.S. 1 (1967)..........................................................................................13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)........................................................................................5

*MH v. Jeppesen*,
   2023 WL 4080542 .......................................................................................13

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982)......................................................................................14

*NetChoice, LLC v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022) ...................................................................20

iv

*Nguyen v. I.N.S.*,
  533 U.S. 53 (2001) ...................................................................................................7

*Parham v. J.R.*,
  442 U.S. 584 (1979) ............................................................................................21, 22

*Peltier v. Charter Day Sch., Inc.*,
  37 F.4th 104 (4th Cir. 2022), *cert. denied*, No. 22-238, 2023 WL 4163208
  (U.S. June 26, 2023) ...........................................................................................24, 25

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ...............................................................................................12

*Petrella v. Brownback*,
  697 F.3d 1285 (10th Cir. 2012) ..............................................................................4, 6

*Reno v. Flores*,
  507 U.S. 292 (1993) ................................................................................................22

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
  965 F.3d 945 (9th Cir. 2020) ..................................................................................23

*Toomey v. Arizona*,
  2019 WL 7172144 (D. Ariz. Dec. 23, 2019) ............................................................8

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ..............................................................................................4

*Troxel v. Granville*,
  530 U.S. 57 (2000) ..................................................................................................20

*Tudor v. Se. Okla. State Univ.*,
  13 F.4th 1019 (10th Cir. 2021) ...............................................................................24

*United States v. Virginia*,
  518 U.S. 515 (1996) .............................................................................................7, 15

*W. Watersheds Project v. Interior Bd. of Land Appeals*,
  62 F.4th 1293 (10th Cir. 2023) ................................................................................4

*Wallis v. Spencer*,
  202 F.3d 1126 (9th Cir. 2000) .................................................................................21

*Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ...........................................................................10, 11

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  485 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................25

**Statutes**

21 Okla. Stat. § 760 ...................................................................................................... 10

63 Okla. Stat. § 2607.1(A)(1) ......................................................................................... 5

63 Okla. Stat. § 2607.1(A)(2)(a) ........................................................................... 8, 10, 11

63 Okla. Stat. § 2607.1(A)(2)(a)(1) ........................................................................ 5, 8, 10

63 Okla. Stat. § 2607.1(A)(2)(a)(2) .................................................................................. 5

63 Okla. Stat. § 2607.1(B) ......................................................................................... 5, 11

42 U.S.C. § 18116(a) .................................................................................................... 23

**Rules**

Fed. R. Civ. P. 12(b)(1) .................................................................................................. 4

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 4

## INTRODUCTION

Defendants cannot prevail on a motion to dismiss by contesting the factual allegations in Plaintiffs' Complaint. Plaintiffs plead that gender dysphoria is a serious medical condition, gender-affirming medical care is the only evidence-based treatment for adolescents, only transgender adolescents seek this care, and the benefits outweigh the risks. This Court must accept those well-pleaded factual allegations as true, and those allegations state claims under the Equal Protection Clause, the Due Process Clause, and Section 1557 of the Affordable Care Act. Plaintiffs have adequately alleged their equal protection claims because the plain language of the two prohibitions at issue—SB 613 and the Hospital Defendants' SB 3 Policy—explicitly make sex the dispositive factor in whether an intervention is permissible. By conditioning treatment on a person's sex, the laws trigger heightened scrutiny. The prohibitions also trigger heightened scrutiny because discrimination based on transgender status *is* sex discrimination, and because transgender status is a quasi-suspect classification. As to the Hospital Defendants, such discrimination also violates Section 1557. And the Parent Plaintiffs have adequately alleged their due process claim because SB 613 displaces their decision-making over their children's medical care, intruding upon their fundamental right to the care, custody, and control of their children.

The Court should deny the Defendants' Motions to Dismiss.[1]

## FACTUAL BACKGROUND

On May 1, 2023, Oklahoma Governor Kevin Stitt signed into law Senate Bill 613 ("SB 613," the "Health Care Ban," or "Ban"), codified at 63 Okla. Stat. § 2607.1. SB 613 categorically bans widely-accepted, medically necessary treatments for transgender adolescents with gender

---

[1] Plaintiffs oppose both motions to dismiss filed at ECF Nos. 80 and 82 but refer only to ECF No. 80 because ECF No. 82 incorporates ECF No. 80.

dysphoria in Oklahoma, including Plaintiffs Peter Poe, Daphne Doe, Brandon Boe, Lydia Loe, and Ryan Roe (the "Minor Plaintiffs"). Decades of clinical experience and a large body of research support these treatments, which allow transgender adolescents, including the Minor Plaintiffs, to live and thrive. *See, e.g.*, Compl. ¶¶ 1, 11, 126, 136, 149, 161, 171 (ECF No. 2).

Gender dysphoria is a medical condition characterized by clinically significant distress caused by the incongruence between a person's gender identity and their sex assigned at birth. *Id.* ¶ 54. Untreated, gender dysphoria can result in negative mental health outcomes. *Id.* ¶ 57. The medical treatment for gender dysphoria aims to alleviate the clinically significant distress by helping a transgender person live in alignment with their gender identity. *Id.* ¶ 58. This care is referred to as "gender transition," "transition-related care," or "gender-affirming care." *Id.* ¶ 58.

Medical providers in Oklahoma and across the country have provided this medically necessary care to transgender minors in accordance with comprehensive, evidence-based clinical guidelines that provide a framework for the safe and effective treatment of gender dysphoria. *Id.* ¶ 4. For some transgender adolescents who have reached the onset of puberty, this treatment may include puberty-delaying medications. *Id.* ¶¶ 62-63. For some older adolescents, treatment with gender-affirming hormone therapy may be medically necessary. *Id.* ¶ 65. Under the existing clinical guidelines, transgender adolescents also may receive medically necessary chest reconstructive surgeries before the age of majority provided that they have lived in their affirmed gender for a significant period of time. *Id.* ¶ 70. The precise treatment for gender dysphoria depends upon a person's individualized needs. *Id.* ¶ 59. The major medical and mental health associations in the United States recognize that gender-affirming medical care is beneficial and even lifesaving treatment for the transgender adolescents who need it. *Id.* ¶¶ 198-99.

Despite the widely-accepted and medically necessary nature of gender-affirming care for

2

transgender adolescents suffering from gender dysphoria, SB 613 makes it a crime for "any health care provider" in Oklahoma to "knowingly provide gender transition procedures to" anyone under 18 years old if the procedures are "performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex." Compl. ¶¶ 5, 97. "Gender transition procedures" include "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" and "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex." *Id*. ¶ 97.

Critically, the Ban does not prohibit these medical treatments for all medical conditions. Puberty-delaying treatments, hormones, and surgery are prohibited *only* if they are "performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex," if inconsistent with the minor's "biological sex," which is not defined. *Id.* ¶ 97. In other words, the Ban permits the exact same treatments to be provided to minors with *other* conditions, such as precocious puberty or hypogonadism, including when their use is to affirm a patient's gender, provided the purpose of the intervention aligns with their sex assigned at birth. *Id.* ¶¶ 185, 187. By singling out for prohibition medical treatments related to "gender transition," SB 613 explicitly classifies on the basis of sex and transgender status. It also usurps a parent's right to seek and direct appropriate medical care for their children.

In September 2022, the Oklahoma Legislature passed SB 3, which also denies gender-affirming care to transgender adolescents. SB 3 appropriated $39.4 million to the University Hospitals Authority "for the construction and equipping of facilities designed to expand the capacity of behavioral health care for the children of [Oklahoma]." *Id.* ¶ 15. However, SB 3

prohibited any monies from being expended for the benefit of any facility performing "gender reassignment medical treatment" on any patient under the age of 18. *Id.* Governor Stitt signed SB 3 into law on October 4, 2022. *Id.* Subsequently, in order to gain access to the conditional funds, the Hospital Defendants ceased providing gender-affirming care to transgender minors suffering from gender dysphoria (the "Policy"), while continuing to provide these same treatments to non-transgender minors to address conditions other than gender dysphoria. *Id.* ¶ 16.

## **LEGAL STANDARD**

A motion under Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of standing tests whether the plaintiff has alleged "a concrete and particularized injury caused by the defendant and redressable by the court." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).[2] Although the plaintiff has the burden to establish standing, *see W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1296 (10th Cir. 2023), the court must accept all factual allegations in the complaint as true and "presume that general allegations embrace those specific facts that are necessary to support" the plaintiffs' standing. *Petrella v. Brownback*, 697 F.3d 1285, 1292 (10th Cir. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Under the Rule 12(b)(6) motion to dismiss standard, a complaint survives dismissal "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (cleaned up).

---

[2] Defendants' challenge to Plaintiffs' standing is incorrectly brought under Rule 12(b)(6) rather than Rule 12(b)(1). *See Colo. Env't Coal. v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004).

## **ARGUMENT**

I.    **PLAINTIFFS HAVE STANDING TO CHALLENGE THE BAN.**

Defendants do not contest that Plaintiffs have alleged a concrete injury traceable to SB 613's unconstitutional ban on gender-affirming care that is likely to be redressed by a court ruling in their favor.[3] *See Lujan*, 504 U.S. at 560-61. Nonetheless, Defendants argue that Plaintiffs lack standing to challenge SB 613's ban on gender-affirming surgery and as applied to pre-pubescent minors. *See* ECF No. 80 at 4-6.[4] Defendants' arguments lack merit.

**First**, Defendants' standing argument relies on a textually unfaithful reading of SB 613. SB 613 bans a "health care provider" from "knowingly provid[ing] *gender transition procedures* to *any* child." 63 Okla. Stat. § 2607.1(B) (emphases added). Surgery is merely a *type* of "gender transition procedure" that is prohibited under SB 613. 63 Okla. Stat. § 2607.1(A)(2)(a)(1). "[G]ender transition procedures," as defined under the statute, also include puberty-delaying medications and gender-affirming hormones, 63 Okla. Stat. § 2607.1(A)(2)(a)(2), which Plaintiffs have been receiving.  *See* Compl. ¶¶ 126, 135, 148, 160, 170.  SB 613 also does not parse out its prohibitions on gender-affirming care by pre- and post-pubertal minors; instead, the law bans the medically necessary treatments for "any child," defined as anyone under age eighteen. 63 Okla. Stat. § 2607.1(A)(1), (B). Because all Plaintiffs have alleged harm as a result of the ban on "gender transition procedures" for "any child," they have standing to bring their facial challenge to SB 613.

---

[3] Since the filing of Plaintiffs' complaint, the Medical Provider Plaintiff, Compl. ¶ 33, has moved out of state. Plaintiffs defer to the Court on whether it would prefer to dismiss the Medical Provider Plaintiff's claim as moot or for Plaintiffs to amend the Complaint.

[4] Defendants' argument about pre-pubescent children is confounding because it seeks to prohibit something that does not occur. No medical interventions are provided to pre-pubertal children. Compl. ¶ 60. Defendants' efforts to conjure a fanciful application of the Ban does not affect Plaintiffs' facial challenge, which is based on the statutory terms, not its applications. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012).

**Second**, Plaintiffs have standing to challenge SB 613 as it pertains to surgical procedures even under Defendants' doctrinally unsound and textually unmoored argument that Plaintiffs must show injury traceable to all possible applications of the statute. All Minor Plaintiffs are diagnosed with gender dysphoria, and gender-affirming surgery is a medically indicated treatment option. Compl. ¶ 70.  Denying Minor Plaintiffs the ability to pursue surgical treatment is not a conjectural or hypothetical harm: it is a real and persisting limitation on Minor Plaintiffs' pursuit of the full range of medically necessary care for their gender dysphoria. That limitation—even if it never *actually* deprives Plaintiffs of care—constitutes an injury in fact for purposes of Plaintiffs' equal protection claim. *See Buchwald v. Univ. of N.M. Sch. of Med.,* 159 F.3d 487, 493 (10th Cir. 1998) ("[I]t is not necessary for the plaintiff to show that she *would* have received the benefit but for the operation of the policy, because the injury is the imposition of the barrier itself."); *see also, e.g.*, *Adarand Constrs., Inc. v. Pena,* 515 U.S. 200, 211 (1995) (in equal protection cases, discriminatory treatment is the injury regardless of whether one ever obtains the actual benefit).[5]

**Third**, Plaintiffs bring a facial challenge to the statute, alleging the Ban violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment because it discriminates against transgender adolescents based on their sex and transgender status. A facial challenge goes to the statute as a whole, not particular applications. The relevant inquiry is whether the terms of the statute fail to meet the relevant constitutional standard, rendering the entire statute invalid in all of its applications. *See City of Albuquerque*, 667 F.3d at 1127. Defendants' theory of standing, which

---

[5] Defendants' passing argument about severability, ECF 80 at 5, is a "question of remedy," not jurisdiction. *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328 (2006).  It comes into play only *after* the Court finds the statute is unconstitutional and must decide the scope of the remedy. *See Petrella*, 697 F.3d at 1296.

conflates facial and as applied challenges, would make facial challenges on equal protection grounds virtually impossible by demanding that a plaintiff demonstrate an injury stemming from every conceivable application of an unconstitutional statute. Of course, that is not the law. As the Eighth Circuit held in rejecting this exact argument in a challenge to Arkansas' ban on gender-affirming care, "well-established constitutional standing principles" do not "require that a plaintiff demonstrate an injury traceable to every possible application of the challenged statute in order to satisfy the constitutional standing requirement." *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). Where, as here, Plaintiffs have alleged a concrete, particularized, and imminent injury-in-fact, which Defendants do not contest, Plaintiffs do not need to demonstrate an injury traceable to every possible application of the statute to bring a *facial* challenge to SB 613. *See id.*.

## II.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED EQUAL PROTECTION CLAIMS.

### A.   Heightened Scrutiny Applies Because the Ban and the Policy Classify on the Basis of Sex and Transgender Status.

SB 613 and the SB 3 Policy explicitly single out for prohibition medical interventions related to "gender transition," "gender reassignment," or for "gender-affirming purposes." Because the Ban and Policy classify based on sex and transgender status, they trigger heightened scrutiny, imposing the burden on the Defendants to justify their line-drawing and demonstrate that they substantially advance an important governmental interest. All sex-based classifications, including those related to physical traits, trigger heightened scrutiny. *See Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001); *United States v. Virginia*, 518 U.S. 515, 533-34 (1996). Regardless of whether transgender people are a quasi-suspect class—which they are, *see*, *e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Brandt v. Rutledge*, 2023 WL 4073727, at *31 (E.D. Ark. June 20, 2023); *L.W. v. Skrmetti*, 2023 WL 4232308, at *13 (M.D. Tenn. June 28, 2023) (collecting cases)—discrimination based on transgender status triggers

7

heightened scrutiny "because it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741 (2020).

### 1.    The Ban and the Policy classify based on sex and transgender status.

The Ban and the Policy determine whether a minor may receive certain medical care based on whether it is designed "to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," 63 Okla. § Stat. 2607.1(A)(2)(a) (SB 613), is "gender reassignment medical treatment," Compl. ¶ 83 (SB 3), or is performed for "*gender-affirming*" purposes. *Id.* ¶ 88 (SB 3 Policy). That is, they target medical care for gender dysphoria, *see* Compl. ¶¶ 58, 62, 65, 70, and under the Ban and the Policy, "[t]o know whether treatment … is legal, one must know whether the patient is transgender . . . one must know the patient's natal sex." *Doe v. Ladapo*, 2023 WL 3833848, at *10 (N.D. Fla. June 6, 2023). The Ban and Policy thus unquestionably "discriminate[] on the basis of sex because a minor's sex at birth determines whether the minor can receive certain types of medical care under the law." *Brandt*, 2023 WL 4073727, at *31; *see also L.W.*, 2023 WL 4232308, at *15, n.28. They also unquestionably discriminate based on transgender status because they single out for prohibition medical care to treat gender dysphoria, which only transgender people seek. *See L.W.*, 2023 WL 4232308, at *10; *Toomey v. Arizona*, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019).

Every court squarely presented with the specific question of whether a law prohibiting gender-affirming medical care for transgender adolescents necessarily discriminates based on sex or transgender status has held that it does. *See, e.g.*, *L.W.*, 2023 WL 4232308, at *10-11, 19; *Doe 1 v. Thornbury*, 2023 WL 4230481, at *3-5 (W.D. Ky. June 28, 2023); *Brandt*, 2023 WL 4073727, at *31; *K.C. v. Individual Members of Med. Licensing Bd.*, 2023 WL 4054086, at *8 (S.D. Ind.

June 16, 2023); *Ladapo*, 2023 WL 3833848, at \*8; *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022); *see also Dekker v. Weida*, 2023 WL 4102243, at \*11-12 (N.D. Fla. June 21, 2023). Attempting to reframe SB 613 as "affecting both sexes based on biological realities," or limited to "treatment[s] designed to change one's existing healthy body or to disrupt natural bodily processes that are ongoing," ECF 80 at 14, does not erase the law's sex classification.

SB 613 and the SB 3 Policy discriminate on the basis of sex for the additional reason that they treat similarly situated transgender adolescents differently from non-transgender adolescents. Neither prohibition categorically bans any particular medical intervention: providers are free to prescribe non-transgender adolescents puberty blockers, hormones, or surgery for any purpose, regardless of whether they "need the treatments to address an objective medical problem with their physical body." ECF 80 at 10. However, SB 613 bans (and the Policy prohibits providing) only when that medical treatment affirms an adolescent's gender identity if that identity is inconsistent with the patient's sex assigned at birth. The prohibited purpose thus turns directly on a patient having a gender identity different from their assigned sex at birth – the definition of being transgender – and not on a physical impairment or whether there are effects on "healthy" organs. When a statute "categorically prohibits transgender minors from taking transitioning medications due to their gender nonconformity," it "places a special burden on transgender minors because their gender identity does not match their birth sex" and thus "amounts to a sex-based classification for purposes of the Equal Protection Clause." *Eknes-Tucker*, 603 F. Supp. 3d at 1147. The Eighth Circuit similarly concluded that a ban on gender-affirming care "discriminates on the basis of sex" insofar as "the minor's sex at birth determines whether or not the minor can receive certain types of medical care." *Brandt*, 47 F.4th at 669.

The Ban and the Policy further classify based on sex by allowing medical interventions that reinforce sex stereotypes, but "tether[ing] Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 14 (M.D. N.C. 2020), *aff'd,* 12 F.4th 422 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022). SB 613 allows medical or surgical services to persons with "disorder[s] of sex development" for the purpose of aligning the patient's body with sex stereotypes, while denying the exact same services to transgender persons because as "transgender individual[s they do] not conform to the sex-based stereotypes of the sex . . . assigned at birth." *Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017). The Ban explicitly prohibits masculinizing or feminizing procedures when *different* from the sex assigned at birth, *see* 63 Okla. Stat. § 2607.1(A)(2)(a) ("if that perception is *inconsistent* with the minor's biological sex"), or procedures that "alter or remove physical or anatomical characteristics or features that are *typical* for the individual's biological sex." 63 Okla. Stat. § 2607.1(A)(2)(a)(1) (emphases added). Permitting interventions to reinforce sex stereotypes while prohibiting the same interventions for challenging them is sex discrimination.[6]

### 2.     Defendants' attempts to escape heightened scrutiny are unavailing.

Defendants' attempts to sidestep the plain language of the Ban and the Policy and well-established precedent to avoid the application of heightened scrutiny fail for at least three reasons.

**First**, Defendants would have this Court ignore the statute's plain language and look

---

[6] Defendants claim enjoining SB 613 would jeopardize Oklahoma's prohibition against "female genital mutilation." ECF 80 at 14. But that separate inquiry turns on whether the law contains a sex-based classification, triggering heightened scrutiny, not the outcome of this case. In addition, Oklahoma's law prohibits a non-medical bodily intrusion, *except* if "necessary as a recognized treatment for a known disease or for purposes of cosmetic surgery to repair a defect or injury," or for medical purposes connected with childbirth. 21 Okla. Stat. § 760. By contrast, SB 613 prohibits procedures based on their purpose by reference to an individual's sex, even though gender-affirming care is a "recognized treatment" for gender dysphoria, "a known disease."

instead to cases about abortion and pregnancy. ECF 80 at 8-14. But the laws upheld in those cases were found to be facially neutral. Here, SB 613 and the SB 3 Policy explicitly classify based on sex and transgender status, drawing lines based on sex designated at birth and prohibiting care that "attempt[s] to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," 63 Okla. Stat. § 2607.1(A)(2)(a), or that is provided as part of "gender reassignment" and "gender-affirming services." Compl. ¶¶ 83, 88. Facially neutral laws concerning pregnancy and abortion are irrelevant.

Unlike in *Geduldig v. Aiello*, 417 U.S. 484 (1974), where the Court held that a state disability insurance program did not violate equal protection because it denied benefits for work loss due to normal pregnancy, described as "merely . . . one physical condition," *id.* at 496 n.20, the Ban and the Policy explicitly classify based on sex because they prohibit knowingly providing "*gender* transition procedures to any child." 63 Okla. Stat. § 2607.1(B) (emphasis added). *See Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1027, 1030 (D. Alaska 2020); *Whitaker*, 858 F.3d at 1051. A minor's sex at birth "determines whether the minor can receive certain types of medical care under the law." *Brandt*, 2023 WL 4073727, at *31. Every person to whom these prohibitions apply therefore is discriminated against because of sex.

Further, *Geduldig*'s holding was limited to situations where there is no showing of "pretext." 417 U.S. at 496 n.20. The Supreme Court has acknowledged that "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). Here, SB 613 and the SB 3 Policy were designed to categorically exclude gender-affirming care, "which is only sought by transgender individuals." *Brandt v. Rutledge*, 551 F. Supp. 3d 882,

11

889 (E.D. Ark. 2021). *Geduldig* and *Bray* prohibit precisely this type of law: a pretextual classification designed to effectuate discrimination. The centrality of gender transition to transgender identity also distinguishes this case from *Geduldig*. Unlike the pregnancy exclusion in *Geduldig*, the Ban and the Policy are based on a characteristic that defines membership in the excluded group. Living in accord with one's gender identity rather than birth-assigned sex is the defining characteristic of a transgender person. *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011). That the Supreme Court has "declined to distinguish between status and conduct in [similar] context[s]," *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring), further supports that the Ban and Policy discriminate based on sex.

Other courts have rejected similar arguments based on *Geduldig*. *See Thornbury*, 2023 WL 4230481, at *4 (finding abortion and pregnancy cases "inapposite" because the laws or policies in those cases "did not bar access to treatment for some patients but not others depending on the patient's sex"); *Dekker*, 2023 WL 4102243, at *13 (*Geduldig* inapplicable because "one must know the patient's natal sex" and transgender status to determine legality of gender-affirming care ban); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999 (W.D. Wis. 2018) (*Geduldig* inapplicable and exclusion of gender transition treatment violated equal protection as it treated individuals differently based on sex).[7]

**Second**, Defendants also incorrectly claim that heightened scrutiny does not apply because the Ban and the Policy do not "single out one sex over the other." ECF 80 at 14.  But a law that discriminates against both sexes is still subject to heightened scrutiny. The "neutral phrasing of

---

[7] Even if the Ban and the Policy were somehow facially neutral, Defendants do not dispute that both were passed to enforce gender conformity. Compl. ¶¶ 101-17. That openly admitted purpose triggers heightened scrutiny. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy J., concurring) (discriminatory use of peremptory challenges against individual women jurors is not cured by discriminatory use of peremptory challenges against men); *cf. Loving v. Virginia*, 388 U.S. 1, 8 (1967) (rejecting "the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classification from the Fourteenth Amendment's proscription of all invidious racial discriminations").

Defendants also contend that *Bostock*'s reasoning does not apply because Defendants assert *Bostock* was limited to Title VII and the employment context. ECF No. 80 at 15. But none of their efforts to distinguish *Bostock* can be squared with well-established precedent. Defendants cite to *Virginia* and *Nguyen* to argue that *Bostock* does not apply because, although "[p]hysical differences between men and women" may not be relevant to the employment context, they "are enduring," and relevant to medical treatment. But in both *Virginia* and *Nguyen*, the Court applied heightened scrutiny to classifications based on physical traits. Indeed, the Supreme Court has been unwavering in its application of heightened scrutiny to sex-based classifications, even those involving "physical differences." As many courts have held, *Bostock*'s reasoning "is equally applicable to the Equal Protection context." *L.W.*, 2023 WL 3513302, at *2; *see also Thornbury*, 2023 WL 4230481, at *3; *Brandt*, 2023 WL 4073727, at *31; *Dekker*, 2023 WL 4102243, at *11; *M.H. v. Jeppesen*, 2023 WL 4080542, at *15 (D. Idaho June 20, 2023); *Ladapo*, 2023 WL 3833848, at *8; *Eknes-Tucker*, 603 F. Supp. 3d at 1147.[8]

---

[8] Defendants' citation to *Bostock* for the meaning of "discrimination," ECF 80 at 10, lacks context: the section Defendants cite dealt specifically with the meaning of "discriminate" under Title VII, in contrast to the analysis of the meaning of "discrimination" on the basis of sex. *Compare Bostock*, 140 S. Ct. at 1740 ("So, taken together, an employer who intentionally treats a person worse

**Third**, Defendants' arguments that heightened scrutiny does not apply because the Ban and the Policy try to protect "vulnerable human beings," ECF 80 at 9-10, or they "create[] restrictions affecting both sexes based on biological realities," *id*. at 14, conflate *whether* heightened scrutiny applies in the first instance with the *application* of heightened scrutiny to the classification. "The reason for sex-based differential treatment is the purported *justification* for treating the natal male and natal female differently—the justification that must survive intermediate scrutiny. One can survive—but cannot avoid—intermediate scrutiny by saying there is a good reason for treating a male and female differently." *Dekker*, 2023 WL 4102243, at *12 (emphasis in original); *see also Kadel*, 620 F. Supp. 3d at 378.

Defendants try to impose upon Plaintiffs a threshold requirement that they justify the discrimination imposed by the Ban or the Policy before this Court applies heightened scrutiny, but this flies in the face of foundational equal protection principles and jurisprudence. Defendants get the analysis backwards. The very purpose of the heightened scrutiny test is to determine *whether* a sex-based classification is discriminatory (i.e., whether it survives heightened scrutiny). *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725-26, 741 n.9 (1982); *accord J.E.B.*, 511 U.S. at 135. Heightened scrutiny plainly applies here.

## B.    The Ban and the Policy Fail Any Level of Scrutiny.

Because SB 613 and the SB 3 Policy discriminate on the basis of both sex and transgender status, Defendants must demonstrate that the prohibitions "serve[] important governmental objectives and that the discriminatory means employed are substantially related to the achievement of these objectives." *Virginia*, 518 U.S. at 524. They fail to do so.  Defendants argue that these

---

because of sex…discriminates against that person in violation of Title VII."), *with id.* at 1741 ("That's because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex.").

14

bans on gender-affirming care "protect[] all minors equally against interventions designed to permanently transform their healthy bodies," ECF 80 at 7, and protect the medical profession's integrity by preventing "sterilizing minors or pumping them full of life-altering hormones when their bodies are indisputably healthy." ECF 80 at 9. But the weight of medical evidence is to the contrary. As Plaintiffs pleaded—and the district courts in *Brandt* and *Dekker* found after full trials on the merits—gender dysphoria is a serious psychiatric condition, diagnosed just like other psychiatric conditions; other clinical practice guidelines, particularly in pediatrics, are based on comparable evidence to that supporting the WPATH and Endocrine Society recommendations to treat gender dysphoria in adolescents; and gender-affirming medical care improves the lives of the transgender adolescents who need it, with no evidence of systemic misdiagnosis or improper treatment. Defendants' alleged concerns about gender-affirming care could apply to many forms of care, but Defendants have singled out for prohibition only gender-affirming care.

### 1. Gender dysphoria is diagnosed just like other psychiatric conditions.

Defendants argue that the Ban and the Policy protect the medical profession's integrity by preventing them from treating a psychiatric condition present in adolescents whose "bodies are indisputably healthy." *Id*. But that statement could be true of any medication prescribed to treat a psychiatric condition. Such a general observation is not a sufficient justification for banning only gender-affirming care. Gender dysphoria is diagnosed, like other psychiatric conditions, based on clinical interviews, a widely used assessment tool not unique to gender dysphoria. Compl. ¶¶ 49, 54, 58, 63, 66; *Brandt*, 2023 WL 4073727, at *4-5. Under the WPATH Standards of Care and Endocrine Society Guideline—as they are actually written and implemented, including at Oklahoma Children's Hospital prior to SB 3, and not as Defendants speculate they might be misused or ignored—adolescents must undergo careful mental health assessments before a gender

dysphoria diagnosis and to determine the suitability of any course of treatment. Those assessments may be extended for youth with more complex mental health histories and comorbidities. Compl. ¶¶ 54, 58, 63, 66; *Brandt*, 2023 WL 4073727, at *5-7.

> **2.      The evidence for the safety and efficacy of gender-affirming medical care is well-researched and longstanding.**

Defendants claim that gender-affirming medical care is experimental and harmful. ECF 80 at 17. But using puberty suppression and hormone therapy to treat adolescent gender dysphoria where medically indicated is best practice and thoroughly supported by research. Compl. ¶¶ 4, 49; *see also Brandt*, 2023 WL 4073727, at *8-9. Puberty blockers and hormones are safe and effective treatments for adolescents with gender dysphoria. Compl. ¶¶ 4, 49; *see also Brandt*, 2023 WL 4073727, at *8-9; *Dekker*, 2023 WL 4102243, at *7-8. As with any medical interventions, potential risks are weighed against potential benefits, including the risks of doing nothing. Defendants claim SB 613 is justified because some adults have regretted receiving gender-affirming medical care. ECF 80 at 13. But the risk of any medical treatment includes regret, and as to this risk, gender-affirming care is a positive outlier: regret is extremely rare. Also, adolescents with gender dysphoria are unlikely to desist from being transgender whether or not they receive gender-affirming medical care. *Brandt*, 2023 WL 4073727, at *20-21. Plaintiffs have adequately pleaded the safety and efficacy of the medical interventions at issue. Compl. ¶¶ 56-73, 197-200.

> **3.      The State's asserted interests do not justify the Ban and the Policy.**

Defendants claim that SB 613 and the SB 3 Policy are justified because they further an interest in preventing adolescents from making "major medical decisions before they have reached the age of majority." ECF 80 at 17.  But it is not clear how that is an important state interest or, if it were, how the law substantially advances it. Adolescents do not consent to medical treatment; their parents or guardians do. If the State is claiming a general interest in preventing adolescents

16

from obtaining medical care that can affect their lives before they reach the age of majority, the Ban and the Policy are grossly underinclusive: these prohibitions target only medical care related to gender transition and fail to address any other interventions, such as cosmetic, orthopedic, and emergency medical care, all of which can have lifelong consequences.

The only "major medical decisions" Defendants want to prevent are those related to being transgender. But a preference for desistance and gender conformity is not a legitimate state interest. Defendants endorse the belief that transgender adolescents would be better off if they grew out of their gender dysphoria, *i.e.*, stopped being transgender when they got older, as opposed to receiving medical treatment to alleviate their gender dysphoria. *See* ECF 80 at 13. But as a matter of law, encouraging people to be cisgender is not a legitimate state interest; and in fact, there is no evidence it is possible to make someone who is transgender become cisgender. *See Brandt*, 2023 WL 4073727, at *3 (finding "[r]esearch and clinical experience show that when gender incongruence continues after the onset of puberty, it is very unlikely that the individual will come to identify with their sex assigned at birth later in life").

    **4.**    **The Ban and the Policy undermine rather than advance public health.**

Defendants claim that the Ban and the Policy are justified because they are rationally related to the state's interest in public health, but both prohibitions undermine any interest in health. ECF 80 at 16-17. Those who actually treat adolescents with gender dysphoria and study the efficacy of those treatments agree that gender-affirming medical care improves the lives of those who need and receive it. *Brandt*, 2023 WL 4073727, *16-18, *32-34; *Dekker*, 2023 WL 4102243, at *15. It is the only treatment supported by evidence, and banning it compromises the health and well-being of adolescents with gender dysphoria. The "risks associated with gender-affirming care for adolescents are no greater than the risks associated with many other medical treatments that are not prohibited"; "the banned treatments are effective to treat gender dysphoria

17

and the benefits of the treatments greatly outweigh the risks." *Brandt*, 2023 WL 4073727, at *34. Moreover, "[t]he choice these plaintiffs face is binary: to use GnRH agonists and cross-sex hormones, or not. It is no answer to say the evidence on the yes side is weak when the evidence on the no side is weaker or nonexistent." *Dekker*, 2023 WL 4102243, at *15.

SB 613 allows adolescents to access any medical care that would make them feel more masculine or feminine, so long as their gender identity accords with their sex assigned at birth. But it categorically denies the same access to adolescents whose gender identity is not congruent with their sex assigned at birth (i.e., transgender adolescents). And the SB 3 Policy does not prohibit the Hospital Defendants from providing the same treatments to adolescents whose gender identity accords with their assigned sex. It is unclear how the provision of gender-affirming care only for gender transition "would threaten legitimate interests of [Oklahoma] in a way that" other types of medical care permitted by SB 613 "would not." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). The stated justifications—protecting minors from medical care that causes more harm than benefit—"ma[k]e no sense in light of how" Oklahoma treats medical care for any other purpose, much of which presents comparable risks to gender-affirming medical care. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001) (citation omitted). Denying necessary medical care and interfering with the relationship between physicians and patients does not substantially relate to any important government objective. And because it is also not rational, Plaintiffs have adequately pleaded equal protection violations under any standard of review.

### C.   The OU Health Plaintiffs Allege an Equal Protection Claim.

The Hospital Defendants' SB 3 Policy is subject to (and fails to withstand) heightened scrutiny for substantially the same reasons as SB 613. Moreover, Defendants misread the OU Health Minor Plaintiffs' equal protection claim: they do not directly challenge SB 3, but rather the Hospital Defendants' policy implementing and enforcing SB 3. *See, e.g.*, Compl. ¶¶ 227, 233-34.

18

That Policy explicitly states the Hospital Defendants "have ceased hormone-related prescription therapies and surgical procedures *for gender-affirming services* on patients under the age of 18." *Id.* ¶ 88 (emphasis added). The Hospital Official Defendants (Defendants 48-53 and Defendant 55), who are sued in their official capacities, adopted and implemented the Policy "[i]n light of the legislation signed by Governor Stitt," namely, SB 3. *Id.*

Defendants argue that "Plaintiffs have not identified a single drug, treatment, or surgery that is not available to a transgender minor but is available to a similarly situated non-transgender minor under the Hospital Defendants' SB 3 policy." ECF 80 at 21. Defendants miss the point. SB 3 and the Policy prohibit the provision of particular medical treatments only when these are performed to affirm a transgender adolescent's gender identity, *i.e.*, they are not provided to transgender patients with gender dysphoria only *because they are transgender*—that is, only because they have a gender identity that does not align with their sex designated at birth. *See L.W.*, 2023 WL 4232308, at *14 (finding SB 1 discriminated on the basis of sex because, *inter alia*, "disparate outcomes" related to permitted or prohibited treatment would be "due to the fact that the minors had sexes at birth different from one another").

Defendants complain that "Plaintiffs' SB 3 claim also has troubling implications" because "the SB 3 policy only keeps Plaintiffs from receiving those treatments at specific state-sponsored hospitals." ECF 80 at 22. According to Defendants, "Plaintiffs possess no right to receive a certain treatment, and they certainly have no right to receive that treatment at a specific location, or to force the State to provide it." *Id.* But Plaintiffs do not claim they are entitled to receive puberty-delaying medications, hormones, or surgery from the State; rather, Plaintiffs allege that to the extent the Hospital Defendants, which are governmental entities, provide such treatments, they must do so consistent with the Constitution.

19

Defendants' analogy to abortion is also inapt. When a state refuses to provide abortion services, it does so for *everyone*. "The situation is different here. Transgender and cisgender individuals are not treated the same." *Dekker*, 2023 WL 4102243, at *13. Defendants continue to provide the services at issue for conditions other than gender dysphoria. *See* Compl. ¶¶ 95, 235. To know whether these treatments can be obtained at University Hospitals, "one must know whether the patient is transgender." *Dekker*, 2023 WL 4102243, at *13.

## III.   PARENT PLAINTIFFS ALLEGE A DUE PROCESS CLAIM.

### A.   SB 613 Impinges on Fundamental Parental Rights to Direct Medical Care.

Defendants erroneously contend that Plaintiffs' due process claim fails because gender-affirming care was not available when the Fourteenth Amendment was adopted. *See* ECF 80 at 20. That historical analysis conflates the *right* being exercised with the *means* by which Plaintiffs exercise it: the Fourteenth Amendment's incorporation does not protect rights only based on technology that existed in the 1860s. *See, e.g.*, *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1203 (11th Cir. 2022); *D.C. v. Heller*, 554 U.S. 570, 582 (2008); *Kyllo v. United States*, 533 U.S. 27, 33–34 (2001). The "interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of the parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69.

Defendants incorrectly argue that *Dobbs* forecloses this due process claim. ECF 80 at 20-21. That argument misapprehends the nature of the restriction here. Unlike the generally applicable law at issue in *Dobbs*, SB 613 is explicitly aimed at overriding the parental judgment and consent required for the care at issue. By displacing the judgment of parents for its own, the State infringes

upon the fundamental rights of parents to care for the medical needs of their children.

The question is whether due process protects the fundamental right of parents to make medical decisions for their children, not whether due process protects a right to a specific medical procedure. *See Parham v. J.R.*, 442 U.S. 584, 603 (1979) (recognizing that the right of a parent, as opposed to the state, to make decisions for a child includes deciding upon "a tonsillectomy, appendectomy, or other medical procedure."); *see also Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (describing "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state"); *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (referring to the "fundamental right" of parents "to direct their children's medical care").

Parents' right "to direct the medical care of their children . . . includes the more specific right to treat their children with transitioning medication subject to medically accepted standards." *Eknes-Tucker*, 603 F. Supp. 3d at 1146; *see also L.W.*, 2023 WL 4232308, at *8; *Thornbury*, 2023 WL 4230481, at *5-6; *Brandt*, 2023 WL 4073727, at *36; *Ladapo*, 2023 WL 3833848, at *11. Parents have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's assent and their doctor's recommendation, make a judgment that medical care is necessary. *See Brandt*, 551 F. Supp. 3d at 892; *Brandt*, 2023 WL 4073727, at *36. Parents "retain plenary authority to seek such care, subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604.

Defendants also proceed from the false assumption that parents' claims are derivative of their children's claims. ECF 80 at 18. That is incorrect: the parent's right to direct appropriate medical care for their child has been recognized even when a child's right has not. *See Kanuszewski*, 927 F.3d at 415 ("[A]ny substantive due process rights related to directing the

medical care of children devolve upon the parents . . . rather than the children themselves."). SB 613 deprives Parent Plaintiffs of a fundamental right available to all other Oklahoma parents. For other medical procedures—including even sterilizing procedures on infants that lack any scientific support—Oklahoma allows parents to weigh comparable risks and benefits in accordance with their child's best interest. Yet, SB 613 denies Parent Plaintiffs the presumption they are capable of weighing risks and benefits. When the government seeks to substitute the judgment of a parent, child, and their physician with its own views of a child's best interest, it must satisfy strict scrutiny.

### B.      SB 613 Does Not Satisfy Strict Scrutiny.

Any impingement on a fundamental right must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Defendants do not come close to meeting this standard. *See* Section II.B, *supra*. There is no compelling state interest in banning the only evidence-based treatment for gender dysphoria. Gender-affirming care has side effects, as do all medical interventions, but the existence of  "risks does not automatically transfer the power to make [the healthcare] decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Moreover, "[b]ecause Defendants themselves offer several less restrictive ways to achieve their proffered purposes, the Act is not narrowly tailored at this stage of litigation." *Eknes-Tucker*, 603 F. Supp. 3d at 1146. While some European countries may have restricted *how* patients may access this care in their nationalized health systems, "no other country in the world" takes the "broad stance" of banning all care. *Brandt*, 2023 WL 4073727, at \*36; *see also K.C.*, 2023 WL 4054086, at \*11; *L.W.*, 2023 WL 4232308, at \*27 n.53.

## IV.      THE OU HEALTH PLAINTIFFS ALLEGE A SECTION 1557 CLAIM.

Section 1557 requires, in relevant part, that "[a]n individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under,

any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). It is "an affirmative obligation not to discriminate in the provision of health care." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020). To state a claim for sex discrimination under Section 1557, a plaintiff must plead that: "(1) the defendant is a healthcare program that receives federal financial assistance; (2) the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination in the provision of healthcare services; and (3) the latter occurred on the basis of sex." *C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, 536 F. Supp. 3d 791, 796 (W.D. Wash. 2021); *see also Fain v. Crouch*, 618 F. Supp. 3d 313, 330–31 (S.D. W.Va. 2022); *Kadel*, 446 F. Supp. 3d at 12–13.

The OU Health Plaintiffs have pleaded each of these required allegations. **First**, the Hospital Defendants are health programs or activities that receive federal financial assistance and subject to the full scope of Section 1557. Compl. ¶¶ 43, 46, 82, 263. Indeed, SB 3 expressly conditioned the receipt of federal financial assistance upon the discrimination at issue. *Id.* ¶¶ 82-83, 263. **Second**, Plaintiffs alleged that, by adopting the Policy and prohibiting "hormone-related prescription therapies and surgical procedures for gender-affirming services" while still providing the same care to other patients, Hospital Defendants excluded from participation, denied the benefits of, or subjected to discrimination the OU Health Plaintiffs in the provision of health care services. *Id.* ¶¶ 89, 94, 268, 270, 274-75. **Third**, this prohibition has occurred on the basis of sex, including based on transgender status. *See* Section II.B, *supra*. No more is needed to properly plead a Section 1557 claim.

Defendants argue the Policy cannot discriminate based on sex in violation of Section 1557 because "discrimination based on transgender status is not protected under Title IX." ECF 80 at

23

24.[9] But SB 3 and the Policy are sex-based classifications on their face,[10] and in the Tenth Circuit, "[c]ourts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001). And "[i]n the wake of *Bostock*, it is now clear that transgender discrimination … is discrimination 'because of sex'[.]" *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021). "Given the similarity in language prohibiting sex discrimination in Titles VII and IX," Defendants' attempts to narrowly read *Bostock*, Section 1557, and Title IX are unavailing. *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (holding *Bostock*'s reasoning applies to Section 1557).[11]

That Title IX contains some limited exceptions or carve-outs also is of no consequence. First, "we view Congress' decision to include specific exceptions in Title IX as a deliberate choice to limit the statute to the exceptions set forth." *Peltier*, 37 F.4th 104 at 128-29. "In doing so, Congress clearly articulated its intent regarding what conduct falls outside the statute's scope." *Id.*

---

[9] Title IX undoubtedly is concerned with sex stereotypes: the Supreme Court denied certiorari after the Fourth Circuit sitting en banc held "that sex-based dress codes like the skirts requirement, when imposed by covered entities, are subject to review under the anti-discrimination provisions of Title IX." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 131 (4th Cir. 2022), *cert. denied*, No. 22-238, 2023 WL 4163208 (U.S. June 26, 2023).

[10] One cannot "'try writing out instructions' for which treatments are excluded 'without using the word[] … sex (or some synonym).'" *Kadel*, 620 F. Supp. 3d at 377 (quoting *Bostock*, 140 S. Ct. at 1746). "It can't be done." *Bostock*, 140 S. Ct. at 1746.

[11] "While the language in Title VII is 'because of sex' and the language in Title IX is 'on the basis of sex,' *Bostock* used those phrases interchangeably..." *Snyder*, 28 F.4th at 114. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc), does not affect this straightforward conclusion. There, the court was concerned with "whether discrimination based on biological sex necessarily entails discrimination based on transgender status," not whether the policy discriminated based on sex. *Id.* at 809. In any event, the Eleventh Circuit's ruling that a "bathroom policy requir[ing] 'biological boys' and 'biological girls'—in reference to their sex determined at birth—to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms," facially "classifie[d] on the basis of biological sex," *id.* at 801, 803, confirms that SB 3 and the Policy are sex-based classifications.

24

at 129. Second, Section 1557 only incorporated the grounds and enforcement mechanisms of Title IX, not its exemptions or carve-outs. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 43 (D.D.C. 2020). Thus, unlike Title IX, Section 1557 lacks express statutory and regulatory carve outs. *Adams* firmly recognizes this textual distinction. *See* 57 F.4th at 811 (finding the School Board's policy "fits squarely within" Title IX's statutory carve out for differentiating between the sexes).

Here, because the OU Health Minor Plaintiffs' sex (however defined) plays "an unmistakable and impermissible role in the" decision to not provide "*gender reassignment* medical treatment," the Policy facially discriminates based on sex. *See Hammons v. Univ. of Md. Med. Sys. Corp.*, 2023 WL 121741, at *8 (D. Md. Jan. 6, 2023) (citing *Kadel*, 2022 WL 3226731, at *28). The Policy also discriminates based on sex for the reasons outlined in Sections II.B-C, *supra*, including because it discriminates based on transgender status. A wide body of case law holds that denying the provision of gender-affirming medical care or coverage for that care, when the same services are otherwise covered or provided, is unlawful sex discrimination under Section 1557. *See, e.g.*, *Dekker*, 2023 WL 4102243, at *19; *Hammons*, 2023 WL 121741, at *10; *C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *Kadel v. Folwell*, 2022 WL 17415050, at *1-2 (M.D.N.C. Dec. 5, 2022); *Fain*, 618 F. Supp. 3d at 327; *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1019-22 (W.D. Wis. 2019); *Boyden*, 341 F. Supp. 3d at 1002-03.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss, ECF Nos. 80 and 82.

Date: July 7, 2023

/s/*Megan Lambert*

Megan Lambert
    (OBA# 33216)
**American Civil Liberties Union**
    **Foundation of Oklahoma**
P.O. Box 13327
Oklahoma City, OK 73113
(405) 524-8511
mlambert@acluok.org

Chase Strangio*
Harper Seldin*
**American Civil Liberties Union**
    **Foundation**
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
cstrangio@aclu.org
hseldin@aclu.org

Laura J. Edelstein*
**Jenner & Block LLP**
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com

Luke C. Platzer*
Madeleine V. Findley*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
LPlatzer@jenner.com

Lauren M. Greene*
Blaine R. Valencia*
**Jenner & Block LLP**
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2246
(213) 239-5100
LGreene@jenner.com
BValencia@jenner.com

* *Admitted pro hac vice*

Respectfully submitted,

Omar Gonzalez-Pagan*
**Lambda Legal Defense**
    **and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Shelly L. Skeen*
**Lambda Legal Defense**
    **and Education Fund, Inc.**
Oak Lawn Ave, Ste. 500
Dallas, TX 75219
(214) 219-8585
sskeen@lambdalegal.org

Sasha Buchert*
**Lambda Legal Defense**
    **and Education Fund, Inc.**
1776 K Street, N.W., 8th Floor
Washington, DC  20006
(202) 804-6245
sbuchert@lambdalegal.org

Remi Jaffre*
**Jenner & Block LLP**
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
RJaffre@jenner.com

Lillian M. McGuire*
Jocelyn Sitton*
Daniel L. Robertson*
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
LMcGuire@jenner.com
JSitton@jenner.com
DRobertson@jenner.com

*Counsel for Plaintiffs*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2023, I electronically filed the foregoing Plaintiffs'

Response to Defendants' Motions to Dismiss with the Clerk of Court via the Court's CM/ECF

system, which effects service upon all counsel of record.

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

*Counsel for Plaintiffs*