IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

PETER POE, et al.,

*Plaintiffs*,

v.

GENTNER DRUMMOND, et al.,

*Defendants*.

Case No. 4:23-cv-0177-JFH-SH

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Absent a preliminary injunction, Minor Plaintiffs and transgender adolescents across Oklahoma will lose access to the only evidence-based medical treatment for their gender dysphoria. Based upon the recommendation and under the supervision of trained clinicians, the Parent Plaintiffs made the decision to consent to treatment intended to relieve their children's deep and unrelenting distress. None did so lightly. Rather, they thoughtfully weighed the risks and benefits and consented to gender-affirming medical treatment for their children. In each case, this care has greatly reduced their child's distress. *See* ECF 6-6 at ¶¶ 14, 21; ECF 6-8 at ¶¶ 15-16; ECF 6-10 at ¶¶ 9-12; ECF 6-12 at ¶¶ 9-11, 13; ECF 6-13 at ¶¶ 13-15, 22.

The State of Oklahoma claims it can displace the informed decision-making of these loving parents, thoughtful adolescents, and their caring providers because not every parent and doctor would make the same choices or because the treatment carries risk. To justify that extraordinary overreach, Defendants 15-53's Response to Plaintiffs' Motion for Preliminary Injunction (ECF 86) relies on non-scientific sources and discredited experts with no relevant experience to erroneously claim that (1) the care is new and provided without adequate safeguards; (2) the care is of "low quality"; (3) the care poses unique risks to patients that warrant categorical prohibition; and (4) there is no "consensus" about the safety and efficacy of treatment. None of that is true. But even if that distorted picture were accurate, it still does not explain why the State singled out only this care for prohibition. SB 613's classification based on sex and transgender status and intrusion into parents' rights to direct their children's medical care violate the Fourteenth Amendment.

This Court, like every other trial court squarely presented with this issue, should enjoin SB 613 from taking effect during the pendency of these proceedings. Enjoining SB 613 will not harm Defendants or their purported interests. Maintaining the status quo is necessary to prevent irreparable harm to Minor Plaintiffs until this Court holds a full trial on the merits.

**RESPONSE TO DEFENDANTS' PROFFERED EVIDENCE**

Defendants' portrayal of gender-affirming medical care is drawn largely from the pages of periodicals, not scientific journals, and in no way resembles the studied, cautious approach to care governed by widely accepted clinical guidelines and supported by major U.S. medical associations. Contrary to Defendants' claims, this care is well-established and provided with caution; it is evidence-based, supported by clinical experience and scientific study; it does not pose unique risks to warrant categorial prohibition; and its safety and efficacy are well-documented.

A.  **Treatment of Adolescents with Gender-Affirming Care.**

There is no dispute that gender dysphoria is a serious medical condition in the DSM-5-TR and that youth with this condition are suffering. ECF 86 at 3. Gender dysphoria is diagnosed (as with other mental health conditions) based on a clinical interview, the clinician's observations, and the reports of the minor's parents. *Brandt v. Rutledge*, 2023 WL 4073727, at *4 (E.D. Ark. June 20, 2023). Under existing WPATH and Endocrine Society protocols, treatment recommendations for adolescents with gender dysphoria are not made lightly or hurriedly. There is a rigorous assessment process involving the patients, their parents, and their doctors. The WPATH Standards of Care highlight the importance of psychosocial assessments prior to the initiation of any medical or surgical interventions. Ex. 1, Janssen Rebuttal ¶¶ 32-33; *see also* WPATH SOC-8, at S50-51.[1] The Endocrine Society Guidelines impose similarly rigorous assessment requirements. ECF 6-3 ¶ 38. Minor Plaintiffs received puberty-delaying treatment or hormones only after careful mental

---

[1] Defendants cite to *New York Times* anecdotes and three declarants who began care 4, 8, and 16 years ago, before the most recent Standards of Care were published, as "evidence" that the guidelines are not followed. *See* ECF 86 at 25. But that a handful of people have *allegedly* not received care consistent with existing clinical guidelines is not a reason to ban the care completely.

health assessments and thoughtful deliberation.[2] Contrary to Defendants' claims that this care is "new," gender-affirming medical care has been used to treat adolescents for decades. Ex. 2, Adkins Rebuttal ¶ 10; Ex. 1, Janssen ¶ 8; Ex. 3, Turban Rebuttal ¶ 34.

### A. Research and Clinical Experience Support Gender-Affirming Medical Care.

Plaintiffs' experts have firsthand knowledge based on their extensive clinical experience and scientific study that this care is effective. Decades of peer-reviewed, cross-sectional, and longitudinal studies demonstrating this care improves health outcomes for adolescent patients bolsters that clinical expertise. ECF 6-3 ¶ 46; ECF 6-4 ¶¶ 15-18; ECF 6-2 ¶¶ 72-78. Under the GRADE system used to grade the quality of evidence and strength of evidence, "low" quality does not mean poor or inadequate: even "strong" recommendations in clinical practice guidelines may be based on "low" or "very low" quality evidence. ECF 6-16 ¶¶ 18-21, 24; *Dekker v. Weida*, 2023 WL 4102243, at *15 (N.D. Fla. June 21, 2023). In pediatric care, clinical practice guidelines often rely on observational studies or expert consensus rather than randomized trials. ECF 6-16 ¶ 25. Research shows only a minority of medical interventions are supported by "high-quality" evidence under GRADE. Ex. 4, Antommaria Rebuttal ¶¶ 21-24; *Dekker*, 2023 WL 4102243, at *15. The quality of the evidence for this care is comparable to that of treatments for other complex interventions. Ex. 4, Antommaria ¶¶ 21-24.

### B. Gender-Affirming Medical Care Does Not Carry Uniquely Dangerous Risks.

As set forth more fully in Section I.A.i *infra*, the risks associated with puberty-delaying treatment and hormones are not unique to gender-affirming care; supervised treatment is low risk;

---

[2] *See* ECF 6-8 ¶ 15; 6-9 ¶ 11; ECF 6-10 ¶ 10; ECF 6-11 ¶13; ECF 6-12 ¶ 11; ECF 6-13 ¶¶ 8, 13-15. There is no evidence that transgender identity or gender dysphoria are caused by "social contagion," social media use, or family dysfunction. *Compare* ECF 86 at 5 *with Brandt*, 2023 WL 4073727, at *3-4; *see also* Ex. 3, Turban ¶ 27.

and adolescents receive extensive information and options about fertility preservation.

    **C.    Mainstream Practice Supports Gender-Affirming Care for Adolescents.**

Defendants rely on a distorted and inaccurate picture of the practices in some European nationalized health systems to suggest a lack of consensus on this care for minors. But "no European country that conducted a systematic review responded with a ban on the use of puberty blockers and cross-sex hormones." *K.C. v. Individual Members of Med. Licensing Bd.*, 2023 WL 4054086, at *11 (S.D. Ind. June 16, 2023); *see also Brandt*, 2023 WL 4073727, at *36. And the mainstream U.S. medical community is aligned in recommending puberty-delaying treatment, hormone therapy, and surgery where medically indicated to alleviate gender dysphoria. *See Brandt*, 2023 WL 4073727, at *33; *L.W. v. Skrmetti*, 2023 WL 4232308, at *29 (M.D. Tenn. June 28, 2023). "[N]ot a single reputable medical association has taken a contrary position." *Dekker*, 2023 WL 4102243, at *7. Though no "consensus" is needed to receive medical care in the U.S.—and it is unlikely that *any* medical intervention has unanimous support—the widely-accepted practice, supported by every major medical association, is to recommend puberty-delaying treatment and hormone therapy to adolescents who need them. *See Doe 1 v. Thornbury*, 2023 WL 4230481, at *6 (W.D. Ky. June 28, 2023); *Brandt*, 2023 WL 4073727, at *5.

    **D.    Defendants' Experts and Declarants are Entitled to Little, If Any, Weight.**

In contrast to the firsthand accounts of Minor Plaintiffs, their parents, and the collective expertise of Plaintiffs' experts, who have treated thousands of adolescent patients with gender dysphoria, Defendants rely on "experts" who lack relevant clinical experience or research expertise in gender dysphoria or its treatment in adolescents. Other courts have recognized Dr. Cantor's and Dr. Laidlaw's lack of qualifications in this area. *See L.W.*, 2023 WL 4232308, at *20, 23-24, 27-28; *id.* at *20 n.40, 25 n.48; *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1142–43 (M.D. Ala. 2022); *C.P. v. Blue Cross Blue Shield of Ill.*, 2022 WL 17092846, at *4 (W.D. Wash. Nov. 21,

5

2022). Defendants' other experts similarly lack relevant experience. Dr. Thompson (an OB/GYN) has only treated an unspecified number of transgender patients "in the context of pregnancy and birth" and did not even know that adolescents could receive gender-affirming medical care until 2020 or 2021. ECF 86-3 ¶¶ 13-15. Dr. Harris is a general adult endocrinologist who does not treat gender dysphoria in adolescents or adults, ECF 86-4 ¶¶ 1, 17-18, 27, and whose lack of relevant experience or methodology renders him (at most) a fact witness whose opinions receive no weight. Defendants' experts are not qualified to opine on gender-affirming medical care for adolescents.[3]

## ARGUMENT

I. **PLAINTIFFS' EQUAL PROTECTION CLAIM IS LIKELY TO SUCCEED.**

   A. **Heightened Scrutiny Applies Because SB 613 Classifies Based on Sex and Transgender Status.**

Every trial court squarely presented with the specific question of whether a law prohibiting gender-affirming medical care for transgender adolescents necessarily discriminates based on sex or transgender status has held that it does. *See* ECF 118 at Section II.A.1.[4] Defendants' attempt to

---

[3] *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001); *Rodgers v. Beechcraft Corp.*, 2016 WL 7888002, at *7 (N.D. Okla. Oct. 27, 2016). Defendants' remaining declarants are fact witnesses whose statements are of minimal to no relevance. One declarant did not transition until she was an adult and later de-transitioned solely because of a religious conversion. ECF 86-5 at ¶¶ 5, 19-22; *Brandt*, 2023 WL 4073727, at *21. The other two were not forthright with their clinicians when being evaluated for gender dysphoria or failed to report side effects they now attribute to hormone therapy. ECF 86-6 ¶ 6; ECF 86-7 ¶¶ 19-22.

[4] On July 8, 2023, the Sixth Circuit granted a stay of the preliminary injunction in *L.W.* In so doing, the Sixth Circuit sharply deviated from the majority of federal courts. However, the Sixth Circuit acknowledged its views "are just that: initial" and they "may be wrong." *L.W. v. Skrmetti*, No. 23-5600, slip op. at 15 (6th Cir. July 8, 2023). Its decision is thus of little persuasive value. Indeed, the Sixth Circuit based its decision, in large part, on the notion that lack of FDA-approval shows there is no medical consensus regarding this care. *Id.* at 7. But "[t]hat the FDA has not approved these drugs for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose." *Dekker*, 2023 WL 4102243, at *19. "Off-label use of drugs is commonplace and widely accepted across the medical profession." *Id.* Any "contrary implication is divorced from reality." *Id.* "Once a drug has been approved, … the drug can be

reframe SB 613 as a restriction affecting both sexes does not erase the law's sex classification. *Id.* SB 613 is not a generally applicable health and welfare law entitled to a presumption of validity. ECF 86 at 17. Rather, SB 613 classifies based on sex and transgender status by singling out for prohibition medical interventions related to "gender transition," i.e., prohibiting medical interventions if designed "to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex." 63 Okla. Stat. 2607.1(2)(a). That line-drawing triggers heightened scrutiny. It is not enough to say that "physical differences" are at play, ECF 86 at 21, because *all* sex-based classifications, *including* those that relate to physiological sex characteristics, trigger heightened scrutiny. *See Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001); *United States v. Virginia*, 518 U.S. 515, 534 (1996). And regardless of whether transgender people are a quasi-suspect class—which they are, *see, e.g.*, ECF 118 at Section II.A—discrimination against transgender people triggers heightened scrutiny "because it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020). Assertions that the law affects both sexes equally is no answer: when a law relies on sex to determine who can receive what medical care, that sex-based classification is subject to heightened scrutiny. *See Brandt*, 2023 WL 4073727, at *31; *Doe v. Ladapo*, 2023 WL 3833848, at *10 (N.D. Fla. June 6, 2023); *L.W.*, 2023 WL 4232308, at *15 n.28; ECF 118 at Section II.A.

---

distributed not just for the approved use but for any other use as well," and "[t]here ordinarily is little reason to incur the burden and expense of seeking additional FDA approval." *Id.* Further, the Sixth Circuit's sex discrimination analysis cited the Supreme Court's 1971 decision in *Reed v. Reed*, 404 U.S. 71, but ignored the Court's recent declarations that "all gender-based classifications today warrant heightened scrutiny," *Virginia,* 518 U.S. at 555. *See also Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017).

### B. SB 613 Fails Any Level of Scrutiny.

Defendants have not met their "demanding" burden under heightened scrutiny. SB 613 undermines, rather than advances, Defendants' claimed interest in protecting the health and best interests of minors. ECF 86 at 23. Ultimately, Defendants' purported interests are so misaligned from the means employed to advance them that the law fails any standard of review.

#### 1. The banned care is safe and effective for treating gender dysphoria.

Gender-affirming medical care is "effective to treat gender dysphoria and the benefits of the treatments greatly outweigh the risks." *Brandt*, 2023 WL 4073727, at *34; *see also Dekker*, 2023 WL 4102243, at *15-16; ECF 6-16 ¶ 62. Defendants argue that puberty-delaying treatment "locks in" adolescents on a particular treatment path, ECF 86 at 7, but this is not true. That so few adolescents with gender dysphoria post-puberty "desist"—i.e., come to identify with their sex assigned at birth—reflects the stringency of the DSM-5-TR criteria for gender dysphoria and the persistence of gender identity once adolescence is reached, not the effect of treatment. Ex. 3, Turban ¶¶ 21-22; *Dekker*, 2023 WL 4102243, at *18. Moreover, puberty-delaying treatment does not cause sterility, brain damage, or osteoporosis, ECF 6-3 ¶ 60; Ex. 2, Adkins ¶¶ 13, 16-17, as Defendants suggest. Rather, it effectively stops gender dysphoria from increasing and is reversible. ECF 6-3 ¶ 33. Hormone therapy reduces gender dysphoria and carries comparable side effects regardless of the indication for which it is prescribed. ECF 6-3 ¶ 58. Potential impacts on fertility are appropriately discussed with patients and families, as are fertility preservation options. ECF 6-3 ¶¶ 59-61; Ex. 2, Adkins ¶¶ 21, 26; Ex. 1, Janssen ¶ 42.

Defendants focus on surgical care, which may be indicated for *some* older adolescents, but most treatments available to minors are non-surgical. "[I]n the rare instance that an adolescent has gender-affirming surgery, the overwhelming majority of surgeries are chest surgeries for adolescent transgender males," which are comparable to treatment for gynecomastia in non-

8

transgender males or breast reductions in non-transgender females. *Brandt*, 2023 WL 4073727, at *5, 9, 20. In those infrequent instances where transgender adolescent males do receive chest surgery as minors, their severe gender dysphoria diminishes. Ex. 3, Turban ¶¶ 14, 17.[5]

### 2. Defendants cannot explain why only gender-affirming medical care requires a categorical ban.

Even assuming arguendo that Defendants' erroneous factual assertions were true, they cannot explain why only gender-affirming treatment is singled out for prohibition when their critiques are true of many other medical interventions. Defendants' purported concerns about gender-affirming medical care are true of almost every medical intervention in pediatrics. *See Dekker*, 2023 WL 4102243, at *19; Ex. 4, Antommaria ¶¶ 10, 24, 39. As courts have repeatedly found, the "risks associated with gender-affirming care for adolescents are no greater than the risks associated with many other medical treatments that are not prohibited" by SB 613. *Brandt*, 2023 WL 4073727, at *34; *see also Ladapo*, 2023 WL 3833848, at *12-13; *Doe 1*, 2023 WL 4230481, at *4; *Eknes-Tucker*, 603 F. Supp. 3d at 1145. And the State does not ban effective medical interventions just because there are physical side effects or because those who receive the treatment do not always achieve perfect mental health. ECF 86 at 12.[6] If it did, it would leave "several

---

[5] The State's reference to a hypothetical thirteen-year-old "hav[ing] his healthy, functioning genitals cut off" is divorced from reality. ECF 86 at 26. Genital surgery is not performed on minors, except in very rare cases, and there is no record evidence of it ever being performed in Oklahoma. The only genital surgeries routinely performed on infants and minors are done on intersex infants – often without evidence of efficacy and with high rates of regret, *see* Ex. 4, Antommaria ¶ 36, ECF 6-16 ¶ 55, – and are permitted by SB 613 as they reinforce, rather than disrupt, gender stereotypes.

[6] Transgender people experience high levels of violence, poverty, and stigma. Ex. 3, Turban ¶ 15; *Brandt*, 2023 WL 4073727, at *24. Even so, adolescents with gender dysphoria who receive this care do better than their peers who are unable to access medically-indicated care, Ex. 3, Turban ¶ 15, and (as demonstrated by Plaintiffs' declarations), individual transgender adolescents experience enormous improvement when they can live and feel like themselves, without gender dysphoria.

pediatric treatments targeting something other than gender dysphoria vulnerable to severe limitations on access." *L.W.*, 2023 WL 4232308, at *29.

Treatment with pubertal suppression, hormone therapy, and chest surgery is not unique to gender-affirming care for gender dysphoria. All these interventions are used for other purposes in adolescents and adults, and the side effects are comparable as when used to treat gender dysphoria. ECF 6-3 ¶ 58; *Brandt*, 2023 WL 4073727, at *17-20; *Dekker*, 2023 WL 4102243, at *7. And "off-label" use of medications is not experimental, but rather common in pediatrics. Ex. 4, Antommaria ¶ 10; *L.W.*, 2023 WL 4232308, at *30 & n.54; *Dekker*, 2023 WL 4102243, at *19.

For example, puberty-delaying treatment is also used in adolescents and adults undergoing chemotherapy to preserve their fertility, for those with hormone-sensitive cancers, and for people with endometriosis. ECF 6-3 ¶ 48. Clinicians have over 40 years of data on the use of GnRHa for precocious puberty, and for over 20 years have used them in adolescents with gender dysphoria, who need them for much less time. *Id*. Hormones are also safe, effective, and used for many conditions. *Id.* ¶¶ 53-55. Transgender adolescents are prescribed hormones in doses appropriate for their age and stage of development. *Id.* ¶ 30. The risks associated with taking testosterone are the same regardless of the condition for which it is used or the birth-assigned sex of the patient, and the same is true for estrogen. *See Brandt*, 2023 WL 4073727, at *18-19; ECF 6-3 ¶ 58. Though there may be risks to fertility from hormone therapy, that is also true of many other medical interventions, ECF 6-3 ¶ 61, none of which SB 613 bans.[7]

---

[7] SB 613 does not ban sterilizing surgeries, such as a gonadectomy, in minors with intersex conditions. *See* 63 Okla. Stat. 2607.1(A)(2)(b)(4). Adolescents treated for gender dysphoria have fertility preservation options, and there is evidence that transgender people can be fertile if they cease hormone therapy and sometimes even while still on it. ECF 6-3 ¶ 60; Ex. 2, Adkins ¶ 26; *Brandt*, 2023 WL 4073727, at *6, 18-20, 34; *L.W.*, 2023 WL 4232308, at *24. Defendants' own witness conceived and gave birth *after* years of hormone treatment. ECF 86-6 ¶¶ 7-8, 16-17, 19.

### 3. The ban does not further a purported state interest in stopping adolescents from making major medical decisions.

Defendants claim that SB 613 furthers an interest in preventing adolescents from making major medical decisions before they have reached the age of majority, but it is not clear whether that is an important state interest or how the law substantially advances it. ECF 86 at 26. Adolescents do not consent to medical treatment; their parents do. Even so, SB 613 is grossly underinclusive: the law fails to address *any* of the other kinds of "major medical decisions" that may have lifelong consequences, *except* to prohibit those related to being transgender.[8] A preference for desistance and gender conformity, *see* ECF 86 at 7, is not a legitimate state interest. Although Defendants endorse the belief that transgender adolescents would be better off if they grew out of their gender dysphoria, as opposed to receiving medical treatment to alleviate it, there is no evidence that psychotherapy or any other intervention can cause a person who is transgender to become cisgender. *See Brandt*, 2023 WL 4073727, at *3, *20-21; ECF 118 at Section II.B.3.

### 4. No other evidence-based treatments for gender dysphoria exist.

Defendants claim that gender-affirming care lacks sufficient evidence, but they cannot offer any evidence-based alternatives because, as the court in *Brandt* found after trial, "[t]here are no other evidence-based treatments besides those prohibited by Act 626 that are known to alleviate gender dysphoria." *Brandt*, 2023 WL 4073727, at *17. Clinicians who treat adolescents with gender dysphoria and researchers who specialize in studying the outcomes of this patient population have consistently found that gender-affirming medical care reduces gender dysphoria

---

[8] If the State were genuinely concerned about breastfeeding or could somehow articulate an important interest in what the breasts of adolescent girls look like, *see* ECF 86 at 10, presumably the law would prohibit all medical interventions that might impede future breastfeeding or cosmetic surgeries. But cisgender adolescents may still alter their secondary sex characteristics however they want, so long as their purpose is to conform with their sex assigned at birth.

and increases positive mental health outcomes. Ex. 3, Turban ¶¶ 15, 34; *L.W.*, 2023 WL 4232308, at \*28. Gender-affirming medical care improves the lives of those who need and receive it. *See Brandt*, 2023 WL 4073727, \*16-18, \*32-34. No country to which Defendants point as purported evidence of a lack of consensus on this point has banned care. *Compare* ECF 86 at 12-14 *with Brandt*, 2023 WL 4073727, at \*36 *and L.W.*, 2023 WL 4232308, at \*27 n.53.

Nonetheless, the Defendants favor either doing nothing or trying psychotherapy alone. ECF 86 at 2-3, 12, but no clinical or research evidence supports either option as effective in treating the severe symptoms of gender dysphoria. Ex. 3, Turban ¶¶ 12, 34; Ex. 4, Antommaria ¶ 37. Defendants critique the research for gender-affirming care but offer alternatives with far *less* evidentiary support. Ex. 4, Antommaria ¶ 37. Therapy can help with anxiety and depression, but it cannot resolve the clinically significant distress of living in a body that does not align with one's gender identity. Further, it is unethical to try to use therapy to resolve gender dysphoria by making someone not transgender. ECF 6-4 ¶ 20; *Brandt*, 2023 WL 4073727, at \*3, 7.

## II. PLAINTIFFS' DUE PROCESS CLAIM IS LIKELY TO SUCCEED.

### A. SB 613 Infringes on Parents' Right to Direct Their Children's Medical Care.

A parent's interest in the care, custody, and control of their children is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Defendants' historical analysis conflates the *right* being exercised with the *means*, which are not constrained by 1860s-era technology. *Compare* ECF 86 at 28 *with* ECF 118 at Section III.A. *Cf. United States ex rel. Polansky v. Exec. Health Res., Inc.*, 143 S. Ct. 1720, 1741 (2023) (Thomas, J., dissenting) ("'Standing alone,' . . . 'historical patterns cannot justify contemporary violations of constitutional guarantees,'" (quoting *Marsh v. Chambers*, 463 U.S. 783, 790 (1983))). Due process unquestionably protects the fundamental right of parents to direct their children's medical care, and that right does not obtain procedure-by-procedure. *See* ECF 118

at Section III.A. Parents' "plenary authority to seek such care, subject to a physician's independent examination and medical judgment," *Parham v. J.R.*, 442 U.S. 584, 604 (1979), includes gender-affirming medical care. *Eknes-Tucker*, 603 F. Supp. 3d at 1146; *Brandt*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022); *Brandt*, 2023 WL 4073727, at *36. *Dobbs* does not foreclose the Parent Plaintiffs' due process claim, as the parents' fundamental right is not derivative of their child's. *Compare* ECF 86 at 27 *with* ECF 118 at Section III.A. And the Supreme Court in *Dobbs* "emphasize[d] that that [its] decision concerns the constitutional right to abortion and no other right. Nothing in [the] opinion should be understood to cast doubt on precedents that do not concern abortion." 142 S. Ct. at 2277-78.

SB 613 deprives Parent Plaintiffs of a fundamental right available to all Oklahoma parents: to weigh comparable risks and benefits in their child's best interest. This right exists even for sterilizing procedures of more dubious efficacy than the care at issue here. Ex. 4, Antommaria ¶ 36. The State's attempt to substitute its judgment for that of parents, children, and their treating physicians must satisfy strict scrutiny.

### B. SB 613 Does Not Satisfy Strict Scrutiny.

Any impingement on a fundamental constitutional right must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Defendants do not come close to meeting this standard. *See* Section I.B. *supra*. There is no compelling interest in banning the only evidence-based care for treating gender dysphoria. All medical interventions have side effects, but the existence of "risk does not automatically transfer the power to make [the healthcare] decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Even the State points to less restrictive means to advance its purported interests: the European countries the State and its experts cite approvingly do not have any categorical bans. Ex. 4, Antommaria ¶¶ 26-28; *see also Brandt*, 2023 WL 4073727, at *36. "Because Defendants themselves offer several

13

less restrictive ways to achieve their proffered purposes, the Act is not narrowly tailored at this stage of litigation." *Eknes-Tucker*, 603 F. Supp. 3d at 1146.

### III. THE REMAINING PRELIMINARY INJUNCTION FACTORS ARE MET.

Maintaining the status quo will not harm Defendants because it is not in the public interest to enforce a law that is likely unconstitutional. *See Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014); *Brandt*, 2023 WL 4073727, at *38. But prohibiting Minor Plaintiffs from receiving gender-affirming medical care will cause them severe and irreparable harm that far outweighs any purported harm to the State. *See K.C.*, 2023 WL 4054086, at *13; *Brandt*, 551 F. Supp. 3d at 892, *aff'd*, 47 F.4th 661, 671-72; *L.W.*, 2023 WL 4232308, at *32 ("Minor Plaintiffs likely will suffer actual and imminent injury in the form of emotional and psychological harm as well as unwanted physical changes if they are deprived access to treatment of their gender dysphoria under SB1."); *Doe 1*, 2023 WL 4230481, at *6 ("If allowed to take effect, SB 150 would eliminate treatments that have already significantly benefited six of the seven minor plaintiffs and prevent other transgender children from accessing these beneficial treatments in the future.").

Absent an injunction, Minor Plaintiffs will be forced to stop the care allowing them to thrive. Daphne Doe is now a happy straight-A student, as opposed to how anxious, depressed, and withdrawn she was before she received care. ECF 6-7 ¶¶ 12-17; ECF 6-8 ¶¶ 11-19. Ryan Roe has gone from "just constantly being in discomfort," even alone in his room, to "a confident and eloquent young man," full of "joy and happiness." ECF 6-13 ¶¶ 15-16; ECF 6-14 ¶¶ 11, 28. Brandon Boe is "more at peace with himself" and "so much more joyful," but keeping his new job would be unimaginable without the physical changes that reduce how often he is misgendered. ECF 6-9 ¶¶ 12-14; ECF 6-10 ¶ 12. Even temporary disruptions in care threaten irreparable harm. Peter Poe has "bloomed" and become "much more social and outgoing" because he does not need to hide his body. But when his access to puberty blockers was interrupted, his struggles with

14

suicidality and self-harm resurfaced. ECF 6-5 ¶¶ 13-14; ECF 6-6 ¶¶ 17, 21. Lydia Loe can leave her room because she can "look like the person I know I am and can be my whole, true self," but her mental health declined rapidly when she briefly lost access to hormones, and her mother worried she would return to self-harm and suicidality. ECF 6-11 ¶ 16; ECF 6-12 ¶ 15.

Losing access to the medical care that treats their gender dysphoria will severely and irreparably jeopardize Minor Plaintiffs' mental health and well-being. And the Parent Plaintiffs will be forced to either move or travel out of state for care, or watch their children suffer.

### IV. A FACIAL INJUNCTION IS NECESSARY AND APPROPRIATE.

This Court should grant a facial injunction prohibiting Defendants from enforcing SB 613. Injunctions should be tailored to particular injuries, *see Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), but must still "provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Complete relief requires a facial injunction, and Plaintiffs need not plead or prove every unconstitutional application of the law to obtain it. *See* ECF 118 at Section I; *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012); *L.W.*, 2023 WL 4232308, at *35. Under SB 613, no provider in Oklahoma can provide the medical services that Minor Plaintiffs require, so merely permitting the Minor Plaintiffs to seek care is not sufficient relief. For this reason, trial courts have facially enjoined substantially identical laws. *See Doe 1*, 2023 WL 4230481, at *7; *L.W.*, 2023 WL 4232308, at *34-35; *K.C.*, 2023 WL 4054086, at *14; *Eknes-Tucker*, 603 F. Supp. 3d at 1151; *Brandt*, 551 F. Supp. 3d at 894, *aff'd*, 47 F.4th 661; *but see L.W.*, No. 23-5600, slip op. at 4-6.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their Motion for Preliminary Injunction and facially enjoin SB 613 during the pendency of this case.

Date: July 10, 2023

/s/*Megan Lambert*
Megan Lambert
   (OBA# 33216)
**American Civil Liberties Union**
  **Foundation of Oklahoma**
P.O. Box 13327
Oklahoma City, OK 73113
(405) 524-8511
mlambert@acluok.org

Chase Strangio*
Harper Seldin*
**American Civil Liberties Union**
  **Foundation**
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
cstrangio@aclu.org
hseldin@aclu.org

Laura J. Edelstein*
**Jenner & Block LLP**
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com

Luke C. Platzer*
Madeleine V. Findley*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
LPlatzer@jenner.com

Lauren M. Greene*
Blaine R. Valencia*
**Jenner & Block LLP**
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2246
(213) 239-5100
LGreene@jenner.com
BValencia@jenner.com

\* *Admitted pro hac vice.*

Respectfully submitted,

Omar Gonzalez-Pagan*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Shelly L. Skeen*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
Oak Lawn Ave, Ste. 500
Dallas, TX 75219
(214) 219-8585
sskeen@lambdalegal.org

Sasha Buchert*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
1776 K Street, N.W., 8th Floor
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Remi Jaffre*
**Jenner & Block LLP**
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
RJaffre@jenner.com

Lillian M. McGuire*
Jocelyn Sitton*
Daniel L. Robertson*
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
LMcGuire@jenner.com
JSitton@jenner.com
DRobertson@jenner.com

*Counsel for Plaintiffs*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2023, I electronically filed the foregoing Plaintiffs' Reply in Support of Motion for Preliminary Injunction with the Clerk of Court via the Court's CM/ECF system, which effects service upon all counsel of record.

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Tel.: 405-524-8511
mlambert@acluok.org

*Counsel for Plaintiffs*