# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| PETER POE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>GENTNER DRUMMOND, et al.,<br><br>*Defendants*. | Case No. 4:23-cv-00177-JFH-SH |

**EXPERT REBUTTAL DECLARATION OF ARON JANSSEN, M.D.**

I, Aron Janssen, M.D., hereby declare and state as follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. The opinions expressed in this declaration are my own and do not express the views or opinions of my employer.

3. I have actual knowledge of the matters stated in this declaration. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4. I incorporate as part of this rebuttal declaration my opinions and qualifications set forth in the expert declaration dated April 30, 2023, and which was previously filed in this matter (Doc. 6-2). Since that time, I have testified as an expert at trial or by deposition in: *Dekker v. Weida*, No. 4:22-cv-00325-RH (M.D. Fla.) (trial).

5. I submit this rebuttal declaration to respond to the expert declarations from James Cantor (Doc. 86-1), Michael Laidlaw (Doc. 86-2), Angela C.E. Thompson (Doc. 86-3), and Curtis E. Harris (Doc. 86-4), which Defendants have submitted in this case. I do not specifically address each study or article cited, or each point made, but rather respond to some of the central

1

points in those declarations and explain the overall problems with some of the conclusions that the Defendants' experts draw and provide data showing why such conclusions are in error.

6. In preparing this rebuttal declaration, I have relied on my training and years of research and clinical experience, as set out in my curriculum vitae (attached as **Exhibit A** to my original declaration) and on the materials listed therein; the materials listed in the bibliography attached as **Exhibit B** to my original declaration; and the additional materials listed in the supplemental bibliography attached as **Exhibit C** to this rebuttal declaration. The sources cited in each of these are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications.

7. I reserve the right to revise and supplement the opinions expressed in this declaration or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise. I may also further supplement these opinions in response to information produced by Defendants in discovery and in response to additional information from Defendants' designated experts.

## SUMMARY OF OPINIONS

8. The declarations submitted by Defendants' designated experts largely argue about hypothetical concerns, for which there is no evidence, and the limitations of particular studies. However, they completely ignore that the evidence base for the safety and efficacy of medical treatment for gender dysphoria is not based on any one particular study. Rather, as is the norm in all of science and medicine, we look at the entire body of research studying the efficacy and safety of gender-affirming medical care. When one does so, the evidence is clear that treatment of gender

dysphoria in transgender adolescents and adults is safe and effective. Decades of clinical experience further support the research.

9. Defendants' experts further ignore the robust evidence of the harm faced by transgender people when barred access to medically necessary gender-affirming care.

10. Medical care for gender dysphoria, including puberty-delaying medications or hormone therapy for transgender adolescents when medically indicated, is safe and effective, and it is not substandard or experimental.

11. Understanding patients' experience of gender dysphoria is a vital component of being an expert in this field. Without understanding the distress transgender patients face – as well remarkable benefits they experience when they get the care they need – opinions about this care are unmoored from the reality of patients' lives.

## I. DEFENDANTS' DESIGNATED EXPERTS LACK EXPERIENCE WITH GENDER DYSPHORIA IN CHILDREN AND ADOLESCENTS.

12. Defendants' experts appear to lack the requisite training and experience to opine on the assessment and diagnosis of gender dysphoria in adolescents and the medical treatment of gender dysphoria. Indeed, expertise in mental health care requires specialized training and ongoing work in the field with appropriate certification and licensure.

### a. Dr. Cantor

13. Based on his declaration and curriculum vitae, Dr. Cantor does not appear to have sufficient training or clinical experience to offer expert opinions regarding the diagnosis and treatment of gender dysphoria in children and adolescents. He discusses his work on academic journals and as a member of the American Psychological Association ("APA"), but Dr. Cantor's CV does not indicate he has ever been on a review board or an editor of a journal that specializes in transgender health. Instead, he has worked with journals that focus on sexuality, sexual

3

behavior, and sexual abuse. His conference presentations and journal publications primarily focus on pedophilia, sex offenders, and hypersexuality. Only a handful of his presentations and publications (most of which were not research) appear to have some connection to transgender people.

14. Dr. Cantor does not appear to have ever treated a minor with gender dysphoria. He does not indicate that he has ever diagnosed a child or adolescent with gender dysphoria, nor does he appear to have ever monitored or supervised any minor patient receiving medication to treat gender dysphoria.

### b. *Dr. Laidlaw*

15. To my knowledge, and based on a review of his CV, Dr. Laidlaw has neither had the training nor the certification and licensure to weigh in as an expert on the appropriateness of a mental health assessment or treatment plan. This lack of expertise, however, has not stopped him from making broad generalizations about mental health care that bear little resemblance to the care as typically delivered. As such, his characterization of the practice of mental health care should be seen as a lay opinion based on secondhand knowledge at best. Furthermore, expertise in the treatment of transgender people requires experience in the care of transgender people, which Dr. Laidlaw does not possess.

### c. *Dr. Thompson*

16. To my knowledge, and based on a review of her CV, Dr. Thompson has neither had the training nor the certification to weigh in as an expert in child development, nor the clinical experience in working with the transgender population to comment on the practicalities of counseling on fertility preservation. This lack of experience and expertise does not stop her from asserting a "professional opinion that children with gender dysphoria… should mature with the

functional biological processes intact." She makes this assertion despite having no experience working with transgender youth or providing treatment for gender dysphoria.

### d. Dr. Harris

17. Dr. Harris is an adult endocrinologist who acknowledges that he does not have experience in treating transgender youth for gender dysphoria. In addition to the lack of clinical experience, he misrepresents the literature on the medical care of adolescents with gender dysphoria, making claims about the safety and efficacy of this care without citing any sources other than his opinion and while neglecting to summarize the extant literature in the field. Furthermore, and most troubling, he asserts that "[t]his disorder is very complex… I don't believe most doctors have the resources or facilities to competently evaluate and treat people in this situation." As physicians, we have a responsibility to treat our patients, regardless of the supposed complexity of their needs, and furthermore there is clear documentation about the capacity of providers to deliver this care safely and effectively, particularly when they follow evidence-based and widely accepted clinical practice guidelines such as the WPATH Standards of Care or the Endocrine Society Guidelines.

## II. RESPONSES TO DEFENDANTS' OPINIONS.

### a. Defendants' experts' criticisms of the clinical practice guidelines for the treatment of gender dysphoria are not well founded.

18. Defendants' experts claim that the clinical guidelines and standards of care for gender dysphoria lack a sufficient evidentiary basis. But, as explained in my original declaration, these clinical practice guidelines are evidence-based. WPATH and the Endocrine Society developed these standards for treating gender dysphoria in minors using the same evidence-based approach used to develop standards of care and practice guidelines for the treatment of many other medical conditions. (Coleman, et al., 2022; Hembree, et al., 2017).

5

19. The criticisms of medical care for adolescents by Defendants' experts reflect a distorted interpretation of the relevant scientific literature and the nature of this care.

20. Defendants' experts criticize the methodology of studies supporting the WPATH standards of care while proposing a "therapy only" treatment approach without any empirical or scientific support whatsoever.

21. As outlined in my original declaration (paragraphs 72 and 74), there is a robust body of evidence, including peer-reviewed cross-sectional and longitudinal studies, demonstrating the benefits gender-affirming medical treatment on the psychological functioning and quality of life of adolescents with gender dysphoria.

22. Defendants' experts criticize the quality of evidence supporting treatment of gender dysphoria. (See, e.g., Cantor Decl. ¶¶ 72, 247; Laidlaw Decl. ¶ 173; Thompson Decl. ¶ 7; Harris Decl. ¶ 24). But treatments for gender dysphoria have the same or similar level of evidentiary support as many other well-established treatment protocols in psychiatry—and other disciplines of medicine. The evidentiary basis for those treatment protocols is developed, and regularly updated, using a combination of peer-reviewed research and the extensive clinical experience of providers who regularly treat patients with a particular condition. Those treatment protocols are considered the standard of care and are safe and effective for the conditions they are intended to treat. Conditions as varied as acute respiratory infections to wound care are supported by so-called "low quality" evidence. In fact, a recent study reviewed 1394 systematic reviews of common medical conditions and only 13.5% of those reviews found that the recommended intervention was supported by "high quality" evidence (Fleming, et al., 2016).

23. Dr. Laidlaw also suggests that the lack of FDA approval of medical treatments for these specific uses indicates that the treatments are not supported by evidence of safety. (Laidlaw

Decl., ¶¶ 76, 119). But like many medications, including most medications that have a robust evidence base in child psychiatry, off-label prescribing of FDA approved drugs is common practice and the lack of an indication does not mean there is a lack of evidence of safety and efficacy. For example, in children, Zoloft is FDA approved to treat Obsessive-Compulsive Disorder, but is also regularly used to treat depression and anxiety, such that the use of Zoloft is considered the standard of care for children who require medication to treat those conditions despite the lack of FDA approval for those indications. Indeed, the American Academy of Pediatrics has stated that "In most situations, off-label use of medications is neither experimentation nor research. The administration of an approved drug for a use that is not approved by the FDA is not considered research and does not warrant special consent or review if it is deemed to be in the individual patient's best interest." (AAP, 2014).

24. The notion that the WPATH Standards of Care require the unquestioned and automatic affirmation of an adolescent's desires is false. Under existing guidelines, gender-affirming medical interventions are provided to an adolescent only after careful evaluation and a discussion of the risks and benefits of treatment with the adolescent and their parents/guardians who are the ones who provide the informed consent. This process includes addressing any co-occurring psychiatric disorders and making differential diagnoses to ensure that a patient is properly diagnosed with gender dysphoria and stable.

### b. *Defendants' speculation about the causes of gender dysphoria is not well founded.*

25. Dr. Cantor uses an outdated and inaccurate definition of sex, which seems to guide his view that it is inappropriate to medically address gender dysphoria in adolescents. Dr. Cantor states that sex can only be determined either by "visual inspection" or "chromosomes." (Cantor Decl. ¶ 106.) However, there are multiple sex-related characteristics including gender identity and,

7

among others, internal reproductive organs, external genitalia, chromosomes, hormones, and secondary sex characteristics.

26. Dr. Cantor also incorrectly claims that gender identity is not innate and has no biological foundation. (Cantor Decl. ¶¶ 109, 136; *see also*, *e.g.*, Laidlaw Decl. ¶¶ 17-19; Thompson Decl. ¶ 123; Harris Decl. ¶ 26). However, there is consensus among professional organizations that one's gender identity cannot be changed by external forces and it is a "deeply felt, inherent sense" (e.g., American Psychological Association 2021). As the Endocrine Society Clinical Practice Guidelines for Endocrine Treatment of Gender-Dysphoric Persons explain: "although there is much that is still unknown with respect to gender identity and its expression, compelling studies support the concept that biologic factors, in addition to environmental factors, contribute to this fundamental aspect of human development." (Hembree, et al. 2017).

27. Defendants' designated experts declare that a lack of a specific laboratory test or imaging study to confirm a diagnosis of gender dysphoria invalidates the diagnosis. (Laidlaw Decl. ¶¶ 18-19, Harris Decl. ¶ 26). There are plentiful examples in medicine in which clearly defined diseases lack a confirmatory laboratory test or imagine study. If we used the criteria of a test existing to validate a diagnosis, then we would not be able to diagnose migraines, or depression, or schizophrenia, just to name a few. Indeed, the entire practice of psychiatry would be compromised by such a limitation on diagnoses.

28. Gender dysphoria is a real and serious medical condition. It is not a manifestation of "gender identity confusion" or caused by other "mental health issues," as Dr. Cantor suggests. (Cantor Decl. ¶ 151). There is no basis for Dr. Cantor to claim that patients who have borderline personality disorder are regularly being misdiagnosed with gender dysphoria. There are no studies that support Dr. Cantor's claims. Nor are transgender adolescents with gender dysphoria just

8

experiencing "confusion relating to sexuality, puberty, personality, and identity," as Dr. Harris suggests. (Harris Decl. ¶ 26).

29. Defendants' experts devote a great deal of space to discussing a theory that an increasing number of transgender people who are assigned female at birth are experiencing a transgender identity as a result of peer pressure and social contagion. (See, e.g., Cantor Decl. ¶ 137; Laidlaw Decl. ¶¶ 217-220). The theory that some adolescents experience "rapid-onset gender dysphoria" as a result of social influences is based almost exclusively on one highly controversial study (Littman, 2018). Although purporting to provide a basis for Defendants' experts' uninformed speculation, the study was based on an anonymous survey, allegedly of parents, about the etiology of their child's gender dysphoria. It did not consider nor solicit the views and experiences of the transgender youth at issue. Participants were recruited from websites promoting this social contagion theory, and the children were not surveyed or assessed by a clinician. Because of those serious methodological flaws, the only conclusion that can be drawn from that study is that a self-selected sample of anonymous people recruited through websites that predisposed participants to believe transgender identity can be influenced by social factors do, in fact, believe those social factors influence children to identify as transgender.[1]

30. What is more, it is a normal developmental process for adolescents to seek out peers with shared experiences. This is not unique to transgender and gender-diverse young people. All types of minoritized youth tend to seek out affinity groups with those that share their experiences. In my experience, transgender youth also seek out those social connections. It is not the social connections that leads to the identity, but it is the identity that leads to seeking out these

---

[1] Aside from these serious methodological flaws, Littman's hypothesis of "rapid onset gender dysphoria" focuses specifically on gender dysphoria in boys who are transgender and were assigned a female sex at birth.

social connections.

31. Subsequent studies have undermined the unproven "hypothesis" that some adolescents experience "rapid-onset gender dysphoria" as a result of social influences (e.g., Bauer, et al., 2022). These studies have illuminated how the time between realization of a person's gender identity and their sharing this with another person can span years (Turban, et al., 2023).

32. Some transgender people who wait to come forward until adolescence may have experienced symptoms of gender dysphoria for long periods of time but been uncomfortable disclosing those feelings to parents for fear of rejection or other negative consequences. Other transgender people do not experience distress until they experience the physical changes accompanying puberty. In either case, gender-affirming care requires a comprehensive assessment and persistent, sustained gender dysphoria before medical treatment is prescribed.

33. Contrary to the portrayal in Defendants' experts' declarations, gender-affirming treatment also requires a careful and thorough assessment of a patient's mental health, including co-occurring conditions, history of trauma, substance use, among many other factors.

34. Dr. Cantor devotes substantial space to discussing the possibility that a person could be misdiagnosed with gender dysphoria instead of another mental health condition. (Cantor Decl. ¶¶ 157, 160-163). Studies on transgender young people have long reported data on co-occurring conditions. Indeed, Dr. Cantor specifically cites to one of my own articles on the topic.

35. The existence—and prevalence—of co-occurring conditions among transgender young people is unsurprising. Transgender young people must cope with many stressors, from the fear of rejection from family and peers to pervasive societal discrimination. Not to mention, their underlying gender dysphoria can cause significant psychological distress, which, if left untreated, can result in or exacerbate the co-occurring conditions identified in studies on transgender young

people.[2] And, given that transgender young people typically delay disclosing their transgender status or initially experience family rejection following disclosure, it is not uncommon for transgender young people to engage with psychological or psychiatric care for other reasons prior to being diagnosed with gender dysphoria.

36. Requiring that a transgender patient resolve all co-occurring conditions, many of which are chronic with no reasonable expectation that they be "resolved," prior to receiving gender-affirming care—as suggested by Dr. Cantor—is not possible, nor is it ethical. (Cantor Decl. ¶¶ 154, 158). No relevant organizations cite the need for co-occurring mental health conditions to be resolved, but instead reasonably well-controlled and not impairing the ability of the patient to make an informed decision or interfering with the accuracy of the diagnosis of gender dysphoria. Indeed, some co-occurring conditions (for example, Attention Deficit Hyperactivity Disorder, Autism Spectrum Disorder, to name a few) could be chronic disorders where complete resolution is impossible and the goal of treatment is to mitigate harm and improve functioning.

37. It is important to note that the distress associated with untreated gender dysphoria can also amplify co-occurring conditions that developed independently of the gender dysphoria. Thus, treating the underlying gender dysphoria is essential to alleviating the psychological distress associated with co-occurring conditions.

### c. *Defendants' experts' opinions about desistance are both inapt and misrepresent the literature.*

38. To support his view that minors should not be permitted to transition, Dr. Cantor

---

[2] A.I.R. van der Miesen, et al. (2020). Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health*. 66:699; Turban JL, et al. (2021). Timing of Social Transition for Transgender and Gender Diverse Youth, K-12 Harassment, and Adult Mental Health Outcomes. *Journal of Adolescent Health*. 69(6):991-998.

claims that "among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty." (Cantor Decl. ¶ 115.) The notion of desistance is not generally applied to transgender people once they reach puberty. Indeed, the studies that are cited in support of this view were not limited to transgender children, but also included children who did not have gender dysphoria and children who did not identify as transgender. As stated above, gender diverse children include transgender children as well as children who will ultimately not identify as transgender later in life. Therefore, the concept of gender dysphoria being "outgrown" does not apply to a large portion of gender diverse children since they did not have gender dysphoria to begin with.

39. All of these studies used criteria for diagnosing gender identity disorder under the now obsolete and overly broad categorizations contained in the DSM III-R and DSM IV for "Gender Identity Disorder in Children," which focused mainly on behaviors (and not identity) and had less specific criteria for distinguishing those with the disorder from other children. A child could meet criteria for the DSM III-R or DSM-IV diagnosis of gender identity disorder without identifying as transgender because the diagnostic criteria did not require identification with a gender other than the one assigned to the person at birth.

40. Steensma & Cohen-Kettenis (2018) agree that their data have been cited incorrectly to support the purportedly low persistence rates and have stated that their "studies cannot be used to support" the persistence estimation, in that they never calculated or reported rates of persistence/desistence. They also note that the negative social climate for transgender children and adolescents should be taken into account when reading the data. They further state that their data did not actually reflect gender dysphoria in children and "expect that future follow up studies using the new diagnostic criteria may find higher persistence rates." (Steensma & Cohen- Kettenis,

2018). Finally, they indicate that the terms "desistence" and "persistence" have been misused; they state that when they were researching youth, there were many youth who may have been "hesitating, searching, fluctuating, or exploring with regard to their gender experience" and that those youth have been misclassified as desisting. (Steensma & Cohen- Kettenis, 2018).

41. As the Endocrine Society Practice Guidelines explain: "It may be that children who only showed some gender nonconforming characteristics have been included in the follow-up studies, because the DSM-IV text revision criteria for a diagnosis were rather broad . . . With the newer, stricter criteria of the DSM-5, persistence rates may well be different in future studies" (Hembree, et al. 2017).

42. Today, based on current scientific knowledge and clinical practice, researchers and clinicians are much better equipped to differentiate transgender from non-transgender children and adolescents. The current DSM-5-TR (American Psychiatric Association, 2022) gender dysphoria criteria require that children/adolescents express a strong desire to be or insistence that one is a gender that is different from their assigned gender for at least six months, which was not the case for any of the studies that are cited to indicate whether or not a youth will identify experience gender dysphoria in the future (Temple Newhook, et al., 2018).

43. Given the broader criteria used at the time, it is unsurprising that these studies demonstrated that most children who exhibited gender-nonconforming behavior did not go on to have a transgender identity in adolescence because they did not have a transgender identity in the first instance.

44. To be clear, not only do none of the studies pertaining to desistance use the current DSM-5 gender dysphoria diagnosis, they also do not pertain to adolescents or adults, which are the only patients who are eligible for gender-affirming medical care. And studies show that if

13

gender dysphoria is present in adolescence, desistance is rare. (e.g., de Vries, et al., 2011)

45. Dr. Cantor does not dispute that minors whose transgender identification persists into adolescence are likely to continue to identify as transgender as adults. As recent studies have shown, for "transgender adolescents who, following careful assessment, receive medical necessary gender-affirming medical treatment," "rates of reported regret … are low" (Coleman, et al. 2022).

### d. *Medical treatments for transgender adolescents reduce suicidality and suicide.*

46. Dr. Cantor asserts that there is no evidence that medical treatment for gender dysphoria significantly reduces rates of suicide or suicidality among transgender youth. (Cantor Decl. ¶ 146.) That is untrue. In fact, studies have repeatedly documented that puberty blocking medication and hormone therapy are associated with mental health benefits for transgender people in both the short and long term, including a reduced rate of suicidality. (Tordoff, 2022; Green, 2021; Turban, 2020; Achille, 2020; Kuper, 2020; van der Miesen, 2020; Costa, 2015).

47. Dr. Cantor and Dr. Laidlaw cite Dhejne et al. (2011) for the proposition that undergoing sex-reassignment surgery does not decrease suicidality among transgender adults. (Cantor Decl. ¶ 147; Laidlaw Decl. ¶ 203) The study in question, Dhejne, et al., was not designed to demonstrate a relationship between treatment for gender dysphoria and mortality. Dhejne, et al. did not compare treated vs. untreated transgender people. Indeed, the study itself warns against drawing any conclusions regarding the effectiveness of surgery as a treatment for gender dysphoria: "For the purpose of evaluating whether sex reassignment is an effective treatment for gender dysphoria, it is reasonable to compare reported gender dysphoria pre and post treatment. Such studies have been conducted either prospectively or retrospectively and suggest that sex reassignment of transsexual persons improves quality of life and gender dysphoria." (Dhejne, 2011). Since the study was published, Dr. Dhejne has denounced that interpretations like Dr.

Cantor's and Dr. Laidlaw's are incorrect. (Dhejne, 2017). It is a gross misuse of the data to assert that shows anything about the effectiveness of gender-affirming treatment on mortality risk. Moreover, the disparity in mortality between transgender people who received care and the general population—an inapt comparison, as it compares apples to oranges—could be attributable to a number of factors, including that transgender people in general face multiple unique stressors not faced by the population at large. What is more, the goal of treatment of gender dysphoria is to treat the gender dysphoria. Data on severity of gender dysphoria pre- and post-treatment are clear in showing improvement in this same data set.

48. Dr. Cantor further opines that McNeil, et al. (2017) does not show that transition reduces suicidality among transgender youth. (Cantor Decl. ¶ 149.) In fact, the study concluded that "[d]iscrimination emerged as strongly related to suicidal ideation and attempts, whereas positive social interactions and timely access to interventions appeared protective." Bauer, et al. (2015), which Dr. Cantor erroneously cites for the proposition that social support is associated with increased suicide attempts, further demonstrates the benefits of treatment (not the harm): "Our findings support a strong effect for social exclusion, discrimination and lack of medical transition (for those needing it) on suicide ideation and attempts, and potentially on the survival of trans persons." The WPATH Standards of Care cite Bauer's study as evidence that "[a]ccess to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt (Coleman et al., 2022).

49. Dr. Cantor also cites Canetto, et al. (2021) in support of his claim that providing social support to transgender youth is associated with increased suicidal attempts. (Cantor Decl. ¶ 150). The Canetto study did not include or address transgender youth and does not support Dr. Cantor's claim.

15

50. Dr. Cantor also relies on the lack of research showing that medical treatments for transgender youth reduce suicide as opposed to reducing suicidality to support his opposition to providing transgender youth with supportive treatment and care. But this gap in the available research does not support his position for several reasons. First, the absence of data about how treatment impacts suicide as opposed to suicidality largely reflects the difficulty of designing or undertaking such research. The Baker study cited by Dr. Cantor did not find that treatment failed to reduce suicide, but only that it was impossible to draw conclusions because of "the difficulty of identifying appropriate comparison groups and uncontrolled confounding factors." (Baker, et al., 2021).

51. Second, the harms caused by suicidality are themselves very serious. In a recent systematic review of the impact of suicidal ideation, the harms directly associated with suicidal thoughts are clear: a sense of loss of the self, lack of self- worth, low self-esteem, loss of meaning in life, self-hatred, feelings of worthlessness, increased guilt, and increased shame. (Søndergaard, 2023). These experiences are incredibly painful. Even if suicidality and suicide were not related, which they are, preventing suicidality alone would be a compelling reason to provide medically needed care to transgender adolescents.

52. And third, because suicide attempts and suicide are interrelated, a treatment that reduces the former reduces the latter, even if current research designs cannot quantify that impact precisely. (Jones, 2023). For example, a recent study found that transgender teens were 7.6 times as likely to attempt suicide as their non-transgender peers. (Kingsbury, 2022). Providing medically necessary care dramatically reduces the suicidality of transgender youth, including reductions in suicide attempts. In one recent study of transgender youth under 18, receiving hormone therapy was associated with nearly 40% lower odds of having had a suicide attempt in the past year. (Green,

16

2021). Given the relationship between suicide attempts and suicide, there can be little doubt that receiving medically necessary care significantly reduces suicide among transgender youth.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 7th day of July 2023.

_____
Aron Janssen, M.D.

*EXHIBIT C*

*Supplemental Bibliography*

**SUPPLEMENTAL BIBLIOGRAPHY**

Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review. *Journal of the Endocrine Society*, *5*(4), bvab011.

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. *BMC public health*, *15*, 525.

Canetto, S. S., Antonelli, P., Ciccotti, A., Dettore, D., & Lamis, D. A. (2021). Suicidal as normal: A lesbian, gay, and bisexual youth script? *Crisis, 42,* 292–300.

Dhejne, C. H. (2017). Science AMA Series: I'm Cecilia Dhejne a fellow of the European Committee of Sexual Medicine, from the Karolinska University Hospital in Sweden. I'm here to talk about transgender health, suicide rates, and my often misinterpreted study. Ask me anything! *Winnower* 10:e150124.46274.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS one*, *6*(2), e16885.

Jones SE, Ethier KA, Hertz M, et al. Mental Health, Suicidality, and Connectedness Among High School Students During the COVID-19 Pandemic — Adolescent Behaviors and Experiences Survey, United States, January–June 2021. MMWR Suppl 2022;71(Suppl-3):16–21. DOI: http://dx.doi.org/10.15585/mmwr.su7103a3external icon

Kingsbury, M., Hammond, N. G., Johnstone, F., & Colman, I. (2022). Suicidality among sexual minority and transgender adolescents: a nationally representative population-based study of youth in Canada. *CMAJ: Canadian Medical Association Journal*, *194*(22), E767–E774.

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. *Psychology of Sexual Orientation and Gender Diversity, 4,* 341–353.

Søndergaard, R., Buus, N., Berring, L. L., Andersen, C. B., Grundahl, M., Stjernegaard, K., & Hybholt, L. (2023). Living with suicidal thoughts: A scoping review. *Scandinavian journal of caring sciences*, *37*(1), 60–78.

Steensma, T. D. & Cohen-Kettenis, P. T. (2018). A critical commentary on "A critical commentary on follow-up studies and "desistence" theories about transgender and gender non-conforming children." *International Journal of Transgenderism*, 19(2): 225-230.

Temple Newhook, J., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., Sinnott, M., Jamieson, A., & Pickett, S. (2018). A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children. *International Journal of Transgenderism*, 19(2): 212-224.