UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

PETER POE, *et al.*,

                *Plaintiffs,*

v.                                 No.  23-cv-00177-JFH-SH

GENTNER F. DRUMMOND, *et al.*,

                *Defendants.*

## RESPONSE OF DEFENDANTS 15-53 TO THE
## UNITED STATES' STATEMENT OF INTEREST

Submitted by:

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

ZACH WEST, OBA #30768
  *Director of Special Litigation*
AUDREY A. WEAVER, OBA #33258
WILL FLANAGAN, OBA #35110
  *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov

COUNSEL FOR DEFENDANTS 15-53                                     July 10, 2023

**INTRODUCTION**

Pursuant to this Court's order on July 3, 2023, Doc. 108, Defendants 15-53 ("State Defendants") submit the following response to the United States' Statement of Interest, Doc. 61. In sum, the Statement is largely duplicative of Plaintiffs' arguments, it ignores compelling evidence in favor of the State, and it is wrong on several aspects of the relevant law where it attempts to expand upon the Plaintiffs' injunction brief. Thus, it should be given no weight in this proceeding.

**I.    The United States adds little to the discussion with its Statement of Interest.**

In its Statement, the United States puts forth no interest that is separate or independent from the Plaintiffs, nor does it contend that the Plaintiffs are inadequately representing their own interests. As State Defendants have already pointed out, this calls into question whether the Statement should have been filed in the first place. *See, e.g., United States ex rel. Kuriyan v. HCSC Ins. Servs. Co.,* No. CV 16-1148, 2021 WL 5238332, at *1-2 (D.N.M. Jan. 29, 2021) (striking the federal government's statement of interest in part because it "does not argue that Defendants' counsel has inadequately argued the legal issues nor does the Government define a separate legal interest"). The federal government does claim, in generic terms, that it "has a strong interest in protecting individual and civil rights" and making sure constitutional standards are applied consistently. Doc. 61 at 1. But if the United States filed a Statement of Interest in every case in the country where "individual and civil rights" were allegedly at stake, it would presumably be filing thousands upon thousands of Statements nationwide. The United States provides little explanation for why this case, or this issue, uniquely merits its attention at this preliminary stage of the proceedings. Its list of similar cases where it has intervened or filed a Statement of Interest across the country, Doc. 61 at 2,[1] suggests that it is just doing so here

---

[1] The United States' list is not entirely accurate. The United States claims that it "obtained a preliminary injunction to halt enforcement of the law" in Alabama, Doc. 61 at 2, but the Alabama injunction only applied to *part* of Alabama's law. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1138 (M.D. Ala. 2022) ("[A]ll other provisions of the Act remain in effect, specifically: (1) the provision that bans sex-altering surgeries on minors …."), *appeal docketed*, No. 22-11707 (11th Cir. May 18, 2022).

*pro forma.* Twenty or so States have enacted similar such laws, and apparently the United States is going to show up in all of them, even if it adds little to the debate.

Unsurprisingly, given its inability to articulate a particularized reason for its presence here, the arguments the United States makes are mostly duplicative of the Plaintiffs' arguments, including their flaws. Like Plaintiffs, for example, the United States denounces the entire law as unconstitutional while declining to expressly defend the practice of irreversible genital-destroying and breast-removing surgeries on healthy minors—*i.e.*, one-half of the law. And it fails to acknowledge the significance of the fact that Plaintiffs' witnesses seemingly admit pre-pubescent minors shouldn't receive the treatments in question. *See* Doc. 80 at 4-6; Doc. 86 at 15-16. Because of the duplicative nature of the Statement, State Defendants will not attempt to comprehensively rebut every point made here.

As State Defendants already pointed out, perhaps the most interesting aspect of the United States' Statement are the arguments that it does *not* duplicate. The United States does not argue based on parental rights and due process, nor does it argue for strict scrutiny to apply. State Defendants are hesitant to read anything definitive into these omissions, but it is still at least noteworthy here that the federal government has not voiced disagreement with State Defendants' position that neither strict scrutiny nor parental rights have any relevance to this dispute or the sought-after injunction. Speaking of the injunction, also noteworthy is the fact that the United States never even mentions an injunction, much less asks this Court to enjoin Oklahoma's law. And the United States explains that it "expresses no view on any issues in this case other than those set forth in this brief." Doc. 61 at 1 n.2. By the force of its own words, then, it cannot truly be said that the United States supports an injunction here.

II.   **The United States declines to acknowledge opposing arguments or evidence.**

The United States filed its Statement of Interest one week *before* State Defendants filed their first substantive responses of any kind in this case. And despite its participation in several other State lawsuits on this topic, the United States does not acknowledge, much less interact with, factual and

2

legal rebuttals put forth by other States. The federal government never mentions, for example, important scientific and governmental developments out of Europe that clearly favor Oklahoma. *See, e.g.*, Doc. 86 at 12-14. And the United States never acknowledges the recent explosion in gender dysphoria cases in adolescent females. *See, e.g.*, Doc. 86 at 5. Nor does it admit any of the substantial risks of the drugs and procedures in question, or the fact that the evidence upon which these procedures are based is undeniably of low quality. *See, e.g.*, Doc. 86 at 11-12. And so on.

Rather than attempting to appear objective, the United States' approach signals its view that interaction with well-known opposing arguments or evidence is unnecessary. In other contexts, like that of the Administrative Procedures Act (APA), agencies of the federal government "must be open to considering" opposing views and "demonstrate the rationality of [their] decision-making process[es] by responding to those [public] comments that are relevant and significant." *Grand Canyon Air Tour Coal. v. F.A.A.*, 154 F.3d 455, 468 (D.C. Cir. 1998). Here, to the contrary, the federal government utilizes a head-in-the-sand approach that would risk being branded arbitrary and capricious under the APA. That is its prerogative, because nothing like the APA applies here, but it provides this Court with no reason to treat the United States' brief as anything more than a partisan exercise.

Digging in a bit, the United States makes various assertions as if they are unassailable, even though those assertions are rebutted by State Defendants and their witnesses (as well as by States and witnesses in other cases where the United States has participated). For example, the United States claims that a "person's gender identity is innate," citing two of Plaintiffs' witnesses. Doc. 61 at 3. But the State's expert witnesses refute this notion, pointing out the lack of objective scientific evidence of immutability, as well as the strong evidence showing that large numbers of children will desist from gender dysphoria if allowed to do so. *See, e.g.*, Doc. 86-1, ¶¶ 114-136, 164, 260-63; Doc. 86-2, ¶¶ 17, 24, 221-24; Doc. 86-3, ¶¶ 123. And all three of State Defendants' lay witnesses have rejected their former gender identity. *See* Doc. 86-5, ¶¶ 4, 21 ("[A]t the age of 25 I decided that I was supposed to

3

have been a man and had just been born in the wrong body. … [Later,] my belief that I was meant to be a man vanished. … "); Doc. 86-6, ¶ 8 ("At age 16, I was absolutely convinced that I was a male in a female body …"); Doc. 86-7, ¶¶ 6, 27 ("I fully socially transitioned to a male identity at age 13 … I am now fully detransitioned. I recognize that I am a female and also embrace that."). The United States' view is further undercut by the concept of "gender fluidity," Doc. 86-1 at ¶¶ 111, 117, whereby "some individuals claim to change gender identities associated with the male and female sexes." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.6 (11th Cir. 2022) (en banc); *see also id.* (criticizing dissent for ignoring gender fluidity when analyzing an equal protection claim).

The United States also claims, citing Plaintiffs' witnesses, that "the delay or denial of *medically necessary* treatment for gender dysphoria *causes* many transgender minors to develop serious co-occurring mental health conditions, such as anxiety, depression, and suicidality." Doc. 61 at 3 (emphases added). Doctors do not all agree that this treatment is medically necessary, though; like Plaintiffs, the United States ignores higher quality evidence and European developments. *See, e.g.*, Doc. 86 at 24-25; Doc. 86-1 at ¶¶ 144, 173-175. Moreover, one defense expert testifies at *length* about the high standard necessary for a finding of scientific causation and how that standard hasn't even come close to being met on these issues. *See, e.g.*, Doc. 86-1, ¶¶ 23, 46-62, 148-154, 266-67, 275-76. "[P]laintiffs' experts," he warns, "repeatedly misrepresent the research, employing causal language to describe studies that do not—indeed, cannot—demonstrate causality." *Id.*, ¶ 49. And again, State Defendants' lay witnesses disagree that their treatment was helpful, much less "medically necessary." To the contrary, in their experience, "taking testosterone caused or coincided with excruciating joint pain, chronic dizziness and fainting spells, light-headedness, heart problems, cognitive problems including memory loss, anxiety, weight gain, vein enlargement, vaginal atrophy, hair loss, poor mental health, hospitalization, and even a suicide attempt." Doc. 86 at 9.

4

Like Plaintiffs, the United States also pretends that the WPATH and Endocrine Society guidelines are mandatory and universally followed, Doc. 61 at 4-5, rather than optional and fiercely disputed even within the community of providers of these procedures. *See* Doc. 86 at 4-5. That some active providers have labeled the "guard rails" mentioned by the United States as "anathema" to the alleged "care" that they provide minors goes unnoticed by the federal government in its Statement. *Id.* Rather, the United States claims that "gender-affirming medical treatment … has long been recognized as part of the standards of care." Doc. 61 at 20. But the Endocrine Society—upon which the United States expressly relies—updated its guidelines in 2017 to state that the "guidelines cannot guarantee any specific outcome, nor do they establish a standard of care …." Doc. 86-1, ¶ 255; Doc. 86-2, ¶ 191.

In sum, the United States presents a woefully one-sided view of the proceedings, taking virtually no counterpoints or countervailing evidence into account despite having ample opportunity to do so thanks to its participation in other State cases.

**III.    The Statement of Interest does not strengthen the Plaintiffs' flawed legal analysis.**

There are a couple areas where the United States attempts to expand upon the Plaintiffs' flawed analysis. In particular, the United States focuses on bolstering allegations of animus, making a more robust argument for a quasi-suspect class, and trying to show that Oklahoma's law triggers intermediate scrutiny based on sex. None of the United States' expansions hold water.

   A.    *The United States fails to put forth evidence of discriminatory animus.*

The United States spills substantial ink discussing short snippets from legislators to allege that Senate Bill 613 was passed with discriminatory animus. As State Defendants have already explained, courts have long been extremely reticent to ascribe malevolent intent to an entire legislature based on quotes from random members. *See* Doc. 80 at 11-13. Indeed, the Tenth Circuit just held earlier this year that "the statements of a few legislators concerning their motives for voting for legislation is a

reed too thin to support invalidation of a statute." *Citizens for Constitutional Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023), *petition for cert. filed*, No. 21-1317. That should be the end of the matter.

In any event, even if this Court dives into the various quotes and legislative debates (which it shouldn't), the Supreme Court has warned that "legislative history is itself often murky, ambiguous, and contradictory," and an "investigation of legislative history has a tendency to become … an exercise in 'looking over a crowd and picking out your friends.'" *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (citation omitted). That is effectively what the United States does here. The federal government makes no effort to comprehensively analyze quotes from legislators, contextualize the tidbits it provides, or quantify how many quotes might invalidate an entire statute. Rather, it cherry-picks a few soundbites and presents them, context-free, as definitive.

The United States ignores quotes indicating that legislators voted for SB 613 to protect children from harm and help them live fulfilling lives. *See, e.g.*, Doc. 86 at 14. Indeed, the legislative debates are replete with references to drastic consequences and potential risks of these procedures and concerns that children were being rushed into making harmful life-altering decisions before maturity. One representative, for example, stated that she had been contacted by people "who have begun transition surgery who felt like it was a tragic mistake and they wish that someone would have spent more time with them and help them manage their mental health before they started making physical changes to their body." Statement of Rep. Toni Hasenbeck, H. Pub. Health Comm. Hearing, 3:19:29-51 PM (April 12, 2023).[2] She cited a study indicating that many such young people have other psychiatric diagnoses and that the law would give minors "a cushion of time before they made long-term life-altering decisions." *Id.* at 3:29:23-45 PM. Other legislators defended the Act by pointing to recent developments abroad, observing that "Europe is shutting this down as we speak[,]" Statement

---

[2] *Available at* https://sg001-harmony.sliq.net/00283/Harmony/en/PowerBrowser/PowerBrowserV2/20230525/-1/53653.

of Sen. David Bullard, Legis. Sess. in the S. Chamber, 10:37:04-10 AM (Feb. 15, 2023),[3] and that "the countries that have been at the forefront of these procedures … have in recent years put roadblocks in place to prevent minors from receiving these procedures," Statement of Rep. Kevin West, H. First Reg. Floor Sess., Morning Sess., 11:46:34-47:20 AM (Feb. 28, 2023).[4]

The United States' assertions that these debates "demonstrated anti-transgender animus[,]" Doc. 61 at 8, or that the goal of protecting children is not "genuine," *id.* at 21, are incorrect. Even out of context, the cited quotes generally indicate that legislators who voted to prohibit the provision of hormones and surgeries to minors are not convinced of the efficacy of those procedures and find the concept of gender dysphoria to be frustratingly malleable and subjective. State Defendants' witnesses—including a former president of the State Medical Board—agree. *See, e.g.*, Doc. 86-4, ¶ 26 (Dr. Harris: "[A] finding of gender dysphoria … typically relies upon more subjective views of doctors, therapists, the family, and the patient. This leaves the door open for misdiagnoses or misunderstandings in a very complex area."). When taken in context, these quotes reveal that legislators consulted scientific literature and reached the same conclusion as the official health care bodies in various European countries. Namely, they all agree that puberty blockers, cross-sex hormones, and genital surgeries are unproven, suspect, and not worth their profound costs. *See* Doc. 86 at 12-14; Doc. 86-1 at ¶¶ 16-33.

The United States quotes one representative (out of 101) who stated that transgender individuals need "wise and clear biblical guidance." Doc. 61 at 8.[5] This snippet comes at the conclusion of a ten-minute speech in which the representative walked through the potential physical consequences of these procedures, discussed the scientific research, and pointed to the conclusions

---

[3] *Available at* https://sg001-harmony.sliq.net/00282/Harmony/en/PowerBrowser/ PowerBrowserV2/20230525/-1/66172.
[4] *Available at* https://sg001-harmony.sliq.net/00283/Harmony/en/PowerBrowser/ PowerBrowserV2/20230228/-1/53511.
[5] Plaintiffs mention this quote in a passing footnote in their injunction motion. *See* Doc. 6 at 15 n.2.

7

that different European countries have reached after examining the studies. *See* Statement of Rep. Jim Olson, H. First Reg. Floor Sess., Morning Sess., 11:30:04-40:00 AM (Feb. 15, 2023).[6] That he added faith-based thoughts cannot possibly be grounds for finding animus. But the only aspect of that statement that the United States could find objectionable is the invocation of a religious text. State Defendants are unaware of precedent indicating that government officials are prohibited from expressing religious views or citing religious texts, or that doing so can support a finding of animus. And any such precedent would likely conflict with the First Amendment, as well as countless examples of such invocations in our country's history. *See, e.g.*, Haley Byrd, *Pelosi cites Ecclesiastes in response to Trump, says it is a time for healing*, CNN (June 2, 2020) ("Holding a Bible at a Capitol Hill event, [House Speaker] Pelosi turned to the book of Ecclesiastes and read about a time for healing.")[7]; COLLECTED WORKS OF ABRAHAM LINCOLN: 7 (Sept. 7, 1864) (President Lincoln: "In regard to this Great Book, I have but to say, it is the best gift God has given to man.")[8]; *Letter From John Quincy Adams to George Washington Adams*, NAT'L ARCHIVES (Sept. 1, 1811) ("[The Bible] is, of all the books in the world, that which contributes most to make men good, wise, & happy ….")[9]; *cf. Perrier-Bilbo v. United States*, 954 F.3d 413, 428 (1st Cir. 2020) ("We cannot discern any discriminatory intent in the decision to maintain the phrase 'so help me God' in the naturalization oath.").

The United States also deems it significant that this same representative lamented that children are being set on a path toward "desolation, destruction, degeneracy, and delusion, ending in delusional

---

[6] *Available at* https://sg001-harmony.sliq.net/00283/Harmony/en/PowerBrowser/PowerBrowserV2/20230228/-1/53511.
[7] *Available at* https://www.cnn.com/2020/06/02/politics/nancy-pelosi-trump-church-response/index.html.
[8] *Available at* https://quod.lib.umich.edu/cgi/t/text/text-idx?c=lincoln;cc=lincoln;type=simple;rgn=div1;q1=September%207,%201864;view=text;subview=detail;sort=occur;idno=lincoln7;node=lincoln7:1184.
[9] *Available at* https://founders.archives.gov/documents/Adams/99-03-02-2021#:~:text=Doddridges%20annotations%20every%20evening%2C%20this,earlier%20my%20children%20begin%20to.

play acting." Doc. 61 at 8.[10] But none of this indicates animus. To the contrary, the representative followed this statement up by repeatedly emphasizing that he was seeking to help the children involved deal with underlying mental health issues rather than saddle them with serious physical risks and side effects for the rest of their lives. "Would it not be kinder," he asked while listing the serious risks of the procedures in question, "to give them actual mental health [treatment]?" Statement of Rep. Jim Olson, H. First Reg. Floor Sess., Afternoon Sess., 6:03:55-04:46 PM (Apr. 26, 2023).[11]

Moreover, the rhetoric he deployed, sharp as it is, resembles the sentiments expressed by the three Oklahoma women who testify for State Defendants here. *See, e.g.*, Doc. 86-5, ¶¶ 16, 25 ("After nine years of transitioning and taking testosterone and going through many surgeries, I was left *empty* and *broken*. I was *devastated* . . . . [T]he physical transition was *never real*, it never resolved the gender dysphoria, and what [I] truly needed was psychological counseling, not hormones and surgery." (emphases added)); Doc 86-6, ¶ 13 ("My mental health was *terrible* while I was on testosterone. I was *hospitalized* six times . . . . In 2018, I tried to commit *suicide* . . . ." (emphases added)). Are legislators not allowed to empathize when citizens of their State suffer and show regret like this? Are they not permitted to recognize that these procedures are quite literally destroying and degenerating the healthy body parts and functions of children *for life*?[12] Where is that clause in the Constitution?

The United States also points out that a co-author of SB 613 referred to the procedures in question as "misinformation" and "a lie." Doc. 61 at 8. But context matters. This legislator opened his remarks by discussing hugging the parents of transgender children and how he agreed with them that "trans lives matter." Statement of Sen. Shane Jett, Legis. Sess. in the Sen. Chamber, 10:16:16-

---

[10] Plaintiffs mention just a part of this quote in a footnote of their injunction brief. Doc. 6 at 15 n.2.
[11] *Available at* https://sg001-harmony.sliq.net/00283/Harmony/en/PowerBrowser/PowerBrowserV2/20230228/-1/53511.
[12] It also should be noted that, as the representative observed moments after his quote in question, the Lupron (puberty blocker) drug label expressly lists "delusions" as a potential side effect. *See FDA Label Search: Lupron Depot*, FDA, https://www.accessdata.fda.gov/spl/data/5aed3ea2-de6d-4f33-b6de-7250fe1993f4/5aed3ea2-de6d-4f33-b6de-7250fe1993f4.xml.

32:40 AM (Feb. 15, 2023).[13] His statements reveal that that he believes the Act is what is best for such children. His argument that "misinformation" has been pushed onto families in the State in no way demonstrates animus, and it aligns with testimony of State Defendants' witnesses. *See, e.g.*, Doc. 86-1, ¶ 144 (Cantor: "Both adolescents and parents are exposed to the widely circulated slogan that 'I'd rather have a living son than a dead daughter,' and such baseless threats or fears are treated as a justification for referring to affirming gender transitions as 'life-saving' or 'medically necessary.' Such claims grossly misrepresent the research literature, however."); Doc. 86-7, ¶ 14 ("My mother ultimately consented to the testosterone prescription because the therapist told her that I would commit suicide if my mother did not agree.").

The United States repeatedly cites a purported confession by a co-author that supporters of the bill were not "saying that [medical organizations in favor of gender transition procedures] are wrong." Doc. 61 at 9, 22. This is misleading. The quote in question comes from a question-and-answer period during a House committee meeting. The legislator's entire answer was "I don't think that we are saying that [these medical organizations] are wrong. I think we are building in a cushion of time until a child's brain is better formed so that they can help be a part of the care team and help their doctors make decisions." Statement of Rep. Toni Hasenbeck, H. Pub. Health Comm. Hearing, Apr. 12, 2023, 3:26:16-27:14 PM (April 12, 2023).[14] This is not a concession, or an admission that the medical organizations are right. The most obvious interpretation is that the representative was merely saying that supporting SB 613 does not require completely disagreeing with the American medical establishment. After all, the Act only prohibits these procedures until a person reaches adulthood. It merely reflects the understanding that minors should not be making these life-altering decisions.

---

[13] *Available at* https://sg001-harmony.sliq.net/00282/Harmony/en/PowerBrowser/PowerBrowserV2/20230525/-1/66172.
[14] *Available at* https://sg001-harmony.sliq.net/00283/Harmony/en/PowerBrowser/PowerBrowserV2/20230525/-1/53653.

In the end, the full recordings of the cited statements demonstrate that the legislators believed, and argued, that SB 613 is beneficial for minor children. The federal government's misleading splicing of these statements is unconvincing. Moreover, the curious suggestion that there was something nefarious about 15 different bills introduced regulating gender transition procedures, Doc. 61 at 8, also fails to indicate animus. Many different—and even redundant—bills are filed in legislatures all the time. For example, on one day in 2022, 15 different bills regulating medical marijuana were heard in a single committee meeting. Beth Wallace, *What to know about the newest round of Oklahoma medical marijuana legislation*, STATEIMPACT OKLAHOMA (Mar. 4, 2022).[15]

Finally, the United States' argument for pretext relies on a presumption that these procedures are medically necessary, and thus that any opposition to them must be grounded in animus. This is wrong. Disagreeing over whether puberty blockers, cross-sex hormones, and gender transition surgeries are beneficial treatments for children is not hateful. It is not animus for a state to ensure that a minor waits until 18 before consenting to lifelong sterility or having healthy body parts cut off. State Defendants have detailed the consequences of these procedures as well as the lack of support for their use. *See* Doc. 86 at 2-12. Further, countries across Europe—after conducting reviews of the literature—have restricted these treatments. *Id.* at 12-14; Doc. 86-1 at ¶¶ 16-33. And rather than demonstrate animus or pretext, the legislative speeches cited by the federal government actually demonstrate that the legislators had examined the medical research prior to voting on the Act.

B.      *Transgender individuals do not constitute a quasi-suspect class.*

To reiterate, the Act does not discriminate on the basis of transgender status. *See* Doc. 80 at 8-13; Doc. 86 at 18-20. Laws regulating medical procedures do not discriminate even if those procedures are only sought by members of that class. *See Dobbs v. Jackson Women's Health Org.*, 142 S.

---

[15] *Available at* https://stateimpact.npr.org/oklahoma/2022/03/04/what-to-know-about-the-newest-round-of-oklahoma-medical-marijuana-legislation/.

Ct. 2228, 2245-46 (2022); *Geduldig v. Aiello*, 417 U.S. 484, 496, n.20 (1974). Therefore, "they are governed by the same standard of review as other health and safety measures." *Dobbs*, 142 S. Ct. at 2246. Regardless, the United States is incorrect that transgender individuals are a quasi-suspect class.

The United States asks this Court to stand on an island within the Tenth Circuit by rejecting binding precedent. In 1995, the Tenth Circuit ruled that a transgender individual "is not a member of a protected class . . . ." *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995). That holding has not yet been revisited. *See Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (unpublished). And various district courts in the Tenth Circuit have found that *Brown* is binding. *See, e.g., Griffith v. El Paso Cnty., Colo.*, No. 21-CV-387-CMA-NRN, 2023 WL 3099625, at *8 (D. Colo. Mar. 27, 2023) ("Bound by *Brown*, the Court must apply rational basis review . . . ."), *appeal pending*; *Fowler v. Stitt*, No. 22-CV-115-JWB-SH, 2023 WL 4010694, at *21 (N.D. Okla. June 8, 2023) ("*Brown* remains good and binding law . . . ."). While the federal government has cited district courts in other circuits, "[a] district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits." *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990).

Even were this Court to disregard *Brown*, it should still find that transgender individuals are not a quasi-suspect class. The United States cites to several courts that have found that transgender status is a quasi-suspect class, but it omits that the *en banc* Eleventh Circuit recently stated that it has "grave 'doubt' that transgender persons constitute a quasi-suspect class." *Adams*, 57 F.4th at 803 n.5. The Eleventh Circuit's doubt stemmed from the fact that "the Supreme Court has rarely deemed a group a quasi-suspect class." *Id.* And just this past weekend, the Sixth Circuit—in lifting a stay of Tennessee's law prohibiting hormones and surgeries on minors—declined to find that transgender individuals constitute a quasi-suspect class. *See L.W. v. Skrmetti*, No. 23-5600, 2023 WL 4410576, at *6 (6th Cir. July 8, 2023). "The bar for recognizing a new quasi-suspect class . . . is a high one," the Sixth Circuit wrote. *Id.* at *7. "The Supreme Court has recognized just two such classes . . . and none in

12

recent years." *Id.* "That hesitancy," the Sixth Circuit found, "makes sense here," in the context of a law very similar to Oklahoma's, since "[g]ender identity and gender dysphoria pose vexing line-drawing dilemmas for legislatures." *Id.*

Moreover, the federal government's collection of cases are not the only district courts that have weighed in on this issue. Other courts have held that transgender individuals are not a quasi-suspect class. *See e.g.*, *Fowler*, 2023 WL 4010694 at *21; *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015); *Jamison v. Davue*, No. CIV S–11–2056 WBS, 2012 WL 996383, at *3 (E.D. Cal. Mar. 23, 2012); *Kaeo–Tomaselli v. Butts*, No. CIV 11–00670 LEK, 2013 WL 399184, at *5 (D. Haw. Jan. 31, 2013); *Lopez v. City of New York*, No. 05–CIV–10321(NRB), 2009 WL 229956, at *13 (S.D.N.Y. Jan. 30, 2009).

Finally, Supreme Court precedent suggests that transgender individuals are not a quasi-suspect class. The Court has looked, among other things, at whether a group "exhibit[s] obvious, immutable, or distinguishing characteristics," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986), and whether the group is "politically powerless." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). As the Sixth Circuit just observed, "[t]he Supreme Court has recognized just two such classes: gender and illegitimacy." *L.W.*, 2023 WL 4410576 at *7 (cleaned up); *see also Fowler*, 2023 WL 4010694 at *19. The Supreme Court has declined to recognize as quasi-suspect classes mental disabilities, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 445-46 (1985), 473 U.S. at 445-46, age classifications, *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976), and sexual orientation, *Romer v. Evans*, 517 U.S. 620, 633 (1996).

The Supreme Court's holding that persons with mental disabilities are not a quasi-suspect class is particularly instructive here, as mental disability is intertwined with the medical field, and it is hard to imagine a classification—besides race—that has experienced more discrimination. *See Buck v. Bell*, 274 U.S. 200, 207 (1927) (holding that "[t]hree generations of imbeciles are enough"). Regardless, the Court held that "[h]ow this large and diversified group is to be treated under the law is a difficult and

13

often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." *City of Cleburne*, 473 U.S. at 442-43. Likewise, the regulation of gender transition procedures is better suited for the Legislature, which has relied upon qualified medical professionals, including those from Europe.

And, for reasons already explained above, *supra* at 3-4, whether a minor child is transgender is not "obvious" or "immutable." *Lyng*, 477 U.S. at 638. Rather, desistance is the norm for children. Nor are transgender individuals politically powerless. *See Fowler*, 2023 WL 4010694 at *21 n.14. Such a claim is difficult to take seriously, given that transgender individuals are enthusiastically supported by the United States, much of the American medical establishment, the media, the entertainment industry, numerous States, and so on. Indeed, the White House recently honored the "Transgender Day of Visibility." *Fact Sheet: White House Honors Transgender Day of Visibility*, THE WHITE HOUSE (Mar. 31, 2023).[16] If this is "powerless," it is hard to envision what "powerful" would look like.

In sum, Oklahoma's law does not discriminate based on transgender status at all, and transgender status is not a quasi-suspect class.

C.  *The United States does not show that Senate Bill 613 discriminates based on sex.*

Consistent with the rest of its Statement, the government's argument that the Act discriminates on the basis of sex is largely duplicative of Plaintiffs' arguments. To the extent that it is not duplicative, the brief actually undermines Plaintiffs' claims. Most significantly, the United States agrees with the State that, pursuant to the law, biological girls would still be allowed to have "a voluntary breast reduction procedure for pain-remediation purposes." Doc. 61 at 13. This undercuts Plaintiffs' reliance on the Eighth Circuit's opinion that mistakenly asserted that a similar law allowed a biological boy to have breast tissue removed but forbid a biological girl to do the same. *Brandt v.*

---

[16] *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/31/fact-sheet-white-house-honors-transgender-day-of-visibility/.

14

*Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). The key is the phrase "for pain-remediation purposes." If a biological female in Oklahoma had a physical/pain-related reason to undergo such a surgery, it would be permitted under SB 613. Again, the Act does not condition the availability of treatments on the sex of the patient, but rather on the purpose of the treatment.

## CONCLUSION

For the foregoing reasons, the United States' Statement of Interest should be given no weight.

Respectfully submitted,

*s/ Zach West*
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
ZACH WEST, OBA #30768
  *Director of Special Litigation*
AUDREY A. WEAVER, OBA #33258
WILL FLANAGAN, OBA #35110
  *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:   (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2023, I electronically filed the foregoing instrument with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*s/Zach West*
Zach West
