UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

PETER POE, *et al.*,

    *Plaintiffs,*

v.

GENTNER F. DRUMMOND, *et al.*,

    *Defendants.*

No. 23-cv-00177-JFH-SH

## SURREPLY IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION BY DEFENDANTS 15-53

Submitted by:

GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

ZACH WEST, OBA #30768
  *Director of Special Litigation*
AUDREY WEAVER, OBA #33258
WILL FLANAGAN, OBA #35110
  *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov

COUNSEL FOR DEFENDANTS 15-53                          August 8, 2023

Pursuant to this Court's order, Doc. 125, Defendants 15-53 offer the following surreply, along with short supplemental declarations. *See* Exhibit 1, Dr. Cantor Suppl. Decl.; Exhibit 2, Dr. Laidlaw Suppl. Decl.; Exhibit 3, Dr. Thompson Suppl. Decl.; Exhibit 4, Dr. Harris Suppl. Decl.

## I. **Plaintiffs' witnesses make various concessions that favor Defendants.**

To begin, the reply affidavits submitted by Plaintiffs' witnesses contain significant concessions that favor Defendants, even if they aren't intended as such. Dr. Janssen, for example, writes that "[n]o relevant organizations cite the need for co-occurring mental health conditions to be resolved …" before a minor is injected with life-altering hormones. Doc. 119-1, ¶ 36. He intends this as a rebuttal, but it is precisely this type of attitude among medical organizations that worries Defendants' experts, as well as detransitioners, who believe that children are being irreversibly altered when other mental health issues may instead require treatment. *See, e.g.*, Doc. 86-7, ¶ 28 (Dixon: "I have finally begun to receive the psychological therapy that I needed to help with my childhood trauma and other mental health issues."). Dr. Janssen also admits that there is a "gap in the available research" when it comes to whether the promoted treatments actually reduce suicide. Doc. 119-1, ¶ 50. He attempts to downplay the significance of this gap, to be sure, but he does not (and cannot) deny its existence.

Next up, Dr. Adkins concedes that she "cannot speak to the practice of every gender clinic in the country." Doc. 119-2, ¶ 5. That is, she relies heavily on her out-of-state clinical experience, *id.* ¶¶ 5, 8, 12, 13 n.4, 14, 20, 21, 28, offers no indication that she has any experience in or knowledge of Oklahoma clinics, and admits she cannot speak to clinics outside her experience. As a result, Dr. Adkins is simply testifying as to how she personally believes clinics should operate, with no basis for extrapolating this to Oklahoma. She also writes that "[p]uberty blockers have been used to treat patients with gender dysphoria since at least 2004 in the United States," *id.* ¶ 10, which buttresses Defendants' assertion that these procedures are new. *See L. W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 415 (6th Cir. 2023) ("Life-tenured federal judges should be wary of removing a vexing and novel topic

of medical debate from the ebbs and flows of democracy by construing a largely unamendable federal constitution to occupy the field."). She further admits, as she must, that WPATH has now "eliminated strict age guidelines for hormone therapy." Doc. 119-2, ¶ 11; *see also id.* ¶ 27. In addition, she concedes that "[g]oing directly from puberty blockers to gender-affirming hormones does affect fertility," *id.* ¶ 26, that "pre pubertal ovarian and testicular tissue cryopreservation remains experimental," *id.*, and that "[s]ome transgender women do not return to their" bone density baseline within two to three years of treatment. *Id.* ¶ 13 n.4; *see also id.* ¶ 22 (admitting that in "the past, some of the estrogens used to treat patients did increase thrombovascular risks …."). She also admits that it "is true" that certain "side effects from these hormone treatments can't be undone." *Id.* ¶ 20. She claims other side effects can be "easily reversed," but then proceeds to describe the "reversals" in a way ("regular use of [] medications along with hair removal techniques") that doesn't sound easy. *Id.* On top of all that, Dr. Adkins admits that for at least "some" unspecified and unquantified number of patients, there will indeed be a lifetime of hormones required once the treatments have started. *Id.* ¶ 24.

Dr. Turban, in turn, admits it "is true that randomized controlled trials provide valuable information that other studies do not …[,]" Doc. 119-3, ¶ 8, although he bizarrely insinuates that Defendants' experts focus too much on "randomized controlled trial study designs and questions of correlation versus causation." *Id.* ¶ 8. Even if obtaining higher quality evidence is difficult or impossible in this arena, as he claims, that fact would not somehow improve the quality of lesser evidence, nor would it render causation unimportant or mean causation could be found in lower quality evidence. The burden is not on the State to disprove the efficacy and safety of a treatment; rather, its proponents must make a robust case in the first place. If such a case is impossible to make, then that is a problem for the proponents, not the State. Dr. Turban also concedes that "even after surgery, many transgender people still suffer elevated rates of mental health problems compared to cisgender people" and that the "reality" of the situation is that "mental health challenges" will still

2

exist after the hormones and surgery have been provided. *Id.* ¶ 14. He is correct that these concessions do not, by themselves, invalidate the proposed treatment, but they do contextualize the alleged harms in a way that favors the State when it comes to balancing harms for a preliminary injunction.

Finally, Dr. Antommaria writes that using puberty blockers for precocious puberty "is not, however, experimental, **as demonstrated by its approval by the United States (US) Food and Drug Administration (FDA)** …." *Id.* ¶ 8 (emphasis added). Two paragraphs later, though, he asserts that "the fact that a medication is not approved by the FDA for a particular indication does not necessarily mean that this use is experimental …." *Id.* ¶ 10. In sum, the FDA's approval is a key factor for showing that puberty blockers are not experimental for one use, according to Antommaria, but when a State wants to cite the FDA's non-approval for another use as significant, he immediately downplays the importance of the FDA. He cannot have his cake and eat it too. *See Skrmetti*, 73 F.4th at 416 (FDA's non-approval gives "us considerable pause about constitutionalizing an answer they have not given or, best we can tell, even finally studied"). Dr. Antommaria also concedes, again, that the "WPATH does not assert that the evidence for gender-affirming medical care for adolescents is high or moderate quality." Doc. 119-4, ¶ 20. And he admits that the persons creating the oft-cited clinical practice guidelines from WPATH and the Endocrine Society are themselves weighing the "balance between the desirable and undesirable outcomes." *Id.* ¶ 21. They can of course do so, but their weighing does not trump the Legislature's right to weigh matters differently. *See Dobbs v. Jackson Women's Health Org.,* 142 S. Ct. 2228, 2283-84 (2022); *Gonzales v. Carhart*, 550 U.S. 124, 166 (2007).

II. **Plaintiffs wrongly attack the expertise of Defendants' witnesses.**

Plaintiffs and their witnesses repeatedly attack Defendants' experts as unqualified to speak here. Their primary complaint is that Defendants' experts do not provide the hormonal (and surgical) treatments in question to minors suffering from gender dysphoria. For example, Dr. Janssen writes that "[w]ithout understanding the distress transgender patients face – as well remarkable benefits they

3

experience when they get the care they need – opinions about this care are unmoored from the reality of patients' lives." Doc. 119-1, ¶ 11. There are multiple problems with this argument.

First and foremost, Defendants' experts do not provide or participate in these treatments **because they do not believe the treatments provide "remarkable benefits."** Whether these treatments should even be provided in the first place, as a scientific and ethical matter, is the central question at issue. Plaintiffs cannot just assume the truth of what they are advocating for and then disqualify those who disagree from opining. The Legislature is not barred from relying on experts who have declined to participate in a new or controversial procedure because they believe it is unproven and likely to be harmful. Otherwise, medical history would have looked a lot different. *See* Ex. 2, Laidlaw, ¶ 6 ("Should the critics of lobotomy have been silenced, for example, then this harmful practice might remain in widespread usage today."). Defendants have not put forth experts from irrelevant fields; rather, they have put forth experts who would otherwise be considered strong candidates to provide or be involved with the treatments in question—*if* they considered those treatments legitimate and proven. And courts have for decades held that an "expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline." *Pagés-Ramírez v. Ramírez-González*, 605 F.3d 109, 114 (1st Cir. 2010) (citation omitted); *see also Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (similar); *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (similar); *Baerman v. Reisinger*, 363 F.2d 309, 310 (D.C. Cir. 1966) (similar).

Second, Dr. Cantor has already explained why clinicians can be biased or conflicted *because of* their practice and involvement in a debated treatment, and why disinterested and objective evaluation is important for scientific understanding. *See, e.g.*, Doc. 86-1, ¶ 55 ("[I]n evidence-based medicine, opinion based on clinical experience is identified as the *least* reliable source of medical knowledge."); *see also id.*, ¶¶ 9-14, 292, 302. Plaintiffs' experts have little to say to this. Only Dr. Antommaria attempts a response, but rather than address the reality that clinical experience has less objective scientific value

4

than other forms of evidence, he instead focuses on arguing that Plaintiffs' experts don't have "conflicts of interest in the relevant sense." Doc. 119-4, ¶¶ 11-13. Even if true, which Defendants do not concede, this does nothing to show that clinical experience merits the value Plaintiffs put on it.

Third, the alleged empathy for the "reality of patients' lives" expressed by Plaintiffs' experts all but disappears when it comes to detransitioners. Not one of Plaintiffs' experts claims to have read the three affidavits submitted by Oklahoma women who detransitioned. *See* Ex. 2, Laidlaw, ¶ 15. Plaintiffs' experts want to be considered the only qualified voices in the room because they have treated minors in other States, but they cannot be bothered to even read the experiences of Oklahomans who dissent from the treatments because of their own traumatic experiences. Plaintiffs' experts leave those Oklahoma patients to the lawyers, who in turn impugn the detransitioners for failing to be "forthright with their clinicians when being evaluated for gender dysphoria" and for failing "to report side effects they now attribute to hormone therapy." Doc. 119 at 6 n.3. (They also indicate that one woman's experience can be ignored because of her "religious conversion." *Id.*) Incredible as this "throw-the-patients-under-the-bus" approach is, it counsels strongly in favor of the State because it is an effective concession of a central point made by Defendants' experts: that the diagnosis of gender dysphoria "typically relies upon more subjective views of doctors, therapists, the family, and the patient," which "leaves the door open for misdiagnoses or misunderstandings in a very complex area." Doc. 86-4, ¶ 26. In attacking detransitioners this way, Plaintiffs validate the concerns of Defendants' experts.

III. <u>**Defendants' experts succinctly and ably rebut various claims made against them.**</u>

In their attached affidavits, Defendants' experts point out various flaws and mistakes made by Plaintiffs' witnesses in the reply. Dr. Harris, for example, defends against attacks on his qualifications by reiterating that he has 40 years of endocrinology experience with the very hormones and drugs at issue in this case, and that he has made a reasoned decision not to participate in such treatments based in part on his belief that they are unproven. Ex. 4, Harris, ¶¶ 3-4.

Dr. Thompson, among other things, explains why the claim that Oklahoma's law "treats different medical conditions inequitably" is wrong: "Treating different medical conditions differently is a bedrock of the entire medical profession." Ex. 3, Thompson, ¶ 4. And Plaintiffs' witnesses conflate "differences/disorders of sex development (DSDs) with gender dysphoria …. [t]he diagnoses are different and thus treatments should differ accordingly." *Id.* Dr. Thompson also defends her ability as an OBGYN to comment on these issues, pointing out that it is "well within my professional area of expertise … to assert my medical opinion that preserving the physiologic health and functional bodily integrity of minors is fundamental and important, especially in regard to reproductive development and future function." *Id.* ¶ 5.

In addition to defending his qualifications as a long-time endocrinologist, Dr. Laidlaw points out that he is actively treating a "detransitioner" patient who transitioned as an adolescent, which undermines Plaintiffs' claim that none of Defendants' experts have any practical experience here. Ex. 3, Laidlaw, ¶ 5. Dr. Laidlaw also pushed back against criticism that Defendants' experts misrepresent European trends, pointing to a recent letter in the Wall Street Journal where numerous European doctors wrote that the "claim that gender transition reduces suicides is contradicted by every systematic review" and that "more and more European countries and international professional organizations now recommend psychotherapy rather than hormones and surgeries as the first line of treatment for gender-dysphoric youth." *Id.* ¶ 22.

Finally, Dr. Cantor explains how Plaintiffs' experts mischaracterize and understate the importance of systematic reviews, which are designed to "minimize bias in selecting and evaluating the studies in the research literature." Ex. 1, Cantor, ¶ 9. As a result, they "engage in the very cherry-picking and biased evaluation of evidence that the process was developed to prevent." *Id.* p.3.

6

          Respectfully submitted,

*s/ Zach West*
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
ZACH WEST, OBA #30768
  *Director of Special Litigation*
AUDREY WEAVER, OBA #33258
WILL FLANAGAN, OBA #35110
  *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for Defendants 15-53*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th of August, 2023, I electronically filed the foregoing SURREPLY IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION BY DEFENDANTS 15-53 with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

       s/ *Zach West*
       Zach West