# Exhibit 3

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PETER POE, *et al.*,<br>        *Plaintiffs,*<br>v.<br>GENTNER F. DRUMMOND, *et al.*,<br>        *Defendants.* | No.  23-cv-00177-JFH-SH |

## **SUPPLEMENTAL DECLARATION OF ANGELA C.E. THOMPSON, M.D., MPH, FACOG**

I, Angela C.E. Thompson, declare the following:

  1. I have reviewed the rebuttal affidavits by Drs. Janssen, Adkins, Turban, and Antommaria. I offer the following responses, although this is not intended to be comprehensive.

  2. In paragraph 25, citing paragraph 65 of my report, Dr. Adkins writes that "[t]he sweeping suggestion that hormone therapy compromises fertility for all patients is simply incorrect." Nowhere did I make this suggestion. What I wrote in paragraph 65 is specifically for minor children and adolescents at early Tanner stage 2 of pubertal development. The children and adolescents exposed to endocrine interventions with puberty blockers, followed by cross-sex hormones, risk permanent sterilization because gametes are not mature at this stage of pubertal development. Dr. Adkins admits this in the next paragraph.

  3. In paragraph 26, Dr. Adkins admits that "[g]oing directly from puberty blockers to gender-affirming hormones does affect fertility" and that "[f]or those whose dysphoria is too severe to wait, pre pubertal ovarian and testicular tissue cryopreservation remains experimental and only done under research protocols that are carefully monitored." Dr. Adkins and I agree that endocrine interventions at such early pubertal stages of development *do* risk permanent sterilization, and that the fertility preservation options at this stage of pubertal development are experimental. Yet Dr. Adkins does not connect the dots. Dr. Adkins has inadvertently outlined the basis for why the burden of proof for "gender affirming" hormonal interventions in minors should be so high: because the risks

of misdiagnosis can be irreversible, including permanent sterilization in a physically healthy child/adolescent. All medical treatment contains side effects; however, the risks of endocrine intervention/embodiment goals in this patient population are arguably much more significant because the child/adolescent is *already in* a state of physical health.

4. In paragraph 36, Dr. Antommaria states that the ban "treats different medical conditions inequitably and Defendants' experts' claims highlight the lack of justification for this differential treatment." This is a highly curious statement. Treating different medical conditions differently is a bedrock of the entire medical profession. Dr. Antommaria conflates differences/disorders of sex development (DSDs) with gender dysphoria, but they are entirely different diagnoses. One has a physical locus (DSDs) and one is a psychological condition. Treating them differently is in no way "inequitable." Another example is if a patient suffers from anorexia nervosa and is severely underweight/malnourished; it is not "inequitable" to deny this patient gastric bypass surgery just because the procedure *is* available for patients suffering from a diagnosis of Class III obesity. The diagnoses are different and thus treatments should differ accordingly.

5. In paragraph 16, Dr. Janssen claims I have neither the training nor the certification to assert a professional medical opinion about the importance of keeping a vulnerable child or adolescent's functional bodily integrity intact. As physicians we take an oath, iterations of which call us to abstain from "mischief and corruption"; modernly interpreted: "do no harm." It is well within my professional area of expertise as a board-certified obstetrician and gynecologist to assert my medical opinion that preserving the physiologic health and functional bodily integrity of minors is fundamental and important, especially in regard to reproductive development and future function. A physician's duty is to safeguard healthy bodily integrity especially for the most vulnerable. The physiologic developmental processes of juvenile males and females is not a pathological process; it is

healthy, and necessary. If the medical profession begins to classify healthy physiologic biological phenomena as a "disease" or something to be avoided, it has lost its way.

6. In paragraph 9, Dr. Antommaria states that because I cite the ASRM 2019 committee opinion about fertility preservation that I "implicitly endorse[] the [ASRM's] removal of the label 'experimental' from ovarian tissue cryopreservation (OTC) for individuals who were assigned female at birth and have completed puberty." I do not endorse this, implicitly or otherwise. This statement deflects from and obfuscates the basis of my report. Dr. Antommaria is insinuating that the ovaries of adult post-menarchal females and pre-menarchal early pubertal females are somehow equivalent in this context; they are not. By citing the ASRM 2019 reference I acknowledge, as do the authors, that "ovarian tissue cryopreservation is currently the *only* way to cryopreserve gametes in prepubertal girls"; the ASRM committee opinion also specifically references this modality as a means to preserve fertility for children and adolescents within the context of cancer therapies (pg. 1027), many of which are toxic to gametes. Gender dysphoria has no physical locus, and will not cause the child to physically succumb, unlike a cancer diagnosis. Dr. Antommaria ignores my reference to Rowell, which states no less than five times that "more research is required" to inform improved care for the pediatric population in regard to fertility preservation, *because* the ovaries in premenarchal children/adolescents are so different from postmenarchal adults. What is also unknown is the effect that GnRHa *and* exogenous testosterone will have on the female uterus to ever gestate a pregnancy to term, even if OTC is performed prior to this "treatment" regimen for gender dysphoria.

7. In paragraph 41, Dr. Antommaria indicates that children as young as ten years of age can potentially consent to having their future reproductive capacity terminated, based on a questionnaire. To the best of my knowledge, one study does not make a sufficient argument that children and adolescents between the ages of 10 and 14 years are able to understand potential permanent loss of fertility, especially when other studies have demonstrated those in this age group

and even older, to change their minds, as I have outlined in my report (paragraphs 117-120). There are wide variations in type and scope of not only fertility preservation counseling, but utilization of fertility preservation techniques as well, which I have provided in my report. Such a wide variation calls into serious question the efficacy and completeness of informed consent about the risks of hormonal intervention.

8. In paragraph 43, Dr. Antommaria writes that "[i]nformed consent, based on Thompson's own logic, is available substantially before 18 years of age." This is erroneous. Just because I have opined that informed consent is illusory for children at Tanner stage 2 because fertility preservation options are experimental and vastly inaccessible does *not* mean that I logically must believe that informed consent is possible for minors beyond Tanner stage 2. Whether informed consent would truly be possible in this realm would involve more than just the availability of non-experimental fertility options, after all. But the absence of any realistic way to preserve fertility at Tanner stage 2 makes it especially clear that informed consent is illusory at that point.

I state under penalty of perjury that the foregoing is true and correct.

Executed on August 7, 2023.

s/# *[signature]*
Angela C.E. Thompson